1          IN THE UNITED STATES DISTRICT COURT

2               DISTRICT OF UTAH

3               CENTRAL DIVISION

4

5   UNITED STATES OF AMERICA,        )

6             Plaintiff,             )

7      vs.                           )   Case No. 2:18-CR-365-JNP

8   LEV ASLAN DERMEN,                )

9   a/k/a Levon Termendzhyan,        )

10            Defendant.             )

11  _____ )

12

13         BEFORE THE HONORABLE JILL N. PARRISH

14     ----------------------------------------

15               November 16, 2021

16                  Bench Trial

17

18

19

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
1                    A P P E A R A N C E S

2

3    For Plaintiff:              John E. Sullivan
                                 U.S. DEPARTMENT OF JUSTICE
4                                TAX DIVISION
                                 601 D St. NW
5                                Washington, DC  20004

6                                Richard M. Rolwing
                                 U.S. ATTORNEY'S OFFICE
7                                TAX DIVISION
                                 303 Marconi Blvd., #200
8                                Columbus, Ohio  43215

9
                                 Darrin McCullough
10                               U.S. DEPARTMENT of JUSTICE
                                 CRIMINAL DIVISION FRAUD SECTION
11                               1400 New York Avenue NW
                                 Washington, DC  20530
12

13   For Defendant:             Mark J. Geragos
                                Setara Qassim
14                              GERAGOS & GERAGOS APC
                                644 S. Figueroa Street
15                              Los Angeles, CA  90017

16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2     Witness                  Examination By              PAGE

 3     Daniel Puls              Mr. Rolwing  (Direct)        221

 4                              Mr. Geragos  (Voir Dire)     249

 5                              Mr. Rolwing  (Direct cont.)  250

 6                              Mr. Geragos  (Cross)         254

 7                              Mr. Rolwing  (Redirect)      316

 8                              Mr. Geragos  (Recross)       325

 9                              Mr. Rolwing  (Further Redirect) 334

10                              Mr. Geragos  (Further Recross)  338

11                              Mr. Rolwing  (Further Redirect) 343

12                              Mr. Geragos  (Further Recross)  344

13     Daniel Brian McDyre      Mr. Rolwing  (Direct)        347

14                              Mr. Geragos  (Cross)         353

15                              Mr. Rolwing  (Redirect)      362

16                              Mr. Geragos  (Recross)       365

17                              Mr. Rolwing  (Further Redirect) 370

18                              Mr. Geragos  (Further Recross)  372

19                              Mr. Rolwing  (Further Redirect) 373

20     Isaiah Kingston          Mr. Sullivan  (Direct)       375

21                              Mr. Geragos  (Cross)         379

22                              Mr. Sullivan  (Redirect)     395

23                              Mr. Geragos  (Recross)       395

24                              Mr. Sullivan  (Further Redirect) 397

25     Stephen Washburn         Mr. Sullivan  (Direct cont.) 400
```

```
 1   SALT LAKE CITY, UTAH; TUESDAY, NOVEMBER 16, 2021; 9:00 A.M.
 2                           PROCEEDINGS
 3           THE COURT:  Good morning, everyone.
 4           Let go back on the record in the case of the
 5   United States of America vs. Mr. Lev Aslan Dermen.  The
 6   docket number is 2:18-CR-365.  It looks like everyone is
 7   here and ready to proceed.
 8           Are there any changes in appearances?  I'm
 9   assuming it's the same as yesterday.
10           MR. GERAGOS:  Same as yesterday.
11           MR. ROLWING:  Same, Your Honor.
12           THE COURT:  All right, then.  Is there anything
13   that we need to address before I turn the time over to you,
14   Mr. Rolwing, to call your next witness?
15           MR. ROLWING:  I don't think so, Your Honor.
16           THE COURT:  All right.  You may call your next
17   witness.
18           MR. ROLWING:  The government calls Dan Puls,
19   P-u-l-s.
20                           DAN PULS,
21           Having been duly sworn, was examined
22                   and testified as follows:
23           THE COURT:  Mr. Puls, you are welcome to remove
24   your mask while you're speaking.  I'll put mine on, and then
25   that will give you some comfort while you're relatively
```

1    close to me.

2                THE WITNESS:  Thank you.

3                THE CLERK:  Would you state your name and spell it

4    for the record, please.

5                THE WITNESS:  My name is Daniel Puls, P-u-l-s.

6                        DIRECT EXAMINATION

7    BY MR. ROLWING:

8    Q    Could you explain -- good morning, Mr. Puls.

9    A    Good morning.

10   Q    Could you explain to the Court who you are, where

11   you're from, what you do?

12   A    Yes.  Again, my name is Daniel Puls.  I'm from the

13   Washington, D.C. area.  I run an organization called PASS.

14   We work around the world in humanitarian affairs and other

15   types of activities.

16   Q    What kind of activities?

17   A    We work in displaced communities, and refugee and IDP

18   camps.  We run a clinic in Nicaragua.  We work around the

19   world, in Africa and other places, primarily humanitarian

20   affairs, but also in development issues, livelihoods, food

21   security, et cetera.

22   Q    How long you have been doing this?

23   A    I established PASS with colleagues in July of 2014,

24   after I left the Atlantic Council in Washington, D.C.

25   Q    Do you know the defendant, Levon Termendzhyan?

1    A    I've met him on three occasions, briefly.

2    Q    And do you know an individual named Sezgin Baran

3    Korkmaz?

4    A    Yes, I do.

5    Q    And how did you come to know Mr. Korkmaz?

6    A    I don't remember exactly how I met him, but I've known

7    him for several years, since I was with the Atlantic Council

8    in Washington.

9    Q    What's the Atlantic Council?

10   A    It's a prominent think tank that was established many

11   years ago and worked around the world in policy thought

12   leadership.

13   Q    Do you remember any of your first interactions with

14   Mr. Korkmaz?

15   A    Well, you know, he always presented himself as a very

16   confident, flashy, wealthy businessperson who was interested

17   in helping people who were suffering in difficult

18   conditions.

19   Q    So did you ever get involved in any initiatives or

20   projects with Mr. Korkmaz?

21   A    Yes.  He was always interested in -- he was always

22   making commitments to assist people where we were working,

23   and he was always interested in joining leadership of

24   organizations that I supported and was a part of.

25   Q    Did you put him in contact with some of these

1    organizations?

2    A    I did.

3    Q    And did he ever get involved with any of the

4    organizations that you put him in contact with?

5    A    Yes, he did.

6    Q    Can you name them?

7    A    Yeah.  He was -- for some time I worked as a --

8    basically an advisor to the chief executive officer on the

9    board of Relief International, which is a prominent

10   humanitarian organization.  Baran Korkmaz made a very large

11   pledge, a $20 million pledge, to the Relief International,

12   and then he eventually joined the board of Relief

13   International.

14   Q    Did you have anything to do with him making a pledge to

15   Relief International?

16   A    I did.  I worked with the board of directors and I

17   worked with the CEO, and I worked very closely with Baran

18   Korkmaz to facilitate and coordinate that engagement.

19   Q    Was the $20 million pledge to Relief International a

20   pretty ordinary course for that entity?

21   A    No.  I mean it wasn't ordinary really at all, you know,

22   within the -- it was a very large -- I think at that time it

23   would have been really the largest commitment of its kind

24   ever for that type of -- that type of project.

25   Q    And what year do you remember this pledge was made?

1    A    What year?  That would have been 2016 perhaps, 2015,

2    2016.

3    Q    Okay.

4    A    There's a document that was signed, a grant agreement

5    that I could look at.

6    Q    Did you know where Mr. Korkmaz was sourcing the

7    $20 million from to pledge to Relief International?

8    A    Well, we did -- we did due diligence.  It's just a

9    matter of course for us to do these types of things, and we

10   hired a third-party firm to do that due diligence.  But I

11   don't know exactly the source of the funds, except that he

12   presented himself as a very successful, you know, wealthy

13   businessperson, and that he wanted to do these types of

14   projects.

15   Q    Did he seek anything in return for making this pledge

16   of $20 million to Relief International?

17   A    Yes.  He was very, very direct about that.  He wanted

18   to be on the board of Relief International.

19   Q    And did Relief International allow him to join their

20   board?

21   A    Yeah.  There was discussion and debate among the board

22   about many things, including the fact that, you know, he

23   didn't speak English so how would that work.  But he was

24   brought onto the board of Relief International.

25   Q    How did you communicate with Mr. Korkmaz throughout

1    these years back then if he didn't speak English?

2    A    We either had, you know, an interpreter, either someone

3    from his staff or someone that worked with me that spoke

4    Turkish.  We used translator apps on phones.  And then, you

5    know, both of us I think were relatively intuitive in terms

6    of hey bud, hey bro, that kind of thing.

7    Q    Did he speak any English?

8    A    He spoke enough to communicate, you know, kind of

9    basically with those that he wanted to.

10   Q    Did you have the sense that he understood your English

11   for the most part?

12   A    I think that -- you know, I suspected he did understand

13   more than he made off that he did, but I don't know that as

14   a fact.

15   Q    Did Relief International do anything for Mr. Korkmaz,

16   other than allowing him to join the board, in response to

17   this pledge or to recognize this pledge?

18   A    Yeah, we did many things.  We organized a trip to a

19   place called Gazi Antep, which is near the border with Syria

20   and Turkey.  We met with our staff, had strategic sessions.

21   We met with our board.  We hired a firm -- a PR firm to

22   promote this gift.  We organized a fairly major event at the

23   Harvard Club in New York, and other similar types of

24   activities.

25   Q    Would you take a look at -- do you know when the event

```
 1   at the Harvard Club in New York took place?

 2   A    It was, if my memory is correct, in the fall of 2015.

 3   Q    Okay.  Would you look at Government Exhibit O-2.  It

 4   will be on your screen.

 5        Sorry, O-3.  Do you recognize this?

 6   A    I do.

 7   Q    What is it?

 8   A    This is a plaque that we made to recognize his

 9   generosity of spirit and effort on behalf of the board of

10   directors.  This is Nancy Wilson and this is Baran Korkmaz,

11   and we presented this to Baran in Turkey in Istanbul.

12   Q    And it's dated when?

13   A    It's dated November 16, 2015.

14   Q    That is six years from today.

15   A    That is.  Wow.

16   Q    This is actually a photo of a plaque, is it not?

17   A    This is a photo of a plaque.

18   Q    Did you take this photo?

19   A    I don't recall.  I think so, but I don't recall.

20   Q    Did you turn over photos to the United States --

21   A    I did.

22   Q    -- in response to subpoenas?

23   A    Yes, I did.  Many photos.

24   Q    And is this possibly one of these?

25   A    It is.  It's absolutely one of those.
```

1    Q    Okay.  So does that refresh your recollection that

2    Baran Korkmaz made that pledge of $20 million to Relief

3    International in the year 2015 rather than 2016?

4    A    It does.  Thank you.

5    Q    When approximately was the Harvard Club reception

6    honoring Mr. Korkmaz for this pledge -- and where is the

7    Harvard Club?

8    A    The Harvard Club is in New York City, and it was around

9    the same time as this photograph.

10   Q    Okay.  And were you there?

11   A    I was there.

12   Q    Did Mr. Korkmaz attend?

13   A    He did.

14   Q    And did he bring any guests?

15   A    He brought a number of guests that he didn't really

16   inform us about prior to when they showed up for the event.

17   Q    And who were the guests that you recall?

18   A    Mr. Termendzhyan was one of the guests.  Jacob Kingston

19   was one of the guests.  And there were some others that I

20   don't recall.

21   Q    Do you know why Mr. Korkmaz invited Mr. Termendzhyan

22   and Mr. Kingston to attend this reception in New York?

23   A    You know, factually I don't know why.

24            MR. GERAGOS:  Objection to anything after I don't

25   know why.

1          THE COURT:  Sustained.

2    BY MR. ROLWING:

3    Q    Did you speak to either Mr. Termendzhyan or

4    Mr. Kingston on this trip they took to New York for this

5    reception?

6    A    I did not speak to them.

7    Q    Did you meet them?

8    A    I did.

9    Q    So you were introduced to them?

10   A    No, I wasn't introduced to them.  I stood near them and

11   greeted them as kind of a host of the event.

12   Q    Were there any issues regarding their attendance at

13   this event?

14   A    Well, there were issues because the event was planned

15   in advance.  The guest list was set in advance.  And then,

16   you know, when Mr. Korkmaz arrived with his guests, we had

17   to shift around all the tables.  We generally try to do a

18   lot of due diligence on everyone that attends.  Security is

19   an issue and so forth.  So there were issues.

20   Q    Was there any background checks done on any of

21   Mr. Korkmaz's guests?

22   A    Yes.  One of the staff members, the communications

23   manager of Relief International, was very concerned because

24   she had done some due diligence, public, you know, research

25   on Mr. Termendzhyan and found some issues.

1           MR. GERAGOS:  There's an objection.  I know what

2   they're going to go into.  I just want to highlight multiple

3   levels of hearsay would not be allowed.  So I pin that for

4   the Court.

5           THE COURT:  All right.  The objection is noted and

6   reserved.

7   BY MR. ROLWING:

8   Q    You can proceed.

9   A    So, you know, the concern was that some issues that

10  came out of this background check, and Ms. Michelle was very

11  upset about this and caused a lot of stress at the event.

12  Q    Did you take any pictures at the event?

13  A    I took many -- well, I took many pictures with my

14  smartphone.

15  Q    Would you look at Government Exhibit O, page two.

16       Do you recognize this picture?

17  A    I do.

18  Q    Did you take this picture?

19  A    Yes, I did.

20  Q    And did you turn it over to the government?

21  A    I did.

22  Q    Was Mr. Termendzhyan being honored also at this Relief

23  International event?

24  A    No, he wasn't.

25  Q    Did he have anything to do with Mr. Korkmaz's pledge to

1    Relief International for the sake of the children, as it

2    describes?

3    A    No, not that I know.

4    Q    Why was he in the picture with Baran next to this

5    banner honoring Baran for his pledge?

6    A    I don't know why he was there in that picture other

7    than --

8                MR. GERAGOS:  Objection to anything after I don't

9    know why.

10                THE COURT:  Sustained.

11    BY MR. ROLWING:

12    Q    What did Relief International do with the $20 million

13    that Mr. Korkmaz gave to Relief International?

14    A    The pledge was never honored by Mr. Korkmaz.

15    Q    Even though he was on the board?

16    A    Even though he was on the board.

17    Q    How much of the 20 million did he actually give?

18    A    Zero.

19    Q    Why didn't he give any, do you know?

20    A    I don't know.

21    Q    Did he give the donation to some other humanitarian

22    entity?

23    A    Eventually he asked me to find another group that would

24    work with him on a project similar to the one that he didn't

25    fund with Relief International.

1    Q    Did you find another program?

2    A    We did.  We worked with another group that wanted to do

3    the infrastructure, the building of schools and other

4    structures that he wanted to do.

5    Q    And did he make the pledge to that entity?

6    A    Yes, he did.

7    Q    And what did that entity do with the $20 million he

8    gave that entity?

9    A    Nothing, because it was -- that pledge was never

10    honored either.

11    Q    How much of the 20 million did he give to that entity?

12    A    Zero.

13    Q    Did he give the $20 million to anybody?

14    A    No.

15            THE COURT:  Did he ever tell you why he was not

16    honoring the pledge?

17            THE WITNESS:  Not directly, Your Honor, but

18    indirectly he implied that he felt that Relief International

19    had -- I don't know if you want me to go into this detail,

20    but Relief International had moved away from his intent,

21    which he wanted to build structures, infrastructure, and not

22    fund the programs.  And so what Relief International wanted

23    to do is help build these structures, but also have teachers

24    and programs in those schools.  So that is really what his

25    issue was with that pledge.

```
 1              THE COURT:  Thank you.
 2   BY MR. ROLWING:
 3   Q    Just a few days at or around the time of this Relief
 4   International reception honoring Mr. Korkmaz's pledge, were
 5   you contacted by the press about Mr. Korkmaz and this
 6   pledge?
 7   A    We were.
 8   Q    Would you take a look at Government Exhibit 0-2 -- or
 9   02 -- sorry.  Not zero.  O-2.
10              MR. ROLWING:  Scroll down to the bottom of the
11   second page, Ms. Bonney, please.
12   BY MR. ROLWING:
13   Q    Is this an email, at the bottom of this or on the
14   second page, from a Tom Buerkle at
15   institutionalinvestor.com, in November of 2016, to you,
16   Daniel Puls, at pass-usa.net?
17   A    Yes, it is.
18   Q    Do you recognize this email?
19   A    I do.
20   Q    And what was Mr. Buerkle, from Institutional Investor,
21   asking you for around the time of this reception, or as a
22   follow-up?
23   A    Well, it says he was asking to speak with a current
24   investor or business partner who can give him some insight.
25   Q    And he had apparently met Mr. Korkmaz at or around the
```

```
 1    reception with you the other day?

 2    A    Yes.

 3    Q    Was that at the reception?

 4    A    I believe so.

 5    Q    Did you know a current investor or business partner of

 6    Mr. Korkmaz to refer Mr. Buerkle to?

 7    A    I did not.

 8    Q    So what does this email show that you did with this

 9    email?

10    A    I forwarded this to one of his associates.

11    Q    Who was that?

12    A    A woman named Umut.

13              MR. ROLWING:  So if you can go to the bottom of

14    page one, Ms. Bonney.

15    BY MR. ROLWING:

16    Q    Is the bottom your forwarding of this email to Umut --

17    A    It is.

18    Q    -- in November of 2015?

19         So Umut was one of Baran's assistants all the way back

20    in 2015?

21    A    Yes -- one of his associates.

22    Q    Had you met her?

23    A    I don't believe I had met her at this point.

24    Q    But had you had some contact with her via WhatsApp or

25    emails --
```

```
 1   A    I believe so, yeah.

 2   Q    -- on Baran Korkmaz's behalf?

 3   A    Yes.

 4   Q    Did you understand she was an agent of Baran Korkmaz?

 5   A    I did.

 6   Q    And what do you ask -- let's go to the top of page two.

 7   What did you ask Ms. Uygun for?

 8             MR. ROLWING:  The top of page two, Ms. Bonney.

 9   The top of page two.

10             THE WITNESS:  I asked for his assistance with this

11   matter that I WhatsApp'd her about earlier, and I told her I

12   was available tomorrow to discuss this further.

13   BY MR. ROLWING:

14   Q    Okay.  So you asked -- forwarding Mr. Buerkle's email

15   asking for an investor or business partner, you need her

16   assistance.  What did she do in response to this email?  Did

17   she respond?

18   A    Yeah.  She emailed me and copied Jacob Kingston I

19   believe.

20   Q    And is that what is indicated on page one in the

21   middle?

22   A    Yes, and then you can get info about Baran from

23   Jacob.

24   Q    And who responded to her email?

25   A    Mr. Kingston replied that he can assist wherever
```

1    needed.

2    Q    And then that's your final response to Kingston's

3    email?

4    A    Yes, and I said thank you.

5    Q    And what did you do with this?  Did you provide

6    Mr. Buerkle Jacob Kingston's contact so they could

7    communicate about Baran Korkmaz?

8    A    I did.

9    Q    Did you know before November of 2015 that Mr. Kingston

10   was a current investor or business partner of Baran Korkmaz?

11   A    I don't -- I did not.

12   Q    Did Mr. Korkmaz ever explain at any time to you that he

13   had business relationships with Mr. Kingston?

14   A    No.

15   Q    How about after this time period?

16   A    After this time he did because, you know, I was told --

17   Q    And did he ever mention that he had a business

18   relationship with Levon Termendzhyan?

19   A    No.

20   Q    What did he tell you about who Levon Termendzhyan was

21   to him?

22   A    Nothing.

23   Q    Did you ever see Mr. Termendzhyan again after this

24   reception at the Harvard Club in New York?

25   A    Yes.  I saw him on two occasions after this.

1    Q    When was the next time you saw Mr. Termendzhyan?

2    A    I saw him -- I was -- Baran invited me to a birthday

3    party for a family friend.

4    Q    That's how he described it?

5    A    Yeah.

6    Q    Where was the birthday party?

7    A    In Beverly Hills.  In Hollywood basically.

8    Q    And did you know who the family friend was who was

9    having a birthday party when you were invited?

10   A    I did not.

11   Q    Did you agree to go?

12   A    I did.

13   Q    Who else was invited?

14   A    Nancy Wilson.

15   Q    From Relief International?

16   A    Yeah.

17   Q    Approximately when was this?

18   A    This was later that same year I believe.

19   Q    If his birthday is in August, Mr. Termendzhyan's

20   birthday is in August, would it have been August of 2016

21   after --

22   A    It was August of 2016.  Thank you.

23   Q    And did you go?

24   A    I did go.

25   Q    Did Ms. Wilson go?

```
 1   A    She did not.  She was not able to go.  We talked about
 2   going together, but she couldn't attend.
 3   Q    And did you travel there by yourself or with someone?
 4   A    I traveled by myself.
 5   Q    And did you meet anyone there when you arrived in
 6   California?
 7   A    I was picked up by a driver and taken basically to the
 8   event.  Earlier in the day, I spent a little time with Baran
 9   before the event.
10   Q    And what did you learn about the event, if anything,
11   before attending the event?
12   A    Really nothing.
13   Q    Describe the event for the Court, please.
14   A    It was a very impressive event.  It was -- you know, I
15   didn't count -- do a headcount, but there were maybe a
16   thousand people there, maybe more.  It was very, very
17   beautifully orchestrated.
18        There was a camera like on a boom that seemed to be
19   filming everything.  The tables were lavishly decorated.  It
20   was a very, very large scale event in a sound studio, kind
21   of like where you make a movie.
22        I mean I thought it was going to be a much smaller
23   event, a much more intimate event, but it was much larger
24   than I had expected.
25   Q    Did you take any pictures at this event?
```

```
 1   A     A took a few pictures, yeah.

 2   Q     Would you take a look at Government Exhibit O, page

 3   three.  Do you recognize this picture?

 4   A     Yeah.  That was a picture I took from where I was

 5   seated at the event.

 6   Q     And what are you taking a picture of?

 7   A     Well, it was just a snapshot.  I took a picture of

 8   Baran presenting Mr. Termendzhyan with some type of a -- it

 9   looked like a wrestling belt, or something like a boxer

10   would get at a championship boxing match, or something.

11   Q     And was there a presentation of any other gifts at this

12   birthday party?

13   A     Yeah.  At one point during the event, these young women

14   came in.  They were wearing kind of like -- as I remember,

15   kind of halter tops.  There was like confetti that was

16   flying.

17         And then on a big screen, one of the Bugatti founders,

18   or something, came on and did like a promotional video about

19   Bugatti sports cars.  And then an actual Bugatti car was

20   brought into the -- into the sound studio, and it appeared

21   as though it was presented by Mr. Korkmaz to

22   Mr. Termendzhyan as kind of a gift.

23   Q     Kind of a gift?

24   A     As a gift.

25   Q     Was this one of many gifts being presented to
```

1    Mr. Termendzhyan at this party or was this a special
2    presentation?
3    A    This was -- it seemed to be the center of the event.  I
4    mean there didn't appear to be other gifts that were
5    presented as part of the program.
6    Q    And do you recognize the individual in this picture
7    who's got his head turned, with the white hair and glasses?
8    A    Yeah.  He was a -- I had like some small talk with him
9    during the event.  He was an executive with one of
10   Termendzhyan's companies.
11   Q    Do you remember his name?
12   A    I'm spacing on the name right now.  I don't remember
13   offhand.
14   Q    Was this a milestone birthday for Mr. Termendzhyan?
15   A    Yes.  I believe it was his 50th birthday.
16   Q    Did you take a -- if you go to page four, is this
17   another picture you took of the event?
18   A    I did, yeah.  I thought that was a cool picture.
19   Q    A nice touch?
20   A    Yeah.
21   Q    Did you ever see Mr. Termendzhyan again after August of
22   '16 at his 50th birthday party in California?
23   A    I did.  I saw him one more time.
24   Q    And what do you recall?
25   A    It was fall of 2016, during the UN General Assembly

1    meetings in New York.  At that time I was assisting a

2    prominent diplomat in her bid to become the UN Secretary

3    General.  We were meeting with many dignitaries.  It was

4    part of our program.  And Mr. Korkmaz invited us to meet in

5    the evening at the hotel, which we did.

6    Q    Invited us.  Who was us?

7    A    It was myself and Ambassador Natalia Gherman of

8    Moldova.

9    Q    And was she the candidate for the next Secretary

10   General of the United Nations at that time?

11   A    Yes.

12   Q    Or one of the candidates?

13   A    She was one of the candidates.

14   Q    Did you know why Mr. Korkmaz wanted you to bring her to

15   the Peninsula Hotel to meet him?

16   A    I did not.

17   Q    Was the meeting with Ambassador Gherman supposed to be

18   with Levon Termendzhyan as well?

19   A    Well, we didn't -- that wasn't planned.  I mean we

20   didn't know that.

21   Q    What happened?  Did you go to the Peninsula Hotel?

22   A    We went to the Peninsula Hotel.  We arrived, you know,

23   like -- I don't remember the specific time, but 9:30, ten

24   o'clock, something like that.  We were sitting in the lounge

25   area, in the bar area, and we were waiting for Baran to

1    arrive.

2    Q    And did he show up?

3    A    He did eventually show up.

4    Q    Did he have anybody with him?

5    A    No.

6    Q    And did he find you in the lounge?

7    A    He did, yes.

8    Q    Describe for the Court what happened.

9    A    Then shortly after he arrived, he took us back to the

10   bar area where we met Mr. Termendzhyan.

11   Q    What did he say before taking you back to the bar area?

12   A    Really nothing that I recall other than, you know, he

13   smiled and greeted us, and then kind of walked us over to

14   meet Mr. Termendzhyan.

15   Q    Was Mr. Termendzhyan there the whole time?

16   A    I believe so, because we were sitting at the top -- if

17   you've ever been to the Peninsula Hotel, that bar, you walk

18   up the stairs, and then there's kind of an area with tables

19   at the top of the stairs, and you need to go -- you need to

20   go through there to get to where Mr. Termendzhyan -- where

21   we greeted Mr. Termendzhyan.

22        So we may have missed him if he came up, but it would

23   have been unlikely because we were kind of -- Natalia is a

24   very patient person, but she was getting tired and she

25   wanted to, you know, get back to her room to sleep.

1   Q    Do you know why Mr. Korkmaz wanted Ambassador Gherman

2   to meet Mr. Termendzhyan?

3   A    I don't know that.

4   Q    Was Mr. Termendzhyan alone?

5   A    I don't know.  He appeared to have others with him, but

6   I don't know that as a fact.

7   Q    Well, did he have others with him or not?

8   A    There were others in the room.

9   Q    In the lounge?

10  A    In the lounge, in the bar area.

11  Q    And what was the nature of the introduction?

12  A    It was -- he just presented us to Mr. Termendzhyan.  I

13  remember shaking Mr. Termendzhyan's hand, and that was it.

14  That was the whole interaction.

15  Q    Was there any discussion about any issue, project?

16  A    Nothing.

17  Q    Were you comfortable back in this --

18  A    It was a little awkward, you know, because normally

19  when, you know --

20          MR. GERAGOS:  Objection, relevance.

21          THE COURT:  Well, I'll give him a little bit of

22  leeway.  But I agree, it seems a bit tangential.

23  BY MR. ROLWING:

24  Q    Were you comfortable in this situation?

25  A    As I said it was awkward because I didn't know who

1    Mr. Termendzhyan was, why we were introducing Ambassador

2    Gherman to him.

3    Q    Did she know, or did you discuss this with Ambassador

4    Gherman afterwards?

5    A    I mean it was kind of -- you know, we just said wow,

6    that was interesting, and it was a little, you know,

7    awkward.

8    Q    What was your understanding of the relationship between

9    Mr. Korkmaz and Termendzhyan at this time?

10   A    Well, at that point I knew they were friends.  I had

11   met them two times before.  So I just -- I mean I knew they

12   were friendly.

13   Q    Did he have anything to do with, as far as you know,

14   Mr. Korkmaz's efforts with Relief International, the UN, or

15   other entities you've got Mr. Korkmaz associated with?

16   A    I have no idea of that.

17   Q    Were there other entities that you got Mr. Korkmaz

18   involved with other than Relief International and the other

19   entity that you described he pledged but did not pay?

20   A    Yeah.  He was very, very interested in getting on the

21   board of the EastWest Institute, which years ago I was a

22   staff member of, and I'd stayed kind of involved in that

23   network over the years.

24   Q    And if you look at page five of Government Exhibit O,

25   do you recognize this as another picture you took and turned

1   over to the United States?

2   A    Yes.  That is Cameron Gunter, who was at the time the

3   president and chief executive officer of the EastWest

4   Institute.  That's Ambassador Gherman.

5   Q    On the left?

6   A    On the left.

7        And that's Baran Korkmaz, and that's Baran's assistant

8   at the time.  Anil Leylek I believe was her name.

9   Q    And when was this picture taken?

10  A    This happened during the day, during that same period

11  of time during the UN General Assembly.

12  Q    So after the meeting at the Peninsula Hotel but on that

13  same trip?

14  A    On that same trip.

15  Q    And did Mr. Korkmaz ever develop an association with

16  the EastWest Institute?

17  A    Yes.  It was at that meeting that Baran I believe had

18  a -- I mean I know had a private meeting with Ambassador

19  Gunter and another executive of the EastWest Institute, and

20  then eventually he was invited to join the board of the

21  EastWest Institute.

22  Q    Was Levon Termendzhyan a part of that EastWest

23  Institute?

24  A    No.

25  Q    By the way, had you ever -- when you were at the

1    birthday party of -- Levon Termendzhyan's 50th birthday
2    party in Beverly Hills, California, did you ever speak with
3    Levon at that party?
4    A    We had a brief interaction.  I had gotten up to go just
5    get a breath of air, and I just happened to bump into him
6    while we were both kind of in the same place.
7    Q    And did you say anything to him?
8    A    I said happy birthday.  And there were some cars with
9    ribbons on them, and I said, wow, there's a lot of cool cars
10   here, or something like that.  And he said, yeah, everyone
11   is giving cars for my birthday, or something like that.  It
12   was kind of goofing around kind of conversation.
13   Q    Take a look at Government Exhibit G, if you will.
14       Do you recognize the boat that's in the Government
15   Exhibit G?
16   A    Yes.
17   Q    How do you recognize it?
18   A    Because at one point Nancy and I were on that boat when
19   we stayed in one of Baran's properties, and they put us on
20   this boat to kind of -- it appeared like they were just
21   putting us on hold while we were waiting for Baran to meet
22   with us.
23   Q    And what do you remember about this boat?
24   A    It was very fancy.  It had huge Bugatti engines.
25   Q    And do you know Bugatti engines, or why do you remember

 1    the Bugatti engines?

 2    A    It just had a big logo on them.  I'm not a big boat guy

 3    or car guy.

 4    Q    But that sticks out in your memory?

 5    A    It does, yes.

 6    Q    Where did you board this boat?

 7    A    I boarded this at a villa that Mr. Korkmaz hosted us in

 8    Turkey, in Istanbul.

 9    Q    Would you recognize that villa if you saw a picture of

10    it?

11    A    Yes.

12             MR. ROLWING:  Can you bring up Government

13    Exhibit H, I believe page 17.

14    BY MR. ROLWING:

15    Q    Ignore the man in the front, but do you recognize the

16    building behind it?

17    A    I believe that's the house that we stayed in, but I

18    remember it being a different color.  But that's -- I

19    believe that's the house.

20    Q    And what was in the house that you stayed in when you

21    were there in Turkey?

22    A    There was a guest -- a room area, and then there was

23    kind of an office area where Baran had some of his staff.

24    We stayed in guestrooms there.  We were the only people

25    there at the time, when Nancy and I were there.

1   Q    Is there more than one guestroom?

2   A    There were more than one guestroom.

3   Q    Approximately how many?

4   A    There were at least two that I -- I don't know because

5   Nancy stayed in one and I stayed in the other.  But there

6   appeared to be -- there appeared -- there seemed to be more.

7   Q    And is there a dwelling behind this house that is in a

8   courtyard that houses the guestrooms on this property?

9   A    Yeah.  There was the villa that faced -- that was right

10  on the Bosporus.  And then there was a courtyard in back.

11  And then there was a separate like guesthouse area where we

12  stayed.

13  Q    And how many times have you stayed at this residence?

14  A    Two or three times.

15  Q    And have you attended events at this residence as well?

16  A    I attended an event at that residence.

17  Q    You've been there in 2018?

18  A    Yes.

19  Q    Did you happen to take any pictures of anything at the

20  villa in 2018?

21  A    Yeah.  I took a picture of a really cool door knocker.

22  Q    Can you look at Exhibit O, page one.

23  A    Yes.  I took that picture.

24  Q    Where is that at this residence?

25  A    That was on an internal -- that was on a door that led

```
 1    into kind of a reception area where we had a brief meeting
 2    with Baran and some others.
 3    Q    And where were you staying the night in 2020 when the
 4    United States government contacted you to speak to you about
 5    Baran Korkmaz and Levon Termendzhyan?
 6    A    I was staying in the guesthouse that night.
 7    Q    Just last year?
 8    A    Just last year -- or before the pandemic.
 9    Q    If we contacted you first in the fall of 2020 --
10    A    That's when it was, yeah.  Thank you.
11              THE COURT:  The pandemic hit in March of 2020,
12    right?
13              THE WITNESS:  Right.
14              THE COURT:  So it would have been after the
15    pandemic.
16              THE WITNESS:  Well, I mean I can -- Your Honor, I
17    can look.  There was the night that I got an email -- just
18    coincidental, I got an email from the government asking me
19    to be -- you know, provide documents and so forth.  That was
20    the night that I was there.  I don't recall the exact date
21    though, but it's documented.
22              THE COURT:  Okay.
23              MR. GERAGOS:  Can I ask a couple of questions on
24    voir dire for just a second on that so I can look at the
25    discovery?
```

```
1              THE COURT:  You may.

2                  VOIR DIRE EXAMINATION

3    BY MR. GERAGOS:

4    Q    Good morning.  Mark Geragos.

5              THE COURT:  Do you want to come forward,

6    Mr. Geragos, so we can hear you?

7              MR. GERAGOS:  I apologize.  For some reason, today

8    it's more difficult to see the witness.

9    BY MR. GERAGOS:

10   Q    Good morning.  I'm Mark Geragos.  I represent

11   Mr. Termendzhyan.

12        When you say it was documented, what do you mean by

13   that?

14   A    I received an email from the government on the night

15   that I was at -- the first time I was ever contacted in this

16   matter by the U.S. government was on the night that I was

17   staying in this guesthouse.

18   Q    Okay.  And did you provide -- did you respond to that

19   email on that night?

20   A    Well, I wrote my attorney, Jason Matechak, and I don't

21   recall, Mr. Geragos, whether he responded to them or I did.

22   Q    Okay.  So if there's an email string from -- was it

23   from Mr. Rolwing, or from Arthur Ewenczyk, or do you

24   remember who it was from?

25   A    I think it was from Arthur actually.  Yeah, it was from
```

```
 1   Arthur.
 2   Q    So if we have an email with Arthur and you, that's what
 3   you mean by establishing the date?
 4   A    Yes.
 5   Q    Got it.  Thank you.
 6            MR. GERAGOS:  Thank you, Your Honor.
 7                 DIRECT EXAMINATION   (Continued)
 8   BY MR. ROLWING:
 9   Q    And did your attorney, Mr. Matechak, then contact the
10   government and set up an interview of you with Arthur and
11   myself, and other agents of the government?
12   A    He did.
13   Q    And if the memorandums prepared from these interviews,
14   the first one is dated December 8th, 2020, would you dispute
15   that it was in the fall or even winter of 2020 when you were
16   first contacted?
17   A    Absolutely not.
18        Can I drink some of this water?  Is that okay?
19   Q    Yes.
20        Okay.  Were you in contact with Mr. Korkmaz throughout
21   the year 2018?
22   A    Occasionally I believe, yeah.
23   Q    Were you in contact with Mr. Kingston in 2018?
24   A    No.  I mean not in contact with him.  I met with him
25   one time with Baran Korkmaz at his request.
```

1    Q     Where was that?

2    A     It was in Houston.

3    Q     And what was the purpose of the meeting?

4    A     Mr. Korkmaz had contacted me and asked me -- said that

5    his friend had some kind of civil matter and that needed a

6    prominent -- the best attorney in the country is what he

7    asked for.

8    Q     And did you help find an attorney?

9    A     I did.

10   Q     And was that meeting in Houston with the attorneys you

11   located for Mr. Korkmaz and Mr. Kingston?

12   A     Yes, it was.

13   Q     And did you later learn in 2018 that Jacob Kingston and

14   Levon Termendzhyan had been arrested?

15   A     Yes, I did.

16   Q     How did you learn?

17   A     Baran called me on the night that they were arrested.

18   Q     Where was Baran calling you from?

19   A     From Istanbul.

20   Q     And what did he tell you?

21   A     He told me Jacob has been arrested.  Go to Salt Lake

22   City.  That's his exact words.

23   Q     Did he also say Levon Termendzhyan had been arrested,

24   and Isaiah Kingston?

25   A     He didn't say that.

1    Q    Did you find out?

2    A    I did find out subsequently based on public, you

3    know -- yes.

4    Q    Did you obtain anything related to the arrest of

5    Kingston and provide it to Mr. Korkmaz?

6    A    Yes.  I was able to get the actual -- I don't know what

7    the document is called, but it was like a legal document

8    that showed the details of the arrest.

9    Q    Indictment?

10   A    Indictment, yes.  Thank you.

11   Q    And did you provide that to Mr. Korkmaz?

12   A    I did.

13   Q    How soon after the arrest?

14   A    Within a few days.

15   Q    Did Mr. Korkmaz ask you to do anything as it related to

16   the indictment and the arrest of Jacob Kingston?

17   A    Yeah.  As I said, he asked me to go to Salt Lake City.

18   Q    And do what?

19   A    I don't know.  He just said go there.

20   Q    Did he ever ask you to help find Jacob Kingston

21   criminal attorneys?

22   A    He did.

23   Q    And did you make some contact with potential criminal

24   counsel?

25   A    I did.

```
 1   Q    Did you have anything to do with Mr. Kingston choosing
 2   Mark Agnifilo and his firm?
 3   A    No.
 4   Q    So the counsel you contacted did not become counsel for
 5   Mr. Kingston?
 6   A    No.
 7   Q    Did he ever ask you to get involved in helping -- or
 8   doing anything on behalf of Levon Termendzhyan?
 9   A    No.
10   Q    How about Isaiah Kingston?
11   A    Not specifically, but -- no, he did not.
12   Q    Thank you.
13             MR. ROLWING:  No further questions, Your Honor.
14             THE COURT:  You may cross-examine, Mr. Geragos.
15             MR. GERAGOS:  Thank you, Your Honor.
16             Would the Court entertain about a five-minute
17   recess?  The only reason is I don't think that we've solved
18   this either/or of the Zoom versus the Elmo.  So I've printed
19   out the exhibits and I want to also use Ms. Bonney, if I
20   can, and try to toggle between the two.
21             THE COURT:  That would be fine.  Let's take ten
22   minutes.
23             MR. GERAGOS:  Thank you.
24             THE WITNESS:  Your Honor, should I stay here?
25             THE COURT:  You can stay there or you can get down
```

```
 1   and go to the restroom, take a break.  Whatever you prefer.
 2               THE WITNESS:  I'm good.  I'd rather just get it
 3   over with.
 4               (Recess)
 5               THE COURT:  You may proceed, Mr. Geragos.
 6               MR. GERAGOS:  Thank you, Your Honor.
 7               For the record, I want to thank the clerk.  We now
 8   have Elmo capabilities.  We've saved ourselves about an hour
 9   in uploading.
10               THE COURT:  Thank you.
11               MR. GERAGOS:  I'm giving her a shout-out.
12               THE COURT:  I thank Ms. Schaerrer.  And I don't
13   know what to do about our IT department that tends to vacate
14   the building at three o'clock every day.
15               MR. GERAGOS:  Ms. Schaerrer is going to do a labor
16   action at some point.
17                         CROSS-EXAMINATION
18   BY MR. GERAGOS:
19   Q    Mr. Puls, good morning.  I introduced myself before.  I
20   represent Mr. Termendzhyan.  My name is Mark Geragos.
21        How are you?
22   A    Good.  Thank you, sir.
23   Q    And I think we already discussed you would like to get
24   this over as quickly as possible, correct?
25   A    Yes.
```

```
 1   Q    I will do whatever I can.
 2        I just want to establish some things.  It sounds to me
 3   like you had three encounters with my client in total,
 4   correct?
 5   A    Correct.
 6   Q    One was for what period of time, the first one?
 7   A    Well, I mean as I've established many times, it was in
 8   late --
 9   Q    I apologize.  That wasn't asked well.
10        The sum total of interaction would have been at the
11   Harvard Club?
12   A    At the Harvard Club.
13   Q    How long did you actually talk to him?
14   A    I didn't talk to him at all.
15   Q    So that's time number one, correct?
16   A    Right.
17   Q    You didn't talk to him.
18        And as far as you knew, he had nothing to do with the
19   Harvard Club commemoration, or announcement, or celebration
20   of Baran Korkmaz's $20 million pledge, correct?
21   A    Other than he was a guest of Mr. Korkmaz, he had
22   nothing to do with the event, planning it.
23   Q    How many people were there?
24   A    A hundred and five, 110.
25   Q    Okay.  How many of those were guests of Mr. Korkmaz,
```

```
 1   that you know?
 2   A    All of them were.  I mean we coordinated that with him.
 3   Q    Okay.
 4   A    They were guests of the Relief International, which
 5   hosted the event, but we made him aware of all the guests.
 6   Q    So Mr. Termendzhyan was one of a hundred or so guests
 7   for this event, and, as far as you know, had nothing to do
 8   with Mr. Korkmaz's giving of the 20 million?
 9   A    Correct.
10   Q    And when I say giving, let's accept the fact that he
11   never gave.  He pledged it?
12   A    Yeah.
13   Q    Okay.  The second time you saw him was at his birthday
14   party?
15   A    The second time I saw him was at his birthday party, I
16   believe, yeah.  It was either -- yeah, I believe it was at
17   his birthday party.
18   Q    And whenever it was, August of whatever, you flew out
19   to Los Angeles, correct?
20   A    I did.
21   Q    You met with -- or a car was sent for you, correct?
22   A    A car was sent to me.
23   Q    As far as you know, Mr. Korkmaz, you thought he was out
24   of Turkey, means that he worked out of Turkey, or Istanbul,
25   correct?
```

1    A    I don't understand the question.

2    Q    Where did you think Mr. Korkmaz was based out of?

3    A    He was based -- well, he was based in Turkey.  That's

4    where his offices were.  And then he would spend time in

5    Beverly Hills on an annual basis.  That's what he told me.

6    Q    Okay.  And when you landed, did you meet him in Beverly

7    Hills?

8    A    I did not -- well, when I landed, I was picked up by a

9    driver.

10   Q    Okay.  And then where did you go?

11   A    And then we went to this like enormous house in Beverly

12   Hills.

13   Q    And whose house were you told that was?

14   A    I wasn't told anything.  We just went there.  We

15   stopped there and we picked up a young woman who drove with

16   me to the party.

17   Q    Okay.  And nobody told you whose house it was, correct?

18   A    Nobody.

19   Q    And was Mr. Termendzhyan at that house?

20   A    No.

21   Q    Was Mr. Korkmaz?

22   A    No.

23   Q    And then you went to the party.  I thought you had told

24   Mr. Rolwing that you first met with Mr. Korkmaz before the

25   party?

```
 1   A    Well, I don't recall that, Mr. Geragos.  I met with him
 2   either -- I think I met with him the next morning before I
 3   left.
 4   Q    Where did you meet with him?
 5   A    Outside his hotel, just on the street at a coffee shop.
 6   Q    And do you remember where that was?
 7   A    There is a picture of that I believe.
 8   Q    Okay.  We'll come back to that and I'll have somebody
 9   find the picture.
10        And the picture is what, of you with Mr. Korkmaz?
11   A    Like a selfie of me and Mr. Korkmaz.
12   Q    And you gave that to the government, correct?
13   A    I'm not sure.
14   Q    Do you have that in your phone now?
15   A    I could look, but I don't have my phone.
16            MR. GERAGOS:  May I approach, Your Honor?
17            THE COURT:  You may.
18            THE WITNESS:  No.  This is not the picture.
19   BY MR. GERAGOS:
20   Q    Do you recognize this picture?
21   A    I do.  I took that picture.
22   Q    From where?
23   A    That was in the lobby of ReedSmith, a law firm in
24   Houston.
25   Q    Why were you in the lobby of ReedSmith with Jacob
```

1    Kingston and Mr. Korkmaz?

2    A    Well, as we established earlier, Mr. Korkmaz had asked

3    me to find the best attorney in the United States, and we

4    didn't think of you, but --

5    Q    Did you think that I had a conflict?

6    A    I don't know.

7         But seriously, Mr. Korkmaz had asked us to -- said his

8    friend, Mr. Kingston, had a civil matter and he wanted the

9    best attorney in the country.  And through kind of people I

10   knew, we connected Mr. Kingston, and then through

11   Mr. Kingston, Mr. Korkmaz with a gentleman named Matt

12   Siembieda and his associate at ReedSmith.

13   Q    Well, but you took this picture, which I will mark as

14   defense next in order.

15            MR. GERAGOS:  B, if I might, Your Honor.

16   BY MR. GERAGOS:

17   Q    You took the picture, and approximately when was that?

18   A    I can't recall the date.  But I mean I could -- I don't

19   remember the date.

20   Q    Was it sometime -- I'm showing you something on the

21   Elmo.  Do you see this ReedSmith letter --

22   A    Yes.

23   Q    -- to Mr. Korkmaz, March 1st, 2018?

24   A    It was approximately around that date.

25   Q    I'll mark that next in order.

```
 1              MR. GERAGOS:  Is it C?
 2   BY MR. GERAGOS:
 3   Q    So you actually -- by the way, was Levon Termendzhyan
 4   on that trip to Houston?
 5   A    No.
 6   Q    Did you ever discuss getting ReedSmith as a lawyer with
 7   Mr. Termendzhyan?
 8   A    Never.
 9   Q    In fact, going back to that line of questioning I had
10   before, the third time that you saw Mr. Termendzhyan, other
11   than the birthday party, and the birthday party you already
12   stated you didn't have any interaction other than goofing
13   around outside, correct?
14   A    No -- I mean yes.  I did not have any discussion --
15   substantive conversation.  It was just like a friendly
16   little -- I think you said goofing around.
17   Q    You went outside at one point at the birthday party,
18   correct?
19   A    Yeah.  I stood -- it was like a sound stage with like
20   doors that opened this way (indicating), and we were
21   standing kind of at the threshold of that door, and we
22   exchanged some pleasantries really.
23   Q    Right.  And you used the term, just a couple of minutes
24   ago, goofing around?
25   A    Yeah.
```

1    Q    Right.  And you interpreted him as saying, yeah, I

2    always get cars for my birthday, or something along those

3    lines?

4    A    Something like that, yeah.

5    Q    But it was a joking comment in passing as you're

6    standing at the side of somebody's birthday party, correct?

7    A    I guess that's one way to look at it.

8    Q    You certainly weren't going to bet your life on that,

9    that he always gets cars on his birthday.  It was a flippant

10   remark, correct?

11   A    Yes.

12   Q    Okay.  It's not a trick question.  I just want to put

13   it in context.

14        The other thing is that was the last time you saw him

15   before you went to the Peninsula, correct?

16   A    Yes.

17   Q    And at the Peninsula -- I'm just going to summarize

18   this also -- he was sitting in an area, after you go up the

19   stairs, as you described it, and when you go up the stairs,

20   that's kind of a -- kind of a lounge area for the bar that

21   is up on the right side, correct, as you're walking up the

22   stairs?

23   A    So you walk up the stairs, and straight ahead and to

24   the right are high tables.  And then to the left -- directly

25   to the left is the bar, and there's kind of a U-shaped

1    lounge, bar area with bench seats along the perimeter of the

2    walls.

3    Q    And that's where he was sitting, correct?

4    A    Like I said, I assumed he was sitting there because --

5    I don't know if he was sitting or standing, but that's where

6    we greeted him.

7    Q    So you don't know if he was there before you were there

8    because you hadn't walked over to that side, correct?

9    A    No.

10    Q    The only thing that you know for sure is that there was

11    a, what, 30-second, one-minute encounter?

12    A    Yes.

13    Q    Okay.  So we've had a 30-second or one-minute encounter

14    at his birthday party, a 30-second or one-minute encounter

15    in the Peninsula lobby, correct?

16    A    Correct.

17    Q    And the Harvard Club wasn't really an encounter.  You

18    were just standing near him, if I understand, correct?

19    A    Yes.

20    Q    Okay.  So we've got less than three minutes sum total

21    of you interacting in some fashion or being in the presence

22    of Mr. Termendzhyan; is that right?

23    A    That is correct.

24    Q    Over the course of how much time, a year and a half,

25    two years?

1   A    I think three or four years maybe.

2   Q    Over three or four years.

3        And as far as you know, you have no indication

4   whatsoever that Mr. Baran Korkmaz -- you don't know what

5   their relationship was, do you, based on your direct

6   knowledge, not something you heard or anything else?

7   A    I mean Mr. Korkmaz had indicated that they were friends

8   and that he was an important partner of his.  But that's the

9   extent of my knowledge.

10  Q    Right.  And you testified at the grand jury, page 14,

11  line ten -- did he ever tell you what his relationship with

12  Levon Termendzhyan was?  Do you remember what your answer

13  was?

14  A    No.

15  Q    No, correct?

16  A    Right.

17  Q    And you were testifying truthfully and accurately then,

18  correct?

19  A    Yeah, as I am now as well.

20  Q    I understand.  I'm not saying anything other than this.

21  Sometimes we have little things that we say for the record,

22  okay?  So I'm not challenging you at this point.  I'm just

23  asking questions.

24       Now that's accurate.  As we sit here today, other than

25  maybe what the government has told you, or somebody has

1    Googled, or anything else, your actual knowledge is Baran

2    Korkmaz never told you what the relationship was and you've

3    had less than 90 seconds of encounters or -- close

4    encounters with my client; isn't that right?

5    A    That's true.  But if it's okay, I would like to clarify

6    something.

7    Q    He'll get up and ask you that.  That's what he does,

8    okay?

9    A    Well, I just would like -- the government never told me

10   anything.  They just asked me questions.

11   Q    Well, did the government -- for the first time today --

12   for the first time today you said you noticed Bugatti

13   engines on the boat you were on in the Bosporus.  Do you

14   remember testifying that this morning?

15   A    I do.

16   Q    When was the last time you told the government about

17   Bugatti engines?

18   A    I mentioned that to them last night because it occurred

19   to me when we were preparing for our testimony.

20   Q    Do you realize that -- before did you ever use the term

21   Veyron engines?

22   A    Never.

23   Q    Never.  So for the first time, last night, after there

24   was back-and-forth over Bugatti, it just occurred to you

25   that there were Bugatti engines, and you said, hey, by the

1    way, there might have been -- I just remembered right now

2    Bugatti engines; is that right?

3    A    No, because I remember joking around about it with my

4    wife, with friends, because these were huge Bugatti -- I

5    mean they were very, very prominent.

6    Q    Okay.  And did you ever tell the government, hey, I

7    remember these huge, prominent Bugatti engines that I joked

8    around with my wife and other people, or that just magically

9    occurred to you last night?

10   A    It didn't magically occur to me.  It just occurred to

11   me.  I don't know what magically means, but it didn't

12   magically -- it just occurred to me.

13   Q    Suddenly you had a Bugatti moment, or epiphany, last

14   night, after court obviously, right?

15        I'm just trying to -- the first time you've ever

16   mentioned to the government anything about Bugatti happened

17   after court last night, correct?

18   A    I didn't have any -- I don't know what court you're --

19   I'm sorry.  I don't mean to be difficult.

20   Q    That's okay.  What time did you tell the government

21   about the Bugatti engines?

22   A    Approximately 6:30, seven o'clock last night.

23   Q    Thank you.

24        Local time?

25   A    This time, yeah, here.

```
 1    Q    Got it.

 2    A    Maybe 7:30.

 3    Q    Also you testified -- the date -- in front of the grand

 4    jury, April -- April of this year, correct?

 5    A    Yes.

 6    Q    Do you remember being asked what was your understanding

 7    of the relationship between Baran Korkmaz and Levon

 8    Termendzhyan at that time in 2016?  What was your answer?

 9    A    I have no idea what the relationship was.

10    Q    Right.  Today you seem to have some idea, or is that

11    wrong?

12    A    It's -- I mean no, it's not wrong.

13    Q    Okay.  This was in April of this year, correct?

14    A    This was in April of this year.

15    Q    You haven't seen Baran Korkmaz or Levon Termendzhyan

16    since April of this year, right?

17    A    No.

18    Q    So when you testified, you said not only -- not only

19    that you didn't know what the relationship was, or that you

20    didn't tell, you said I have no idea?

21    A    Correct.

22    Q    And was it in 2016, and you said no, correct?

23    A    I'm sorry, sir.  Could you --

24    Q    You were being asked about 2016; is that right?

25    A    I believe so, yes.
```

1    Q    Got it.

2         Now why did you -- if Mr. Korkmaz had -- by the way, in

3    it looks like March -- you can correct me if I'm wrong -- do

4    you recognize this document that I'm putting on the screen

5    right now?

6         If you can't see the whole thing let me know.

7         Do you recognize this?

8    A    I do.

9    Q    Could you describe for the Court what that is?

10   A    Yes.  So when Baran was retaining the legal counsel for

11   the civil matter, I was asked to have a power of attorney to

12   sign the letter of engagement, and I think it was limited to

13   that only.

14        MR. GERAGOS:  Your Honor, I'm going to mark that

15   D, next in order.

16   BY MR. GERAGOS:

17   Q    So you had a -- let's see.  This is March of 2018.

18   When was the pledge for the 20 million bucks?

19   A    It was earlier than that, in 2015, '16.  As I said,

20   there's a grant agreement that would date that exactly.

21   Q    Well, is it fair to say that even after the pledge was

22   never fulfilled -- to establish, you got zero, right?

23   A    Right.

24   Q    -- you continued along with Mr. Korkmaz to the point

25   where -- did you fly to Houston?

1    A    I did.

2    Q    Did you do this limited durable power of attorney?

3         Where was that done?

4    A    Where was it done?

5    Q    Yeah.

6    A    Well, it was certified in Turkey.  And then I signed it

7    in my office in Alexandria, and then presented it to

8    ReedSmith.

9    Q    So you signed it.

10        By the way, is there a Queen Anne Place or Road in

11   D.C.?  Have you ever heard of Queen Anne?

12   A    No.

13   Q    You now had a representation letter, is that right,

14   with ReedSmith, joint representation; is that correct?

15        You see what the terms are, right?  Do you see where it

16   says joint representation and engagement?  That's what you

17   executed, right?

18   A    That's what it appears to be, yes.

19   Q    You signed it, right?

20   A    I believe I did sign it, yes.

21   Q    Okay.  So you jointly engaged the ReedSmith law firm,

22   which you found with Mr. Korkmaz, right?  You both hired the

23   lawyers together.

24   A    Well, my understanding of my part in this was simply to

25   have a limited power of attorney to sign the engagement

1    letter because physically Baran Korkmaz was not going to be

2    there to do that and they wanted to start the legal work.

3    So this expedited that.

4    Q    Let me ask you, what due diligence did you do after you

5    learned -- first of all, you said that there was due

6    diligence by Googling Levon Termendzhyan.  Who was the woman

7    who was upset after she did that?

8    A    There was a member of the -- I mean there was a member

9    of the staff of Relief International that when

10   Mr. Termendzhyan attended -- was at the event, she did some

11   public search and found --

12   Q    I remember all that.  What was her name?

13   A    Her first name was in Michelle.  It's in one of the

14   emails.  I don't recall her last name.

15   Q    Okay.  But that concerned you or concerned her, or

16   both?

17   A    It concerned my client Relief International, so it

18   concerned me.

19   Q    Okay.  But when Mr. -- and you knew Mr. Kingston.  You

20   had been told Mr. Kingston -- prior to him getting arrested,

21   you had been told he was a partner of Baran Korkmaz,

22   correct?

23   A    I have been told that he was an important business

24   associate of Mr. Korkmaz.  I was never told that he was a

25   partner.  I just --

```
 1   Q    Weren't you told that he was an investor?

 2   A    Yes.

 3   Q    Okay.  Weren't you told that when somebody inquired as

 4   to due diligence of Mr. Korkmaz, that you referred them to

 5   Mr. Kingston -- Jacob Kingston?  Isn't that true?

 6   A    No, that's not true, Mr. Geragos.  What I was --

 7   Q    You never told anybody that; is that right?

 8   A    No.  No.  I mean if I can just clarify.

 9   Q    Well, I don't want --

10   A    Okay.

11   Q    -- to get into the back-and-forth with you.

12        But you understood now there's a legal matter.  You

13   flew to Houston, correct?

14   A    I did.

15   Q    Okay.  So first you get ReedSmith hired, correct?

16   A    Right.

17   Q    Joint representation with you.  Your story or your

18   understanding -- I don't mean to imply story, but your

19   understanding is you are getting involved because he's not

20   around to sign the engagement agreement, correct?

21   A    Correct.

22   Q    That's approximately five months before Mr. Kingston is

23   arrested, correct?

24   A    Yes.

25   Q    And you're at the point where Mr. Kingston gets
```

```
 1   arrested, and you had already just traveled to Houston and
 2   had a picture taken of you and Mr. Kingston, correct?
 3   A    Correct.
 4   Q    How much time would you say you spent with
 5   Mr. Kingston?
 6   A    We had a dinner together where -- you know, it was a
 7   short dinner at a restaurant.
 8   Q    Just the two of you?
 9   A    No.  No.  It was Mr. Korkmaz, Mr. Kingston, and myself.
10   Q    I assume Mr. Termendzhyan is not there?
11   A    Mr. Termendzhyan was not there.
12   Q    Okay.  And is there some reason you said -- by the way,
13   who took the picture that we marked as Defendant's B?
14   A    I did.
15   Q    Didn't you just testify that the reason you signed the
16   joint engagement and the power of attorney is because
17   Mr. Korkmaz wasn't there to sign it himself?
18   A    Yeah, but this was after that time.  This was --
19   Q    When was it?  Were you in the ReedSmith lobby on
20   multiple occasions?
21   A    No.  I was there once.
22   Q    What is the date of that?
23   A    I don't recall, Mr. Geragos.
24   Q    Okay.  So Mr. Korkmaz was able somehow to get to
25   Houston to the ReedSmith lobby, correct?
```

 1   A     He was.

 2   Q     Okay.

 3              THE COURT:  So, sir, was ReedSmith hired to

 4   represent Baran Korkmaz or Jacob Kingston, or both?

 5              THE WITNESS:  It was very confusing, Your Honor.

 6   He was hired to represent Mr. -- ReedSmith was hired to

 7   represent Mr. Kingston, but Mr. Korkmaz said he guaranteed

 8   to pay all the fees.  That was my understanding.

 9              THE COURT:  All right.  So the reason for the

10   power of attorney, then, was to put Mr. Korkmaz on the hook

11   to pay the bill for Jacob Kingston?

12              THE WITNESS:  Right.

13              THE COURT:  But your understanding was that Baran

14   Korkmaz was not a defendant in the lawsuit -- or the civil

15   matter?

16              THE WITNESS:  That was my -- I'm not a lawyer.

17   You know, that was my understanding, yes.

18   BY MR. GERAGOS:

19   Q     Did Mr. Korkmaz tell you before you arrived, apart from

20   what I've told you, do not go into certain subjects?

21   A     Yes.  He told me that he did not want Mr. Kingston to

22   know that he was guaranteeing the fees.  That's my -- that's

23   my recollection.

24   Q     So he wanted to guarantee the fees, but didn't want

25   Mr. Kingston to know he was guaranteeing the fees?

```
 1  A    Yes.

 2  Q    And isn't true that you've already testified you had no

 3  idea what he meant?

 4  A    It's true.  I had no idea what he meant.

 5  Q    And you said you responded to him, well, I'll follow

 6  your lead completely, dear friend.  Is that what you

 7  testified to?

 8  A    I believe so.

 9  Q    Okay.  And you had no idea what he was asking you,

10  correct?

11  A    Well, he was asking me not to disclose to Mr. Kingston

12  that he was guaranteeing the fees.

13  Q    Well, you were asked that question in your grand jury

14  testimony, at page 26, line 14, You'll follow your lead

15  completely, dear friend, what did you think he was asking

16  you?  I don't really know.  I just know that he was a very

17  arrogant and self-directed kind of person.

18       This was when the grand jury was for Baran, correct?

19  A    Yes.

20  Q    Okay.  Back then, because you knew he was the target of

21  the grand jury, you described him as a very arrogant and

22  self-directed kind of person, correct?

23  A    Yeah.  He was.

24  Q    Right.  Today you've described the relationship as --

25  or the reason for it is he didn't want to know about the
```

```
 1   fees; is that correct?  Do I have that right?
 2   A    I'm sorry.  Who didn't?  You're talking about --
 3   Q    Baran.
 4   A    No.  Baran --
 5   Q    You were describing a conversation, right?
 6   A    Uh-huh.  (Affirmative)
 7   Q    For the record, you have to say yes or no.  Uh-huh
 8   doesn't translate.
 9        So you're describing this conversation -- by the way,
10   where was this conversation?
11   A    It was -- it was -- I don't recall.
12   Q    Well, it was before that lobby meeting because Jacob
13   Kingston is sitting there, right?
14   A    Yes.
15   Q    Okay.  So you would have met with Baran before then.
16        Did you travel with Baran to Houston?
17   A    No.  I traveled separately.
18   Q    Did you meet with him in a hotel beforehand?
19   A    No.  We had the dinner together.  That was the only
20   meeting before the -- we did have some time privately in the
21   lobby -- in the conference room when Mr. Kingston wasn't
22   there.
23   Q    You would text with Baran, correct?
24   A    Yes.
25   Q    Technically WhatsApp?
```

```
 1   A     WhatsApp.

 2   Q     Got it.

 3         Now the WhatsApp messages, you WhatsApp'd him in

 4   English, correct?  You don't know Turkish.

 5   A     Well, yes, I did WhatsApp in English, and sometimes in

 6   Turkish.

 7   Q     Okay.  So do you know Turkish?

 8   A     I don't.

 9   Q     Okay.  What would you do, use a translation?

10   A     Use a translator.

11   Q     Okay.  Let me go for a second.  You arrived at least a

12   day or two before in Houston.  You're told not to -- by

13   him -- was this in person or by WhatsApp, not to mention

14   anything about the certain information in front of Jacob?

15   A     I don't recall.

16   Q     Okay.

17         THE COURT:  Did you have any understanding as to

18   the nature of the civil dispute for which ReedSmith was

19   being retained to represent Jacob Kingston?

20         THE WITNESS:  I did not understand it like -- it

21   was a very technical matter, and my role was just simply to

22   help him find the attorney.

23         THE COURT:  Did you know who his adversary was in

24   the civil matter?

25         THE WITNESS:  It was a U.S. company.  I don't
```

 1    recall the name of the company.

 2    BY MR. GERAGOS:

 3    Q    It was a company out of New York, wasn't it?

 4    A    Out of New York, correct.

 5    Q    Right?

 6    A    Yes.

 7           MR. GERAGOS:  And Your Honor might remember --

 8           THE COURT:  LifeTree.

 9           MR. GERAGOS:  Exactly.

10    BY MR. GERAGOS:

11    Q    LifeTree?

12    A    That's the company.  Thank you.

13    Q    And do you know how much the expenses were?

14    A    The legal fees?

15    Q    Right.  I assume that if you were there as kind of the

16    joint rep and there was going to be an indemnification or a

17    guarantee, whatever you want to call it, that was not to be

18    disclosed, did they send you the bills?

19    A    They did send me the bills.

20    Q    Okay.  Do you remember how much the bills were?

21    A    Not specifically, but it was hundreds of thousands of

22    dollars.

23    Q    Correct.  And that was after the -- I think it's

24    obvious.  Do you know the dates of those bills?  Did you

25    turn those over, for instance, to the government?

```
 1   A    I did.

 2   Q    When you turned them over to the -- let me show you

 3   something.

 4        That picture and the power of attorney was in March of

 5   2018, correct?

 6   A    Correct.

 7   Q    Now you turned over -- I'm assuming you turned over

 8   your WhatsApp messages, correct?

 9   A    I did, yes.

10   Q    I'm going to put up here -- I apologize.  I don't have

11   a Bates number stamp on here -- but I'm putting it up here.

12        Can you see this right here that looks like it's also

13   in March of 2018?

14   A    Yeah, I see that.

15   Q    This is you speaking at 1:24:52.  I have no idea how

16   that translates into what time zone, but let's just -- for

17   reference sake.

18        Now you said I spoke with ReedSmith attorney Matt

19   S-i-e-m-b-i-e-d-a.  Do you know how to pronounce that?

20   A    Siembieda.

21   Q    He says the Kingston case is moving along well.  He

22   said that they will likely have to reach out to the

23   Kingstons for some additional information, and their

24   paralegal is very helpful, right?

25   A    Yes.
```

1  Q    He suggested a meeting with Baran Bey.  What do you

2  mean when you say Baran Bey?

3  A    Bey is basically like mister or sir.  It's like saying

4  Mr. Geragos kind of.

5  Q    Okay.  Would be helpful, and his strategic mind would

6  help sharpen their legal approach.  Is that accurate?  Am I

7  reading that accurately?

8  A    Yes.

9  Q    And then it goes on.  We can all read what it says.

10 You will be in Istanbul on April 8th.  Hope to see you and

11 Baran, right?

12 A    Yes.

13 Q    Who are you communicating with, Umut?

14 A    Umut, yeah.

15 Q    Correct.  So you weren't just involved -- I mean this

16 would indicate to me, feel free to correct me, this doesn't

17 look like this was bill or invoice related.  This looks like

18 it's substantive legal discussion.  Is that a fair

19 statement?

20 A    I mean I was just -- I'm not an attorney.

21 Q    I'm not suggesting that.

22 A    I was just helping facilitate.

23 Q    Okay.  You're facilitating the discussion of the legal

24 strategy that Baran is apparently paying for for the

25 Kingstons; is that correct?  Is that a fair statement?

1    A    No, it's not.

2    Q    Okay.  So when they say he said they will likely have

3    to reach out to the Kingstons for some additional

4    information, their paralegal is helpful, but a meeting with

5    Baran would be helpful, and his strategic mind, to sharpen

6    their legal approach, you don't think that is a discussion

7    of strategy about the Kingston case being communicated to

8    Baran?  The way I've encapsulated that you think is wrong?

9    A    I don't agree with that.

10   Q    Okay.  Let me show you and see if you agree with this.

11            MR. GERAGOS:  I think I should mark that page as

12   the next in order, E.

13   BY MR. GERAGOS:

14   Q    This looks like, if I'm not mistaken, a February of

15   2018 WhatsApp.  Is this yours?

16   A    Yes, it is.

17   Q    This would have been before your -- this would have

18   been before your meeting on that picture that we saw in the

19   lobby, correct?

20       If this is accurate -- I can't vouch for that.  You

21   tell me.  But it looks like it's February 27th, which is

22   before the obvious power of attorney, which was dated in

23   March, and before that WhatsApp that I just showed you,

24   right?

25   A    Yes.

1   Q    And, Umut, all seems to be going well here.  We meet

2   with the attorneys at 10:00 a.m.

3        So am I mistaken, did you meet with the attorneys in

4   February?

5   A    Yes.

6   Q    Okay.  So you met with the attorneys by yourself in

7   February?

8   A    No.  Baran and I met at the University Club in New York

9   with the attorneys.

10  Q    That's a different meeting than -- obviously, because

11  it's in New York -- the one in Houston, correct?

12  A    Correct.

13  Q    And that was also for Jacob Kingston's litigation,

14  correct?

15  A    Correct.

16  Q    Okay.  And did you mention that, by the way, to the

17  government?  Did they know about this?

18  A    No, I didn't.  It's something I had forgotten about.

19  Q    Okay.  Even though they had this WhatsApp, nobody ever

20  discussed the fact that you had, previous to retaining

21  ReedSmith, met with them and Baran in New York?

22  A    I don't know.  I'm not aware of --

23  Q    This is the first time you've ever discussed this

24  meeting with anybody in connection with this trial?

25       You've never discussed it with the government, correct?

1    A    Mr. Geragos, I don't recall.

2    Q    Okay.  Do you remember anybody -- did Mr. Washburn ever

3    ask you about it?  Did Arthur ever ask you about it?  Did

4    anybody ever ask you, hey, what is this WhatsApp?  What are

5    you talking about ReedSmith at 10:00 a.m.?  And why is it

6    that your power of attorney is dated in March yet you're

7    having a meeting in New York in February?

8         I don't want you to speculate.

9    A    I don't recall.

10   Q    Okay.  And as you sit here today, you don't have an

11   explanation as to why that was never brought up?

12   A    I don't recall it was never brought up.

13   Q    Okay.  It could have been?

14        Is that right?

15   A    It --

16   Q    And you say one of the attorneys we will meet with

17   today -- today, meaning February 27th.  This is at

18   presumably 8:25 a.m., correct?

19   A    Yes.

20   Q    Okay.  So the meeting -- if we're going to try and

21   contextualize this, the meeting happened on February 27th at

22   the -- what club?

23   A    The University Club.

24   Q    Okay.  And one of the attorneys we'll meet with is a

25   close friend of the judge in the matter.  Is that correct?

1    A    That's what I was told by the attorneys.

2    Q    And the attorneys would have been either Matthew

3    Siembieda -- is that how you pronounce it?

4    A    Siembieda.  That's the way I understand it.

5    Q    S-i-e-m-b-i-e-d-a, or Kenneth Broughton,

6    B-r-o-u-g-h-t-o-n?

7    A    Yes.

8    Q    And then Umut said, that great.  Our finance work on

9    it.  I think today I will send you a SWIFT.  Bank asked

10    invoice.  We try to solve it.  Is that right?

11    A    Yes.

12    Q    Now you know what a SWIFT is, correct?

13    A    Yeah.  It's a confirmation of a wire transfer.

14    Q    And did you get a wire transfer, or did they?

15    A    No, I did not.

16    Q    Do you know if ReedSmith did?

17    A    I don't believe -- I don't know if they did.

18    Q    Well, shortly thereafter, it would from been sometime

19    within that week, you're in Houston, right?

20         MR. GERAGOS:  By the way, before you answer that,

21    I'm going to mark this next page as F.

22    BY MR. GERAGOS:

23    Q    The meeting with Baran and the two gentlemen who are

24    lawyers, one of whom is a close friend with the judge, you

25    believe it was for the LifeTree case, correct?

1  A    Yeah, it was for the LifeTree case.

2  Q    You remembered it because the name rang a bell?

3  A    The name rings a bell, yeah.

4  Q    Total of invoices that ReedSmith billed that Baran paid

5  for, are you aware how much?

6  A    I'm not -- no, I'm not.  They sent me the invoices.  I

7  forwarded them.  There were payment issues.  They were

8  concerned about that, but I'm not aware of the amount that

9  was paid, or even the amount -- I mean I can't remember the

10  amount that was invoiced.

11  Q    Okay.  Now after -- that did not end your involvement

12  in this matter, correct?

13  A    No, it did not.

14  Q    Okay.  In fact, your involvement -- we didn't talk

15  about it on direct, so I'm going to get into it now.  You

16  not only arranged for the litigation expenses in the

17  LifeTree case, you got yourself immersed, for lack of a

18  better term, in yet another matter with the Kingstons?

19  A    I did, yes.

20  Q    Okay.  And that's after they got arrested, correct?

21  A    That's after they got arrested.

22  Q    Right.  You know that they got arrested in August,

23  correct?

24  A    Yes.

25  Q    Now what was the next litigation or lawyer procurement

 1    for the Kingstons that you got involved with?

 2    A    Baran asked me to help, you know, the Kingstons --

 3    Mr. Kingston get a criminal attorney.

 4    Q    Okay.  So at that point you knew that he had been

 5    arrested obviously, correct?

 6    A    Yes.

 7    Q    Baran, the individual -- and I'm just saying that

 8    because there's SBK.  When I say Baran, I mean the

 9    individual.  He then tells you let's get a criminal defense

10    lawyer, correct?

11    A    Yes.

12    Q    And I believe you were asked in the direct exam, you're

13    not a criminal defense lawyer, you're not a bondsman.  He

14    asked you to go there because Jacob was arrested, correct?

15    A    Yes.  His -- yes.

16    Q    Okay.  Now you knew that Levon Termendzhyan was

17    arrested, correct?

18    A    Not that evening when I was told -- he told me that

19    Jacob was arrested.  He said go to Salt Lake City.

20    Q    Did he say, hey, my good friend Levon was arrested, go

21    help him out?

22    A    No, he did not.

23    Q    Did he mention Levon at all?

24    A    No.

25    Q    Did he mention Sally Kingston at all?

```
 1   A      No.

 2   Q      Rachel Kingston?

 3   A      No.

 4   Q      Isaiah Kingston?

 5   A      He did not.

 6   Q      The only person he was concerned with was Jacob

 7   Kingston, correct?

 8   A      The only person he mentioned that night was Jacob.

 9   Q      I assume he was concerned?

10   A      He seemed concerned about Jacob.

11   Q      Okay.  Nobody else in connection with this arrest,

12   correct?

13   A      He didn't mention anyone else's name.

14   Q      Okay.  And you flew to Salt Lake City, right?

15   A      I did not.

16   Q      You did not?

17   A      I did not fly to Salt Lake City.  He asked me to and I

18   didn't do that.

19   Q      Okay.  I'm confused.  You testified to that --

20   A      I did.

21   Q      -- in front of the grand jury?

22          Do you remember being asked are you a criminal defense

23   lawyer?

24   A      I said no.

25   Q      A bail bondsman?
```

```
 1   A     No.
 2   Q     Why is he asking you to go to Salt Lake City?  What was
 3   your answer?
 4   A     I have no idea.
 5   Q     Did you go?
 6   A     No.
 7   Q     What else did he ask you to do?
 8   A     He asked me to help secure a criminal defense attorney
 9   for Jacob.
10   Q     Did you agree to do that?
11   A     I did.
12   Q     Did you spend any time or resources?
13   A     I did.
14   Q     Then, did you actually fly to Salt Lake City?
15   A     I said yes.
16   Q     Was that true?
17   A     Yes, it was.
18   Q     Okay.  So here you say -- did you go?  You say no.  And
19   here you say -- did you actually fly?  And you said yes.
20   A     I did.
21   Q     Did you meet with Sally Kingston?
22   A     Yes, I did.
23             THE COURT:  So did you go to Salt Lake City then,
24   or later?
25             THE WITNESS:  Later, Your Honor.
```

```
 1   BY MR. GERAGOS:

 2   Q    How much later?

 3            MR. SULLIVAN:  Your Honor, may we approach?

 4            MR. GERAGOS:  Do we have to approach on a bench

 5   trial?

 6            MR. SULLIVAN:  It's a sensitive issue, Your Honor.

 7            MR. ROLWING:  We don't want the witness to hear

 8   the argument.

 9            THE COURT:  Could I just ask you, Mr. Puls, to go

10   out in the hall for just a moment so I can hear what the

11   lawyers want me to know?

12            THE WITNESS:  Yes.

13            (The witness, Daniel Puls, exited the courtroom.)

14            MR. ROLWING:  Your Honor, my colleague made the

15   objection, but I will say I get how this is the attractive

16   part of Mr. Puls's experience with Baran Korkmaz and Jacob

17   Kingston.  Baran Korkmaz has been charged with ten wire

18   fraud counts for this.  This relates to the Korkmaz

19   indictment.  It doesn't relate to the Termendzhyan

20   forfeiture proceedings in the least.  And we're spending a

21   great deal of time going over these interactions with

22   Mr. Korkmaz in 2018 with Mr. Kingston on this criminal case.

23            I understand I asked the question to clarify his

24   involvement with Kingston and not Termendzhyan at that time

25   period, but where Mr. Geragos is attempting to impeach him,
```

     1   not very effectively in using the right method, by just

     2   putting up his grand jury transcript and reading it into the

     3   record, that's not the way you use a grand jury transcript

     4   to impeach a witness.  That's improper on all counts.

     5         He got very good at doing this during the trial.

     6   He's gone back to the sloppier way that is not proper.  I

     7   understand this is a bench trial, but to just slap a grand

     8   jury transcript --

     9         THE COURT:  Okay.  What is the nature of your

    10   objection under the rules of evidence, please?

    11         MR. ROLWING:  I understand we're not following the

    12   rules.  It's both relevance and improper use of the grand

    13   jury transcript for impeachment, just slapping it up for --

    14         THE COURT:  First of all, you were the one who

    15   said the rules of evidence don't apply in this proceeding.

    16   You're just saying it's improper, but you're not telling me

    17   why or what rule it violates.

    18         MR. ROLWING:  I agree, and I hesitate to object.

    19   My counsel stood up.  Because we're not following the rules

    20   of evidence, we've gone down now 40 minutes of what I would

    21   consider pretty irrelevant testimony.  And we'll go another

    22   hour, it seems, but it's all related to the Korkmaz

    23   defrauding of Kingston in 2018, with this witness, that has

    24   not a lot to do with Mr. Termendzhyan, and the Queen Anne,

    25   and the properties we're seeking to forfeit.

1          We're not -- as I said in my initial housekeeping

2     matters, we're not seeking to impose the $6 million that

3     Mr. Korkmaz defrauded Mr. Kingston of in this year, 2018,

4     with the help of this -- with his attempted help of this

5     witness, even though this witness did not know about it.

6     We're not seeking to impose that $6 million against

7     Mr. Termendzhyan in the money judgment, and that's why all

8     of this is not that relevant to this proceeding.

9          I'm happy to sit here and listen to him to do

10    this, but it's not relevant and it's wasting the Court's

11    time.

12          THE COURT:  Let's hear what Mr. Geragos has to

13    say.

14          MR. GERAGOS:  We had to listen to all of that to

15    get what the rub is.  The rub is is this completely

16    undermines everything Jacob Kingston talked about with the

17    $6 million.  That's why they pulled it off.  They didn't

18    pull it off because, oh, we just want a money judgment.

19          Jacob Kingston, their whole theory on the

20    $6 million was the protection, and the grandpa, and all of

21    this.  This is the real story.  None of this got turned

22    over.  Now we know what the real story was.  The reason they

23    took the $6 million off is because they know it directly

24    undercuts what they presented to the jury in this case.

25          I will make the representation to the Court, I did

1    not think it was a sloppy way of doing impeachment.  In

2    fact, I've had a judge call that the classical way of

3    impeachment, which is did you testify?  Yes, here it is.

4    And I'm doing it because there's no jury.  I put it on the

5    Elmo, and I'm I thought saving time.

6            But the idea that it's marginally relevant, I beg

7    to differ.  I'm not going to get into name-calling, but this

8    is all exculpatory.  This puts a whole new cast on the idea

9    of they want to find a nexus.  The Court has already made

10   some distinctions between Baran and Mr. Termendzhyan.  And I

11   don't mean to just call him by the name, but I've said it

12   before.  The Court has already made some distinctions in the

13   trial.  When the Court hears the rest of what was going on

14   here, I submit the Court is going to make some further

15   distinctions, and also maybe have some questions for the

16   government as to what they knew and when they knew it.

17           MR. ROLWING:  If I can respond, Your Honor?

18           The reason why we are not imposing -- seeking to

19   impose the $6 million against Levon Termendzhyan is

20   because -- two reasons.  We did not convince the Court in

21   our submission that Mr. Termendzhyan was sufficiently

22   involved in this conduct in 2018, that the Court admitted

23   Mr. Korkmaz's text messages about the grandpa as

24   co-conspirator admissions.  So those do not come into the

25   trial.  We did not think it worth it to try and prove

1   Mr. Termendzhyan's involvement in this $6 million and renew

2   that argument.  We can.

3             We do think Mr. Termendzhyan was involved in this

4   $6 million defrauding of Kingston in 2018.  We don't have

5   the text messages between Mr. Termendzhyan and Mr. Korkmaz,

6   but we have the text messages between Mr. Termendzhyan and

7   Mr. Kingston and Korkmaz and Mr. Kingston all throughout

8   2018 that indicate that they're both trying to suck money

9   from Kingston at the same time.

10            And ironically, just coincidentally, Mr. Korkmaz

11  is using the same shtick that Mr. Termendzhyan has used for

12  years to suck all this money out of Kingston, and he's

13  protecting Kingston from prosecution and investigation,

14  which was false.  Korkmaz is doing the same in 2018, to suck

15  six million more out him.

16            And who is Mr. Korkmaz in communication with about

17  all this money and all these assets?  The defendant.  We

18  don't need to go down this path and prove it all for that $6

19  million because it's a drop in the bucket of how much they

20  stole from the government and how much we're going to seek

21  to impose in the money judgment against this defendant.

22  That's the strategical decision we made, to not impose this

23  six million against Mr. Termendzhyan.

24            THE COURT:  All right.  I'm going to overrule the

25  objection and allow you to continue with your examination,

```
 1   Mr. Geragos.
 2               MR. GERAGOS:  Thank you, Your Honor.
 3               (The witness, Daniel Puls, returned to the
 4   courtroom.)
 5               THE COURT:  Thank you, Mr. Puls.
 6               THE WITNESS:  Thank you, Your Honor.
 7               THE COURT:  You may proceed, Mr. Geragos.
 8               MR. GERAGOS:  Thank you.
 9   BY MR. GERAGOS:
10   Q    Mr. Puls, I think where we left off, the Court had
11   asked you a question and then I followed up with it.  How
12   much later did you go to Salt Lake City?
13   A    I don't recall, but within a couple of weeks.
14        I mean it's a matter of record.  I have plane tickets
15   and so forth, but within a couple of weeks.
16   Q    And you met with Sally Kingston, correct?
17   A    I did.
18   Q    Now you were asked did you extract yourself from this
19   process?  Do you remember that?
20        (Court reporter did not hear an answer and the question
21   was reasked by Mr. Geragos.)
22   Q    Did you extract yourself from this process of being
23   kind of Baran Korkmaz -- I mean is it fair to say you were
24   Baran Korkmaz's legal liaison?
25   A    Yeah.  You know, I was coordinating this.  And then at
```

     1    some point I just said this was just too much, I was in over

     2    my head, and I stopped.

     3    Q    Well, you didn't extract yourself in 2018, did you?

     4    A    I don't recall.

     5    Q    Let me show you defendant's next in order.  I'm going

     6    to assume that you've seen this before.

     7         You turned this over to the government, didn't you?

     8    A    Yes, I did.

     9    Q    Defendant's next in order, G.

    10         This is a new matter, is that correct, with Holland &

    11    Knight.  That's a different law firm than the ReedSmith,

    12    correct?

    13    A    Let me apologize to the Court and to you, Mr. Geragos.

    14    This was the matter that I was initially involved with,

    15    finding a civil -- so I was incorrect when I stated this

    16    other company.  This was the company that --

    17    Q    Yes, because you see what's here, right?

    18    A    Yes.

    19    Q    This is the name of the person, the lawyer that you

    20    said you met with in New York regarding LifeTree, correct?

    21    A    And I was incorrect.

    22    Q    Okay.  Because this is a completely different law firm,

    23    right?

    24    A    It is.  And if you'd like, I can explain that.

    25    Q    We're going to go through it because I want to make

 1   sure that we get this correct.

 2        You just had a bunch of testimony.  We spent 20 minutes

 3   on testimony.  It appears it was all incorrect, is that

 4   right, in terms of names, and matters, and things of that

 5   nature?

 6   A    The name of the company was incorrect.

 7   Q    When you say the company, you're talking about the law

 8   firm?

 9   A    Yes.

10   Q    Okay.  Isn't it true that Mr. Siembieda left ReedSmith

11   and went to Holland & Knight during the year 2018?

12   A    He did, yes.

13   Q    Okay.  So the stuff you testified to before was

14   actually correct.  It wasn't incorrect.  The LifeTree,

15   ReedSmith, seeing the bills with Mr. Siembieda, that was

16   correct.  You weren't mistaken.

17   A    Well, the name of the company that was in that matter I

18   think was incorrect, but Mr. Siembieda was with ReedSmith,

19   and then moved over to the Holland & Knight firm, and then

20   moved this case with him.

21   Q    Okay.  Well, this case, you see here, is a case

22   involving a different company, right?

23        Do you see where it says regarding?

24   A    I do, yes.

25   Q    Okay.  That's not LifeTree, is it?

1  A     Yes, it's not.

2  Q     It's not LifeTree.  Okay.

3        And specifically -- where's the WhatsApp?

4        You were giving updates on this case, correct?

5        By the way, this is November of 2018.  August,

6  September, October, November, 3 months after the arrest,

7  we've now got yet another matter.  We've dealt with

8  LifeTree.  You've at least made an attempt on the criminal

9  defense case.  And now you're dealing yet with another case

10 down in -- do you know where that case was?

11 A    I don't.  This was all about payment.  The law firm

12 wanted to get paid.  This was what the whole matter was.

13 They were not getting payment and they wanted to have their

14 fees paid.  So they didn't expect that payment to come from

15 me and they didn't ask me to pay it, but they were trying to

16 get their payment for their fees.

17 Q    Okay.  That's your same position, that you're not

18 making -- you're not a liaison at that point, or you are?

19 A    Well, not -- I mean not in any formal way.  I was

20 just -- you know, I had connected these guys to Baran and he

21 wasn't making the payments, and I felt, you know,

22 embarrassed by that and I was trying to just facilitate to

23 get these fees paid, if that helps.

24 Q    Didn't you have -- I'll show you another WhatsApp.

25      Baran, I just now received this.  This would have been

1    what date?

2    A    That would have been 5-18-18.

3    Q    This case is pending in Harris County, Texas, which is

4    a dangerous and plaintiff-friendly jurisdiction.  Do you see

5    that?

6    A    Yeah.

7    Q    Plaintiffs are seeking 350 million --

8         MR. GERAGOS:  I'm going to mark this, by the way,

9    as Defense H.

10   BY MR. GERAGOS:

11   Q    It would appear that this case is different than the

12   LifeTree case, correct?

13   A    Yes.

14   Q    In fact, look at the case status here in the middle.

15   Washakie recently lost the $25 million judgment in a similar

16   case, LifeTree Trading.  This is off of your WhatsApp,

17   correct?

18   A    Yes.

19   Q    The same plaintiffs' lawyers are involved in the OPGR

20   case, correct?

21   A    Yes.

22   Q    The New York court found the defendants were not

23   credible and changed critical facts over the course of their

24   defense, right?

25   A    Yes.

1    Q    Got it.

2         Now you see where it says plaintiffs are seeking

3    350 million for alleged fraud and breach of contract

4    relating to an unsuccessful biofuel deal, right?

5    A    I see that, yes.

6    Q    Are seeking to pierce the corporate veil, right?  As

7    far as Jacob and Isaiah.

8         Does this refresh your recollection as to what was

9    going on here, that there was a LifeTree case, that there

10   was this biofuel $350 million case?  Does that refresh your

11   recollection as to what was going on?

12   A    Yes.

13   Q    Now as late as November, they were still sending you

14   overnight mail.

15             MR. GERAGOS:  And, Your Honor, if I may approach?

16   BY MR. GERAGOS:

17   Q    It looks like Defendant's G is -- I'm just guessing --

18   about 50 pages.  Just thumb through it and tell me if you

19   remember seeing this.

20   A    Yeah.

21   Q    Okay.  It's about a 50 -- I haven't counted it.  I'll

22   do it at the break.

23             MR. ROLWING:  What is it, Mark?

24             MR. GERAGOS:  The November 8, 2018.

25   //

```
 1   BY MR. GERAGOS:

 2   Q    At any point does Baran tell you -- at some point, to

 3   have some kind of -- I think one time he said don't discuss

 4   something with Jacob, that he was paying the fees, right?

 5   A    Yeah.  That's my recollection.

 6   Q    Was there something about -- I have a memory of,

 7   looking at your file, that there was something about also

 8   telling you to be CIA related.  Do you remember this?

 9   A    That was -- yes.

10   Q    Okay.  So take me back, because you told the government

11   this, didn't you -- about this?

12   A    Well, they asked me about that and I answered their

13   questions.

14   Q    Okay.  When I was asking you before, don't go into that

15   other matter when you're talking to Jacob -- do you remember

16   I just asked you that before the break?

17   A    Right.

18   Q    And you said I had no idea what they meant, right?

19   A    Right.

20   Q    And then when you and Jacob and Baran went to dinner --

21   you remember that?

22   A    I do.

23   Q    What you characterized as a short dinner, and he told

24   you to say what -- Baran told you to say what?

25   A    Well, he wrote me some confusing text messages, that I
```

1   really didn't understand, about telling him that I was an

2   associate of Graham Fuller, and so forth.

3   Q    Okay.  And he wanted you to tell Jacob that you were an

4   associate of a person who was believed to be CIA; is that

5   right?

6   A    That was my understanding.  I mean not at the time, but

7   after I looked at those emails and -- I mean at the time it

8   was just confusing.  It looked like, you know, gibberish to

9   me really.

10  Q    And that Baran was trying to make it look like you were

11  connected and had a CIA connection; is that right?

12  A    Yeah, and he seemed -- Yes.

13  Q    Okay.  I'm not saying you do.

14       Do you have a CIA connection?  You couldn't tell me.

15  You'd have to kill me if you told me, right?  So there's no

16  way to get an answer to that question.

17  A    I do not have a CIA connection.

18  Q    Okay.  There are many people who believe that if you're

19  connected with a think tank in Washington, D.C., that's

20  usually a cover for CIA; isn't that correct?

21  A    That is correct.

22  Q    And that's well known that when CIA operatives move out

23  of the field, they go and work at think tanks, like the

24  Atlantic Council, or the EastWest Institute, or things of

25  that sort, right?

1   A    That's correct.

2   Q    In fact, Graham Fuller, who was invoked in this case,

3   when interviewed said something about he hadn't been in

4   Istanbul in years.  You were aware that that was the case,

5   right?

6   A    I was not aware of that.

7   Q    Did you know that there was a connection between --

8   you've mentioned Nancy -- did you ever hear of Nancy Miller?

9   A    Nancy, I met her once or twice, yes.

10  Q    Who was she?

11  A    She was the -- she's the late wife of the former CIA

12  Director Woolsey, Jim Woolsey.

13  Q    And she's now passed away, unfortunately, correct?

14  A    Yes.

15  Q    And you knew that Jim Woolsey also traveled to Turkey

16  and met with Jacob Kingston and Baran Korkmaz, correct?

17  A    I've come to know that.  At the time that he did that,

18  I didn't know that.

19  Q    Did you know that Baran Korkmaz met with Woolsey at the

20  Peninsula, the same hotel?

21  A    Yes.

22  Q    We're talking the ex-CIA director, correct?

23  A    Yes.

24  Q    His wife was alive at the time, correct?

25  A    Yes.

1  Q    And met at the Peninsula Hotel with Baran Korkmaz?

2  A    I didn't know it at the time, but I've heard that

3  through this process.

4  Q    And you knew that Woolsey -- did you know about a

5  pastor who was kidnapped or held hostage, for lack of a

6  better term, in Turkey?

7  A    I did.

8  Q    Did you have any involvement in that?

9  A    None.

10  Q    Did you talk to Baran Korkmaz about that?

11  A    He wrote some email -- one or two text messages, I

12  believe, you know, that weren't really clear what he was

13  actually conveying.

14  Q    He told you at one point he was --

15           (Zoom feedback)

16           MR. GERAGOS:  It's a brave new world is all I've

17  got to say.  I'm glad my 40 years is behind me.

18  BY MR. GERAGOS:

19  Q    I'm not going to belabor it, but Baran Korkmaz was

20  taking credit for the release of the pastor -- it starts

21  with a B -- from Turkey, correct?

22  A    I don't know.

23  Q    He never talked to you about that, about being an

24  intermediary and working with the CIA and getting that done?

25  A    He never talked to me about it.

1    I'm trying to follow your directions now more clearly.

2  He never talked to me about it.

3  Q    You learned later, correct?

4  A    I learned later.

5  Q    You also learned later that part of the reason that he

6  wanted to switch the $20 million from your particular

7  endeavor, if you will, was because he was telling people

8  that he was taking CIA money and he was redirecting it to

9  Syria on behalf of the Kurds, correct?

10 A    I never heard that.

11 Q    Well, part of what you were doing was to help the

12 Kurds, correct?

13    Mr. Rolwing had asked you about what your initiative

14 was, right?

15 A    I've worked for the Kurdistan Regional Government for

16 years helping with emergency response and with humanitarian

17 affairs.

18 Q    Right.  And you have said in Kurdistan -- you testified

19 to this.  You said in Kurdistan, there have been as many as

20 two million people that have sought refuge there, right?

21 A    Yes.

22 Q    You were asked about this in the grand jury, correct?

23 A    Correct.

24 Q    They live in camps that are interspersed through the

25 community, right?

1    A    Correct.

2    Q    And you said I have worked with the KRG, the Kurdistan

3    Regional Government, right?

4    A    Yes, I did.

5    Q    And you say you worked with the LDS Church here in

6    Utah, correct, to partner on projects?

7    A    Yes.

8    Q    Now in real time -- by the way, Baran Korkmaz is

9    Kurdish, correct?

10   A    He's Turkish and he's from a Kurdish family based in

11   eastern Turkey.

12   Q    And for context here, so the record is clear, there is

13   a longstanding animosity, if you will, especially in the

14   present Erdogan administration, between the Kurdish

15   community and the Turks, correct?

16   A    Absolutely.

17   Q    And at the time that this was going on and he's making

18   the $20 million pledge, at that time the U.S. government was

19   actively embroiled in the Syrian conflict, correct?

20   A    Yes.

21   Q    And the ally for the U.S. were the Kurds, correct?

22   A    Yes.

23   Q    On the ground in Syria?

24   A    The Kurdistan Regional Government, because the Kurds is

25   an ethnic group, so --

1    Q    But what I'm telling you is they were our allies,

2    correct?

3    A    They were.

4    Q    That's who we were fighting on behalf of, correct, or

5    next to?

6    A    The Peshmerga, yes.

7    Q    Yes, the Peshmerga, right.  In fact, when we pulled

8    out, we kind of left them high and dry, correct?

9    A    Yeah.  Well, that's a -- yeah, uh-huh.

10   Q    Now we have Baran Korkmaz pledging these large amounts

11   of money, we have large amounts of money coming from the

12   U.S. that you didn't know about until after the fact,

13   correct?

14   A    I don't know about it now.  I don't know exactly what

15   money you're talking about.

16   Q    There was a supposed fraud at the IRS, right?  You read

17   the indictment in real time.  You were actively seeking

18   criminal defense lawyers, correct, at one point?

19   A    Yes.

20   Q    All that's right.  I'm not characterizing anything.

21        You know that there's a $350 million lawsuit down in

22   Texas, correct, for biofuel fraud?

23        Would it surprise you that Baran Korkmaz was a CIA

24   operative?

25   A    It would surprise me if he was a CIA operative.

```
 1   Q    But you knew that the ex-CIA head met with him in the
 2   Peninsula Hotel, the same place you were at coincidentally
 3   with the UN -- the putative or aspiring UN head, right?
 4             MR. ROLWING:  Your Honor, he's already asked that
 5   question.  The witness said he was not aware of that meeting
 6   until after -- through this process.  If Mr. Geragos wants
 7   to tell some story through these questions, it's not through
 8   this witness.
 9             MR. GERAGOS:  I'll make the proffer.  I'm laying a
10   foundation.  Jacob Kingston will bring it home.
11             THE WITNESS:  Please.
12             MR. GERAGOS:  We wait for Her Honor.
13             THE COURT:  You may proceed, but let's --
14             MR. GERAGOS:  I'm going to --
15   BY MR. GERAGOS:
16   Q    Now did you meet with Nancy Miller?
17   A    Once or twice.
18   Q    Where?
19   A    We had a brunch at the Metropolitan Club, and she came
20   on to an event I think at the -- she came to an event at the
21   Relief Internet that we did with the Relief International.
22         And then over the -- you know, earlier I met her once
23   or twice.  I didn't know her well.
24   Q    Didn't you serve as advisor to Minister Krim --
25             (Zoom feedback)
```

1    BY MR. GERAGOS:

2    Q    Did you serve as an advisor to Minister Krim, K-r-i-m,

3    Sinjari, S-i-n-j-a-r-i?

4    A    Yes.  He was the minister of interior and the minister

5    of Peshmerga, the Kurdistan Regional Government, and I

6    served in a consulting capacity to his ministry.

7    Q    And he was also the chief of staff to the president of

8    Kurdistan, correct?

9    A    He is now.  At the time he wasn't.

10   Q    And it's your assertion here that your organization had

11   nothing to do with getting money to the Kurds or the

12   Peshmerga?  That's your testimony here?

13   A    My organization works in humanitarian affairs.  So we

14   sought funds to help refugees living in horrible conditions

15   in Kurdistan.

16   Q    My question is more specific.  Is it your assertion

17   today -- because you hesitated a little bit as if you were

18   thinking about how to answer that.  Did I misread that?

19   A    Well, we also wanted to -- I mean if you want me to

20   explain this, I can.  We also tried to create a funding

21   mechanism through the UN to have a donor conference to help

22   alleviate suffering and save lives in Kurdistan.

23        We went to the Congress and tried to find a sponsor for

24   a -- basically like a proclamation in support of such a

25   donor conference, but we failed to get that done.

```
 1   Q     You anticipated my next question, right?  You
 2   understood why I was asking that, right?
 3   A     I think so, yeah.
 4   Q     Because Congress wouldn't do it, correct?
 5   A     Congress wouldn't -- we got -- for instance, in Marco
 6   Rubio's office, there was some interest, but there were all
 7   sorts of other issues that were more important to Congress.
 8   We just couldn't get traction.
 9   Q     And then after that you got some traction, at least
10   seemingly, with Baran Korkmaz, correct?
11   A     Baran Korkmaz, I don't know what the sequence was,
12   but --
13   Q     It was after, wasn't it?
14         Think about it.
15   A     I don't know.
16   Q     Well, certainly you never got traction from 2016 to
17   2018, correct, in terms of collecting the money from him?
18   A     He never gave any money to support these initiatives.
19   Q     Got it.
20         And do you remember when you went to -- in 2016, and
21   didn't get traction, whether that was before or after the
22   first time that you met Baran Korkmaz?
23   A     It was after I believe, but I don't -- it was after.
24   Q     And --
25   A     I had met him earlier.
```

```
 1   Q    And Congress, no traction.  Next thing you know Baran
 2   says I'll give money.
 3   A    I don't know.  I don't know if there is -- I don't
 4   know.
 5   Q    There's been a sanitized paragraph that's been given to
 6   the defense about Baran Korkmaz -- and when I say sanitized,
 7   apparently it was classified at some point -- that would
 8   seem to directly implicate this area that we're talking
 9   about.  Do you know why that would be classified?
10   A    I have no idea why that would be classified, or what
11   that is all about.
12            MR. GERAGOS:  Could I have one moment, Your Honor?
13            THE COURT:  You can.
14            While you're doing that, did Mr. Korkmaz ever tell
15   you why he wanted to pay Jacob Kingston's legal fees in
16   these civil matters?  Did you understand what the motivation
17   was?
18            THE WITNESS:  I did not.
19            THE COURT:  You never had a conversation with him
20   in which he explained why he was footing the bill?
21            THE WITNESS:  He -- never.
22            THE COURT:  And he never explained to you why he
23   didn't want Jacob Kingston to know he was footing the bill?
24            THE WITNESS:  He did not.
25            THE COURT:  Did you ever have any conversations
```

 1    with Jacob Kingston about who was paying all the bills of

 2    these lawyers that were representing him?

 3            THE WITNESS:  Never.

 4            THE COURT:  Did you find that strange?

 5            THE WITNESS:  I found it very strange.  The whole

 6    thing was strange.

 7            THE COURT:  So why were you doing this?  I'm just

 8    confused.  Why were you off arranging lawyers for Jacob

 9    Kingston at the behest of Baran Korkmaz who didn't honor his

10    pledge?

11            THE WITNESS:  Because it's so hard, Your Honor, to

12    secure funds to help these communities that we try to

13    assist.  There are very few people who even make the kind of

14    promises that he was making.  So we kept holding hope

15    against hope, and it skewed our judgment and it skewed my

16    judgment.  That's the honest answer.

17            THE COURT:  And even after Jacob Kingston was

18    arrested, you continued on?

19            THE WITNESS:  You know, yes.  The answer is yes.

20    BY MR. GERAGOS:

21    Q    Mr. Puls, are you telling me that somebody did a Google

22    search about Levon Termendzhyan who, when they did the

23    Google search, he'd never been convicted except for a

24    misdemeanor.  He'd been acquitted of two other cases.  And I

25    don't know if that's what popped up, I haven't done a Google

1    search, but I know that to be the case.  Do you accept that?

2        And somebody who had been convicted of a misdemeanor

3    caused great alarm.  Is that overstating it?

4    A    I don't recall, you know, what caused alarm.  I know

5    there was great alarm.  It all happened in real time,

6    Mr. Geragos.

7    Q    I understand.  I'm just trying to accurately capture

8    it.

9        And yet you've had a sum total of 90 seconds worth of

10   any kind of involvement with that person over the course of

11   years, correct?  We've established that.

12       Jacob Kingston and Baran Korkmaz are enmeshed in some

13   pretty heavy stuff, right?  Wouldn't you say that's -- and

14   you don't have to Goggle search it, correct?

15   A    Yes.

16   Q    Yet you were still willing to stay the course, so to

17   speak.  In fact, more than stay the course.  I mean some

18   Herculean efforts on your part without getting paid, right?

19   A    Baran repeatedly told me I was going to get paid for

20   the efforts that I made.  But no, he never really made good

21   on any of his promises.

22   Q    But he wants to pay the legal fees for somebody who's

23   accused in a plaintiff's action in May for 350 million on

24   U.S. biofuel.  Can you figure out why Baran Korkmaz would

25   have any interest in paying the legal fees for Jacob

1    Kingston in a $350 million biofuel scam that is filed in

2    Harris County, Texas?  Does that make any sense to you in

3    retrospect?

4    A    It doesn't.

5    Q    Okay.  Does it make any -- in retrospect, does it make

6    any sense to you that Baran Korkmaz would be having you in

7    August, roughly thereabouts, when the arrest takes place,

8    wanting to also pay the legal fees and not tell Jacob?

9    A    He didn't want to pay the legal fees at that time.  He

10   wanted -- he wanted my help to find an attorney.  But then

11   when we found attorneys, some prominent firms, you know, he

12   wouldn't pay the fees.

13   Q    Okay.  And then yet still after he finds an attorney,

14   you then still are getting the invoices and following up

15   with Mr. Siembieda --

16   A    Siembieda, yes.

17   Q    -- as late as November, after there had been countless

18   articles publicly that you could Google, correct?

19   A    Yes.

20   Q    I'm going to read you something.  You tell me if

21   this -- May of 2019, you were still in contact, or still in

22   the mix, correct?

23   A    I believe so, yes.

24   Q    Korkmaz was considering creating an American company to

25   nominally take control of the portion of his business, which

1    provides security and logistics support to U.S. military

2    based in Iraq and Syria, in order to be able to tell his

3    colleagues he was no longer involved in the United States

4    government subcontracting.  Have you ever heard this before?

5    A    Never.

6    Q    Okay.  Did you know that he had a company that was not

7    American that was providing security and logistical support

8    to U.S. military bases in Iraq and Syria?

9    A    I did not.

10   Q    Would that have changed -- if that's U.S. government

11   information, wouldn't that suggest to you that he is

12   connected to the CIA?

13   A    Well, Mr. Geragos, no, because there are many companies

14   that serve in that way.  You know, I don't know.  It's not

15   my expertise, but -- I don't know.

16   Q    Just as I said before, that a lot people suspect that

17   places like the Atlantic Council, EastWest Institute are

18   nothing but CIA infiltrated organizations for people who are

19   no longer there or want cover.  You know that, correct?

20   That's a common perception.

21   A    It's a myth.

22   Q    Right.  And is it a myth that somehow -- did you know,

23   by the way, that the IRS tipped off Mr. Kingston a week

24   before the search warrant was executed?  Did you know that

25   happened?

1    A     I did not know that.

2    Q     Did you know that the IRS was just letting one-page

3    forms trigger hundreds of millions of dollars to go to

4    Mr. Kingston, and then goes to Turkey?  Did you know that?

5    A     I did not know that.

6    Q     And you didn't know that Baran Korkmaz had apparently a

7    company that was providing logistical support, correct?

8    A     I did not know that.

9    Q     In Iraq and Syria.

10         And you didn't know or understand why Mr. Korkmaz was

11   offering to pay Jacob's legal fees but not tell Jacob that,

12   correct?

13   A     Correct.

14   Q     Okay.  And you didn't know why Mr. Korkmaz changed the

15   original $20 million pledge to just wanting to put up

16   infrastructure, right?

17   A     That never changed.  That's what he always wanted to

18   do.

19   Q     Now you testified before that you wanted to put

20   programs in the infrastructure.  Do you remember that?  You

21   wanted teachers, you wanted programs.

22   A     It wasn't what I wanted, Mr. Geragos.  It's what he

23   committed to do with Relief International, what Relief

24   International wanted to do.  It had nothing to do with what

25   I wanted to do.

1    Q    Let's go back to what you told Mr. Rolwing.  You said

2    at some point his mission statement or his desire changed.

3    That's what he told you, right?

4         Do you remember testifying this morning?

5    A    I do remember testifying --

6    Q    I was sitting over there and, unless I'm hallucinating,

7    you said at some point he told you there was a change in

8    what he wanted you to do with the 20 million.

9    A    Well, if you'd like, I can clarify it, but that's not

10   clear --

11   Q    Then what did you testify to this morning?  What was

12   the change?

13   A    He made a commitment to Relief International to provide

14   $20 million to build hard structure.  Then Relief

15   International said, well, we want to use some of the money

16   to do programs, to hire teachers, to hire, you know, health

17   care workers, and so forth.  He didn't want to do that.  So

18   that was part of the reason why the pledge, I think, might

19   have gone south.  In retrospect, I don't think he ever would

20   have paid, but that's just my opinion.

21        But the fact of the matter is he wanted to build stuff

22   only, Relief International wanted to use that money for a

23   different purpose than they originally agreed on, and then

24   that caused Mr. Korkmaz to say that he -- that's my

25   understanding.

1    Q    And maybe I didn't say it artfully.  He wanted to build

2    infrastructure, not build back better like the Biden

3    administration, build infrastructure, right?

4    A    Yes.  Schools, clinics, that kind of thing.

5    Q    Correct.  Your organization --

6    A    I worked -- yeah.

7    Q    Your ex-organization, or whatever you want to call

8    them, they wanted to insert people in that infrastructure or

9    programs.  Is that fair?

10   A    Yes.

11   Q    Okay.  That didn't interest him, correct -- or it

12   soured his pledge, right?

13   A    It soured his pledge, or his pretense for him not to

14   pay, either way.  I don't know.

15   Q    Either way.  Or maybe that wasn't the CIA directive?

16   A    I have no idea.

17   Q    You don't know?

18   A    No.

19   Q    Thank you.

20            MR. GERAGOS:  I have no further questions.

21            THE WITNESS:  Thank you, sir.

22            MR. GERAGOS:  Thank you.

23            THE COURT:  You may redirect, Mr. Rolwing.

24            MR. ROLWING:  Thank you, Your Honor.

25   //

```
 1                      REDIRECT EXAMINATION

 2   BY MR. ROLWING:

 3   Q    Mr. Geragos asked you a number of questions, Mr. Puls.

 4   I'm going to just focus on a few.  I'm going to try to

 5   expedite this.

 6        First of all, he tried to ask a bunch of questions to

 7   make it look like you made up this Bugatti thing last night,

 8   about the Bugatti motors on the Mega yacht.  Do you remember

 9   those questions?

10   A    I do, yes.

11   Q    Did you tell us back in April -- on April 24th, when we

12   interviewed you, before testifying in the grand jury, that

13   Puls recalls the boat that he and Wilson were on was a boat

14   that had two huge outboard motors in a cabin area was the

15   size of a conference room.  The boat was white.  Does that

16   sound familiar?

17   A    Yes.

18   Q    Do you think you mentioned the Bugatti back then?

19   A    I think I do remember that, yes -- I do remember that.

20        Sorry for misstating that earlier.

21   Q    Mr. Geragos asked you a bunch of questions about this

22   LifeTree and then OPGR.  You tried to tell him, when he

23   showed you this G exhibit, that this was the case that you

24   went down to Houston for and helped Baran Korkmaz and Jacob

25   Kingston get counsel to represent them, or Kingston, in the
```

1    OPGR matter.  That's what you tried to tell him, right?

2    A    That's what I tried to tell him, yes.

3    Q    And he kept saying no, it was LifeTree.

4         MR. GERAGOS:  I realize we've got relaxed

5    evidence, but these are just terribly leading.

6         THE COURT:  Well, I think there was some confusion

7    in the prior questioning.  Let's just clear that up and move

8    on.  We don't need to suggest that people were trying to

9    mislead people.

10   BY MR. ROLWING:

11   Q    And I'm not suggesting Mr. Geragos was trying to

12   mislead.  I'm suggesting Mr. Geragos got it wrong in the

13   question and wasn't listening to your answers.

14        Was this the case for which you originally went to

15   Houston in February of 2018, where you sat with Baran

16   Korkmaz and Jacob Kingston at ReedSmith so that they could

17   hire ReedSmith to represent the Kingstons in this OPGR case?

18   A    Yes.

19   Q    And this November 2018 communication, even though it's

20   coming from a different firm, Holland & Knight, it's because

21   the lawyer from ReedSmith went to Holland & Knight, as you

22   testified?

23   A    That's what I was trying to explain, yes.

24   Q    And so there weren't two -- a new civil matter in

25   November of '18 for which you were asked to hire counsel for

1    Kingston, right?

2    A    That was my understanding, yes.

3    Q    That there was a new civil matter?

4    A    No, that there wasn't.  I'm sorry.  That there was not.

5    Q    And it was on this trip to Houston -- and I'm pulling

6    up Defense Exhibit G in November of '18 and Defense

7    Exhibit B, which is the picture of Korkmaz and Kingston in

8    the lobby of ReedSmith as you testified; is that right?

9    A    Yes.

10    Q    It was on this trip that Mr. Korkmaz gave you all these

11    lines in text messages which you called confusing, right?

12    A    Right.

13    Q    Did Mr. Geragos ask you some questions about that?

14    A    Yes.

15    Q    And when you looked at those text messages, was he

16    telling you to make statements to Kingston?

17    A    He was attempting -- in retrospect -- and I've looked

18    at it -- he was trying to script -- he was kind of scripting

19    out what he wanted me to say and project myself, I think.

20    Q    To Kingston?

21    A    To Kingston, yeah.

22    Q    And part of that was that you were --

23            MR. GERAGOS:  Objection, leading.  This is not

24    clearing up anything.  This is trying to rehabilitate by

25    asking legal questions.

```
 1              THE COURT:  Again, the rules of evidence don't
 2   apply, but let's try not to lead.
 3   BY MR. ROLWING:
 4   Q    Who was he asking you to tell Jacob Kingston in all of
 5   those text messages as you were prepared to go to this
 6   meeting, who was he asking you to tell Jacob Kingston you
 7   were working for?
 8   A    He was either telling me -- he was asking me to pretend
 9   to be Graham Fuller or to, you know, lie and say that I
10   worked for Graham Fuller.  It wasn't clear.
11   Q    And you looked up who Graham Fuller was at the time?
12   A    I looked up who he was.  And then I also thought maybe
13   Graham Fuller was going to be at the meeting.  So I looked
14   up his bio, and I sent that to him saying is this the Graham
15   Fuller you're talking about basically.
16   Q    And then he later told you you work for the American
17   State and Fuller?
18   A    Right.
19   Q    Was any of that true?
20   A    None of it's true.  I don't work for Graham Fuller.
21   I've never met Graham Fuller.  I don't work for the American
22   State.  I'm not in the CIA.
23   Q    Do you know why Mr. Korkmaz wanted you to tell Jacob
24   Kingston you were with the CIA?
25   A    I don't know -- I mean he was trying to impress.
```

 1  That's my assumption.

 2  Q    Do you know where Mr. Korkmaz got all this money in

 3  2018 to pay for Jacob Kingston's legal fees?

 4  A    I believe it was from money that --

 5  Q    Do you know?

 6  A    I don't know.  I do not know.

 7  Q    And even the legal fees he agreed to pay, did he pay

 8  them all?

 9  A    My understanding is he never honored the payments.

10  Q    And he agreed to pay you a significant amount of money

11  to help find attorneys, you said?

12  A    He did.

13  Q    Did he pay you?

14  A    He did.

15  Q    Did he pay you?

16  A    No.

17           THE COURT:  Did he pay any attorneys any money

18  ever?

19           THE WITNESS:  I believe he paid some partial

20  payments, but I'm not sure how much were --

21  BY MR. ROLWING:

22  Q    Did he pay any of the pledge or the pledges that he

23  made in '15 and '16?

24  A    No.

25  Q    Did he pay any of the initiative that he had with you

```
 1   for your work for the Syrian and Kurdish --
 2   A     Never.
 3   Q     When he sent you out to help find attorneys for Jacob
 4   Kingston in the criminal matter after they were arrested,
 5   did you find attorneys?
 6   A     We found attorneys.
 7   Q     And they wanted payment, right?
 8   A     They wanted payment.
 9   Q     How much?
10   A     Millions, very significant amounts of money.
11   Q     Did they initially want an installment payment of a
12   certain amount to get started?
13   A     Yes.
14   Q     Approximately how much?
15   A     It was a six-, seven-figure amount.  It was a lot.
16   Q     $250,000?
17   A     250.
18   Q     Would that be surprising?
19   A     No.
20   Q     And did you attempt -- did you ask for Baran Korkmaz to
21   send the 250?
22   A     I informed him that -- I didn't ask him to do it.  I
23   informed him that that's what they were asking for and told
24   him that that would be required for him to --
25   Q     Sir, do you not recall asking him to pay the 250?
```

```
1   A     Yes, I did.

2   Q     And you asked Umut and Anil, his assistants, to have

3   him pay the 250?

4   A     Yes.

5   Q     And he did ever pay that 250?

6   A     No.

7   Q     Did you eventually extract yourself from the

8   involvement in seeking counsel for Jacob Kingston's criminal

9   affairs?

10  A     Absolutely.

11  Q     Mr. Geragos has characterized your interactions with

12  his client, Levon Termendzhyan, as lasting 90 seconds.  Do

13  you remember those questions?

14  A     I do.

15  Q     But you sat at his birthday party.  How long did that

16  take?  How long did that indoor --

17  A     You know, it was a few hours.

18  Q     You were there for hours?

19  A     Yeah.

20  Q     Did you observe how he interacted with Mr. Korkmaz?

21  A     Yes.

22  Q     Did you observe Mr. Korkmaz being the featured event,

23  gifting him this wonderful car from the Bugatti --

24  A     Yes.  I've testified to that.  I've been interviewed

25  about that.  I've shown pictures about that.  I've done
```

1    everything I can to be transparent and honest in this

2    matter.

3    Q    Were you at the birthday party of Jacob Kingston when

4    Mr. Korkmaz gave Kingston a Bugatti?

5    A    No.

6    Q    Now to be clear, when you were asked to get involved in

7    helping Jacob Kingston get criminal defense counsel, did you

8    feel comfortable with that task he asked you to perform?

9    A    I'm sorry.  Can you ask that question again?

10   Q    When he informed you of Jacob Kingston's arrest and

11   asked you to get involved in helping find criminal counsel

12   for Jacob Kingston, did you feel comfortable to do that on

13   your own?

14   A    No.

15   Q    Did you consult with your attorneys about that?

16   A    I did.

17   Q    And did you ask Mr. Korkmaz to pay for your

18   consultation with your attorneys?

19   A    I did.

20   Q    And did he do so?

21   A    He did.

22   Q    He did pay that?

23   A    Yes.

24   Q    And your attorneys were involved with you and the

25   actions you were taking to find counsel for Kingston for a

```
 1   several months' period?

 2   A     Yes.  It was maybe two months.

 3   Q     They ran up some fees?

 4   A     They ran up some fees.

 5   Q     For you?

 6   A     Fees to me, yes.

 7   Q     Which Korkmaz did pay?

 8   A     Yes.

 9   Q     Through you so you could pay your attorneys?

10   A     Yes.

11   Q     So he never paid for Kingston's criminal attorneys, as

12   far as you know?

13   A     As far as I know he never did.

14         MR. ROLWING:  One moment, Your Honor.

15   BY MR. ROLWING:

16   Q     You said in retrospect, regarding Mr. Korkmaz, that you

17   did not think he would ever pay on those pledges.  Why do

18   you say that?

19   A     On which pledges?

20   Q     Any of them.

21   A     Because, you know, history is the best predictor of the

22   future.  He just never came through with anything he said.

23   I mean there are multiple, multiple commitments he made that

24   haven't come up in this proceeding or these interviews where

25   he promised this, promised that, and --
```

1    Q    Do you know if Mr. Korkmaz was in contact with anybody

2    from Lev Termendzhyan's family or his legal defense after

3    the arrest of Mr. Termendzhyan on the same day Mr. Kingston

4    was arrested?

5    A    I do not know that.

6              MR. ROLWING:  No further questions, Your Honor.

7                         RECROSS-EXAMINATION

8    BY MR. GERAGOS:

9    Q    Mr. Puls, at some point were you asked to backdate some

10   invoices?

11   A    He --

12   Q    Who's he?

13   A    Baran Korkmaz had made multiple commitments to us for

14   work we did in 2018, and then throughout, you know, a period

15   of time.  In 2020, he called us and he asked us to date

16   those invoices in 2020.

17   Q    Did you do that?

18   A    I did.

19   Q    So when you dated those invoices in 2020, those weren't

20   correct invoices.  Is that fair?

21   A    Well, they were dated -- you know, he asked us to date

22   them then, but they were invoices for work we had done, for

23   commitments he had made, and we wanted to get paid for the

24   work we did.

25   Q    Who is we?

```
 1   A      My company.

 2   Q      What company is that?

 3   A      PASS.

 4   Q      PASS is what?

 5   A      We're an agency that does humanitarian work and, you

 6   know, for various -- which I testified to earlier.

 7   Q      Okay.  This is the same one that was doing the Kurdish

 8   work, related work?

 9   A      Yes.

10   Q      And you wanted to get paid by Korkmaz for your

11   payments, so you took a $900,000 bill; is that right?

12   A      Yes.

13   Q      And that bill was from a law firm, correct?

14   A      Um --

15   Q      And you split it up into two invoices, 640 for your

16   group, right?

17   A      Yeah -- well, you know, it's a little bit more complex

18   than this, but he had made a number of commitments to us,

19   Mr. Geragos, and he didn't -- we would ask him -- I would

20   ask him are you going to pay us for this work.  He would say

21   yeah, yeah, yeah.  And then he wouldn't come through.  And

22   so it was very confusing.

23   Q      Okay.  But what wasn't confusing is that there was a

24   $900,000 bill, and then you split it up into a bill for 640

25   and a bill for 260, and backdated it; is that right?
```

1    A    I don't recall the specifics, but I mean we provided

2    all those documents and --

3    Q    I didn't ask what you provided.

4    A    He wanted to pay us a fixed fee for legal services for

5    the civil matter and for our fees.  And I told him that the

6    law firm would never agree to that, and there was no way

7    that we could do that because what if the legal fees were

8    more than the amount that he wanted the fixed fee to be.

9    Q    Why don't you just answer this question, please.

10        I've got the PASS invoice, SBK Holdings, right,

11   $640,000.  Do you see that?

12   A    Uh-huh.  (Affirmative)

13   Q    Is that a yes?

14   A    That's a yes.

15   Q    Okay.  The original date was what?

16   A    2018.  10-20, 2018.

17           MR. GERAGOS:  Defendant's next in order is I?

18           MS. SCHAERRER:  Yes.

19   BY MR. GERAGOS:

20   Q    Do you see that bill for PASS?  That's also your

21   company?

22   A    That's my company.

23   Q    This one is for $2,400,000?

24   A    It is.

25   Q    That would be J.

```
 1        By the way, who prepared this one?

 2   A    My finance person and myself.

 3   Q    Do you see where there's the $900,000?

 4   A    Right.

 5   Q    Coordination of legal affairs for Jacob Kingston?

 6   A    I do.

 7   Q    You wrote that, right?

 8   A    Yes.

 9   Q    You were billing 900,000; is that correct?

10   A    Yes.

11   Q    And then you wanted 1.5 million durable humanitarian

12   housing.  That would be that housing we talked about?

13   A    No.  That was a separate project altogether,

14   Mr. Geragos, that we continue to work on actually in

15   Kurdistan.

16   Q    But you were billing Baran Korkmaz for that, correct?

17   A    Yes.  He had agreed to fund that initiative.

18   Q    And you're still working on it today, correct?

19   A    Yes, I am.

20   Q    And then the invoice amount for the 640, PASS, all

21   caps.  And then you see what is Defendant's K.  Do you see

22   where it says to remove 900,000 for legal affairs?

23   A    Uh-huh.  (Affirmative)

24   Q    Is that a yes?

25   A    Yes.
```

1    Q    So basically we've got these three invoices.  Are any

2    of these three the ones that you backdated?

3    A    I don't recall.

4    Q    Let me approach, if I could, just so you can have all

5    three in front of you.  I want to get your best answer.

6         Tell me if any of those were the ones you backdated.

7    A    I don't -- it's just so confusing.  I don't recall.

8    Q    The confusion is -- there is no confusion that you

9    backdated invoices, correct.  You're not confused about

10   that?

11   A    I'm not confused by that.

12   Q    And you're not confused about the fact that when we

13   were asking you questions before about was there an

14   expectation to get paid, you were just there -- in fact, I

15   think Her Honor asked you a bunch of questions about this,

16   didn't she?

17   A    Yeah.

18   Q    Had you forgotten or were you confused in terms of when

19   Her Honor was asking the questions about payment?  Because I

20   don't remember hearing anything about 2.4, or 640, or 900

21   grand, none of that.

22   A    Well, no one asked me about that until now.

23   Q    You don't think the Court was asking you about that?

24   A    I'm sorry.  If I misunderstood, Your Honor, I don't

25   mean any disrespect.  I'm trying to do my very best here.

1    Q    Nobody is suggesting that.  What I'm suggesting is

2    we've spent hours with you here today, correct?

3    A    Yes.

4    Q    Okay.  And do you think we've gotten the truth out of

5    you?

6    A    Yes, I do.

7    Q    You do?

8    A    Yeah.

9    Q    Or only whatever your CIA handlers let you say?

10   A    That's ridiculous, Mr. Geragos.

11   Q    No --

12   A    CIA handlers?

13   Q    I don't want to get into it, sir.

14   A    That's ridiculous.

15        Let me just testify to the Court.  I am not affiliated

16   with the CIA.  I never have been.  I don't coordinate with

17   CIA handlers.  I never have.  And you've accused me of that,

18   just now you just did, and it's untrue.

19   Q    Okay.  And you have no CIA involvement --

20   A    I have no CIA involvement.

21   Q    PASS has no CIA involvement?

22   A    PASS has no CIA involvement.

23   Q    It just so happens out of nowhere that the Classified

24   Information Protection Act is invoked in this case in

25   regards to Baran Korkmaz, and the pastor is involved, and

1    you're doing durable housing, and you have the chief of

2    staff of the present -- who, president of Kurdistan working

3    on behalf of the KPG, and all of this is just a giant

4    coincidence in your mind?

5    A    I can't follow this really.  You know, what you're

6    saying is -- with all respect to the Court, it's ridiculous.

7    Q    Do you think that you billing out -- how much, 900,000

8    for legal services, which didn't come up for the first two

9    and a half hours of your testimony -- I got the impression,

10   correct me if I'm wrong, you were doing this just out of the

11   goodness of your heart so you could get a $20 million pledge

12   for the group.  Isn't that the way you portrayed it this

13   morning?

14   A    I don't know what the question is you're asking.  I'm

15   sorry.  I'm trying to be --

16   Q    I'm sorry.  I don't mean to interrupt.

17        I listened to you for two hours, I listened to the

18   direct examination, I listened to the Court ask you

19   questions, and I don't think any person who has a pulse

20   wouldn't have come away, before Mr. Qassim handed me the

21   bills --

22        MR. ROLWING:  Mr. Geragos's thoughts about this

23   and his description of it are so argumentative --

24        MR. GERAGOS:  You know what, I've got no more

25   questions because this has been a complete waste of three

 1    hours.

 2            THE COURT:  If you have a question, you can ask

 3    it, but let's not make speeches.

 4    BY MR. GERAGOS:

 5    Q    Did you think to answer any questions and say, well,

 6    yeah, I was expecting to get paid for PASS?

 7    A    If I would have been asked that, I would have answered

 8    it clearly.  I expected to get paid for PASS, because

 9    Mr. Korkmaz told me numerous times that he was going to pay

10    us for fees.  We're a consulting company, that's what we do.

11    We work with humanitarian organizations around the world and

12    we have for years.

13    Q    It's your testimony right now that when you were asked

14    questions earlier, that you were never asked as to why you

15    were doing what you were doing?  That's your testimony and

16    you're going to stand by that?

17            Nobody asked you, prior to right now, this minute, when

18    I'm asking you and showed what was marked has Defense J, I,

19    and K, prior to me showing you those three invoices, you

20    don't think you were asked a question in the last three

21    hours that would have been answered by of course I was doing

22    this for pay.  I have a consulting firm.  None of the

23    questions you've been previously asked would have said

24    that -- or had triggered that answer?

25    A    Well, if you're asking me that question now, we do work

1    for fees.  That's what we do.  But we also focus our work on

2    helping very, very fragile communities around the world.

3    Sometimes we get paid, Mr. Geragos.  Sometimes we do not.

4         For instance, in the Kurdistan region, we've worked

5    there since February, and because of the financial crisis in

6    that country, they have not been able to pay our fees.  But

7    we continue the work that we do.

8         Mr. Korkmaz offered to fund an initiative to design a

9    new type of housing for displaced communities, which we did

10   with various partners, Georgia Tech and so forth.  And we've

11   done that work.  It's a major piece of thought leadership

12   and engineering that we've done.

13        So yes, we do our work for fees, but sometimes we get

14   paid and sometimes we don't.  And I'm sorry for, you know,

15   going off like this, but I'm trying to explain something so

16   that you understand.

17   Q    Okay.  What I understand is that you backdated

18   invoices, you billed a $900,000 fee for coordination of

19   legal affairs for Jacob Kingston, and you then sent another

20   bill for 640,000 for coordinating a civil legal matter

21   regarding Jacob Kingston, correct?  Is all that correct?

22   A    Yes.

23   Q    And you backdated the invoices, correct?

24   A    Backdated -- the work had been done previous to 2020,

25   and then he asked us to date them in 2020.

```
 1   Q     Thank you.
 2              MR. GERAGOS:  Nothing further.
 3                      FURTHER REDIRECT EXAMINATION
 4   BY MR. ROLWING:
 5   Q     Do you mean he asked you to date them in 2018?
 6              THE COURT:  When you say he, you're saying --
 7              THE WITNESS:  2018.  I'm sorry.  I got it mixed.
 8   I'm so sorry.
 9   BY MR. ROLWING:
10   Q     Okay.  Let's get back on this, Mr. Puls.
11         He showed you three invoices.  When did Baran Korkmaz
12   call you and ask you to create these invoices?
13   A     In 2020.
14   Q     And he asked you to backdate them to when?
15   A     2018.
16   Q     Do you know why he wanted these invoices backdated to
17   2018?
18   A     At the time he told me that the government -- the U.S.
19   government had asked him to return funds and that he was
20   going to do that, but he had told the U.S. government that
21   there was certain debts, you know, that were due payable,
22   and that he included the commitments he had made to my
23   company in those debts.
24   Q     And so he asked you to make invoices in 2020?
25   A     He asked us to make invoices.
```

```
 1   Q    And did he ask you to give them to anybody?

 2   A    He asked me to give them to his attorneys.

 3   Q    And did he then pay these invoices?

 4   A    No.

 5        THE COURT:  So I'm confused.  You said he didn't

 6   pay those invoices, but you also testified that he paid you

 7   for some of the work you did in coordinating the legal

 8   services.

 9        THE WITNESS:  No.  He only -- Your Honor, when he

10   asked us to help find a lawyer in the criminal matter, I

11   told him that I didn't know how to do that and I would have

12   to have an attorney involved.  So I needed to have some of

13   those legal fees covered, and that's the only time he ever

14   sent us any fees.

15        He sent us three payments.  One I believe was

16   50,000, and then there were two $25,000 payments in

17   successive days.  And we spent about 60,000 or $70,000 for

18   my attorney to help with this matter.  And then there was

19   some other travel, and so forth, that we used the balance

20   for.

21        THE COURT:  So he paid your lawyers for the work

22   they did in helping to find counsel, but he never paid you

23   any consulting fees?

24        THE WITNESS:  Any consulting fees.

25   //
```

```
 1   BY MR. ROLWING:
 2   Q    But throughout 2018, when you were working so
 3   diligently to retain civil counsel and then later criminal
 4   counsel, didn't Mr. Korkmaz promise to pay you as well?
 5   A    He did.
 6   Q    And then only in late 2020, when he called back, did he
 7   raise that again?
 8   A    Yes.
 9        If I may, I don't know if it's appropriate, but just
10   with due respect to Mr. Geragos, you know, this was very
11   confusing.  It was hard to track all of this.
12   Q    Well, he was telling you in 2020 that he wanted to pay
13   you for all this work that you had done in 2018?
14   A    Exactly.
15   Q    But you never had invoiced him for that work, correct?
16   A    No.
17   Q    So he said create an invoice?
18   A    Right.
19   Q    Backdate it to '18 and I'll pay you?
20   A    Exactly.
21   Q    And the Syrian refugee initiative that Mr. Geragos
22   asked you questions about for 1.5 million, had he asked you
23   to do work in furtherance of this Syrian refugee initiative
24   over the years?
25   A    Yes, and I asked him to support that work.
```

1   Q    And he had said he would?

2   A    Right, and we did that work.

3   Q    But he never paid?

4   A    But he never paid.

5   Q    So in 2020, he asked you to put that in an invoice too?

6   A    He did.

7   Q    He gave you the information to put on these invoices?

8   A    Right.

9   Q    And did he give you the date?

10  A    Yes, he gave me the date.

11  Q    And then he told you he was going to pay you?

12  A    He did.  And he also sent me this very strange little

13  document out of the blue, which I have disclosed, that

14  basically said that he committed to pay this, and it was

15  signed by him and this other guy, Jacob Kingston.

16  Q    And did you know what any of that meant?

17       THE COURT:  Did he tell you how much to bill or

18  did you come up with the numbers?

19       THE WITNESS:  Well, he had agreed to amounts, and

20  then it was like, you know, very confusing.  He was more

21  concerned about the date, Your Honor, of the invoices than

22  the amount.

23  BY MR. ROLWING:

24  Q    And did you go back and forth with him over the course

25  of two or three days to finalize these invoices and the

```
 1   amounts and the dates?

 2   A    I did.

 3   Q    In September of 2020?

 4   A    Yes.

 5   Q    The month before the U.S. contacted you through this

 6   email from Arthur Ewenczyk to say we would like to talk to

 7   you about these?

 8   A    Yes, that's my recollection.

 9   Q    So these are created in September 2020, and all of a

10   sudden the United States government e-mailed you --

11            MR. GERAGOS:  If Mr. Rolwing would like to go

12   under oath, I'm happy to cross-examine him.  This is

13   leading.

14            THE COURT:  It is leading.

15   BY MR. ROLWING:

16   Q    So near or around the time that Arthur Ewenczyk then

17   contacted you to be interviewed about these?

18   A    Yes.

19   Q    Thank you.

20                  FURTHER RECROSS-EXAMINATION

21   BY MR. GERAGOS:

22   Q    Is this the document you just referred to?

23   A    Yes, that's it.

24   Q    Okay.  And this is dated in 2018.  Defense next in

25   order, which is L.
```

```
 1         That's your firm right there, PASS?
 2    A    Yes.
 3    Q    I'm going to show you another document.  Is this from
 4    your WhatsApp?
 5    A    Uh-huh.  (Affirmative)
 6    Q    Is that you, Daniel Puls?
 7    A    Yeah.
 8    Q    Dear Baran, I need your help.
 9         This is dated July 25th of '19?
10    A    It is.
11    Q    And that would be approximately when in this time line?
12         He hasn't paid you anything at this point?
13    A    Anything, right.
14    Q    A large invoice payable to us by our largest client has
15    been delayed.  I need to ask you to consider providing a
16    short-term loan of 100,000.  Our business deal is doing well
17    and growing.  Our income is double what it was at this time
18    last year.  We've just completed renovations for our second
19    floor.  Appreciate your consideration --
20              THE COURT:  We can't see that, Mr. Geragos.  Pull
21    it down.
22              Thank you.
23    BY MR. GERAGOS:
24    Q    Do you see that highlighted?  That's you, correct?
25    A    It is.
```

1   Q    When was that -- I'm going to mark this as N.

2        So you're asking for a loan in July of '19, correct?

3   A    I was.

4   Q    When did you go to Houston?

5   A    How many times -- I've been asked this so many times.

6   Q    I'm sorry.  I don't want to tire you.  This is you

7   purchasing another small office building.  I need a

8   short-term loan of 100,000 in '19?

9   A    Yes.

10  Q    So you asked him twice for $100,000 loans in the 2019

11  year?

12  A    Yes, and he didn't agree to that either time.

13  Q    Okay.  You asked him in March and then you asked him

14  again -- whatever the date was.

15       And this will be N.

16       What did you do with what's been marked as L?

17  A    With this document?

18  Q    Yes.  The one you said was strange.

19  A    I didn't do anything with it.  I mean I just -- he sent

20  it to me and I received it.

21  Q    Prefabricated houses for old yezdi carrying out in Iraq

22  and Syria refugees is on Stone Heat Insulation Industry.

23  Did you ever ask what that meant?

24  A    I wanted to ask him, but I never, you know, was given

25  that opportunity or had that opportunity.  I had no idea

1    what stone heat was.  This isn't even the name of our

2    project.  It was just complete confusion.

3    Q    Is that date accurate, 6-24-18?

4    A    I don't know what that -- I mean I don't know.

5    Q    You know when it was in your WhatsApp, right?

6         This was extracted from your WhatsApp?

7    A    I believe so, yes.

8    Q    Okay.  Is it accurate that on 6-24-18 you said I never

9    had an opportunity to ask him?  Isn't that what you just

10   testified to?

11   A    Yes.

12   Q    Don't you have countless requests and conversations

13   with him and Umut since 6-24 of '18?

14   A    Yes.

15   Q    To the point where you asked him, a month apart, what

16   loan is what, correct -- or you need a loan, right?

17   A    Yes.

18   Q    But you never said what are you talking about, why are

19   you sending me something about Iraq and Syria refugees on

20   Stone Heat Insulation Industry?  That didn't cause you to

21   say why are you sending me this, what does this mean?

22   A    I just never was -- I never had an opportunity to do

23   that.

24   Q    You never had an opportunity.  So all of the -- how

25   many pages of WhatsApp conversations do you think you had

1    after 2018?

2    A    Many.

3    Q    Countless pages?

4    A    I don't think it's countless, but it's many.

5    Q    And this document specifically mentions PASS and the

6    law firms, which you subsequently enter into a joint

7    engagement, correct, with the law firms?  PASS, you as a

8    representative of PASS, and Baran, right?

9    A    Well, what I've tried to explain is that I wasn't in a

10   joint engagement with him and the law firms.  I was serving

11   as an agent to sign a letter of engagement.  That's all I --

12   I mean I never was liable for any of the fees.  There was

13   never any expectation that I would pay the fees.  And I made

14   that clear to everyone involved.

15   Q    Did you ever bring this document to the attention of

16   any of the law firms or the people during the year that you

17   were getting the invoices and everything else while you were

18   trying to collect money?

19   A    I don't recall, but -- I don't recall that.

20   Q    In 2020, when he asked you to split up these invoices,

21   did you ask him wait a second, what was this thing you said?

22   A    I did, and he didn't answer my question.

23   Q    Okay.  A minute ago you told me -- or told the Court

24   that you never had the opportunity.  Is that different than

25   your answer right now?

```
 1        Let the record reflect the witness is just shaking his
 2   head.
 3   A    I'm trying to, you know, do my best here.
 4                    FURTHER REDIRECT EXAMINATION
 5   BY MR. ROLWING:
 6   Q    Mr. Puls --
 7            MR. ROLWING:  If I might, Your Honor?
 8   BY MR. ROLWING:
 9   Q    Who were the parties that were jointly engaged with the
10   law firms Holland & Knight and ReedSmith?  Was it Dan Puls
11   and PASS?
12   A    No, it was not.
13   Q    Who?
14   A    It was -- the matter was between Baran Korkmaz and the
15   law firms, and Jacob Kingston.
16   Q    And you signed a power of attorney to act on Baran
17   Korkmaz's behalf for the purpose of signing the engagement
18   letters, is what you're asked to do?
19   A    My understanding was my involvement was limited to just
20   simply signing an engagement letter on his behalf.  And I
21   had no authority.  I had no delegation of authority.  I
22   didn't direct the law firm in any way.
23   Q    And when Mr. Korkmaz gave you this document, whenever
24   he did, that said he will be liable to pay all the
25   litigation expenses with regard to the action filed against
```

 1    his company before the U.S. and enforcement proceedings in

 2    Turkey to consulting company, namely PASS and the law firms,

 3    did you know where Mr. Korkmaz got all the money to pay

 4    these litigation expenses?

 5    A     No.

 6    Q     And did you know where he got any of the money to send

 7    to Stone for products liability with regard to prefabricated

 8    houses?

 9    A     No.

10    Q     Were you part of the conversation between he and Jacob

11    Kingston that led to the signing of this document?

12    A     No.

13    Q     You don't know anything about this document and the

14    context thereof?

15    A     I do not.

16    Q     Thank you.

17                    FURTHER RECROSS-EXAMINATION

18    BY MR. GERAGOS:

19    Q     I've referred to the voluminous WhatsApp messages.  Can

20    you just flip through this and tell me if those are what I

21    was referring to, or what you thought I was referring to

22    when you answered it yes?

23    A     Yes, it was.  Thank you.

24    Q     Okay.

25              MR. GERAGOS:  I'm going to mark this next in

```
 1   order, which is O.
 2   BY MR. GERAGOS:
 3   Q    The very last one that I see, is it fair to say that
 4   you were communicating through December, sending photos, all
 5   the way up until January of this year?  Is that correct?
 6   A    Yes.
 7   Q    And have you had any other contact since January of
 8   this year?
 9   A    No.
10   Q    Okay.  And anything else significant happen in January
11   of this year in regards to Korkmaz and you?
12   A    Not that I can think of.
13   Q    Thank you.
14             MR. GERAGOS:  May I have one moment, Your Honor?
15             THE COURT:  You may.
16             MR. GERAGOS:  Thank you.  I have no further
17   questions.
18             MR. ROLWING:  Neither does the government,
19   Your Honor.
20             THE COURT:  May this witness be excused?
21             MR. ROLWING:  Yes.
22             THE COURT:  Thank you, Mr. Puls.  You may step
23   down and I guess return home.
24             THE WITNESS:  Thank you, Your Honor.
25             THE COURT:  Mr. Geragos and Mr. Rolwing, it's
```

1    about 20 after 12:00.  Would now be a convenient time to

2    break for lunch?

3            MR. ROLWING:  I think so, Your Honor.

4            THE COURT:  What's on tap for the afternoon?

5            MR. ROLWING:  We have a witness via Zoom who's

6    been waiting, we're going to go with next.  Then we have two

7    live witnesses that we hope we can get to.  Nazmi is next,

8    and then Dan McDyre is here, and Isaiah Kingston, who is

9    local.  So if we can't get to Isaiah, we can bring him back

10   tomorrow.  And we have two witnesses via Zoom that we can

11   also do tomorrow if we don't get to that.

12           THE COURT:  What time should we return?

13           MR. GERAGOS:  Should we come back at 1:30?

14           THE COURT:  Let's try for 1:15.

15           MR. GERAGOS:  That's even better.  Thank you.

16           MR. ROLWING:  Thank you, Your Honor.

17           (Recess)

18           THE COURT:  You may call your next witness,

19   Mr. Rolwing.

20           MR. ROLWING:  Thank you.  The government calls Dan

21   McDyre.

22                   DANIEL BRIAN McDYRE,

23            Having been duly sworn, was examined

24                and testified as follows:

25           THE CLERK:  If you could state your name and spell

1    it for the record, please.

2             THE WITNESS:  Daniel Brian McDyre.  D-a-n-i-e-l,

3    B-r-i-a-n, M-c-D-y-r-e.

4                          DIRECT EXAMINATION

5    BY MR. ROLWING:

6    Q    Good afternoon, Mr. McDyre.  Welcome back.

7    A    Thank you, sir.

8    Q    You testified before this Court in the trial in early

9    2020 so I won't bore the Court with your background and your

10   impressive resume.

11            I asked you to come testify -- or we subpoenaed you to

12   come testify.  You were served a subpoena to appear,

13   correct?

14   A    Yes, sir, I was.

15   Q    We subpoenaed you to appear to testify for just a few

16   reasons.  First, do you know where the Bugatti is?

17   A    I do not.

18   Q    Have you seen it since Levon was arrested in August of

19   2018?

20   A    Not knowingly.  It could hit me and I wouldn't know.

21   Q    And were you at Levon's birthday party in 2016, his

22   50th birthday party?

23   A    Yes, sir, I was.

24   Q    Do you remember any gifts being provided by Sezgin

25   Baran Korkmaz to Mr. Termendzhyan at that party?

1  A    My recollection is there was a Bugatti gift.

2  Q    Different than the Bugatti that Jacob Kingston bought

3  him for his birthday back in 2013?

4  A    Yes, sir.  It was newer.

5  Q    Okay.  At some point in that year, 2016, were you ever

6  asked by Mr. Termendzhyan to do anything as it related to an

7  airline investment?

8  A    I have a question first.  Did you say 2013?

9  Q    I said '16.

10  A    I'm sorry.

11  Q    That's the year of his 50th birthday party?

12  A    Yes.

13  Q    August 13th, 2016 was his 50th birthday party.

14      At some point in that year were you ever asked to do

15  anything related to an investment in an airline?

16  A    I was asked by Mr. Termendzhyan what I thought about

17  acquiring an airline.

18  Q    Who was in this conversation?

19  A    At that time it was just the two of us.

20  Q    And were you provided any other details of where this

21  airline might be?

22  A    No.

23  Q    Did you look into and research anything about an

24  airline?

25  A    Yes, sir, I did.

1    Q    And what did you do?

2    A    Well, I tried to find out where the interest lied on an

3    airline.  That's a very expensive proposition and takes a

4    lot of talent, a specialist.

5         As to Mr. Termendzhyan, was he looking at something in

6    the U.S. or something international.  And at that time he

7    was looking at something perhaps in Turkey.

8    Q    And were you aware of an airline that was being

9    marketed for sale in Turkey in that time period?

10   A    I was not at the time, but I did become aware of it,

11   yes, sir.

12   Q    What was the name of it?

13   A    It's Borajet, B-o-r-a-j-e-t.

14   Q    And did you ever report back to Mr. Termendzhyan on

15   what your position or opinion was on his -- first of all,

16   who did you understand him to be considering buying an

17   airline with?

18   A    Well, I need to take a step backwards, if you will.

19   Q    Okay.

20   A    I did not become aware of the fact that the company

21   purchased a corporate jet until September of 2016.  And that

22   turned out to be accurate, but we also lost the airplane due

23   to some fraudulent activities.

24   Q    Well, I'm asking specifically when he asked you what do

25   you think of an airline, did you ask him whether it was

1    going to be domestic or international, and who he was

2    getting in business with?

3    A    Yes, sir.  Eventually I did get around to those

4    questions.

5    Q    And what did Mr. Termendzhyan respond?

6    A    His interest was going to be overseas, and in

7    particular in Turkey.

8    Q    And with whom?

9    A    With Borajet.

10   Q    And who would he be -- were you ever told who he was

11   considering buying this airline with?

12   A    No.

13   Q    Okay.  Did you eventually report back to him your

14   opinion?

15   A    Yes, sir, I did.

16   Q    And what was your opinion that you reported to him?

17   A    The interest in particular, in a Turkey area, was a

18   company called Borajet, which was formed in 2008.  At that

19   time it had no aircraft.  It had a founder, who was a

20   Turkish businessman, and he was in the U.S.  And it was

21   difficult to get information.  It was not readily available,

22   except I was able to go and Google it and I got some

23   information about passengers not being satisfied with the

24   airplane and with the airline.

25   Q    And so what did you report back to Mr. Termendzhyan?

1    A    Well, I essentially said -- and this is in poor

2    taste -- that if you want to make $10 million in the airline

3    business this year, you better start with a hundred million.

4    And unfortunately that's more true than it is not.

5    Q    Did you understand -- were you ever aware that

6    Mr. Termendzhyan was investing in Turkey with

7    Mr. Korkmaz?

8    A    Not on an airline, no, I was not.

9    Q    Generally, in any other investments?

10   A    Yes.  They are very close businessmen.

11   Q    Do you know what kind of investments they made in

12   Turkey with Mr. Korkmaz other than the airline?  I'm talking

13   about generally.

14   A    Well, there were some acquisitions on the part of

15   Mr. Termendzhyan on some businesses in Turkey.  In fact,

16   there were a total of eight of them, the names of which I

17   provided the Court before.

18   Q    That's those eight businesses under the umbrella of SBK

19   Holding AS?

20   A    Yes, sir.

21   Q    And were you ever aware that SBK Holding AS did, in

22   fact, acquire Borajet Airlines on December 29th, 2016, later

23   that year?

24   A    Okay.  Would you say that date again?

25   Q    December 29th, 2016.

1    A    '16.  I'm aware of the papers.  It was acquired by

2    Baran Korkmaz on January 1st, 2017.

3    Q    Around there, a couple days apart?

4    A    Yes, sir.

5    Q    By Baran Korkmaz and SBK Holding AS?

6    A    I assume that.  I did not see the paperwork.

7    Q    Was this after you had already advised Mr. Termendzhyan

8    that it would not be a smart financial investment?

9    A    That was my belief.

10   Q    Did you and Mr. Termendzhyan ever talk about Borajet

11   Airlines after that?

12   A    We had one other conversation, and I think that was it,

13   on Borajet, and I reiterated that I was concerned that we

14   were investing in something that we didn't have knowledge

15   about and how expensive it is.  And the fact that this

16   particular airline has, in my belief, with my background in

17   maintenance -- on aviation maintenance, that this aircraft

18   company, or airline, was headed toward maintenance problems.

19   Q    And what was Mr. Termendzhyan's response?

20   A    Essentially he did not want to talk about it anymore.

21   Q    And you do have a great deal of experience in the

22   airline industry, right?

23   A    Not so much in the airline, but --

24   Q    Aviation.

25   A    I have 50 years experience in aviation.

1   Q     Thank you.

2         MR. ROLWING:  No further questions.

3                       CROSS-EXAMINATION

4   BY MR. GERAGOS:

5   Q     Good afternoon, Mr. McDyre.

6   A     Mr. Geragos, good to see you again.

7   Q     Good to see you as well.

8         I'll do the same order that Mr. Rolwing just did.

9         The party -- the 50th birthday party for Mr. --

10        (Zoom feedback)

11        THE COURT:  Could I just ask everyone who is

12  listening on Zoom to please mute your microphones.  Someone

13  is not muted and we're hearing feedback.

14        Thank you.

15  BY MR. GERAGOS:

16  Q     Mr. McDyre, the 50th birthday party, the Bugatti --

17  A     Yes, sir.

18  Q     -- you don't remember, as you sit here, whether the car

19  was there or it was a video, correct?

20  A     Well, there was a video for sure.  I'm not sure about

21  the car.

22  Q     That's what I meant.  For sure there was a video.  You

23  don't know if there was a car?

24  A     Correct.

25  Q     Got it.

1          Then on Borajet, you had mentioned, in response to

2     Mr. Rolwing's questioning, one jet that you said was

3     fraudulently transferred.  Do you remember that?

4     A    Yes, I do.

5     Q    That fraud transfer of a jet, what you're referring to

6     is Edgar Sargsyan, correct?

7     A    Yes.

8     Q    And I tried to find the date, and I couldn't.  You

9     actually filed a lien with the FAA on that jet when Edgar

10    Sargsyan tried to --

11              (Zoom Feedback)

12    BY MR. GERAGOS:

13    Q    You actually filed a lien when Edgar Sargsyan changed a

14    tail number and serial, whatever it was, with the FAA,

15    correct?

16    A    That is correct.  He could not change the serial, which

17    is 1315, but he changed the tail number.

18    Q    And by doing that was able to fraudulently refinance

19    the plane, correct?

20    A    Well, it was easier than that in that Mr. Termendzhyan

21    is a representative at the purchase of the airplane.

22    Mr. Termendzhyan sent in excess of $6 million to Oregon for

23    the transaction, and the total price was almost seven

24    million.  The missing million was paid by Mr. --

25    Q    By Mr. Sargsyan?

1  A    That's correct.

2  Q    Got it.

3      And you were just talking about the January --

4  Mr. Rolwing was asking you about --

5          MR. GERAGOS:  I believe December 30th of 2016, for

6  Borajet?

7          MR. ROLWING:  I said 29th.  He said January 1st.

8  BY MR. GERAGOS:

9  Q    Right.  Correct me if I'm wrong.  I think that date was

10  the date you filed the lien for this other jet.  Does that

11  refresh your recollection?

12  A    No, sir.  I've read from a document on Google when the

13  airline was formed and then also when it was purchased.

14  Q    Hold on for one second.  I'm going to have Ms. Qassim

15  look it up.

16      What I'm referencing for you is do you remember filing

17  a lien -- there was a transaction regarding -- you had

18  mentioned 1315, correct?

19  A    Yes, sir.

20  Q    1315, you called it a serial number, and I defer to

21  you.  You know more about this than I do, but that was a

22  Gulfstream IVSP, correct?

23  A    Yes, sir.

24  Q    A Gulfstream IVSP is different than Borajet, correct?

25  A    Absolutely.

1    Q    Okay.  So we're not talking the same thing.  When we

2    say a Gulfstream IVSP, and being defrauded, that refers to a

3    Gulfstream jet that Edgar Sargsyan, as the owner's

4    representative, had fraudulently transferred by changing the

5    tail number, correct?

6    A    Well, he eventually changed the tail number, but that

7    was maybe six months later.  What he did that was

8    fraudulent, rather than putting down Mr. Termendzhyan's

9    company as the owner, he transferred that paperwork with the

10   paperwork going to the FAA in Washington.

11   Q    What I'm asking you, do you remember filing a lien with

12   the FAA?

13   A    I do, yes, sir, and that was in December of 2016.

14   Q    Correct.  December 30th, correct?

15   A    Yes, sir.

16   Q    Got it.

17        That's totally separate than any Borajet issue,

18   correct, as far as you know?

19   A    The corporate jet we're talking about could seat, if

20   the owner wanted to, maybe 12 to 14 people.  The Borajet is

21   a moneymaker, and we're talking about something -- if it's

22   an ATR 72, which was the first plane it acquired, it would

23   hold about 70 people.

24   Q    Correct.  The G-IVSP 1315, which you filed the lien on,

25   it appears to be -- you filed the lien the day or two days

```
 1   before Google told you that Borajet was acquired by SBK; is
 2   that right?
 3   A    In that time frame, yes, sir.
 4   Q    Literally within a day or two, correct?
 5        If your memory is that it was January 1st, and if what
 6   I'm telling you is you filed the lien on December 30th, it
 7   would be within two days, right?
 8   A    Yes.
 9   Q    But literally two business -- one business day if the
10   31st is a holiday; is that correct?
11   A    Correct.
12   Q    Got it.
13        Now did you ever -- or have you seen or had any contact
14   with Korkmaz since Mr. Termendzhyan was arrested?
15   A    No, sir, I have not.
16   Q    And you're not aware of any meetings between -- you
17   work daily with George, his son, correct?
18   A    Absolutely, yes.
19   Q    You haven't seen any contact between those two, have
20   you, Korkmaz and George?
21   A    I have almost daily contact with George but not
22   Mr. Korkmaz.
23   Q    When you were interviewed, you said you have no contact
24   with Korkmaz and you're not aware of any financial
25   transactions with Korkmaz.  Is that what you told them?
```

1    A    Yes.

2    Q    Did you also tell them you're not aware of any meetings

3    between Korkmaz, George, or Grigor, correct?

4    A    Would you repeat that last name?

5    Q    Let me show you.

6         Is it easier if I put it on the screen or easier if I

7    just hand it to you?

8         Read that silently to yourself and see if that

9    refreshes your recollection.

10        Does that refresh your recollection?

11   A    Yes.

12   Q    So is it a fair statement that you're not aware of any

13   meetings between Korkmaz and George or Grigor Termendzhyan;

14   is that correct?

15   A    Well, it's correct if I mean all three of them together

16   in conference.

17   Q    Do you remember any Korkmaz meetings since -- with

18   George or Grigor since Mr. Termendzhyan has been arrested?

19   A    Not that I'm aware of.

20   Q    And you don't recall Mr. Termendzhyan opening SBK

21   Holding AS, right?

22   A    No.  As far as I know, he did not.  It was opened by

23   Mr. Edgar Sargsyan.

24   Q    And do you remember Edgar Sargsyan having dealings with

25   Korkmaz?

1    A    Edgar and Baran having a meeting?

2    Q    Correct, or contact or phone calls.

3    A    I'm not aware of it.  They could have had many, but I

4    was not present at any.

5    Q    And is it your understanding that Edgar not only

6    defrauded the company out of the plane, but also out of tens

7    of millions of dollars?

8    A    That is my belief, and that was a reason for

9    Mr. Korkmaz visiting with Edgar on one of his visits back to

10    California.  This would have been in 2017.

11    Q    To find out what Mr. Sargsyan had done with the money?

12    A    Yes.  At the time we had a miss of about $25 million,

13    fraudulent.  It was no longer in Mr. Termendzhyan's

14    accounts.

15    Q    And Korkmaz came to meet with Mr. Sargsyan to confront

16    him?

17    A    He had a meeting with Edgar.  I do not know what the

18    subject matter was.

19    Q    Sometime in 2017?  Do you remember the date?

20    A    No, sir.  I think the date would have been post October

21    of 2016.  That's when I was taking over some of Edgar's

22    responsibilities.  Mr. Termendzhyan wanted me to find out

23    what's going on with the corporate jet.

24    Q    Is it a fair statement that if you filed the FAA lien

25    on December 30th of 2016, that you would have, as of that

1   date, been aware of or known at that point that Edgar

2   Sargsyan was engaged in theft?

3   A    Yes, from October of 2016 forward.

4   Q    Is when you found it out?

5   A    I did an in-house investigation.

6   Q    Got it.  Thank you.

7          MR. GERAGOS:  I have no further questions.

8          THE COURT:  I have just a couple of questions

9   while Mr. Rolwing is coming up.

10         So do I correctly understand, then, that there was

11  one Bugatti that Jacob Kingston gave to Mr. Dermen in 2013

12  for his birthday?  Were you aware of that?

13         THE WITNESS:  I'm aware that Jacob Kingston did

14  give a Bugatti to Mr. Termendzhyan.  I don't think it was a

15  new one.  I think it was maybe three or four years old.

16         THE COURT:  Okay.  And do you know what year that

17  was gifted to Mr. Dermen?

18         THE WITNESS:  In the 2015, '16 time frame.

19         THE COURT:  All right.  And did you see that

20  Bugatti from time to time, then?  Did Mr. Dermen drive it

21  around or were you aware of its whereabouts?

22         THE WITNESS:  No, ma'am.  I mean I'm sure they

23  drove it around.  I never saw them or witnessed

24  Mr. Termendzhyan in the Bugatti.

25         THE COURT:  All right.  And then with respect to

1   the 2016 Bugatti that was presented to Mr. Dermen at his

2   50th birthday party, did you ever at any time see that

3   vehicle?

4           THE WITNESS:  I saw the vehicle on film.  It was a

5   presentation at the birthday gathering itself.  And I don't

6   think I went out to look at it physically.

7           THE COURT:  Okay.  So was it your understanding,

8   then, that it was outside of the venue where the birthday

9   party was being held?

10          THE WITNESS:  That's my assumption -- it's not my

11  assumption.  That's my belief that that's where the car was.

12          THE COURT:  And what is that belief based on?

13          THE WITNESS:  The fact that we had two live

14  tigers -- or lions, I'm sorry, out there guarding the new

15  car.

16          THE COURT:  Okay.  So based on that, it's your

17  belief that that Bugatti from the 50th birthday party

18  actually made it into Mr. Dermen's possession in California?

19          THE WITNESS:  Yes, ma'am, that's my understanding.

20  And I may have even touched it.  I have not knowingly gone

21  out there to see the car.

22          THE COURT:  All right.  As you sit here today, do

23  you have any information with respect to the whereabouts of

24  either of the two Bugattis.

25          THE WITNESS:  No, ma'am, I really do not.

1          THE COURT:  And when was the last time you saw the

2     2016 Bugatti?  If you saw it, the only time you saw it was

3     on the date of the birthday party?

4          THE WITNESS:  I'm not sure I saw the Bugatti.  I

5     did see a brand new Mercedes Benz that Mr. Termendzhyan

6     received that day.

7          THE COURT:  So he received a Mercedes and a

8     Bugatti for his 50th birthday?

9          THE WITNESS:  I don't think Mr. Termendzhyan

10    received both cars.  I believe he did receive the Bugatti

11    and his mother also received a new car, which was a

12    Mercedes.

13         THE COURT:  Do you know who gifted that to his

14    mother?

15         THE WITNESS:  I think that was Mr. Termendzhyan

16    himself.

17         THE COURT:  Okay.  All right.  Thank you.

18         Sorry for the interruption.

19                    REDIRECT EXAMINATION

20    BY MR. ROLWING:

21    Q    If the records show that Jacob Kingston bought the

22    Bugatti in 2013 that he gifted to Mr. Termendzhyan, could it

23    have been as early as 2013, in your memory, when Jacob

24    Kingston presented the Bugatti at another birthday party of

25    Mr. Termendzhyan?

1    A    Well, the car could have been from 2013.

2    Q    It's actually a 2010 car.

3    A    Okay.  It was a used car.  And what the dates were I

4    don't know, but I believe that Mr. Termendzhyan had it by

5    2015.

6    Q    Is it possible that the 2010 Bugatti was gifted in a

7    2013 birthday party to Mr. Termendzhyan by Mr. Kingston, and

8    Mr. Korkmaz gifted a different Bugatti in 2016?

9    A    That certainly is possible.  I was not there when -- I

10    don't think I was present when Mr. Kingston presented the

11    car to Mr. Termendzhyan.

12    Q    And ironically, Mr. Geragos asked you a number of

13    questions about Sargsyan, the private jet, because you

14    answered one of my questions, which had nothing to do with

15    that private jet, with that story of that jet.

16         MR. GERAGOS:  He's arguing.

17    BY MR. ROLWING:

18    Q    Do you remember those questions he just asked you about

19    all that Sargsyan nonsense and that jet and the --

20         MR. GERAGOS:  Objection, argumentative.

21         THE COURT:  Mr. Rolwing, we don't need to

22    characterize the testimony and the questions as nonsense.

23    If you have a question, ask it.

24    BY MR. ROLWING:

25    Q    I was asking you and did ask you on direct about

1    Borajet.  Do you remember that?

2    A    Yes, sir.

3    Q    And I asked you about if Mr. Termendzhyan asked you to

4    look into investing in an airline, he was going to do so in

5    Turkey?  Do you remember those questions?

6    A    I do.

7    Q    Did that have anything to do with Sargsyan and that

8    other jet that Mr. Geragos asked you about?

9    A    Well, it does from my own side.  We're now talking

10   about two different airplanes in the course of a quarter of

11   2016, the fourth quarter.

12   Q    It's at the same time period?

13   A    It is.

14   Q    But are they at all related in business transactions?

15   A    Well, the corporate jet that was fraudulently signed

16   off to Edgar has nothing to do with Borajet, to claim that.

17   One was a commercial and one was a corporate airplane.

18   Q    Okay.  So my question is does any of that story about

19   the corporate jet and Edgar Sargsyan change your answers

20   that you provided on direct about Mr. Termendzhyan informing

21   you of his interest in a Turkish airline, you doing the

22   research and reporting back to him, and learning that he

23   later invested with Korkmaz in a Turkish airline?

24   A    Essentially that's true, but I'm not aware that he told

25   anything about investing with Mr. Korkmaz in the airline

 1    until I saw the paperwork showing the date of January 1st,

 2    2017.

 3    Q    But at the time you were aware of his investments in

 4    Turkey with Korkmaz in other matters?

 5    A    Yes, sir.

 6    Q    And in your mind, did you know of any other individual

 7    in Turkey with whom Mr. Termendzhyan was investing?

 8    A    No, I was not --

 9    Q    Okay.  Thank you.

10    A    -- part of those meetings.

11    Q    Have you ever seen the share transfer agreement where

12    Baran Korkmaz bought Borajet Airlines on 12-29-16?

13    A    You know, I never saw it.  It's something you dashed in

14    front of me during that time frame that the Court had

15    approved it.

16    Q    Back at the trial?

17    A    Yes, sir.

18    Q    But other than in preparation for this trial, you

19    haven't seen the share transfer agreement between Baran

20    Korkmaz and Borajet at that time period?

21    A    I still have not seen it.

22                        RECROSS-EXAMINATION

23    BY MR. GERAGOS:

24    Q    So other than Mr. Rolwing or one of the agents telling

25    you, or doing Google, you don't have any knowledge, in real

1  time, of an investment by Mr. Termendzhyan in Borajet,

2  correct?

3  A    Yes, sir.

4  Q    And isn't it true that when Mr. Termendzhyan was asking

5  you about it, he was asking about whether or not you wanted

6  to do fuel deals with this company?

7  A    Well, the fuel deal would have been included if there

8  was a purchase of the airline.  The fuel deal would have

9  been offered if we just wanted to do fuel.

10  Q    Correct.  Isn't that one of the businesses that

11  Mr. Termendzhyan had, a fuel business for -- I believe

12  they're called FBOs, correct?

13  A    Yes, sir.

14  Q    And FBO is a fixed-base operation, correct?

15  A    Correct.

16  Q    Isn't that a major part of what the company did and

17  what you did?

18  A    Well, it's a lot of what I did.  I was a director of 17

19  different FBOs in northern California, Nevada, Texas,

20  Arizona.

21  Q    Can you explain to the Court what that is?

22  A    Sure.  I was a general manager of a single FBO in Reno,

23  Nevada.  We were growing.  The chairman asked me did we want

24  to buy more FBOs, and I said every one that we had purchased

25  has a good cash flow.  Let's investigate.

1    And then we bought four more, and then four more, and

2    then six more.  All of a sudden we had a fleet of about 20

3    FBOs.  And then we were purchased out.  But our real cash

4    flow was not just the corporate jets.  I was selling fuel to

5    the military.  I was selling fuel to UPS, FedEx, all the big

6    guzzlers, and that's where we were making our money.

7    Q    And the company you work for is Noil, correct?

8    A    At that time when I was working the FBO business, I was

9    working for a company called Mercury Air Group.

10    Q    I remember this from the trial.  What I'm getting at is

11    prior to you investigating through Google the Borajet deal,

12    Mr. Termendzhyan was asking you about that deal, and did I

13    understand you correctly that you would assume if that deal

14    came about, that he would be able to promote the --

15    whatever, the FBO gas supply; is that correct?  Fuel supply

16    I think is the way you call it.

17    A    Not really.  I pretty much controlled the fuel supply

18    before I ever worked for Mr. Termendzhyan.

19    Q    Correct.  I'm just talking about when he's asking you

20    about the Borajet, or the airline, you would have been the

21    person to talk to about fuel supply or expanding it,

22    correct?

23    A    Yes, sir.

24    Q    Okay.  So if you're the person that he was going to

25    talk about it with and he knew that Baran was going to buy

 1   an airline or interest in it, Mr. Termendzhyan would mention

 2   to you whether -- or you would be the logical person to ask

 3   about expanding fuel supply, correct?

 4   A    Yes, sir.

 5   Q    Now you also talked about -- and I didn't follow up

 6   with this.  You said you did an investigation on Edgar, is

 7   that correct, in-house?

 8   A    Yes, I did.

 9   Q    What did you determine?  How much did he steal?

10   A    How much did he steal?

11   Q    Yes.

12   A    I thought it was in a category between 23.5 and

13   $25 million.

14   Q    And he was president of SBK, correct, at the time?

15   A    Yes, he was.

16   Q    And he was also SBK's lawyer, correct?

17   A    Yes, he was.

18   Q    And the law firm that he worked for was called Pillar

19   Law firm, P-i-l-l-a-r, correct?

20   A    Yes, sir.

21   Q    And most of the money he stole, when you did the

22   investigation, he stole from SBK as president of SBK, and

23   with his dual role as lawyer for SBK, he would run it

24   through his law firm trust account, correct?

25   A    Correct.

1  Q    That's what the result of your investigation was?

2  A    Plus the point that he actually falsified paperwork I

3  sent to the FAA.

4  Q    Correct.  So all of the transfers that were going in

5  and out of SBK at the time would have been Edgar related up

6  until the time he was terminated, correct?

7  A    Yes, sir.

8  Q    Thank you.

9        MR. GERAGOS:  I have no further questions.

10       I'm sorry.  One more.

11 BY MR. GERAGOS:

12 Q    Is this the letter that we've been talking about with

13 the FAA?

14 A    Yes, sir, it is.  And this also depicts the new tail

15 number.

16 Q    And what's the date on that letter?

17 A    This is the 30th of December of 2016.

18 Q    Got it.  Thank you.

19       When did you -- last question.  I want to confirm.  You

20 started your internal investigation when?

21 A    I started my internal investigation in October -- the

22 first week in October of 2016 at the request of

23 Mr. Termendzhyan, who asked me to go over to the hangar

24 where the airplane was housed, at Van Nuys, and get whatever

25 information I could on the airplane, and I visited with the

1    pilot.  And I carried it through until I sent the paperwork

2    to the FAA for a fraudulent transfer of an aircraft.

3    Q    Did you ever run into an FBI agent by the name of Babak

4    during your investigation?

5    A    Babak, no, I don't think so.  But I was looking for one

6    who was an undercover agent.  I think was a dual agent.

7    Q    The name Babak in connection with Edgar does not ring a

8    bell?

9    A    No, sir.  I felt that Edgar had an FBI agent on his

10   payroll.  I'll put it that way.

11   Q    Did you feel like that was happening prior to Edgar

12   getting arrested?

13   A    Yes, I did.

14   Q    Did you express that to anybody?

15   A    To Mr. Termendzhyan.

16   Q    Okay.  Thank you.

17            MR. GERAGOS:  I have no further questions.

18                    FURTHER REDIRECT EXAMINATION

19   BY MR. ROLWING:

20   Q    Directing your attention back to the airline that

21   Mr. Termendzhyan asked you to advise him about, do you

22   remember him talking about a possible joint venture with

23   some Turkish people regarding this?

24   A    Yes, sir.

25   Q    And what did he say?

1    A    Well, essentially he wanted to know would that pique my

2    interest more.

3    Q    What does that mean?

4    A    If he had some partners in Turkey who would take care

5    of the cash flow requirements on an airline.

6         This was an airline at that time, in 2014, '16, had

7    only three aircraft.  They were turboprops.  And at the same

8    time, comments from the users, the passengers on his planes

9    were not very endearing.

10    Q    So it had a bad reputation?

11    A    It was starting to accumulate too much traffic from a

12    negative side.  And when a new airline -- or a new company

13    is taking over an old airline, one of the first things they

14    start to cheat on is maintenance, and that's where I stopped

15    because I had investigated too many crashes.

16    Q    And did you have these communications with

17    Mr. Termendzhyan about this Turkish airline?

18    A    The background, yes, we did.  We were very candid with

19    each other.

20    Q    Do any of those questions about Edgar Sargsyan and the

21    corporate jet, and everything Mr. Geragos had you talk

22    about, affect in any way what you've just said about the

23    airline in Turkey that he was asking you to look into and

24    report back to him on?

25    A    They are separate situations.

1    Q    Thank you.

2                    FURTHER CROSS-EXAMINATION

3    BY MR. GERAGOS:

4    Q    They were separate situations, but Mr. Sargsyan was the

5    president of SBK at the time, correct?

6    A    He was until -- essentially until the end of June of

7    2016.

8    Q    Right.  So when Mr. Rolwing keeps suggesting they are

9    separate situations, Mr. Termendzhyan is talking to you

10   about it, but Edgar Sargsyan is the person who is president

11   of SBK?

12   A    Well, the first time I was talking to Mr. Termendzhyan

13   about investigating the aircraft, the corporate aircraft

14   that he thought he had just purchased, that was after Edgar

15   had been fired.

16   Q    Correct.

17   A    I think he was fired in June, but I wasn't made aware

18   of the fact that there was a corporate jet out there until

19   sometime in October.

20   Q    And when was the time period you were talking about a

21   Turkish airline?  When was that?

22   A    That would have been more towards the November time

23   frame of 2016.

24   Q    Okay.

25   A    My concentration was on that corporate jet.

```
 1   Q    Your concentration was on the corporate jet, and
 2   sometime Baran Korkmaz met with Mr. Sargsyan prior -- or he
 3   came to meet with him in Beverly Hills, correct?
 4   A    Yes, I do.
 5   Q    Got it.
 6        So when we're talking about the inquiries about Turkey,
 7   that was prior to you Goggling and finding out that date,
 8   correct?
 9   A    Well, it was, yes.  I started with the corporate jet.
10   I hung on to it.  And then in the October, November time
11   frame, Borajet became more of a topic.
12   Q    Exactly.  Thank you.  Appreciate it.
13                      FURTHER REDIRECT EXAMINATION
14   BY MR. ROLWING:
15   Q    And finally, Mr. Sargsyan was gone from SBK USA in the
16   October, November time frame in 2016, correct?
17   A    He was gone for a period during that time frame.  I
18   don't think it was a whole ten weeks.  But I think during
19   that ten weeks he may have made two trips back and forth to
20   Turkey.
21   Q    Mr. Sargsyan -- my question was Mr. Sargsyan had been
22   fired from SBK USA as of October and November 2016, correct?
23   A    I think it was earlier.
24   Q    You were the president of SBK USA in late 2016, right?
25   A    I was assigned that duty really in the first month or
```

1  two of 2017.

2  Q    So it is true that Sargsyan was gone during the time

3  period October, November 2016, when Mr. Termendzhyan asked

4  you to look into the Turkish airline?

5  A    Correct.

6  Q    Thank you.

7           THE COURT:  Anything further, Mr. Geragos?

8           MR. GERAGOS:  No, Your Honor.

9           THE COURT:  May this witness be excused?

10          MR. ROLWING:  Yes.  Thank you, Mr. McDyre.

11          THE COURT:  Mr. McDyre, thank you.  You may step

12 down.

13          You may call your next witness, Mr. Rolwing.

14          MR. ROLWING:  Isaiah Kingston.

15                   ISAIAH KINGSTON,

16          Having been duly sworn, was examined

17                   and testified as follows:

18          THE COURT:  Mr. Kingston, if you choose, you may

19 remove your mask while you're speaking.

20          THE CLERK:  State your name and spell it for the

21 record, please.

22          THE WITNESS:  My name is Isaiah Kingston.

23 I-s-a-i-a-h, K-i-n-g-s-t-o-n.

24          THE COURT:  You can actually take the mask all the

25 way off.  I know they hurt your ears.

```
 1                          DIRECT EXAMINATION

 2    BY MR. SULLIVAN:

 3    Q    Good afternoon, Mr. Kingston.

 4         I want to direct your attention back to the years 2011

 5    through 2015.  Were you employed or part of Washakie

 6    Renewable Energy?

 7    A    Yes.

 8    Q    And what was your position there?

 9    A    CFO.

10    Q    And that stands for chief financial officer?

11    A    Yes.

12    Q    And are you familiar with what we call the Washakie

13    plant up in Plymouth, Utah?

14    A    Yes.

15    Q    Do you recall the address of that plant?

16    A    24000 North -- or South Field, 192 exit in Plymouth,

17    Utah.

18              MR. SULLIVAN:  Could we pull up Government Exhibit

19    F-1, please.

20              THE WITNESS:  I don't recall the exact address.

21    BY MR. SULLIVAN:

22    Q    If you look at the top of Government Exhibit F-1, is

23    8100 West 24000 North, Plymouth, Utah the location of the

24    Washakie Renewable Energy plant?

25    A    Yes.
```

1    Q    And do you recall that you testified in the prior trial

2    approximately a year and a half ago?

3    A    Yes, I did.

4    Q    And do you recall the government attorney by the name

5    of Leslie Goemaat?

6    A    Yes, I do.

7    Q    And when she first asked you how much money did

8    Washakie put into that plant, do you recall that you

9    testified upwards of at least $50 million?

10   A    Yes.

11   Q    And did we meet prior to your testimony today, last

12   Thursday?

13   A    Yes.

14   Q    And did I ask you -- did we, the government, ask you to

15   do something with respect to Government Exhibit F-1?

16   A    Yes.

17   Q    First of all, what is Government Exhibit F-1?

18   A    It is expenditures at the Plymouth plant.

19   Q    And does this consist of the cover page here that has

20   the breakdown of the expenditures, and then an additional 34

21   pages?

22   A    Yes.

23         MR. SULLIVAN:  And so if we just look at the

24   second page, Ms. Bonney.

25   //

1    BY MR. SULLIVAN:

2    Q    Are the rest of these pages the same in that they

3    detail funds that were used to build up the plant?

4    A    Correct.

5    Q    And if you look at the upper left here, it says bank

6    account number.  Do you see that?

7    A    Yes.

8    Q    So could you tell the Court what bank account 4874 was?

9    A    That was the original bank account that Jacob set up

10   with the Bank of Utah.

11   Q    And was that in the name of Washakie Renewable Energy?

12   A    Yes.

13   Q    If you go down toward the middle, the first different

14   account is account 6754.  Do you see that?

15   A    Yes.

16   Q    And could you tell the Court what that account is?

17   A    That was a separate construction account that was set

18   up solely to receive funds for the construction projects at

19   the plant.

20   Q    And why was a separate account set up?

21   A    A budget was made for each project that Jacob had at

22   the plant, and this account was set up to then have those

23   funds in that account for that allocation.

24   Q    And if we had the luxury of time, if we page through

25   this entire exhibit, pages three through page -- the last

1    page is page 35, are the rest of the expenditures listed

2    here coming out of account number 6754?

3    A    Yes, as I reviewed it.

4    Q    And after you left the meeting with us on Thursday,

5    what, in fact, did you do with Government Exhibit F-1?

6    A    I looked through every page to verify that was projects

7    at the plant.

8    Q    And so if we go back to page one, and enlarge the first

9    part of it, top part, what is the total amount of funds in

10    the total funds column that were expended by Washakie

11    Renewable Energy to build up the Washakie plant?

12    A    $65,985,551.

13    Q    So when you testified it was upwards to 50 million,

14    this is a little higher than 50 million, but it's in the

15    ballpark, right?

16    A    It is.

17    Q    Do you have any doubt in your mind that the

18    expenditures listed here were used to build up the plant up

19    in Plymouth?

20    A    No, I don't.

21            MR. SULLIVAN:  That's all I have, Your Honor.

22            THE COURT:  You may cross-examine.

23            MR. GERAGOS:  Could I have just one moment to talk

24    to my client, Your Honor?

25            THE COURT:  You may.

                              CROSS-EXAMINATION

BY MR. GERAGOS:

Q    Mr. Kingston, how are you?

A    Very well.  How are you?

Q    Good to see you out of the orange jumpsuit.

     You haven't -- since you have been out, you haven't

done any kind of an accounting or anything, have you?

A    Sorry.  What was the question?

Q    An accounting of the funds.

     As I remember, your testimony in the trial was that you

were in a financial position, correct?

A    Yes, I was.

Q    And we went through -- and you and I talked for quite a

while, correct?

A    Correct.

Q    And I had you identify various financial transactions?

A    Yes.

Q    And is it fair to say that even though you were in

custody at the time, that you had a pretty good recall about

the financial transactions back and forth?

A    Very good.

Q    Okay.  I guess broadly it was my impression that while

you were doing something, you would defer to whatever Jacob

was telling you; is that correct?

A    Correct.

1   Q    Okay.  But specifically what you actually did

2   financially, you had a pretty good handle on those

3   transactions.  Like if you moved 15 million here or ten

4   million here, or things like that, you had a memory of doing

5   that, correct?

6   A    Yes.

7   Q    You may not have -- is it fair to say you may not have

8   known why you were doing it because you were deferring to

9   Jacob, or somebody else up the ladder, but the transactions

10  themselves, you understood what was happening?

11  A    Yes.

12  Q    All right.  How long have you been out of custody?

13  A    Probably close to 19 months, 18 months.

14  Q    Okay.  Have you looked over financial flowcharts, funds

15  flowcharts?

16  A    Not since, no.

17  Q    Have you looked over -- has anybody from the government

18  come to you and said here are the bank statements, tell me

19  where this went to, where this money came from?

20  A    Only the exhibit that we've seen today.

21  Q    Only today?

22  A    Only the exhibit we saw today.

23  Q    Okay.  When did they come to you for that?

24  A    Last Thursday.

25  Q    Last when?

1    A    Thursday.

2    Q    And who came to you for that?

3         Mr. Washburn on the end?

4    A    Yes.

5    Q    Okay.  It wasn't a trick question.

6         The things that they just showed you, the charts that

7    they just showed you --

8              MR. GERAGOS:  Maybe Ms. Bonney can bring up the

9    first one.  Thank you.

10   BY MR. GERAGOS:

11   Q    This is F-1.  Do you remember being asked questions

12   about that?

13   A    Yes.

14   Q    Now the total funds, you see where it says 15,378,837?

15   A    Yes.

16   Q    Do you see where it says SUA funds?

17   A    Yes.

18   Q    And the percentage, and the page number.

19        Did you review any backup for that?

20   A    Just the pages in this document here.

21   Q    This document.

22             MR. GERAGOS:  How many pages is this, Ms. Bonney?

23             MS. BONNEY:  Thirty-five.

24             MR. GERAGOS:  Thirty-five.

25   //

```
 1   BY MR. GERAGOS:

 2   Q    Did you do any investigation beyond that?

 3   A    No.

 4   Q    Did you do any tracing to see what was SUA funds?

 5   A    No.

 6          MR. SULLIVAN:  Your Honor, I didn't ask him about

 7   that column and he has no knowledge about that column.  So

 8   we can just cut to the chase on this one.

 9          THE COURT:  Well, I think he's certainly entitled

10   to explore what this witness knows and what came from

11   another source.  Overruled.

12          MR. GERAGOS:  Thank you.

13   BY MR. GERAGOS:

14   Q    So when you say total funds 15,378,837, you didn't do

15   any investigation about that, correct?

16   A    Correct.

17   Q    SUV funds, 14,846,041, that didn't come from you, did

18   it?

19   A    No.

20   Q    I assume the same thing for the crush plant and

21   warehouse, 21,526,648, that wasn't your work, right?

22   A    No, it wasn't.

23   Q    Okay.  And the same thing with the SUV funds, that

24   21 million figure, that wasn't your work, correct?

25   A    Correct.
```

1    Q    And liquid storage tank farm, for instance, what is a

2    liquid storage tank farm?

3    A    It's to store biofuel, just big tanks.

4    Q    Was that built by you and your brother's company?

5    A    Yes.

6    Q    When you built it, do you know how much that cost to

7    build?

8    A    At the time, yes.

9    Q    But not now, right?

10        I mean you see this figure, 3,434,543.  You don't know

11    if that's the actual cost, do you?

12    A    Not exactly, no.

13    Q    Okay.  And you haven't been provided access to anything

14    or been asked any questions in order to determine whether

15    that accurately captures the total cost of the liquid

16    storage tank farm, correct?

17    A    Correct.

18    Q    And it's got SUA funds, 3,433,811, 99.98 percent.

19    There's no way for you to know, as you sit here, whether

20    that figure, which comes within .02 percent, you don't know

21    if that's accurate, correct?

22    A    I did not make this document.

23    Q    Okay.  So when you're asked about this, you're kind of

24    up here just saying yes to whatever they tell you?  Isn't

25    that basically it, look at this, are these the documents?

1        You don't have any real input into this, correct?

2        I'll ask you a question that might make this clearer.

3   How many gallons is the liquid storage tank farm?

4   A    I believe the first one was 300,000.  And there was

5   another one across the railway that was two million gallons.

6   Q    Two million gallons.

7        So you've got roughly shy of two and a half million

8   gallons in two different storage tank farms, correct?

9   A    I believe so.

10  Q    When you reviewed the 35 pages that this chart is based

11  on, do you have any confidence whatsoever that both of those

12  storage farms used only $3,434,000?

13  A    I can't say for sure it was only that.

14  Q    You what?

15  A    I can't say for sure it was only this amount.

16  Q    Correct.  It could have been a lot more, couldn't it?

17  A    It could have been.

18  Q    And you don't know, based on this, there is no way for

19  you to say, with any degree of confidence whatsoever, that

20  it was only 3,400,000, correct?

21  A    No.

22  Q    Now I'm going to go to the unclassified construction

23  account expenditures.  Do you see that?

24  A    Yes.

25  Q    Do you have any idea what that means?

1    A    It was -- it was construction projects that were not

2    allocated to a specific category.

3    Q    Okay.  And from what date to what date?

4    A    It didn't say on this document, but I believe it was

5    2012 to '15.

6    Q    Did you go through the document and add it up and make

7    sure that that's an accurate figure?

8    A    It does add up to this amount in the document.

9    Q    Right, but do you know that that document encompasses

10   all of them?

11   A    No.

12   Q    Now I assume --

13           MR. GERAGOS:  If we could go to some of the backup

14   pages, the next one.

15   BY MR. GERAGOS:

16   Q    You see this?  What does this look like to you, this

17   biodiesel production plant?

18   A    It looks like the costs that were spent to construct

19   the plant.

20   Q    Does this look like some kind of a QuickBooks

21   application.

22           Is this anything you produced?

23   A    No, it's not.

24   Q    Have you ever seen this before -- when did you say they

25   came to see you?

1    A    Last Thursday.

2    Q    Okay.  Is this the first time you've seen this

3    biodiesel production plant chart?

4    A    Last Thursday was the first time, yes.

5          MR. GERAGOS:  If we could go down to page three.

6    BY MR. GERAGOS:

7    Q    Same thing here, did you go and take a look at any of

8    these to figure out whether or not -- what these numbers are

9    and whether they're true, and whether they correspond or

10   correlate?

11   A    I did recognize them as expenditures for those

12   projects.  And that is the last four of that account

13   number -- the construction account number.

14   Q    Right.  So the bank account number is correct?

15   A    Yes.

16   Q    Okay.  How about SUA funds, did they ask you whether or

17   not a particular item was only SUA funds?

18        Do you know what SUA funds is?

19   A    That was the funds that were from the tax credit.

20   Q    From the biofuel tax fraud, correct?

21   A    Yes.

22   Q    Did you look at -- did they show you the bank

23   statements, to take a look?

24   A    No.

25   Q    Did you do any kind of investigation, correlation,

1    anything at all to check on this?

2    A    No.

3    Q    In fact, if you had had the bank statements, you

4    probably -- to lay them side by side, you probably could

5    have, correct?

6    A    I could have.

7    Q    That was part of what you did, right?

8    A    Yes.

9    Q    Don't you also have -- I would assume that bank account

10   number 6754 also had corresponding QuickBooks accounts and

11   things of that nature that were kept in real time?

12   A    It was in Peachtree.  We didn't use QuickBooks, but --

13   Q    Point well taken.  The Peachtree is the accounting

14   software you used?

15   A    At that time, yes.

16   Q    Okay.  And did you do anything to compare the Peachtree

17   software?

18   A    No.

19   Q    Do you know if you've ever seen the Peachtree software

20   since you've been arrested?

21   A    No, I have not.

22   Q    You certainly didn't see the Peachtree software last

23   Thursday, correct?

24   A    Correct.

25   Q    Nobody brought you a laptop or said, hey, here's a

1     desktop that we seized, here's the software, do a

2     comparison, make sure that this is accurate, did they?

3     A     No.

4     Q     And these percentages that you testified to --

5              MR. GERAGOS:  If we can go back up to the first

6     page, please, on Exhibit F-1.

7     BY MR. GERAGOS:

8     Q     You're not vouching for SUA funds on the column that's

9     to the right of total funds, are you?

10    A     The items funds were used for these projects.

11    Q     You haven't done anything to investigate whether the

12    SUA funds is accurate, correct?

13    A     Correct.

14    Q     And the percentage is just a percentage.  And the total

15    funds, you haven't done anything to confirm that that's the

16    total funds or the costs.  We just went through that.

17            Wouldn't you admit to me that the liquid storage farm,

18    at three million four, looks woefully small for the amount

19    that those two farms cost?

20    A     There could have been more.  I think there was more.

21    Q     By a factor of three, four, or five times, correct?

22    A     I don't know exactly, but it could have been.  It would

23    be more.

24    Q     If you had not seen this -- and I'm going to ask you to

25    do mental gymnastics.  If you had not seen this chart and I

1    had asked you how much did just the 300,000-gallon liquid

2    storage tank cost to construct, what would you have thought?

3    A    I would have thought half a million.

4    Q    And what would you have thought for a two-million

5    gallon tank?

6    A    Probably two and a half million.

7    Q    Okay.  And you wouldn't know unless you looked at the

8    paperwork, correct?

9    A    No.  It's just a guess.

10   Q    It would just be a blatant guess or a complete off the

11   top of your head, right?

12   A    Correct.

13   Q    No basis whatsoever in evidence.  What I would call

14   rank speculation, correct?

15   A    Correct.

16   Q    Got it.

17        Same thing with unclassified construction account

18   expenditures, you don't know -- did you do the

19   classification or unclassification?

20   A    No.

21   Q    Did you classify every construction account expenditure

22   when you were doing it in real time?

23        This is what I mean.  That was a poor question.

24        You're doing Peachtree software, correct?

25   A    Correct.

1   Q    You would reconcile accounts either monthly or

2   quarterly?

3   A    Monthly, yeah.

4   Q    And you would do that on this Bank of America account,

5   correct?

6   A    Bank of Utah, yes.

7   Q    Bank of Utah.  Sorry.  Bank of America this morning.

8        When you reconcile the accounts, isn't one of the

9   things you do is to classify the items?

10  A    Yes, we did.

11  Q    Isn't that the whole idea of reconciliation?

12  A    Yes.

13  Q    Otherwise, what's the point of reconciling the account,

14  right?

15  A    Correct.

16  Q    It makes zero sense to reconcile an account if you

17  don't classify the expenditure, right?

18  A    Correct.

19  Q    Otherwise you've got bank statements, you can just

20  leave it unclassified, right?

21  A    Correct.

22  Q    So is there any reason in the world that you can think

23  of that fully one-third of the total funds here are

24  unclassified when you in real time classified them?

25  A    Like I say, I didn't make this document.

1   Q    Right.  So you just got up here and they basically,

2   last Thursday, said look at this, we're going to have you

3   testify to this, and go on your way, right?

4         I'm cooperating.  I haven't been sentenced yet.  I want

5   to stay in their good graces.  Is that a fair statement?

6   A    I wouldn't quite --

7   Q    You certainly want to stay in their good graces, right?

8   A    I want to do the right thing.

9   Q    Right.  You want to do the right thing and you want to

10  stay out of custody, right?

11  A    Of course.

12  Q    Okay.  It's not a trick question.  I've only known two

13  clients in my day who didn't want to stay out of custody.

14        I'm going to walk up and hand you, for a second, F-1

15  itself because it's easier than me flipping through this.

16        Can you take a look?  Can you see where there's

17  category and things like that?

18  A    Yes.

19  Q    Take a look -- pick a random page.  Pretend I'm asking

20  you to pick a card.  Pick a random page.  After page 16,

21  pick any page.

22        What's your favorite number between 16 and call it 35?

23  Pick a number, any number.

24  A    Twenty-one.

25  Q    Twenty-one.  Okay.

1          Let's take page 21.  Take a look at page 21.  And then
2    I'm going to go put it on the screen.
3          You see it, right?
4    A    Yes.
5    Q    You see where the right-hand side does not have any
6    classifications?
7    A    Yes, I do.
8    Q    We picked this randomly.
9          Do you see the Electrical Contractors, Inc. for 28,000?
10   A    Yes.
11   Q    Do you see Endress & Hauser?  Do you know what that is?
12   A    I believe that was a consultant.
13   Q    Okay.  Environmental Response, EVCO.  You would have
14   input into all of these -- or for most of these, wouldn't
15   you?  You would know what they were, right?
16   A    Yes.
17   Q    You would know the categorization, right?
18   A    Yes.
19   Q    You would know probably -- maybe you would know
20   absolutely -- you would be able to figure out, if you had
21   access, how to classify these things, right?
22   A    Yes.
23   Q    And you would know whether or not they applied to the
24   biodiesel production plant, right?
25   A    A fair idea, yes.

1   Q    Or the crush plant, correct?

2   A    Yes.

3   Q    Or the liquid storage tank farm, correct?

4   A    Yes.

5   Q    You would know how to separate it out.  That was your

6   job, right?

7   A    Yes.

8   Q    Okay.  This isn't -- I don't mean to demean your job,

9   but this wasn't that tough of a task -- how long have you

10  been out of custody?

11  A    Roughly 18 months.

12  Q    Eighteen months?

13  A    19 months.

14  Q    Do you think in 18 months you could have taken this

15  35-page document and probably classified all those things?

16  A    Yes.

17  Q    It wouldn't have been that hard, right?

18  A    They were -- yes, I could have.

19  Q    You could have done it, right?

20  A    I could have.

21  Q    Okay.  Thank you.

22         MR. SULLIVAN:  Very briefly, Your Honor.

23         THE COURT:  I'm not sure Mr. Geragos was finished.

24  Let's make sure that he is finished.

25         Okay.  You may proceed.

```
 1              MR. SULLIVAN:  Thank you, Your Honor.
 2                    REDIRECT EXAMINATION
 3  BY MR. SULLIVAN:
 4  Q    When you met with the government on Thursday, you were
 5  there, I was there, who else was there?
 6  A    You was there, I was there, Washburn was there, Richard
 7  was there.
 8  Q    And during that meeting did you learn who created this
 9  document?
10  A    Yes, I did.
11  Q    Who?
12  A    Mr. Washburn.
13  Q    And did we ask you to do anything with this column
14  entitled SUA funds?
15  A    No.
16  Q    What did we ask you to do?  What simple task did we ask
17  you to do?
18  A    You asked me to verify that it was expenditures that
19  happened at the plant.
20  Q    Right.  And if there were other expenditures listed --
21  if there were other expenditures to build out the plant that
22  were not listed here, all that would do would increase the
23  amount, correct?
24  A    Exactly.
25  Q    Is it fair to say that this is the minimum amount that
```

```
 1   Washakie Renewable Energy expended to build out the plant in

 2   Plymouth?

 3                THE COURT:  Do you have an objection, Mr. Geragos?

 4                MR. GERAGOS:  I do, Your Honor.  It's a little

 5   leading.

 6                MR. SULLIVAN:  That was my final --

 7                THE COURT:  Well, it is leading.

 8                MR. SULLIVAN:  I will admit that.

 9                THE COURT:  Okay.  Ask a non-leading question.

10   BY MR. SULLIVAN:

11   Q    Is there any doubt in your mind that Washakie Renewable

12   Energy spent at least $64.9 million to build up the plant up

13   in Plymouth, Utah?

14   A    No doubt.

15                MR. SULLIVAN:  That's it, Your Honor.

16                THE COURT:  Anything further, Mr. Geragos?

17                MR. GERAGOS:  Let's just ask it again.

18                          RECROSS-EXAMINATION

19   BY MR. GERAGOS:

20   Q    All they did was ask you to come in and say does this

21   sound like a figure of how much it cost, right?

22   A    They asked me to verify that that was an expenditure at

23   the plant.

24   Q    And they didn't give you the -- how many people came,

25   four people?
```

1    A    Yeah.

2    Q    But they didn't bring with them a disk for the software

3    and just say, hey, can you classify this 20 million?

4    A    No.

5    Q    They didn't bring with them a disk of the bank accounts

6    to say why don't you cross-check?

7    A    No.

8    Q    And just as I asked you before, you are just basically

9    guessing; isn't that correct?

10   A    I am sure it was at least that much.

11   Q    Right.  But you don't know?

12   A    I don't know the exact amount, no.

13   Q    You don't have any idea, right?

14   A    I am sure that it was at least what they gave us.

15   Q    Okay.  But what they're trying to do here is create

16   categories, right?

17        You didn't create those categories?

18   A    No.

19   Q    Okay.  When he asked you all we wanted to do was say it

20   was 64 million, the document itself has categories here.

21   You don't have any idea that the categories are accurate,

22   right, because they didn't ask you to classify them, right?

23   A    They did look accurate when I looked at them, but I did

24   not classify them myself.

25   Q    Right.  So you didn't do -- what have you been doing

1    since last Thursday?

2    A    I've been working.  Going home.

3    Q    If they had asked you, since last Thursday, take this,

4    here's the Peachtree, here's the bank accounts, do you think

5    you could have gotten this done in a week?

6    A    I could have.

7    Q    Thank you.

8                    FURTHER REDIRECT EXAMINATION

9    BY MR. SULLIVAN:

10   Q    Did you ever meet with Special Agent Washburn prior to

11   last Thursday to go over some of the categories that these

12   expenditures fell into?

13   A    No, not since I've been home.

14   Q    You didn't meet with him in June of 2019 after you pled

15   guilty?

16   A    I was incarcerated at that time, but not since I've

17   been home.

18   Q    You don't recall going over some of the categories and

19   some of the expenditures with Mr. Washburn prior to Thursday

20   and saying this would be for building the plant, or

21   whatever?

22   A    I did do that when I was preparing for the other trial,

23   but --

24   Q    So you did meet with Mr. Washburn and did go over some

25   of the categories prior to Thursday, correct?

1  A    Yes, a couple years back, yes, while I was

2  incarcerated.

3        MR. SULLIVAN:  That's it, Your Honor.

4        THE COURT:  Anything else, Mr. Geragos?

5        MR. GERAGOS:  No.

6        THE COURT:  May Mr. Kingston be excused?

7        MR. GERAGOS:  Yes, please.

8        THE COURT:  Thank you, Mr. Kingston.  You may step

9  down.

10       THE WITNESS:  Thank you, Your Honor.

11       MR. GERAGOS:  Could I ask that he be on call?  We

12  may recall him.  I'll do it through -- I see him right

13  there.  I was going to suggest I would do it through

14  Mr. Williams, and look who's all masked up and in his purple

15  suit.

16       THE COURT:  Mr. Williams, can you agree to make

17  Mr. Kingston available again should Mr. Geragos need to call

18  him?

19       MR. WILLIAMS:  Of course, Your Honor.  Thank you.

20       THE COURT:  Thank you.

21       MR. WILLIAMS:  Your Honor, can I just clarify

22  because I wasn't here, whether the exclusionary rule would

23  still apply to Mr. Kingston if there has been one invoked?

24       THE COURT:  No one invoked it yet, but I suppose I

25  should ask counsel.

1              MR. GERAGOS:  No.  That's fine.

2              THE COURT:  You're not invoking the exclusionary

3    rule?

4              MR. GERAGOS:  Yeah, I'm not invoking it.  If

5    Mr. Williams wants to stay, he can stay.

6              MR. WILLIAMS:  No.  I wasn't here to know whether

7    it was invoked or whether he should not communicate with

8    certain people.  I don't know who the witnesses are in this

9    trial.

10             MR. GERAGOS:  I would ask that he not communicate

11   with his brother, who's a subpoenaed witness.

12             THE COURT:  Okay.  But other than that, you don't

13   have any objection to him, for example, if he wants to watch

14   the proceedings?

15             MR. GERAGOS:  Not at all.

16             THE COURT:  Okay.

17             MR. WILLIAMS:  Thank you.

18             THE COURT:  Thank you.

19             You may call your next witness.

20             MR. SULLIVAN:  The government calls Stephen

21   Washburn to the stand again.

22             MR. GERAGOS:  When were you thinking of --

23             THE COURT:  I was just looking at my watch.  It's

24   a quarter to 3:00, so we've been going for about an hour and

25   a half.

1          MR. GERAGOS:  If they're going to do funds flow,

2     I've got to splash water on me.  I've get to get some

3     caffeine if I have to endure this.

4          THE COURT:  All right.  So let's take our

5     afternoon break now.  It's a quarter to 3:00.  We'll come

6     back at 3:00, and we'll go as long as you are all capable of

7     continuing.

8          MR. GERAGOS:  Thank you.

9          (Recess)

10          THE COURT:  All right.  Mr. Washburn may take the

11    stand.

12          Special Agent, you may take the stand.  Let me

13    remind you you are still under oath.

14               DIRECT EXAMINATION (Continued)

15    BY MR. SULLIVAN:

16    Q    When we left off yesterday, we were looking at

17    Government Exhibit B.

18          MR. SULLIVAN:  Could we have that back up, please,

19    Ms. Bonney.

20    BY MR. SULLIVAN:

21    Q    If we look at the box in green, which is Grigor

22    Termendzhyan, can you refresh everyone's recollection about

23    what those transactions represent?

24    A    Yes.  So the top arrow there going from right to left

25    is the creation of two cashier's checks, one in the amount

1    of 21,367,000, and the other in the amount of 20 million,

2    which were made out to Grigor Termendzhyan.

3         And then below that there are arrows coming back in to

4    Speedy Lion.  One you'll see on the 22nd of October, 2015,

5    for 21,367,000, and then below -- it's somewhat cut off, but

6    there's an April 21st, 2016, 20 million deposit into Speedy

7    Lion Renewable Fuel Investments at their Wells Fargo

8    account.

9    Q    And is that the one you testified to yesterday had to

10   be reissued because it had expired?

11   A    That's correct.

12   Q    And what's the approximate amount of time between when

13   the initial $20 million cashier's check was issued and when

14   the replacement $20 million check was deposited into the

15   Speedy Lion Renewable Fuel Investments?

16   A    It's approximately six months.

17   Q    And $20 million, if you had $20 million,

18   Agent Washburn, would you put it into a cashier's check and

19   hold on to it for six months?

20   A    No.

21   Q    What would you do with it?

22   A    I would likely invest so it could earn me interest or

23   work for me.

24   Q    And of that 20 million, the chart in Government Exhibit

25   B shows that nine million went to this G.T. Energy account.

```
 1    Do you know what happened to the other 11 million of the
 2    20 million that went into that Speedy Lion account?
 3    A    Yes.
 4    Q    Did you prepare a flow of funds chart that depicts
 5    where that other 11 million went?
 6    A    Yes.
 7    Q    Which chart is that?
 8    A    I don't recall which letter it is, but I believe it
 9    might be C.
10    Q    If it's Government Exhibit D, would you accept that?
11    A    I would not dispute it.
12    Q    And this 28 million -- well, we're now on D.  Does that
13    show the 11 million going from the Speedy Lion account, at
14    the top of Government Exhibit D, being transferred to
15    another Speedy Lion account?
16    A    Yes.  It's transferred back to the initial one from
17    which the cashier's checks were made.
18    Q    Okay.  We're going to get back to Government Exhibit D,
19    but let's go back to B.  There's one last question in B, and
20    that is of the -- at the bottom there it says total SUA
21    proceeds, $28,993,450.  Do you have a flow of funds chart
22    that depicts where that money went then?
23    A    Yes.
24    Q    Which flow of funds chart is that?
25    A    C.
```

1    Q    Let's move on Government Exhibit C to see where the

2    28.9 million went.  Can you identify this?

3    A    Yes.  This is a flow of funds chart showing the

4    movement of money from that G.T. Energy account, which at

5    the time, as it shows, as of May 2nd, contained $28,993,450

6    of SUA proceeds.

7    Q    And refresh everyone's recollection.  When were the

8    search warrants executed here in Salt Lake City on the

9    offices of Washakie?

10   A    February 10th of 2016.

11   Q    And if we focus in on the upper right, can you describe

12   what financial transactions are depicted that took place on

13   June 9th of 2016 and June 10th of 2016?

14   A    Yes.  So out of this account, 23 million was sent to

15   SBK Turkey, or AS, and it had a memo line of pay back loan,

16   but then that money was returned.  They recalled the wire

17   and had it returned, and it was returned the next day.

18   Q    And based on your investigation and all the bank

19   records and all the documents that were gathered during the

20   course of the investigation and for trial, did you see any

21   indication that G.T. Energy had taken a loan from SBK

22   Holding AS in Turkey of $23 million?

23   A    Not that I'm aware.

24   Q    If we go back to the full chart of Government Exhibit

25   C, can you tell the Court what happened three days later

1   after the 23 million went back to G.T. Energy?

2   A    Yes.  So it went back to G.T. Energy, and then was

3   transferred to SBK Holdings USA.

4   Q    And did the wire transfer reflect in the memo section

5   what the purpose of the wire transfer was?

6   A    Yes.  It also indicates pay back loan.

7   Q    Did you find any evidence during the course of the

8   investigation and leading up to the trial in this case any

9   evidence that G.T. Energy had borrowed money from SBK

10  Holdings USA?

11  A    Not that I'm aware.

12  Q    In fact, where did the 23 million actually come from?

13  A    The 23 million was funded from Turkey.

14  Q    Twenty of it came from the Alptekin Yilmaz account,

15  correct?

16  A    That's correct.

17  Q    And another nine million came from one of the Speedy

18  Lion accounts that Grigor Termendzhyan set up to receive the

19  $20 million cashier's check, correct?

20  A    That's correct.

21  Q    So that 23 million payback loan, is that just a fiction

22  based on your investigation?

23            MR. GERAGOS:  Objection.

24  BY MR. SULLIVAN:

25  Q    Did you find any evidence in the record to suggest that

1    was in fact a truthful statement on that wire transfer

2    record?

3    A    Not that I'm aware of.

4    Q    And then once that 23 million was wire transferred to

5    SBK Holdings USA, what happened to the money then?

6    A    There were a number of transactions from the SBK

7    Holdings USA account out to SBK Holding AS, which also, as

8    you can see here, are listed, as those three arrows,

9    October 21st of 2016, a six million loan pay back in the

10   memo line on the wire.

11   Q    Was there any evidence found in the investigation that

12   there was a $6 million loan from SBK Holding AS to SBK

13   Holdings USA?

14   A    No.

15   Q    How about the next two that occurred on November 8th,

16   2016?

17   A    Yes.  November 8th is a $15 million transfer, and then

18   a 265,000 transfer, one of which has the memo line of a loan

19   pay back, and the other is a pay back commission.

20   Q    And, in fact, did you find evidence of a $15 million

21   loan coming from an entity in Europe that went to SBK

22   Holdings USA?

23   A    Yes.

24   Q    And what was that?  Where is that located in the flow

25   of funds here?  Is that on Government Exhibit A?

1    A    As I recall, it is.

2    Q    Let's look at A.

3         Is that on the right-hand side, that $15 million that

4    was sent from Isanne SARL to SBK Holdings USA on June 3rd,

5    2015?

6    A    Yes, that's correct.

7    Q    But if we go back to Government Exhibit D -- C, excuse

8    me, when that $15 million was paid on November 8th, 2016

9    from SBK Holdings USA to SBK Holding AS in Turkey, were any

10   of those funds that were in that SBK Holdings account, did

11   they come from Isanne SARL?

12   A    Not directly, no.

13   Q    No, because you just testified that those funds came

14   from Alptekin Yilmaz and it came from that $20 million

15   cashier's check from Speedy Lion?

16   A    That's correct.

17   Q    Through G.T. Energy?

18   A    Yes.

19   Q    And then in the left-hand part it shows that

20   4.9 million went to Pillar Law Group on June 30th, 2016?

21   A    Yes, that's correct.

22   Q    When we get to some of the other flow of funds charts

23   that relate to the actual forfeiture, the properties the

24   government is seeking forfeiture of, do you know whether or

25   not any of these funds were used to purchase assets that the

 1    government is seeking forfeiture of?

 2    A    Yes, they were.

 3    Q    And will those be reflected in the charts that we'll

 4    see after this chart?

 5    A    Yes.

 6    Q    And of all the funds reflected on these charts here,

 7    what percent of the funds represent illicit fraud proceeds,

 8    otherwise listed on these charts as SUA funds?

 9    A    Almost all of them.  The only one that reflects

10    anything less than 100 percent is the 4.9 million to Pillar

11    Law Group.

12    Q    And that is less than -- 200,000 less than the 4.9

13    million that was transferred, correct?

14    A    That's correct.

15            MR. SULLIVAN:  Unless the Court has any questions

16    about Government Exhibits A, B, and C, we'll move on to D.

17            THE COURT:  Okay.

18    BY MR. SULLIVAN:

19    Q    Agent Washburn, what does this reflect?

20    A    This reflects that Wells Fargo Speedy Lion Renewable

21    Fuel Investments account which received the $20 million

22    cashier's check, and it shows the flow of that money and

23    where it eventually ended up.

24            So 11 million was transferred back to Speedy Lion

25    Renewable Fuel Investments.  This was after the nine million

1  was transferred to G.T. Energy.

2  Q    And under your methodology, because this says that it's

3  100 percent SUA, slash, property involved in money

4  laundering funds, did you keep track of both the SUA and the

5  property involved in the money laundering parts of this?

6  A    Yes.

7  Q    And where did the property involved in money laundering

8  come from?

9  A    About 5.6 million of it is from a deposit into the

10  Speedy Lion Renewable Fuel Investments Bank of America

11  account.

12  Q    And that's reflected -- if we go back to Government

13  Exhibit B really quickly, is that in the middle box there

14  where it says on January 13th it was that 5.6 million?

15  A    Correct.

16  Q    And, again, just to refresh everyone's memory here,

17  what is property involved in money laundering?

18  A    It's any property, in this case money, which is from a

19  known claimed source or unknown source, in this case

20  unknown, which is deposited into an account and commingled

21  with proceeds of a fraud with the purpose of concealing or

22  attempting to legitimize the fraud proceeds.

23  Q    Let's go back to Government's Exhibit D and follow the

24  flow of funds.

25       After the 11 million was transferred from one Speedy

1    Lion account to the other Speedy Lion account here, to what

2    entity did the $11 million get transferred to on

3    December 29th, 2016?

4    A    Century Energy at Citibank.

5    Q    And who opened the account and when did they open that

6    Century Energy account?

7    A    That's opened on the 19th of December in 2016 by Grigor

8    Termendzhyan.

9    Q    And what is reflected in the middle part of Exhibit D?

10   A    These are additional deposits into that account that

11   originated from Araratbank in Armenia.

12   Q    And do you know whose account that came from over in

13   Armenia?

14   A    They said they were from Grigor Termendzhyan.

15   Q    And how did you treat it -- based on your methodology,

16   how did you treat those funds once they were deposited and

17   commingled into that Century Energy account?

18   A    These were also treated as property involved in money

19   laundering.

20   Q    So if we go and follow the flow of funds on

21   December 21st --

22            MR. GERAGOS:  I lost the -- the Araratbank were

23   also treated as?

24            THE WITNESS:  Property involved in money

25   laundering, the PIML.

```
 1              (Court reporter asked to have the question
 2     repeated.)
 3              MR. GERAGOS:  My question was I believe in
 4     response to how did you treat those funds, and now I ask
 5     what was your answer to the money or the property from
 6     Araratbank.
 7              THE WITNESS:  That is property involved in money
 8     laundering, or PIML is the acronym you'll see on here.
 9     BY MR. SULLIVAN:
10     Q    If we follow the flow of funds, on December 21st, 2018,
11     it shows that $15 million from the Century Energy account
12     was transferred into a certificate of deposit in the name of
13     Century Energy.  Do you see that?
14     A    I do.
15     Q    And as of that point in time, how much of the funds
16     represented illicit fraud proceeds, specified unlawful
17     activity, and how much of the funds represented product
18     involved in money laundering?
19     A    There were roughly five and a half million of SUA
20     proceeds -- directly traceable proceeds.
21     Q    So a little under ten million, then, was property
22     involved in money laundering that had been commingled
23     together?
24     A    That's correct.
25     Q    And then what does the final arrow show occurred on
```

1  March 16th, 2019?

2  A    On that date the CD was withdrawn and deposited into a

3  different Century Energy bank account at Citibank.

4  Q    And that account has the last four digits of 8979,

5  correct?

6  A    That's correct.

7  Q    And when we look at the specific assets that the

8  government is seeking forfeiture of and the flow of funds

9  that relate to those, are we going to see this Century

10  Energy account 8979 later?

11  A    Yes.

12         MR. SULLIVAN:  Your Honor, unless there are

13  questions on those, I'm going to go to E, and then I'm going

14  to proceed to go through F-1 through F-39.

15         THE COURT:  All right.

16  BY MR. SULLIVAN:

17  Q    Let's go to the next one, Government Exhibit E.  Could

18  you explain to the Court what this is?

19  A    Yes.  This is a flow of funds with regards to the joint

20  bank account of Mr. Termendzhyan and Mr. Korkmaz.

21         MR. SULLIVAN:  Let's just enlarge the heading,

22  please.

23  BY MR. SULLIVAN:

24  Q    Now this says at the top that it's revised Government

25  Exhibit 2-7.  Do you recall during the trial that we

```
 1   admitted into evidence Government Exhibit 2-7?
 2   A    Yes.
 3   Q    Is it substantially the same as this but with this new
 4   Government Exhibit E has some new information?
 5   A    Yes.
 6   Q    What is the new information on this Government Exhibit
 7   E?
 8   A    I was able to fill in some gaps on the tracing of the
 9   proceeds.
10   Q    All right.  Let's start at the top and let's go from
11   the left to right.
12        What occurred in September and October of 2015?
13   A    There are two wire transfers, one in the amount of
14   $6 million and one in the amount of $4 million, that were
15   deposited from Sezgin Baran Korkmaz to this joint Bank of
16   America account.
17   Q    And are the underlying bank records listed?
18   A    Yes, pages three through six.
19            MR. SULLIVAN:  So if the Court wants to look at
20   those, the Court can look at those.
21   BY MR. SULLIVAN:
22   Q    But what happened to that $10 million in December of
23   2015?
24   A    It was transferred out to an account in the name of DK
25   Zvezda, LLC, another Bank of America account.  And then --
```

1    Q     It says that that transfer of the ten million contained

2    $8,564,950 of specified unlawful activity funds; is that

3    correct?

4    A     That's correct.

5    Q     What is that based on?

6    A     So this is based on a report that we received that was

7    created by the Turkish officials who did an investigation

8    into the accounts of Mr. Korkmaz and his businesses, labeled

9    the MASAK report.  I went through that report and they have

10   several sections that trace out some of this money.  And I

11   was able to find that the money that was transferred, the

12   six million from Baran Korkmaz to their joint account, and

13   then part of the four million, or vice versa, I can't recall

14   which one was partial, but that was traced back to the money

15   from Isanne SARL and the $56 million that Washakie Renewable

16   Energy sent to Luxembourg.

17   Q     So if we go back to Government Exhibit A, just to show

18   this, are you saying that -- and is that report called the

19   MASAK report?

20   A     It is.

21   Q     And what are the initials -- or is that --

22   A     M-A-S-A-K.  I don't recall when they stand for at this

23   moment.

24   Q     Are those Turkish words probably?

25   A     Yeah, I presume.

1   Q    But it's the entity in Turkey that investigates alleged

2   financial crimes, including money laundering; is that

3   correct?

4   A    That's my understanding from the report.

5   Q    So of the money that went to -- of the 56.3 million

6   that went to Isanne SARL, 40 went to BioFarma, did the MASAK

7   report indicate that of the $10 million, or six million and

8   four million that was transferred to the joint Termendzhyan,

9   Korkmaz account come from the 40 million that was

10  transferred to BioFarma?

11  A    I'm sorry.  Could you repeat that.

12  Q    In the MASAK report, where did it say that the money

13  came from that led you to conclude that the money was

14  illicit fraud proceeds to the tune of 8.5 million?

15  A    It referred to money from BioFarma to Alptekin Yilmaz,

16  and then to accounts in -- I guess the name of or controlled

17  by Sezgin Baran Korkmaz.

18  Q    If we go back to Government Exhibit E, at the very top,

19  it's showing that the funds came from accounts in the name

20  of Sezgin Baran Korkmaz?

21  A    That's correct.  He had personal accounts there.

22  Q    And you actually know that is based on wire transfers

23  that you obtained from U.S. banks showing the incoming

24  funds; is that correct?

25  A    That's correct.

1   Q    If I give you the actual MASAK report, at page 48, will

2   this refresh your recollection on the details?

3   A    Yes, it will help.

4        Okay, I remember now.  It didn't go through Mr. Yilmaz.

5   It went through a related pharmaceutical company by the name

6   of Munir Sahin -- it's M-u-n-i-r, S-a-h-i-n -- and then

7   through SBK Holding to Baran Korkmaz's personal account.

8   Q    So by indicating here that the 8.5 million is SUA fraud

9   proceeds, are you basically saying that based on the MASAK

10  report and all the evidence that you gathered during the

11  investigation, you were able to trace it back to a claim

12  filed with the Internal Revenue Service seeking fraudulent

13  biofuel tax refunds?

14  A    Yes.  These would have been related to claim 37.

15  Q    And was that the real big one that --

16  A    That was the last claim that was paid out.

17  Q    That resulted in two checks of $82 million plus, that

18  added up to roughly 164 million?

19  A    That's correct.

20  Q    All right.  If we just look at the rest of this, please

21  describe to the Court what eventually happened to all these

22  funds and where they were eventually transferred.

23  A    So these funds moved around a little bit, as you can

24  see.  But the $10 million was transferred into the DK Zvezda

25  account.  It is combined with an additional four million

1    that came in that same day from SBK Holdings USA, and then

2    goes back to SBK Holdings USA, all in the same day.

3        And then a portion of the money goes to Noil Energy

4    Group, which is then sent out to Turkey to two different

5    defense entities.  And there's an additional 458,000 paid

6    directly from SBK Holdings USA, Inc. to SBK Holding AS in

7    Turkey.

8    Q    And if we look at this from 10,000 feet in the air, we

9    see that the ten million comes from Turkey in September and

10   October of 2015, and roughly almost eight million of it goes

11   back to Turkey in February and March of 2016, and do you

12   recall the exact date of when the search warrants were

13   executed in Salt Lake City on Washakie?

14   A    Yes, February 10th.

15   Q    So the money was transferred back to Turkey shortly

16   after the execution of the search warrants; is that correct?

17   A    Yes, within a month and a half.

18          MR. SULLIVAN:  Your Honor, I'm just going to go

19   into the F series unless there are questions on this

20   exhibit.

21          THE COURT:  I don't have any questions.

22   BY MR. SULLIVAN:

23   Q    Directing your attention to F-1, did you just hear the

24   testimony of Isaiah Kingston?

25   A    I did.

1    Q    And can you explain to the Court what the SUA funds

2    column represents?

3    A    Yes.  This comes from my analysis where I kept track of

4    the proceeds that were in that account and what portion of

5    each transaction was comprised of proceeds of the fraud.

6    Q    So is this based on your methodology of just bad in,

7    first out?

8    A    Correct.

9    Q    And did you ask Isaiah to do anything with any of the

10    figures in this column?

11    A    No.

12    Q    Who prepared this summary chart?

13    A    I did.

14    Q    Is it a true and accurate summary and does it

15    accurately total up all the items that are included on pages

16    two through 35?

17    A    Yes.

18    Q    Can you tell the Court whether or not you did, in fact,

19    ever meet with Isaiah Kingston prior to Thursday of last

20    week to ask him about expenditures that relate to the

21    Washakie plant in Plymouth, Utah?

22    A    Yes.  On a couple of occasions, I brought lists of

23    entities and transactions for which I was trying to

24    classify.

25    Q    And if we just forget about the classifications, what

1    is the total amount of funds that Isaiah Kingston just

2    testified represented funds related to the buildup of the

3    plant up in Plymouth, Utah?

4    A    $64,985,551.

5    Q    And based on your investigation, could there have been

6    other expenses that didn't make their way into this total?

7    A    Yes.  I tried to be as conservative as possible.

8    Q    And based on your methodology, what is the total amount

9    of illicit fraud proceeds that were used to build up the

10   Washakie plant up in Plymouth, Utah?

11   A    62,015,111.

12   Q    And if you didn't know the classification for any of

13   this but Isaiah still said this was all used to build up the

14   plant, would that number change?

15   A    No.

16   Q    All right.  Let's go to F-2.

17        F-2 relates to the proceeds the government is seeking

18   to forfeit from the sale of the real property at 2072 East

19   Creek Road.  Are you familiar with that property?

20   A    I am.

21   Q    And who used to reside in that?

22   A    Jacob Kingston and his family.

23   Q    And what happened on that property after the trial?

24   A    It's been sold.

25   Q    Where did the proceeds go?

1    A      Escrow.

2    Q      And if we look at Government Exhibit 8-1, which came

3    into evidence at trial, does this indicate that funds from

4    four Treasury checks went through a maze of accounts,

5    including Noil Energy Group --

6    A      Yes.

7    Q      -- that were used to purchase this residence?

8    A      It does.

9    Q      And did the jury return a guilty verdict on -- I

10   believe this was Count 8, finding the defendant guilty of

11   engaging in a money laundering transaction with respect to

12   this house?

13   A      Yes.

14          MR. SULLIVAN:  If we go back to F-2, please.  And

15   there was another one -- the Court can look at that if the

16   Court wants to.  There was another Government Exhibit that

17   was a demonstrative.  But let's pull it up just to refresh

18   everyone's recollection.

19          Can you pull up 8-1.3?

20   BY MR. SULLIVAN:

21   Q      Do you remember this chart?

22   A      Yes.

23   Q      Is this a more simplified version of one-half of the

24   bulk of the transaction?

25   A      That's correct.

1    Q    And what percent of the funds used to purchase this

2    residence up to 3.16 million represented illicit fraud

3    proceeds traced back to the Count 1 conspiracy?

4    A    All of it.

5    Q    And since the defendant was convicted of money

6    laundering with respect to this transaction, another basis

7    for forfeiture would be money laundering, correct?

8    A    Yes.

9    Q    Let's move on to F-3, which relates to the property

10   located at 16572 Somerset Lane, Huntington Beach.  Are you

11   familiar with this property?

12   A    Yes.

13   Q    And where is that property located?

14   A    It's in Huntington Beach, California.

15   Q    Was this the subject of Count 10 of the renumbered

16   indictment in the trial?

17   A    Yes.

18   Q    And did the jury convict the defendant of that count?

19   A    They did.

20   Q    If we go back to the trial exhibit that was admitted,

21   Government 10-1, does this represent the flow of funds

22   related to the purchase of the Huntington Beach property?

23   A    It does.

24   Q    And did you testify at trial that you traced back the

25   3.5 million that was used to purchase this property to claim

1    number 37, the $164 million that represented the two

2    Treasury checks that were obtained in the mail fraud scheme?

3    A    I did.

4    Q    So would the basis for forfeiture be both Count 1, the

5    mail fraud scheme and, Count 2, conspiracy to commit money

6    laundering offenses?

7    A    Yes.

8    Q    Let's move on to F-4 and F-6.  Which property does this

9    relate to?

10   A    This relates to -- it's two separate properties, but

11   they are in a related location.  The address is up there at

12   the top, Cactus Road and Camino Maquiladora.  They are in

13   San Diego.  This is a gas station that's also combined with

14   a small restaurant.

15            MR. GERAGOS:  A gas station combined with a?

16            THE WITNESS:  Small restaurant.

17            MR. GERAGOS:  Thank you.

18            THE WITNESS:  It's a Mexican restaurant.

19   BY MR. SULLIVAN:

20   Q    So just for the record, in the bill of particulars,

21   this is the property known as 1605 Cactus Road, San Diego,

22   California.  And number six is the property described as

23   7004 Camino Maquiladora, San Diego.  The spelling there is

24   M-a-q-u-i-l-a-d-o-r-a.

25        Can you describe to the Court what this represents,

1    this flow of funds?

2    A    This is an additional flow of funds showing the origin

3    of the IRS Treasury check, which is claim 37, to Washakie.

4    And then Washakie eventually transferred 120 million to a

5    new Washakie account, or a new WRE at JP Morgan.  And then

6    eventually 75 million went to yet another Washakie account

7    at Wells Fargo.  And then a couple of smaller transactions

8    for three million and ten million in May and June were

9    transferred to yet another Washakie Energy account at Wells

10   Fargo.

11   Q    February 12th, it looks like $100,000 of 100 percent

12   illicit fraud proceeds were used to make the down payment;

13   is that correct?

14   A    Yes, that's correct.

15   Q    Then on March 1st, how much of 100 percent SUA fraud

16   proceeds were used to actually purchase these two

17   properties?

18   A    There were -- March 1st is 3,320,000, with the 100,000

19   paid in February.

20   Q    And since these funds were traced to Treasury checks

21   obtained pursuant to the mail fraud scheme that the

22   defendant was convicted of in Count 1, would that be a basis

23   for forfeiture for these two properties?

24   A    Yes.

25   Q    Let's move on to Government Exhibit F-5.

```
1          Does this flow of funds relate to the property the
2  government seeks to forfeiture listed as 13720 Vanowen
3  Street, V-a-n-o-w-e-n, Van Nuys, California?
4  A    It does.
5  Q    Do you know what is located at this address in Van
6  Nuys?
7  A    As I recall, it's a carwash.
8  Q    And did you trace the purchase -- what is the purchase
9  price for this particular property?
10 A    $1 million.
11 Q    On September 30th, 2014, how much money was paid as the
12 down payment on this property that represents 100 percent
13 SUA funds?
14 A    50,000.
15 Q    Then what occurred on October 7th, 2014?
16 A    A remaining wire of $953,638.32 was wired to finalize.
17 Q    And what percentage of the funds did the 953,000 odd
18 dollars represent?
19 A    100 percent.
20 Q    And which U.S. Treasury checks obtained pursuant to the
21 fraud scheme did you trace this to?
22 A    These relate to claim 35.
23 Q    Claim 35.  Was that obtained pursuant to the fraud
24 scheme in December of 2013 to the total tune of $33,578,660?
25 A    It was.
```

1              MR. SULLIVAN:  Your Honor, we're going to skip F-6

2   because F-4 and F-6 are the same exhibit, and we're going to

3   F-7.

4   BY MR. SULLIVAN:

5   Q    And here the government is seeking forfeiture of the

6   property at 14021 Margate Street, Sherman Oaks, California,

7   otherwise known as 14027 Margate Street, Sherman Oaks,

8   California.  Do you know what is located at this address?

9   A    I believe it's a home, like a residence.

10  Q    Let's just go to the bottom line.  What was the

11  purchase price for this property?

12  A    1.2 million.

13  Q    And who was the original purchaser?

14  A    Teesdale, LLC.

15  Q    Would that be 6507 Teesdale, T-e-e-s-d-a-l-e, LLC?

16  A    Yes.

17  Q    And how much in 100 percent illicit fraud proceeds did

18  you trace on January 6th, 2016, in connection with the

19  purchase of this property?

20  A    1,175,000.

21  Q    And given all the green arrows here, can you generally

22  describe to the Court how -- the journey that this money

23  took, where it started and where it ended?

24  A    Yes.  This originated from claim 37, the $164 million

25  checks, that made its way through Washakie, and then made

1    its way through various Washakie accounts out to Isanne

2    SARL, the $56 million that was transferred out to

3    Luxembourg.  And then some of that money came back to SBK

4    Holdings USA from Isanne SARL, 15 million.

5        And then, as you'll see -- we showed it in one of the

6    other exhibits, but the four million goes to DK Zvezda, and

7    then comes back in a transfer combined with the money from

8    Levon and Baran's joint bank account.  And then from there

9    it goes from SBK Holdings USA to Pillar Law Group, and then

10   from Pillar Law Group paid out for the property.

11   Q    The bottom line here is that there are a lot of green

12   arrows on this chart, but they all represent the flow of the

13   illicit fraud proceeds through a maze of different companies

14   that end up purchasing a $1.2 million house in Sherman Oaks,

15   California, correct?

16   A    That's correct.

17   Q    And because you've traced those funds back to those two

18   Treasury checks that were obtained in March of 2015, would

19   the basis for forfeiture be that these funds represent the

20   proceeds of the Count 1 mail fraud conspiracy?

21   A    Yes.

22   Q    Let's move on to F-8.

23       And for all of these, would the other basis be that

24   these were transactions involved in the international money

25   laundering and money laundering conspiracy that were alleged

1   and proven in Count 2?

2   A    Yes.  For any one that went through an international

3   wire would be involved in the international money

4   laundering, and then the others would pertain to the money

5   laundering conspiracy count.

6          MR. SULLIVAN:  Count 2 actually was -- in addition

7   to the international money laundering, it also alleged that

8   there were transfers to entities that the Kingstons

9   controlled, or whatever.  But Count 2 will speak for itself,

10  Your Honor.

11  BY MR. SULLIVAN:

12  Q    Let's go on to F-8, and that relates to the

13  government's allegation of forfeiture relating to the 2010

14  Bugatti Veyron.

15       And if we go back to the trial exhibits, we're going to

16  look at 2-5 first.  Can you describe what this is?

17  A    Yes.  This is, again, a flow of funds, beginning with

18  the IRS, with the Treasury checks.  These are from early in

19  '13.  I don't remember the claim numbers off the top of my

20  head for these.

21  Q    Do you remember, though, that of the funds that are

22  listed here at the bottom, the 100,000 that was transferred

23  on July 29th, 2013 as the down payment, and the subsequent

24  1.72 million wire transfer on August 5th, do you remember

25  what percentage of these transfers represented SUA funds?

```
 1    A     Yes.  It was 100 percent SUA funds.

 2    Q     And if we look at 22-1, is that another document that

 3    was admitted at trial that relates to the purchase of this

 4    $1.8 million Bugatti?

 5    A     Yes.

 6    Q     And if we go back to F-8, is there -- if we look at

 7    Government Exhibit 22-3, does this have the VIN number --

 8    this was admitted at trial.  Does this have the VIN number

 9    relating to this vehicle?

10    A     Yes, up at the top there.

11    Q     And does it, for sake of just -- for the record, does

12    it end with the digits 795205?

13    A     It does.

14    Q     And would the Count 1 and Count 2 convictions that were

15    obtained at the trial, would those be the basis for

16    forfeiture of this asset?

17    A     Yes.

18    Q     Do you know where the Bugatti is?

19    A     I do not.

20    Q     Let's move on to F-9.  F-9 relates to the 2015

21    Lamborghini -- how do you pronounce that?

22    A     Aventador.

23    Q     Aventador, with a VIN number ending 03759.

24          And can you describe what's now on the screen,

25    Government Exhibit F-9?  Can you walk the Court through
```

1    this, briefly?

2    A    Yes.  So I traced, at the starting point again, the

3    checks in claim 37 as they worked their way through Washakie

4    and Isanne SARL, and then back to SBK Holdings.  And

5    eventually from SBK Holdings account 1857, $462,000 of SUA

6    proceeds were paid.

7    Q    And those were all 100 percent SUA funds?

8    A    That's correct.

9    Q    And we're starting to see some of the same transactions

10   over and over again, and that's because the money started at

11   the 164 million, and some of it flowed through the same way

12   until it was used to buy specific assets, correct?

13   A    That's correct.

14   Q    And who was the purchaser of this Lamborghini on

15   February 4th, 2016?

16   A    Noil, LLC.

17   Q    And would the convictions obtained on Counts 1 and 2 be

18   a basis to forfeit this to the United States?

19   A    Yes.

20   Q    Let's move on to F-10.

21        And, by the way, you testified yesterday that all of

22   these flow of funds are true and accurate depictions of the

23   underlying financial transactions to the best of your

24   ability; is that correct?

25   A    That's correct.

1    Q    And did you take these with you Friday night and do

2    anything on Saturday with them, all the government flow of

3    funds charts in this case?

4    A    Yeah.  I went through and reviewed them again.  These

5    were created a while back so I wanted to make sure and go

6    through them again to familiarize myself with them, and also

7    verify the information on them with my records and analysis.

8    Q    And did you find that you had to make some changes to

9    any of them?

10   A    Yes.  There are a few that had a numerical change that

11   needed to be made that I noticed involving my analysis of

12   SUA proceeds.

13   Q    Okay.  And on this particular one, one of these green

14   arrows, did you have to change the amount -- and I'm now

15   looking at the June 30th, 2016.  Again, look at that.

16        So if we can look at this transfer that occurred on

17   June 30th, 2016, of 4.9 million, did you, in fact, change

18   the amount listed as the specified unlawful activity?

19   A    Yes.

20   Q    Did you increase it or decrease it?

21   A    It was increased by about 13,000.

22   Q    And because of that, did that affect the next box over,

23   the next green arrow?

24   A    It did.

25   Q    And so did it affect the lower one, August 3rd, 2016,

1    the SUA had to increase by 13,000?

2    A    Yes.

3    Q    Other than that, did that change affect anything else

4    that had already been put on this flow of funds?

5    A    No, it did not.

6    Q    So, if anything, it would have made the purchase of a

7    property increase, but it didn't affect it here, correct?

8    A    No.  None of these were affected by that.

9    Q    Okay.  What is the property at F-10?

10        The government is seeking the forfeiture of the

11   property known as 1901-1903 West Magnolia Boulevard,

12   Burbank, California.

13        Now F-10, F-11, F-12, F-13, F-14, are those known as

14   the Regdalin properties?

15   A    Yes.

16   Q    What are those?

17   A    These are properties that were purchased through an

18   entity Regdalin Properties, which is an entity of Mr. Edgar

19   Sargsyan, and these have since been sold through bankruptcy

20   and the proceeds are sitting in escrow.

21   Q    All right.  And I'm going to treat these all as the

22   same for purposes of establishing that they're forfeitable.

23        So let's look at F-11.  Is this the flow of funds

24   relating to the property the government seeks to forfeit at

25   5761 South Anderson Street in Vernon, California?

1    A    Yes.

2    Q    If we look at F-12, is this the flow of funds relating

3    to the property the government seeks to forfeit at 6507

4    Teesdale Avenue in Valley Glen, California?

5    A    Yes.

6    Q    If we look at F-13, is this the flow of funds relating

7    to the property the government seeks to forfeit at 160 East

8    Alondra Boulevard in Carson, California?

9    A    Yes.

10    Q    And finally F-14.  Is this the flow of funds relating

11    to the property the government seeks to forfeit at 12026

12    Hoffman Street, number 302, in Los Angeles, California?

13    A    Yes.

14    Q    And with respect to all these five properties, do your

15    flow of funds indicate that fraud proceeds obtained from the

16    mail fraud scheme were used to purchase these five

17    properties?

18    A    Yes.  Not all of them are 100 percent fraud proceeds,

19    but all of them contain fraud proceeds.

20    Q    And do you know how much was obtained from the -- I

21    believe it was the bankruptcy court -- Regdalin properties

22    that are sitting in escrow, approximately?

23    A    My recollection is it was just under a million dollars,

24    about 900 something thousand.

25    Q    And the amount of funds that were used -- of the

```
 1   illicit fraud proceeds that were used to buy these five
 2   properties, did they greatly exceed that amount?
 3   A    Yes.
 4            MR. SULLIVAN:  Your Honor, we're just going to
 5   submit these for the record, these flow of funds.
 6            THE COURT:  All right.
 7   BY MR. SULLIVAN:
 8   Q    Let's move on to F-15.
 9            MR. SULLIVAN:  F-15 is described, Your Honor, in
10   the bill of particulars -- the seventh bill of particulars
11   as the outstanding amount of principal and interest due on
12   the June 21st, 2013 loan to Zubair Kazi in the amount of
13   $11,226,211.21.
14   BY MR. SULLIVAN:
15   Q    Was this the subject of multiple counts -- money
16   laundering counts at the trial?
17   A    Yes.
18   Q    Did the jury return guilty verdicts?
19   A    They did.
20   Q    Does the Government Exhibit 3-1 flow of funds, does
21   that indicate that fraud proceeds were used to make this
22   loan?
23   A    Yes.
24   Q    And you testified at trial.  What percent of the fraud
25   proceeds represented illicit fraud proceeds?
```

1    A    All of them.

2    Q    I mean what percent of the loan I should say.

3    A    All of it.

4    Q    All fraud proceeds?

5    A    Yes.

6    Q    And would that be a basis, then, to forfeit the

7    outstanding principal and interest due on this loan?

8    A    Yes.

9    Q    All right.

10            MR. SULLIVAN:  Your Honor, absent any questions on

11    that, I'm going to move to F-16.

12            THE COURT:  All right.  You may.

13    BY MR. SULLIVAN:

14    Q    F-16 relates to the property described as the assets of

15    SBK Holdings USA, Inc. and any investments held or made by

16    SBK Holdings USA, Inc. which have value.

17            And if we look at Government Exhibit 2-2, what is the

18    amount -- and this is an exhibit that was admitted at

19    trial -- what is the net amount of the funds that were

20    transferred from Washakie to SBK Holdings USA during 2014

21    and 2015?

22    A    $21,550,000.

23    Q    And do those represent SUA proceeds?

24    A    Yes.

25    Q    So to the extent that the Court orders a general order

1  of forfeiture relating to SBK Holdings USA -- by the way, do

2  you know of any assets that might be outstanding or owned by

3  SBK Holdings USA that might be forfeitable down the road if

4  certain things happen?

5  A    Not that I can think of right now.

6  Q    Is there some litigation going on -- is it Rhode

7  Island -- Connecticut -- is there some litigation going on

8  over a plane?

9  A    Yes.

10            MR. SULLIVAN:  So, Your Honor, the government is

11 going to be seeking a general order of forfeiture.  SBK

12 Holdings USA is, I believe -- the government might, through

13 discovery, find other assets that might be forfeitable.  So

14 our basis for that is going to be the fact that fraud

15 proceeds were transferred to SBK Holdings USA.

16            THE COURT:  Okay.

17 BY MR. SULLIVAN:

18 Q    And if we look at Government Exhibit A, we also see

19 that 15 million, correct, went to SBK Holdings USA from

20 Isanne SARL?

21 A    That's correct.

22 Q    And if we look at Government Exhibit C, we see that

23 other funds were sent to SBK Holdings USA.

24            MR. SULLIVAN:  All right.  Your Honor, absent any

25 questions from the Court on that, we're going to continue --

```
 1              THE COURT:  All right.
 2              MR. SULLIVAN:  -- until the Court wants to stop.
 3              THE COURT:  No.  I'm prepared to continue if you
 4   are.  I mean it's only 4:15.  I don't know.
 5              MR. SULLIVAN:  I know this is a little dry, but we
 6   have to go through it I guess.
 7              THE COURT:  I understand.
 8   BY MR. SULLIVAN:
 9   Q    Let's move on, then, to F-17.  And this is the category
10   described as Speedy Lion Renewable Fuel Investments, and any
11   property purchased or traced to transfers made to On Track
12   Escrow, including the property depicted here, which is
13   described as Desert Properties Holding, LLC -- and this is
14   in Mojave, California.
15         And, Agent Washburn, what is APN -- no, actually it's
16   parcel 427-111-11.  What type of property is located here,
17   do you know?
18   A    I believe this is the property that Century Energy was
19   using to install an LNG plant.
20   Q    And what is depicted in Government Exhibit F-17?
21   A    This is a flow of funds where it originates from claim
22   35, the $33 million check from December 26th, 2013, which
23   made its way to Komak, and then eventually paid from Komak
24   to Speedy Lion Renewable Fuel Investments.  And from that
25   account, this property was purchased.
```

1  Q    And the amounts aren't great here, but do the next two

2  properties relate to the parcels that are adjacent to this

3  one?

4  A    Yes.  As I recall, there were several right next to

5  each other.

6  Q    But because you were able to trace these back to the

7  claim number 35, fraudulently obtained Treasury check, and

8  it's 100 percent SUA fraud proceeds, would that be a basis

9  to forfeit this property to the United States?

10 A    Yes.

11 Q    And let's look at F-18.

12        MR. SULLIVAN:  Your Honor, that's described in the

13 same way in the bill of particulars, but it has a different

14 parcel number ending in dash 08.

15 BY MR. SULLIVAN:

16 Q    And could you just identify F-18 for the record?

17 A    Yes.  Again, this is another flow of funds.  It looks

18 near identical to the previous, but the purchase price is a

19 little bit different.  It's 65,000.

20 Q    And the same answers would apply to this, the basis for

21 forfeiture would be that you traced the roughly $75,000 back

22 to that claim number 35 that was fraudulently obtained?

23 A    Yes.

24 Q    If you look at F-19.

25        MR. SULLIVAN:  Your Honor, this is described in

```
 1   the same way, except for the last three -- the last two
 2   digits of the parcel number are dash -- I think we want
 3   F-19.
 4             I think we just did -- did we just do that?
 5             THE WITNESS:  This one is different.
 6             MR. SULLIVAN:  F-19, we want to do.
 7             Could we look at F-18 real quickly?
 8             F-18 looks like it's correct, Your Honor.  At the
 9   top it's a dash 08.  If we go to F-19, that should be a dash
10   11 -- no, dash 10.
11   BY MR. SULLIVAN:
12   Q    Agent Washburn, are you willing to change the heading
13   after today to make it correct?
14   A    Yes.
15             MR. SULLIVAN:  I apologize, Your Honor.
16             THE COURT:  That's okay.
17             THE WITNESS:  It wasn't my job to do the headings.
18   That was the art department.
19   BY MR. SULLIVAN:
20   Q    Anyway, did this parcel cost a little bit more than the
21   first two that we looked at in F-17 and F-18?
22   A    Yes.  This one is 325,000.
23   Q    And escrow of another 15,000?
24   A    Yes.  I believe that escrow is the same for all three.
25   There's earnest money on the same day for all three.
```

1   Q    And what would be the basis of forfeiting this property

2   along with the other two?

3   A    It's traceable back to the mail fraud proceeds in

4   Count 1 and money laundering, and actually specifically with

5   the Komak transactions.

6   Q    And to move on, let's go to F-20.  That's the

7   government seeking the forfeiture of Willow Crest

8   Apartments, 5217 Willow Crest Avenue, Los Angeles,

9   California.  And are those, in fact -- is that an apartment

10  building?

11  A    Yes.  I believe it's a small apartment building.

12  Q    And what was the purchase price based on Government

13  Exhibit F-20?

14  A    800,000.

15  Q    And how much in 100 percent illicit fraud proceeds did

16  you trace back to money that was sent to Komak, and money

17  that was sent to Isanne SARL, to BioFarma through the

18  Alptekin Yilmaz account?

19  A    There was 791,525, and this is very similar to the last

20  one, but because of the timing, some of the money from

21  BioFarma and Alptekin Yilmaz was swapped around.  So that's

22  depicted in here.  And then those cashier's checks were

23  taken and redeposited during this time.

24  Q    Right.

25          MR. SULLIVAN:  So, Your Honor, if you look at

1    this, the 21.3 million cashier's check goes in in October,

2    and 20 million leaves.

3    BY MR. SULLIVAN:

4    Q    That, Special Agent Washburn, means that there was

5    still SUA that could be used to purchase this property.  Is

6    that what happened?

7    A    Yes.

8    Q    And would the basis of both Count 1 -- the conviction

9    on Count 1 and Count 2 of the renumbered indictment be --

10   would make this property forfeitable to the United States of

11   America?

12   A    Yes.

13   Q    So let's move on to F-21.  And now we're back to --

14   this is described in the bill of particulars as solar

15   turbines paid for in part by the 3,935,541 transfer on

16   October 1st, 2019, to Century Energy account 9961, and

17   a 3.9 million wire transfer to Hendrix Energy.

18        Can you tell the Court what F-21 through F-25 relate

19   to?

20   A    These relate to assets purchased through the Century

21   Energy accounts.  These are the accounts in the name of

22   Grigor Termendzhyan.  In this particular one, it shows on

23   October 1st they purchased, according to the wire

24   information, the two solar turbines.

25   Q    Did you speak with Rick Hendrix of Hendrix Energy about

1    this?

2    A    Yes.

3    Q    And what did he say -- what are solar turbines?  Do

4    they have anything to do with the sun?

5    A    No.  It's a misnomer.  In fact, they were called --

6    according to him, they were called solar turbines before

7    solar energy was a hot thing.  These relate to liquid

8    natural gas.  They're energy producing turbines that --

9    yeah, that he helped broker.

10   Q    Did he say anything about the value of these?

11   A    Yeah.  He said he got a smoking deal on these from

12   Mr. Termendzhyan.

13   Q    Who --

14   A    Mr. Hendrix.

15   Q    Who got the deal?

16   A    Oh, Mr. Termendzhyan got the deal.

17   Q    Which Mr. Termendzhyan?

18   A    Grigor.

19   Q    And are these the subject of a restraining order that

20   was issued by the Court --

21   A    Yes.

22   Q    -- ordering certain people not to try to sell or

23   dissipate these assets?

24   A    That's correct.

25   Q    And where did you trace the 3.9 million to that is

1  represented here as being 100 percent illicit fraud

2  proceeds?

3  A    This comes from the CD of 15 million that was deposited

4  and then withdrawn, at Century Energy, which originates

5  through Speedy Lion and G.T. Energy, and, you know, back up

6  the chain.

7  Q    So this account here, Century Energy at the top, number

8  8979, if we went back to Government Exhibit D, just to show

9  the Court, that would be what's represented in the lower

10 left box, correct?

11 A    Yes.

12 Q    And you testified, I believe, earlier that of the

13 15 million that went into that account, that was a

14 combination of the illicit fraud proceeds and the property

15 involved in money laundering that approximately -- was it

16 5.5 million that represented just pure specified unlawful

17 activity?

18 A    Correct.

19 Q    So let's go back to F-21.  So of that 5.6 million,

20 based on your methodology, you have traced 3.9 million was

21 used to buy these solar turbines?

22 A    Correct.

23 Q    Let's move on to F-22.  What does this depict?

24         MR. SULLIVAN:  By the way, this is seeking,

25 Your Honor, the forfeiture described as compressors paid

 1    for, at least in part, by the $100,000 transfer on

 2    October 4th, 2019 to Century Energy account 9961.

 3                THE WITNESS:  So this appears to be more

 4    industrial equipment that we used, and it's traced back to

 5    that same source of that money deposited into the CD, of

 6    which five and a half million was directly traceable fraud

 7    proceeds, and this 200,000 is comprised of all SUA proceeds.

 8    BY MR. SULLIVAN:

 9    Q    And do you recall whether or not the restraining order,

10    when it described the property subject to the orders,

11    included the solar turbines and other equipment?

12    A    Yes.

13    Q    Is that what this would be?

14    A    Yes.  This company, Industrial Energy Solutions, has

15    several transactions with Century Energy for equipment.

16    Q    And given that you traced this back to the Count 1 mail

17    fraud conspiracy, would that be a basis for forfeiture,

18    along with money laundering?

19    A    Yes.

20    Q    Let's move on to F-23.

21         Is that a similar flow of funds relating to the same

22    type of transaction you've just testified about?

23    A    Yes.  This is just another wire transfer out to a

24    company which I can't pronounce, based out of China.

25    Q    We will let Government Exhibit F-23 speak for itself.

1   A    And the memo line on that wire deposit, it is for

2   storage tank deposit, presuming more equipment for an LNG

3   plant, or a plant of some kind.

4   Q    And that is listed in the bill of particulars as

5   industrial equipment and/or storage tank paid for in part by

6   the $200,000 wire transfer on October 20th, 2019 to Century

7   Energy account 9961.  And would the basis of forfeiture be

8   the convictions obtained in this case against the defendant

9   on Count 1 and Count 2?

10  A    That's correct.

11  Q    And let's move on to F-24.

12          MR. SULLIVAN:  This now, Your Honor, is described

13  as 9153 Stellar Court, Corona, California.

14  BY MR. SULLIVAN:

15  Q    And do you know what is located there, Agent Washburn?

16  A    Yes.  This is an office building.  It's the office for

17  the company Century Energy as well as Industrial Energy

18  Solutions.

19  Q    And could you describe to the Court and explain why now

20  these indicate 100 percent specified unlawful activity,

21  slash, property involved in money laundering?

22  A    Yes.  At the point of this transaction, the actual

23  amount of SUA proceeds barely exceeded 1.1 million.  So just

24  over 1.1 million of traceable proceeds, which was combined

25  with the PIML funds.

1   Q    Given this property was purchased with 100 percent SUA

2   property involved in money laundering funds of $2 million on

3   October 30th, 2019, would that be a basis for forfeiting

4   this property to the United States of America?

5   A    Yes.

6         MR. SULLIVAN:  Unless the Court has questions, I

7   you will move to F-25.

8         THE COURT:  You may move on to F-25.

9         MR. SULLIVAN:  This is described, Your Honor, in

10  the seventh bill of particulars as any estate asset

11  purchased or traced to $275,000 transfer on November 20th,

12  2019 to Century Energy account 9961.  And I would note that

13  document ECF 1297, the government's revised list of

14  properties the government seeks to forfeiture, also has a

15  parenthetical of welding machines, skid manufacturing, and a

16  five-ton crane.

17  BY MR. SULLIVAN:

18  Q    What is a five-ton crane?

19  A    I don't know.

20  Q    What do you think the capacity of a five ton crane is

21  for lifting?

22  A    I hope it's more than five tons.

23  Q    Anyway --

24        THE COURT:  It wouldn't be exactly five tons?

25        MR. SULLIVAN:  I think it's probably similar to at

1   least five tons, but maybe not more.

2   BY MR. SULLIVAN:

3   Q    But anyway, can you describe to the Court what this is?

4   And it's now changed to 100 percent property involved in

5   money laundering.

6   A    Yes.  This occurred just under a month after that last

7   transaction on October 30th.  So at this point the remaining

8   funds in the account for those that relate to the financial

9   transactions that have been classified as property involved

10  in money laundering.

11          MR. SULLIVAN:  So, Your Honor, this one is pure

12  property involved in money laundering.  I believe it's the

13  only one we have.  And it's of slightly different character

14  than pure specified unlawful activity, but we had be

15  briefing this because I don't think we've briefed this issue

16  for the Court.  So just a note.

17          THE COURT:  All right.

18          MR. SULLIVAN:  So moving on to F-32 -- we're

19  skipping now because we removed some properties, Your Honor,

20  from the seventh -- that were on the seventh bill of

21  particulars.  This is described as the four million which

22  remained at Komak in Turkey after being transferred to Komak

23  on December 31st, 2013, and continues to be owed to Washakie

24  pursuant to the additional protocol dated January 13th,

25  2016.

1  BY MR. SULLIVAN:

2  Q    And if we look at Government Exhibit 2-3,

3  Special Agent Washburn, I know you have all these memorized,

4  but what is the total amount of funds that were transferred

5  to Komak?  There were two them.  What do they total?

6  A    The first two there was nine million.

7  Q    And then was there was a subsequent transfer?

8  A    Yes, 13 million.

9  Q    What do those total?

10  A    22 million.

11  Q    So you've got 22 million that went to Komak.  How much

12  went from Komak to Speedy Lion?

13  A    18 million.

14  Q    So that leaves the four million we are talking about

15  here?

16  A    That's correct.

17  Q    If we look at the additional protocol, if we go back to

18  F-25 -- no, F-32, and look at Government Exhibit 6-80, which

19  is the additional protocol.

20        MR. SULLIVAN:  And this one was admitted into

21  evidence, Your Honor.  It's entitled the Additional Protocol

22  to the Partnership Agreement dated September, 23rd, 2013.

23  BY MR. SULLIVAN:

24  Q    Do you recall how this treats the $4 million?

25  A    Yes.  It treats it -- my recollection is it treats as

1    owed by Speedy Lion Renewable Fuel Investments to Washakie,

2    up to a certain date.

3    Q    And if we go to the next page --

4              MR. SULLIVAN:  I stand corrected.

5    BY MR. SULLIVAN:

6    Q    This indicates that the 18 million -- let's go back to

7    the first page.  This is entered into between Washakie and

8    Komak, and does this indicate that the $18 million that

9    Komak sent to Speedy Lion is basically going to be owed to

10   Washakie and not to Komak if it's not paid by a certain

11   date?

12   A    That's correct, yeah.

13   Q    So therefore the $4 million that went over to Komak is

14   still over in Komak as of right now?

15   A    Yes.

16             MR. SULLIVAN:  Well, we know that we're going to

17   be seeking, I believe, a general order of forfeiture for

18   that, Your Honor.  So that's our evidence.

19   BY MR. SULLIVAN:

20   Q    Let's move on to F-33.

21             MR. SULLIVAN:  And we are seeking here, according

22   to the seventh bill of particulars, the $3,810,000

23   transferred to Komak by Noil Energy on March 22nd, 2016,

24   which continues to be owed to Washakie pursuant to the

25   additional protocol dated -- the one we just looked at --

1    January 13th, 2016.

2    BY MR. SULLIVAN:

3    Q    If we look at two dash --

4         Well, actually, we can look at Government Exhibit E.

5             MR. ROLWING:  One moment, Your Honor.

6             THE COURT:  Okay.

7    BY MR. SULLIVAN:

8    Q    If we look at Government Exhibit E, does this indicate

9    at the bottom that 3,810,000 was sent by Noil Energy Group

10   to Komak on March 22nd, 2016?

11   A    It does.

12   Q    Agent Washburn, what does the MASAK report say happened

13   to that money once it was transferred to Komak?

14   A    According to the MASAK report as well as my own review

15   of Turkish bank records we got from Mr. Korkmaz -- well,

16   from Mr. Korkmaz's counsel, that money was withdrawn in

17   cash.  All but a couple thousand of it -- or a couple

18   hundred of it was withdrawn in cash by Mr. Kamil Feridun

19   Ozkaraman.

20   Q    We'll get the spelling of that later.

21   A    I stand corrected.  I don't think it says who withdraws

22   the cash actually for this transaction.

23   Q    Did the report say what happened to the cash, or what

24   happened next?

25   A    From this transaction?

1    Q    Yeah.

2    A    Not that I recall.

3    Q    Did the report indicate that funds were deposited into

4    any entity over there?

5    A    Yes.  There is an entity, Noil something with travel

6    or --

7    Q    Would the report refresh your recollection?

8    A    I have it here still.

9         Yes, this will help.

10        Do you happen to have a page number?

11             MR. ROLWING:  I will in a second.

12             MR. SULLIVAN:  Your Honor, I'm going to move on

13   and we will supply this information as soon as we locate it.

14             THE COURT:  I take it you'll have Mr. Washburn on

15   the stand for longer than just today?

16             MR. SULLIVAN:  It's going to be close.

17   BY MR. SULLIVAN:

18   Q    Seventy-two and 74.

19   A    Seventy-two and 74.  Okay.

20        The company is called Noil Investment Construction

21   Tourism Industry and Commerce, Inc.

22   Q    And was the financial transaction that was uncovered by

23   the MASAK report?

24   A    Yes.  On March 23rd, it was deposited, 1,100,000 U.S.

25   dollars into that account.

1    Q    And if you spelled Noil backwards, what does it spell?

2    A    Lion.

3    Q    And you are familiar with any entities, based on the

4    trial evidence, that relate to Noil?

5    A    Yes.

6    Q    Who owned Noil Energy Group?

7    A    Levon Termendzhyan.

8         MR. SULLIVAN:  Your Honor, we are still just going

9    to seek a general order of forfeiture and have to do

10   discovery to see if we can find any forfeitable assets that

11   relate to this $4 million.  I'm going to move on.

12   BY MR. SULLIVAN:

13   Q    Let's go to F-34 where the government is seeking the

14   forfeiture of the entity called SBK Holding AS.

15        Where is SBK Holding AS located?

16   A    In Turkey.

17   Q    Did Levon Termendzhyan ever indicate that he owned that

18   entity?

19   A    In his resume he indicated that he founded it.

20   Q    Let's look at Government Exhibit -- entered into

21   evidence at trial -- 19-10.

22        Are you familiar with this, Special Agent?

23   A    Yes.

24   Q    And if we go to page two, and if we blow up the last

25   two paragraphs, what does the -- just read into the record

1  the first two sentences, I think -- yes, please.

2  A    The first two sentences?

3  Q    Of the first paragraph.

4  A    Okay.  In 2011, Mr. Termendzhyan visited Turkey and was

5  very impressed with the amount of building and business

6  opportunities he found in Istanbul.  He returned again in

7  2012 to conduct more due diligence.

8  Q    And does the third sentence begin with on March 8th,

9  2013, he formed SBK Holdings and opened his headquarters,

10  and it lists an address in Istanbul, Turkey?  Is that

11  correct?

12  A    It does.

13  Q    And during the trial, was there evidence that Washakie

14  directly transferred funds to SBK Holding AS in Turkey?

15  A    Yes.

16  Q    Let's look at Government Exhibit 2-3.  And on November

17  13th, 2013, how much money was transferred by Washakie to

18  SBK Holding in Turkey?

19  A    Ten million.

20  Q    And that $10 million, that was approximately seven or

21  eight months after Mr. Termendzhyan claimed that he formed

22  SBK Holding in March of 2013, in Turkey, correct?

23  A    Yes.

24  Q    If we look at, again, Government Exhibit E, do we

25  see -- in the lower left quadrant, do you see two transfers

1  to SBK Holding from two different entities?

2  A    I do.

3  Q    And for the record, what are they?

4  A    $458,000 from SBK Holdings USA, and $3,885,135 from

5  Noil Energy Group, Inc.

6  Q    Those occurred in February and March of 2016; is that

7  correct?

8  A    That's correct.

9  Q    Did those transfers occur shortly after the execution

10  of the search warrants in this case?

11  A    Yes, within a couple of months.

12  Q    And if we go to Government Exhibit C, how much money

13  was transferred to SBK Holding in Turkey in October and

14  November of 2016 from SBK Holdings USA?

15  A    Just under 23 million.  About 22 million.

16  Q    Would the precise number be 21,265,000?

17  A    Yes.

18       MR. SULLIVAN:  And, Your Honor, this bill of

19  particulars also references, in paragraph 34-G, the assets

20  of BioFarma Ilac AS, Turkey, purchased or traced to fraud

21  proceeds transferred thereto.

22  BY MR. SULLIVAN:

23  Q    And if we look at Government Exhibit 19-10, the resume

24  of Mr. Termendzhyan, and go to page three -- by the way,

25  let's go back up to page two.

1      Does the bottom of page two, does that indicate an

2  amount of money that supposedly Mr. Termendzhyan has

3  invested in Turkey?

4  A    Yes.  It claims over 500 million.

5  Q    And does it refer to eight additional Turkish

6  companies?

7  A    It does.

8  Q    And on page three, is one of those companies called

9  BioFarma?

10  A    It is.  It's the second company on the list.

11  Q    And if we go back to Government Exhibit A, does that

12  show that $40 million of fraud proceeds went into BioFarma

13  on June 16th, 2015?

14  A    Yes.

15  Q    And that 30 million left to the Alptekin Yilmaz account

16  shortly thereafter -- the next day?

17  A    Yes, it did.

18  Q    And what is 40 million -- and we get numbed by all the

19  numbers in this case, but what is 40 million minus

20  30 million?

21  A    Ten million.

22  Q    Do you know where that ten million went?

23      You know where some of it went, right?

24  A    Some of it went through Munir Sahin.

25  Q    But is it possible there are still other funds -- or

1   the funds were used in BioFarma itself that could be

2   forfeitable to the United States?

3   A     Yes.

4   Q     And those funds you just referred to, those were the

5   ones that we talked about that went to the United States to

6   the joint bank account in the name of Korkmaz and

7   Termendzhyan?

8   A     Correct.

9          MR. SULLIVAN:  Your Honor, I'm going to move on,

10  then, to bill of particulars paragraph 34-H, which specifies

11  the assets of Isanne SARL in Luxembourg either purchased or

12  traced to fraud proceeds.

13  BY MR. SULLIVAN:

14  Q     And let's look at Government Exhibit 2-14, which came

15  into evidence.  Can you identify what this is?

16  A     Yes.  This is a document that we received in our MLAT

17  to Luxembourg, and it shows the ownership structure.

18  Q     And underneath SBK -- which entity does this chart

19  indicate is the 100 percent owner of Isanne SARL in

20  Luxembourg?

21  A     SBK Holding AS.

22  Q     And if we look at Government Exhibit A --

23          MR. SULLIVAN:  One moment, Your Honor.

24          Your Honor, we have come across additional

25  organizational charts that were provided by Luxembourg, but

1    we haven't marked them yet.  So we can either try to mark

2    them now or we can --

3              THE COURT:  Do they differ from the one that --

4              MR. SULLIVAN:  No.  They just have more detail and

5    they show more ownership structure.

6              THE COURT:  Well, we can mark them now while

7    you're here.

8              MR. SULLIVAN:  Your Honor, what I would prefer to

9    do is just keep going until 5:00, and we'll mark these

10   tonight and we'll slip them in tomorrow.

11             Is that okay?

12             MR. ROLWING:  Yeah.

13             MR. SULLIVAN:  So if we look at Government

14   Exhibit A, which we were just looking at, Your Honor, you

15   will see that the 56.3 million did go to Isanne SARL.

16   BY MR. SULLIVAN:

17   Q    And if we look at 6-227, which was admitted at trial,

18   what is this, Special Agent Washburn?

19   A    This is a loan agreement with Washakie and SBK Holding

20   AS.

21   Q    And if we go to the second page, does it indicate that

22   SBK Holding -- at the top two paragraphs -- AS owes Washakie

23   Renewable Energy because it had borrowed money supposedly

24   from Washakie Renewable Energy?  Is that what this

25   indicates?

1    A    Yes.

2    Q    And if we go down the page, what is the amount of money

3    that is covered by this agreement?

4    A    56,300,000.

5    Q    Which is the 56.3 million that was sent over.  So this

6    is just -- so is this just additional evidence that there

7    might be funds over in the name of SBK Holding AS or Isanne

8    SARL that might be forfeitable to the United States, and

9    that would be because fraud proceeds were sent?  That would

10   be a basis for a general forfeiture order?

11   A    That's correct.

12   Q    All right.  Let's move on to F-35, which is described

13   in paragraph 36.

14        MR. SULLIVAN:  Your Honor, this is where the

15   paragraphs don't align perfectly.  I apologize.  They are

16   off by one or two.  But it's listed, for reference, in the

17   government's revised list of properties to be included in

18   the forfeiture trial, document number 1297.  The bill of

19   particulars, at paragraph 36, lists the assets of Mega

20   Varlik Yonetim, Turkey, purchased or traced to fraud

21   proceeds transferred thereto.

22   BY MR. SULLIVAN:

23   Q    And what does this flow of funds depict in Government

24   Exhibit F-35?

25   A    This shows, at the bottom here, the $10 million on

1    March 12th, 2014 was wired out to Jacob Kingston's Garanti
2    Bank account, and the source of those funds is traced back
3    in part to claims 35 and 36 checks, as well as the proceeds
4    from the sale of product used in the fraud.
5    Q    And of the ten million, what portion represents illicit
6    fraud proceeds traced back to the mail fraud scheme?
7    A    $7,887,055.
8    Q    And if we look at Government Exhibit 1-10, which was
9    admitted at trial, in the upper right does it show that
10   $15 million was transferred to Turkey from Washakie?
11   A    Yes.
12   Q    And if we go to page eight of this document -- let's
13   find out the date.
14   A    April 16th.
15        This is 15 million transferred out of the account.
16   Q    Do the millions mean anything to you any more -- on
17   April 28th.
18        Okay.  Let's look at Government Exhibit 2-3.  We can
19   always go back to 2-3 to double-check this stuff.  Let's
20   look at the second page.
21        Does that reflect that $15 million was sent from
22   Washakie to Turkey Garanti Bank on April 28th, 2016?
23   A    It does.
24   Q    Based on the text messages that were admitted at the
25   trial between Levon Termendzhyan and Jacob Kingston, what

1    was this money used for?  Where did it go?

2    A    This was sent to Setap.

3    Q    Is that part of the Mega Varlik -- is that a holding of

4    Mega Varlik, Setap?

5    A    I believe it's a company owned by Jacob Kingston now in

6    Turkey.

7            MR. SULLIVAN:  So, Your Honor, that's the basis

8    for seeking -- to the extent that Mega Varlik has assets

9    traceable to the mail fraud scheme, a general order of

10   forfeiture from Mega Varlik.

11   BY MR. SULLIVAN:

12   Q    Tell the Court what you know about Mega Varlik as of

13   right now.

14   A    Mega Varlik currently, at least as of this summer when

15   we spoke to Mr. Caglar Sendil, it has assets, but it's

16   restricted from conducting business.  But they have a series

17   of real property and vehicles that have value, that could be

18   sold.

19           THE COURT:  And it's restricted from conducting

20   business by way of what?

21           THE WITNESS:  Through the Turkish criminal

22   investigation.  So it's been restrained.

23           They are still operating and still running, at

24   least it was this summer, but they weren't allowed to sell

25   any of their assets or buy any new assets.  So it's just

1   slowly bleeding money.  But it's worth, as I recall -- it

2   was, I want to say, about $20 million in value, of U.S.

3   dollars, in assets.

4           THE COURT:  Is that hard assets or is that because

5   it's a going concern?

6           THE WITNESS:  I believe the majority of that would

7   be hard asset value, because the people running the company

8   didn't -- they were trying to get out of the company and

9   they wanted to sell the assets of the company out --

10          THE COURT:  And remind me what business it was

11  conducting.

12          THE WITNESS:  It was an asset management bank.  So

13  what they would do is they would buy distressed assets and

14  sell them.

15          So they buy boats, like, for example -- an example

16  of something they would do would be something along the

17  lines of the Queen Anne, where the boat was in financial

18  distress from the bank and they would buy it at a premium --

19  at a cheap price, and then sell it, presumably, after

20  renovating.

21  BY MR. SULLIVAN:

22  Q    And that first ten million, if we go back to F-35, do

23  you recall Jacob Kingston testifying about the role that he

24  was going to play in Turkey with regard to Mega Varlik?

25  A    Yes.  He stated that he was just going to be the face

```
 1  of the company.  He was going to be the American face.
 2  Q    And subsequent to the trial, we received some financial
 3  reports indicating that he was the 99 point something
 4  percent shareholder, correct?
 5  A    That's correct.
 6  Q    But his testimony at the trial was that he was
 7  basically --
 8  A    Nominally only.  A nominal owner.
 9          MR. SULLIVAN:  Your Honor, his testimony is part
10  of the record, so the Court can consider that too.  So we
11  will be seeking a general order forfeiture with respect to
12  Mega Varlik.
13          MR. GERAGOS:  Is that a concession that the
14  witness was materially false at trial?
15          MR. SULLIVAN:  I can't hear you.
16          MR. GERAGOS:  Is that a concession that the
17  witness was materially false at trial?
18  BY MR. SULLIVAN:
19  Q    What is a nominee owner?
20  A    It means you own it in name.  Generally you hear it
21  when you own a company but you don't control it or have any
22  access to running the company.
23  Q    And based on the hundreds and hundreds of pages of
24  financial records you've looked at, bank accounts, wire
25  transfers, even records from Turkey, how much money from
```

```
 1   Turkey or Luxembourg ever made its way back to Utah, Jacob
 2   Kingston, or to Isaiah Kingston?
 3   A     None, that I recall.
 4         MR. SULLIVAN:  Your Honor, I think that's a good
 5   point to stop.  We've made it through pretty far, and I can
 6   report, happily, there's not a lot left of these.
 7         THE COURT:  So what are your thoughts on timing
 8   generally?  How are you doing in terms of being on pace?
 9         MR. SULLIVAN:  We were in the hole, Your Honor,
10   earlier today due to unexpected -- the length of witnesses,
11   but we just made up tremendous ground here.  And it really
12   is going to depend on cross-examination, because we don't
13   have that many witnesses.
14         THE COURT:  So how many witnesses do you have
15   left, and who are you calling tomorrow, I suppose?
16         MR. ROLWING:  Tomorrow is Nazmi Topcuoglu, who
17   will be in France.  So at 9:00 a.m. it's 5:00 p.m. in
18   France.  So we'll put him on to start the day.  I anticipate
19   Mr. Geragos will have substantial cross for Mr. Topcuoglu
20   since he's contacted us so much, but I don't want to speak
21   for him.  But I probably will have an hour of direct.
22         MR. GERAGOS:  I would imagine I'll have the same
23   in cross.
24         THE COURT:  Okay.
25         MR. ROLWING:  And then we have two I think very
```

```
 1   short witnesses via Zoom, but they're having some medical
 2   issues.  Both are suffering from medical issues and timing
 3   issues.  In fact, Mr. Hendrix just told me his wife is
 4   suffering from a recent emergency in the last few days and
 5   has to be at the doctor's tomorrow.  So that's a game time
 6   decision.  I've got to communicate with the witnesses to
 7   figure out if we can put them on on Zoom.
 8            If not, we have a lot of cleanup to do with
 9   Mr. Washburn.  We're going to put him back on and then open
10   him up for cross.  But I think we will be resting by
11   Thursday morning, at the latest, is my guess.
12            THE COURT:  All right.
13            MR. ROLWING:  Depending on cross.
14            THE COURT:  Mr. Geragos, do you know the length of
15   time you will need?
16            MR. GERAGOS:  If I put Jacob Kingston back on,
17   that's the game changer.  I've got him under subpoena.  He's
18   on an on-call arrangement.  The government knows about it.
19   So I've got to reassess that tonight.
20            THE COURT:  Okay.
21            MR. GERAGOS:  That will be the biggest
22   determination.
23            Also potentially Kazi, but I will talk to the
24   government about that.
25            THE COURT:  Okay.
```

1          All right, then.  So I'm assuming we're just

2   sticking with 9:00 to 5:00, and a lunch break at noon,

3   unless there's some special circumstance that you'll advise

4   me of?

5          MR. GERAGOS:  I'll work with them on the other two

6   other witnesses for tomorrow.  Whatever they need to do,

7   I'll try to accommodate.

8          MR. ROLWING:  We're certainly at 9:00 tomorrow.

9   Whether we go all the way to 5:00 depends on these other two

10  witnesses, and then cleanup with Mr. Washburn and when

11  Mr. Geragos wants to conduct his cross.

12         THE COURT:  Okay.

13         All right.  Is there anything else we need to

14  address before we recess?

15         MR. GERAGOS:  Not from the defense.

16         THE COURT:  All right.  Thank you.  Have a good

17  evening.

18         (Whereupon, the trial was continued to Wednesday,

19  November 17, 2021 at 9:00 a.m.)

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4         I hereby certify that the foregoing matter is

 5    transcribed from the stenographic notes taken by me and is a

 6    true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16    PATTI WALKER, CSR-RPR-CP      DATED: 12-15-2021
      Official Court Reporter
17    351 South West Temple, #8.431
      Salt Lake City, Utah  84101
18    801-364-5440

19

20

21

22

23

24

25
```