1              IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF UTAH, CENTRAL DIVISION

3

4

5   UNITED STATES OF AMERICA,    )

6            Plaintiff,          )

7      vs.                       )   Case No. 2:18-CR-365-JNP

8   LEV ASLAN DERMEN,            )

9   a/k/a Levon Termendzhyan,    )

10           Defendant.          )

11   _____)

12

13           BEFORE THE HONORABLE JILL N. PARRISH

14        -------------------------------------

15                  January 29, 2020

16                  Jury Selection

17                  Volume III

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    385-215-5889

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101

1                    A P P E A R A N C E S

2

3    For Plaintiff:              Leslie A. Goemaat
                                 John E. Sullivan
4                                Arthur J. Ewenczyk
                                 US DEPARTMENT OF JUSTICE
5                                TAX DIVISION
                                 601 D St. NW
6                                Washington, DC  20004

7                                Richard M. Rolwing
                                 US ATTORNEY'S OFFICE
8                                TAX DIVISION
                                 303 Marconi Blvd. #200
9                                Columbus, Ohio 43215

10

11   For Defendant:             Mark J. Geragos
                                 Setara Qassim
                                 Linda Moreno
12                               Arthur Karagezian
                                 GERAGOS & GERAGOS APC
13                               644 S. Figueroa Street
                                 Los Angeles, CA  90017
14
                                 Jon D. Williams
15                               JON D WILLIAMS PC
                                 9 Exchange Place, #600
16                               Salt Lake City, Utah  84111

17

18

19

20

21

22

23

24

25

```
 1   SALT LAKE CITY, UTAH; WEDNESDAY, JANUARY 29, 2020; 9:00 A.M.
 2                         PROCEEDINGS
 3             THE COURT:  Good morning.  We are here in the
 4   matter of the United States of America vs. Mr. Lev Dermen.
 5   The case number is 2:18-CR-365.  Let's begin with
 6   appearances.
 7             MS. GOEMAAT:  Good morning, Your Honor.  On behalf
 8   of the United States, Leslie Goemaat, Arthur Ewenczyk,
 9   Richard Rolwing, and John Sullivan.
10             MR. GERAGOS:  I'm getting acclimated.
11             Good morning, Your Honor.  Mark Geragos,
12   G-e-r-a-g-o-s, with Ms. Qassim, who is present, my client,
13   who is present at counsel table, Jon Williams and Linda
14   Moreno.
15             THE COURT:  Thank you.
16             Well, the jury pool is supposed to be reporting so
17   that we can start with any follow-up we need to do by ten
18   o'clock.
19             I did ask Ms. Schaerrer last night to send out an
20   email with respect to communications that our jury
21   coordinator had received from jurors, and then there was one
22   additional one that we received just moments ago as the
23   juror came into the building.
24             So did you all receive those communications from
25   Ms. Schaerrer?
```

1           By my count, we have four jurors who have -- I

2   don't know, have come up with reasons that they don't

3   believe they should serve.  Juror No. 4 has migraines at

4   least once a month.  Juror No. 27 thought about it at home

5   and has a bias against the IRS.  Juror No. 36 has a

6   religious obligation every Thursday at 5:00.  And then

7   Jurors 51, 60 and 72 indicated they financially can't afford

8   to be on the jury for the length of time that we have set

9   aside for this trial.  And then Juror No. 10, upon coming in

10  this morning, simply said she had a question about something

11  that defense counsel said on Monday and he may want to talk

12  to the Judge.  I have no idea what that means.

13          So I suppose --

14          MR. GERAGOS:  Which one was that, Your Honor?  I

15  don't have that on my list.

16          THE COURT:  That happened this morning as the

17  jurors were entering the building.  Juror No. 10 mentioned

18  to the jury coordinator that she has a question about

19  something defense counsel said on Monday, I guess during the

20  session, and he might want to talk to the Judge.  I don't

21  know what that means.

22          MR. GERAGOS:  Thank you.

23          THE COURT:  So by my count, that's seven potential

24  problems.  I still think that gives us enough members in the

25  pool to complete our jury, even if all of those were to be

1  released, and I'm not suggesting that they would be.  I

2  would like your input on how we go about following up on

3  these issues.  We could call them back one by one.

4          MR. GERAGOS:  I'm sorry to interrupt.  I just

5  think that there's an issue that has occurred over the

6  evening that I believe Ms. Moreno and Mr. Williams want to

7  address the Court on.

8          THE COURT:  Okay.  Thank you.

9          All right.  You may be heard.

10          MR. WILLIAMS:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. WILLIAMS:  Your Honor, yesterday the

13  government informed the Court that one of the federal agents

14  had conducted a criminal history investigation of one of the

15  panel members.  We inquired of the government yesterday

16  through email to ask more details about that.  The response

17  that we got -- and I'd like to read this email.  This is

18  from Mr. Ewenczyk.  It said, counsel, ASAC Tyler Hatcher

19  asked an investigative analyst at IRS CI to look for a

20  potential criminal history for Juror No. 37 on NCIC.  Upon

21  finding two potential Utah state misdemeanor convictions, he

22  looked up Juror 37's two misdemeanor cases on Exchange,

23  which is the Utah state court's online record system.  He

24  also pulled up the DMV photo for the defendant in those two

25  cases, which confirmed those two cases pertained to

1   Juror 37.

2           We then had a paralegal at the USAO look up the

3   same two cases, also on Exchange, and then there's some

4   additional information about the history of those cases.

5   They provided us state court dockets this morning.

6           The concern, through our informal investigation

7   last night about this, is that my understanding is in order

8   to run an individual's criminal history on NCIC, which is

9   the database maintained and operated by the FBI, is that it

10  has to be connected to a subject investigation for a case.

11  And in this case, I think that we found it difficult to

12  believe that a prospective juror, sitting here, is subject

13  to a criminal investigation that can lead to that invasion

14  of their privacy.

15          The question then becomes who else in this panel

16  did the government investigate and does this inform their

17  decisions before we start the preemptory challenges today.

18  Does the government have more information than we have about

19  all of these prospective jurors?

20          That sort of segues, I think, and begs the

21  question what chilling effect does this have when jurors --

22  potential jurors are summoned by this court to come and sit,

23  and do they become the subject of a criminal investigation

24  by federal law enforcement officers, and do they have a

25  right to know that before they come.  Could they refuse to

1   sit knowing that they might become the subject of an

2   investigation.

3          And unless I'm missing something -- I hope I'm

4   not -- Ms. Moreno wanted to add something to this.

5          MS. MORENO:  A few comments, Your Honor, if I may

6   address the Court.

7          THE COURT:  Okay.

8          MS. MORENO:  If the Court recalls, very recently

9   the government passionately and ardently argued that

10  providing social media platform identifiers was an invasion

11  of privacy, was a bridge too far.  The defense can think of

12  no greater invasion of privacy than for the federal

13  government to be running background checks on potential

14  jurors who are coming to do their civic duty, who are

15  answering questionnaires.

16         I think what's really troubling for me,

17  Your Honor, is that this gives a tremendous unfair advantage

18  to the government in this way.  When both sides are

19  exercising their cause challenges, they are doing it on the

20  basis of public information, either the answers in court or

21  the answers in the questionnaire.

22         The preemptory challenges, however, is a different

23  story, and here the government has an unfair and very

24  strategic advantage in being able to access NCIC and getting

25  information.  And NCIC produces all kinds of information,

1    arrests, if you're on probation, if you violate probation,

2    et cetera, which is also a question in this case because we

3    believe that there was -- I won't say it was a

4    misrepresentation because I don't know that it was

5    intentional, but it was a mischaracterization of what

6    happened with Juror No. 37.  That's all we're talking about.

7           We believe the government may have run all the

8    jurors they didn't like to get a strategic advantage, and of

9    course we would want to know that.  So we believe they've

10   gained -- it's a tremendous invasion of privacy.  It's an

11   unfair advantage.  And, quite frankly, Your Honor, I think

12   it implicates Mr. Dermen's Fifth Amendment due process

13   rights.

14           I'd submit it.

15           THE COURT:  Well, let's hear from the government.

16           MR. EWENCZYK:  Your Honor, I can only get partial

17   information.  I'll give the Court the information I have,

18   and if the Court requires more information, I'll be happy to

19   confer with case agents to get a fuller picture.

20           But the point I want to make here is the defense

21   is getting up and talking about nonpublic information, and

22   what is at issue here is the criminal record of a

23   potential -- the criminal record of a potential juror, which

24   is public information, which is docketed on the Utah state

25   court system.

1          THE COURT:  Well, but I guess the question,

2    Mr. Ewenczyk, is did you or your agents get on the Utah

3    state Exchange system and look up this juror or did you use

4    some other resources that the defense didn't have access to?

5          MR. EWENCZYK:  As we disclosed to the defense, my

6    understanding is that the case agents first looked to NCIC,

7    which is a law enforcement database which grabs docket

8    information from dockets all around the country and

9    centralizes them.  That's what led to this leap.

10          I have no other information about -- any other

11    pertinent information about any jurors gathered from NCIC. I

12    was just told by the agents this juror, NCIC, there was

13    something that looked like a Utah state conviction.  So we

14    went to the public record and pulled that information, and I

15    conveyed exactly what happened to the defense.  I wrote them

16    this email to explain the process, and I have given them the

17    docket records that we obtained from the Utah state records,

18    which are, again, public documents.

19          THE COURT:  Would private investigators have

20    access to this NCIC database?

21          MR. EWENCZYK:  I believe they would not,

22    Your Honor.  My understanding is it is a law enforcement

23    database.

24          THE COURT:  What are the criteria for law

25    enforcement using that database?  If you're a member of law

1    enforcement, can you look up your neighbor?

2             MR. EWENCZYK:  Your Honor, I don't presume to know

3    all the rules that govern NCIC, which is the database

4    maintained by the Federal Bureau of Investigation.

5    Obviously, you know, it cannot be used for unauthorized

6    purposes.  While I'm happy to do further research, I have no

7    doubt that the protocols followed by the case agents in this

8    case complied with all the rules and regulations that apply

9    to NCIC.

10            THE COURT:  And you base that on what, if you

11   don't know the protocols?

12            MR. EWENCZYK:  On the confidence that I have in

13   the agents of IRS criminal investigations, and these are

14   databases that they use regularly.  I've not seen any

15   reference to any rules or regulations by the defense that

16   would suggest otherwise.

17            And as I said, Your Honor, I mean, this issue has

18   just been brought up.  So as Your Honor can imagine, I

19   haven't had a chance to look up the NCIC rules and

20   regulations.  And if Your Honor wants more information, I'm

21   happy to get it.

22            THE COURT:  How many jurors did you run -- or your

23   agents run an NCIC check on?

24            MR. EWENCZYK:  As I stand here, Your Honor, I do

25   not know.  I just note that I was informed by the agents

1    that for one juror, there was a flag on NCIC that led them

2    to look at the court docket.  The NCIC information can be

3    incomplete, you know --

4         THE COURT:  That's not my question.  My question

5    is do you know how many members of the jury panel your

6    agents ran NCIC checks on.

7         MR. EWENCZYK:  I do not know, Your Honor.  I just

8    know about --

9         THE COURT:  You didn't inquire of them as to that

10    issue?

11         MR. EWENCZYK:  I did not.  This issue has just

12    been brought up by the defense.  I sent an email to the

13    defense last night about it, and this morning I'm hearing

14    about this issue.  So, Your Honor, I just haven't had time

15    to inquire more fully.  Had the defense asked yesterday, I

16    would have inquired yesterday.

17         MR. GERAGOS:  Could I add some facts to this

18    because I was the one who requested, when I got the

19    transcript -- or reviewed my notes, that I wanted to find

20    out if they used NCIC.  The reason I'm attuned to that is I

21    have personally defended a deputy district attorney who was

22    criminally charged for going on to NCIC in order to check on

23    his estranged wife's boyfriend.

24         There are specific protocols for NCIC, and I

25    guarantee you that looking up jurors' profiles are not any

```
 1   of those.  I was the one who then asked for confirmation
 2   that the agent had done it.  They then tell me that it's
 3   Tyler Hatcher.  Less than 60 days ago, they were telling me
 4   Tyler Hatcher was no longer on this case, that I had to
 5   file -- in an email from Mr. Ewenczyk on November 14th, he
 6   told me please be advised that Mr. Hatcher is no longer a
 7   case agent.  He's not been a case agent on this case since
 8   January 2019.  At that time he became the assistant special
 9   agent in charge.  I asked this be marked as the next
10   exhibit, and handed to Your Honor.
11           We now find out that Tyler Hatcher is not only
12   working on this case -- by the way, that email, if you
13   scroll down, they are also telling me to comply with TUAY if
14   I want him in court, yet at the same time this guy is using
15   NCIC on jurors.
16           By the way, I haven't even gotten to the biggest
17   problem about this.  If you take a look at the Utah law, and
18   I will defer -- I'm not going to practice illegally here,
19   but I believe Mr. Williams will back me up.  They now have
20   to divulge who they ran -- under Utah law, anybody that they
21   ran, because they're going to have to notify these jurors to
22   comply with Utah law under the privacy statute.  So now we
23   need to know.
24           THE COURT:  Just back up a minute.  You're saying
25   that Utah law requires anyone who runs, what, an Exchange
```

1    search, to notify someone, or an NCIC search?

2            MR. WILLIAMS:  Your Honor, no.  I will give the

3    Court the code.  It's Utah Code 53-10-108, and my reading of

4    this statute is that it becomes a Class B misdemeanor if you

5    utilize the BCI searches.

6            Now here's the problem when we talk about this.

7            THE COURT:  BCI is the Utah Bureau Of Criminal

8    Investigation?

9            MR. WILLIAMS:  Your Honor, correct.  I should have

10   used that acronym in more detail.  But it makes it,

11   obviously, unauthorized.  It's a crime, potentially, if you

12   access that information.  The code also includes a due

13   process provision that if someone's information is accessed,

14   they have a right to know that.

15           Now here's where the confusion is.  I, through my

16   investigation last night -- I don't know how the system

17   works.  I don't know if a law enforcement officer has to

18   access the computer, the NCIC computer through an avenue of

19   BCI and that that's the channel to NCIC.  I don't know.

20           Here's the problem.  We can't, without complying

21   with TUAY, have someone get up here and educate us.  So that

22   was the best investigation I can do.

23           But Mr. Geragos is right, if they did access it

24   through that means, then it is potentially a crime, and then

25   there's the due process right that the person's privacy who

1    was invaded has an absolute right to know their information

2    was accessed.

3              MR. EWENCZYK:  Your Honor, if I may.

4              The defense gets up here and accuses members of

5    federal law enforcement of violating Utah law by accessing a

6    Bureau of Criminal Investigations database.  There's no

7    basis -- they have no basis to believe that anyone accessed

8    the BCI database.  This is the first I ever hear of the BCI

9    database.

10             THE COURT:  I think the BCI database just

11   incorporates the NCIC database.

12             MR. EWENCZYK:  Sure, but this is a Utah state law

13   that pertains to Utah law enforcement accessing a Utah state

14   database.

15             THE COURT:  That may be true, but I think that the

16   initial allegation was that the NCIC database was accessed

17   for a purpose that was not a proper purpose.  The Utah stuff

18   I suppose is, in my view, perhaps background noise to what

19   the primary question is.

20             MR. EWENCZYK:  Certainly, Your Honor, and I'm just

21   trying to unravel these accusations one by one to get us to

22   the core of the matter.

23             THE COURT:  I suppose the question -- I think

24   there are two or three important questions.  One, do federal

25   regulations and does federal law allow case agents to access

1    NCIC to investigate members of a jury panel, and what do the

2    regulations and what does the law say about that?

3            Then question two is the facts.  What did your

4    agents access, which jurors did they search, and then what

5    are the ramifications for using that information that came

6    from this database to exercise preemptories when the defense

7    lacks access to that same information?

8            MR. EWENCZYK:  Certainly, Your Honor, and I wish I

9    had more information to present to Your Honor.  This has

10   just been brought to me.  So I don't have that information

11   for the Court right away.  I'd be happy to do some research

12   into it.

13           I think my colleague, Mr. Sullivan, would like to

14   say something.

15           MR. WILLIAMS:  Your Honor, if I could just respond

16   before Mr. Sullivan speaks.

17           THE COURT:  Okay.

18           MR. WILLIAMS:  I think one way to cut to the core

19   here is to have Special Agent Tyler Hatcher get on the

20   stand.  He can answer all of these questions for the Court.

21   He was in here shortly before this argument began, and now I

22   don't see him here.  Maybe we could invite him back and

23   let's get some answers to these questions, because the

24   defense believes that no, you cannot, as a federal law

25   enforcement officer, run a prospective juror's background.

1    You can't do it.  You are probably subject to an FBI

2    investigation if you did do it.

3              THE COURT:  Well, and I suppose that leads to the

4    next question, which is Special Agent Hatcher may be subject

5    to an investigation, he may be subject to criminal

6    prosecution, but I suppose we have to assess -- or you have

7    to assess, as a defense team, what are the ramifications for

8    this case and what remedy are you seeking because that's

9    where the rubber meets the road.

10             MR. SULLIVAN:  Your Honor, may I just be heard

11   briefly?

12             THE COURT:  Yes.

13             MR. SULLIVAN:  In my experience, you're allowed to

14   do this, because I just had a trial in the District of

15   Hawaii where we did it.  We got three hits and we turned

16   over that information to the defense.

17             In this particular case, we have only been

18   notified about one hit with respect to Juror No. 37.  So

19   it's done all over the country and I think they're allowed

20   to do it, because it's not just Special Agent Tyler Hatcher.

21   He's the assistant special agent in charge.

22             THE COURT:  Well, I suppose what you're telling me

23   is it's routinely done.

24             MR. SULLIVAN:  That's my understanding.

25             THE COURT:  And it may be that it's routinely done

1  because it's in line with the law and the regulations, or it

2  may be it's routinely done and no one ever raises it as an

3  issue.  I've seen both scenarios in my time.  The fact that

4  it's routinely done for me isn't determinative.

5          MR. SULLIVAN:  But if we're here for voir dire,

6  search for the truth, what is the prejudice?

7          MR. GERAGOS:  I don't know if you want cross talk

8  here.  I don't think you do, based on my experience.  I will

9  tell you that the issue --

10         MR. SULLIVAN:  What is the prejudice to the

11  defense, Your Honor?

12         THE COURT:  We can't talk at once because

13  Ms. Walker can only write one of you at a time.  So let's

14  make a rule, whoever is holding that portable mike may

15  speak.  No one else can.  You'll get a turn.

16         MR. GERAGOS:  As I said, I agree with you.  We've

17  always done it this way or we've done it before is of no

18  moment whatsoever.  I know that prosecutors, because I've

19  defended it, get prosecuted if they misuse NCIC.  So I

20  understand that.  That's the state of the law.

21         Number two, it sounds like they're conceding that

22  they've run more than one of the jurors, and it sounds like

23  they only got, as to quote Mr. Sullivan, one hit.  They did

24  not turn this over willingly.  I demanded it, and it was

25  brought in this morning, what they ran, in a printout, which

1   I believe Mr. Williams has now got, and Mr. Ewenczyk asked

2   that it be attorneys' eyes only.

3          They did not provide this information -- any

4   information that they received from the NCIC, which we have

5   no access to and which is strictly limited to law

6   enforcement.  My experience practicing in many state

7   jurisdictions is that they don't even turn that over to the

8   defense unless it's been redacted, or anything else.  It's

9   only for a law enforcement purpose.

10          The idea that somehow he doesn't understand the

11  prejudice -- let me explain the prejudice.  I think you've

12  already hit on it.  They now have access to information we

13  don't have access to.  They have information that informs

14  what choices they make on preemptories.

15          And at the same time, I would say every argument

16  that Ms. Goemaat sat up here and made to Your Honor in

17  getting Your Honor to go along with her argument that it was

18  an undue intrusion to get social media handles, I'll

19  incorporate Ms. Goemaat's representations and arguments by

20  reference.  That to me is fairly outrageous.  It's not a

21  public database.  I pay a lot of money every month for

22  public databases to have access to that they don't.

23          I think they need to come up here and I think the

24  next thing that needs to be done is I want to know who ran

25  it, how many people they ran, and what they came back with.

 1    I don't know the answers to those questions.  The Court

 2    doesn't know the answers to those questions.  But the

 3    prejudice is self-evident.

 4         To answer the last question, until I know that

 5    information, I don't know what remedy I want.  I mean, we're

 6    sitting here to exercise a preemptory.  We're sitting here

 7    to go and talk with Juror No. 37.  They just handed me the

 8    stack of the documents that they retrieved as a result of

 9    their database search on Juror 37, including a picture of

10    his -- I don't know if it's driver's license or booking

11    photo.  I don't know what it is.  But that's where we stand

12    right now from the defense standpoint.  I don't know what

13    the remedy is until I know what the information is.

14         THE COURT:  Okay.  You can pass the microphone to

15    the prosecution.

16         MR. SULLIVAN:  Thank you.

17         Like I said, we got one hit.  We turned over that

18    information.  And the information we turned over, the stack,

19    a DMV photo, which is a public record, and also the public

20    docket records for the local court here, we don't know of

21    any other hits.  We would turn over that, of course.

22         THE COURT:  Can you tell me who ran the potential

23    jury pool and how many potential jurors were investigated?

24         MR. SULLIVAN:  No, I can't tell you that, but

25    Special Agent Hatcher could.

1          THE COURT:  Where is he?

2          MR. SULLIVAN:  He's probably here.

3          Is he here?

4          He's coming back.

5          MR. ROLWING:  Your Honor, if we can have a recess,

6     we can go contact Special Agent Hatcher.

7          THE COURT:  All right.  In the meantime, what do

8     you suggest we do with the jurors who are down on the first

9     floor?

10         MR. GERAGOS:  Unfortunately, we're going to have

11    to keep them waiting, would be my suggestion.  I'm not being

12    presumptuous.  I don't know what I want to do at this point.

13         MS. MORENO:  Briefly on the timing issue, let me

14    just add I believe it was the Court's desire to bring in

15    Juror No. 37 and talk to him further.

16         Now given everything that we've learned, I would

17    suggest he might need counsel and that might figure into the

18    whole timing situation.  So it's a thought I wanted to share

19    with the Court and with the prosecution, depending upon the

20    kinds of questions that were going to be asked this young

21    man.  I just wanted the Court to consider that.

22         THE COURT:  You're suggesting he may need counsel

23    because he may have been not truthful in answering the

24    questions on the questionnaire or the questions during voir

25    dire?

 1              MS. MORENO:  I can't even speak to that,

 2   Your Honor, because I think that there is a -- as I said

 3   before, I didn't want to say it was a misrepresentation by

 4   the prosecution about what his records showed.  We believe

 5   it's a mischaracterization.  I think Mr. Williams can

 6   address that further.  But all I'm saying is that in order

 7   to think about our timing, in fairness, I think that Juror

 8   No. 37 might need counsel.

 9              MR. WILLIAMS:  Just to add to what Ms. Moreno

10   said, I think the issue regarding counsel is really more

11   that the way this is unfolding, it appears the government

12   might be accusing him of something.  Not that we have a

13   belief that he did something, but rather he may now be a

14   focus or a target of the federal government, that would

15   trigger counsel.

16              MR. SULLIVAN:  He's not a target of the federal

17   government.  The state court records indicate that it was a

18   plea in abeyance and then he didn't pay his fine.

19              Mr. Ewenczyk knows the details, if that matters.

20              THE COURT:  Well, and I don't know that that

21   matters.  I don't want to waste time with a lot of ancillary

22   issues when we have the jury down on the first floor -- or

23   the jury panel down on the first floor.

24              So I suppose the question is, to the government,

25   do you have an objection to putting Special Agent Hatcher on

1   the stand and allowing Mr. Geragos to question him?

2          MR. ROLWING:  At this point we do, Your Honor.  I

3   would ask for a recess and we can discuss this.  But the

4   fact that they don't have access to the NCIC law enforcement

5   database and whatever information was uncovered by whoever

6   did it is of no import.  It's what was communicated to the

7   prosecution team, who is making decisions on this panel,

8   which was that number 37 had a criminal conviction, which

9   was confirmed in the public records.  And so they want to do

10  a deep dive on this ancillary issue into what all those

11  jurors that came up with -- apparently, if they looked at

12  more, came up with no criminal history, as if that's

13  relevant.  It has no relevance to the proceedings which

14  we're about to engage in right now.  If they want to have

15  some hearing about that in the future to gauge Mr. Hatcher's

16  propriety in having his agents access the database available

17  to them.

18          THE COURT:  Well, I suppose what I would like, and

19  I don't know how quickly this could be done, I would like

20  some authority as to whether or not what your agents did is

21  legitimate.  If it's legitimate, then all of this is of no

22  moment.  If it's not legitimate, then I think we need to

23  examine where we are.

24          MR. ROLWING:  Your Honor, so I'd request a recess,

25  maybe about 30 minutes, to try and look into this issue,

1    inquire of Mr. Hatcher, and gather some information so we

2    can educate the defense and the Court.

3            THE COURT:  I'm wondering -- because we do have

4    jurors waiting and I hate to not be productive with our

5    time, would it be possible to peel off one member from each

6    team to ask the other folks who have issues about their

7    migraines, their religious obligations, and their financial

8    hardships, and perhaps we could be at least utilizing the

9    time while the government is getting the information I have

10   requested?

11           MR. GERAGOS:  I think that's a great idea.

12           THE COURT:  All right.  So I don't know if it

13   makes sense to just call the folks who have issues to the

14   courtroom to tell the other jurors that we're going to be

15   questioning some.  I suppose we could even make our way down

16   to the conference room off the jury room and then just call

17   them back one by one into that room.

18           Do you know if that's a possibility,

19   Ms. Schaerrer?  I don't even know the physical setup there.

20           I suppose you could go down to the jury room and

21   bring them back to our conference room one by one.

22           At this point, I just received a notification that

23   Juror 52 says she has -- or he, I don't know if it's a

24   female or a male, has a trip scheduled that just didn't

25   occur to them before.  So I think that that means we have

1   one, two, three, four, five, six, seven, eight jurors, aside

2   from Juror 37, that we need to question.  And so maybe

3   Ms. Schaerrer can go down and indicate to the panel as a

4   whole that we have been contacted by a number of jurors with

5   respect to things they wanted to raise that were not raised

6   on Monday.  We'll call them back one by one into the

7   conference room.

8           In the meantime, the government can see what

9   answers it can provide me with respect to the issue that has

10  been raised.

11          MR. GERAGOS:  That's a great idea.

12          THE COURT:  So, Ms. Schaerrer, the juror numbers

13  are four, ten, 27, 36, 51, 52, 60 and 72.

14          I suppose you could bring them all up and just

15  seat them in the jury box, and then we'll bring them back

16  one by one.  So if everyone wants to take a couple of

17  minutes to go to the restroom, or whatever, we'll convene in

18  the jury room and go from there.

19          MR. GERAGOS:  I think that makes sense.

20          (Recess)

21          PROCEEDINGS CONDUCTED IN JURY ROOM

22          THE COURT:  Let me just tell you, they went down

23  to retrieve the jurors, and when they retrieved the jurors

24  who expressed issues, four more said, oh, we have things we

25  want to bring up.  Interestingly enough, they are what we

1    were just discussing in the courtroom.  The additional four

2    jurors decided they want to speak were jurors number 12, 37,

3    43, and 46.  With respect to juror 37, I would advocate when

4    he comes in, we ask what he wants to tell us, and we don't

5    engage in any questioning of him.  We just hear what he has

6    to say.  If we excuse him, that may bear on the issue we are

7    dealing with in the courtroom.

8              MR. GERAGOS:  I couldn't agree more.

9              THE COURT:  I guess we'll take them by number,

10   starting with number four.

11             Normal practice, never excuse a juror before the

12   end of the day because I don't like to see other jurors

13   seeing others getting out of it.  I'm wondering --

14             MR. GERAGOS:  I would agree with that.

15   Otherwise --

16             THE COURT:  The lateness of the hour on Monday, we

17   started letting folks go.  Now it's turned into a MeToo

18   thing.

19             MR. GERAGOS:  That's exactly right.  That's the

20   individual questioning in front of everybody because then

21   all of a sudden one person says okay.

22             MR. SULLIVAN:  Keeping score, we're at a plus 18.

23             THE COURT:  I can't remember.

24             MS. SCHAERRER:  Juror number four.

25             THE COURT:  Well, we have received word through

1    our jury coordinator there was an issue that you had not

2    raised on Monday that you thought we should be aware of.  So

3    we're just here to let you tell us what you think it is we

4    need to know.

5              JUROR NO. 4:  Okay.  I suffer from migraines and I

6    guess I compartmentalize my life when I have a migraine.  I

7    deal with that situation.  I didn't think about it until I

8    was traveling home on Monday.  I felt a migraine.  I have

9    medicine I take for my migraine.  But I usually get them

10   about once a month.  It may last between one day and three

11   days.

12             I didn't sleep at all Monday night.  I kept

13   hearing what you said about a woman who hadn't disclosed she

14   had surgery, medical difficulties.  I didn't want to be

15   responsible for -- like I didn't want to let people down.

16   And when I get a migraine I literally have to lie down and

17   I'm just not able to function.  A two- to three-week trial

18   I'd say go for it, and maybe I'd be fine.  It concerns me,

19   the length of time.  If there would be a situation, I would

20   make everything stop.  I don't know.  I just wanted to make

21   sure you knew and then you decide.  But I wanted to make

22   sure you knew.

23             THE COURT:  We appreciate that.  I will let the

24   lawyers follow up, if they would like to.

25             MD. MORENO:  A very quick question.  I'm

1    sympathetic.  I suffered from migraines and injected the

2    medicine.  It makes you sleepy.

3            JUROR NO. 4:  The medicine can cause drowsiness.

4    Driving up and down the mountain pass, I wouldn't be able to

5    do that on the medication.

6            MS. MORENO:  Thank you very much for your candor.

7            I have nothing further.

8            MS. GOEMAAT:  Thank you for bringing that to our

9    attention.  My experience is you are right.  Even if you

10   were able to get the Amtrak in time, you wouldn't be able to

11   sit during that period of time.

12           THE COURT:  Okay.  All right.  Thank you for

13   letting us know.  We appreciate your candor.

14           JUROR NO. 4:  Thank you.

15           (Excused)

16           MS. MORENO:  We would stipulate.

17           Another thing I hadn't thought of before,

18   Your Honor.  In talking to jurors, sometimes it might be

19   wise to advise or caution the juror not to discuss anything

20   with other jurors about what has been discussed back here.

21           THE COURT:  I will do that.

22           MR. SULLIVAN:  No objection from the government.

23           MS. SCHAERRER:  Number ten.

24           THE COURT:  So let's see, you had a question about

25   something, and so we're just here to follow up on issues

```
 1   that have arisen.

 2            JUROR NO. 10:  I thought of this after the fact.

 3   Kind of late in the day, thinking about lunch more than

 4   anything.  But if I recall correctly, as you were speaking,

 5   you were kind of talking to the back -- the jurors that were

 6   sitting in the back benches.  Maybe I misunderstood what you

 7   were saying.  Your intent is to not have your defendant

 8   actually testify under oath or --

 9            MR. GERAGOS:  The question we were saying -- or

10   that I was asking is he has an absolute right not to.

11            JUROR NO. 10:  I understand that.

12            MR. GERAGOS:  So I never make that decision until

13   after the prosecution ends their case.  Saying that more as

14   an example.  I never make that decision until the

15   prosecution stands up and says --

16            JUROR NO. 10:  That's my -- I guess I will say

17   that the decision is made to -- say your defendant is not

18   going to testify I wouldn't say necessarily influences my

19   decision.  It would give me pause, I guess.  You know

20   someone is innocent -- you know, I guess the concern is

21   self-incrimination.  If you're innocent, how can you

22   self-incriminate?  The rationale.  I'm saying that to the

23   extent I will give it a fair shake, I just --

24            MR. GERAGOS:  That would factor into your

25   thinking?
```

1          JUROR NO. 10:  To some extent, yes.

2          MR. GERAGOS:  You'll get an instruction from

3   Her Honor you can't consider that at all.

4          JUROR NO. 10:  I'll certainly follow those

5   instructions.  I'm just saying, you know, better or worse,

6   if someone is actually innocent, why they would be reluctant

7   to testify on their own behalf?

8          MR. GERAGOS:  Okay.  Thank you.  I appreciate

9   that.

10          THE COURT:  Any need to follow up?

11          MS. GOEMAAT:  Thanks for coming back.

12          I heard two different things.  I heard you say

13  that if the Judge gave you an instruction not to consider

14  the fact that Mr. Dermen may or may not testify, that you

15  would follow that, and then I heard you say, well, it would

16  factor in.

17          JUROR NO. 10:  To the best of my ability just

18  through -- I mean, I would try to.  In the back of my mind,

19  I still have -- not doubt necessarily.  I would question the

20  rationale behind it.

21          MS. GOEMAAT:  The question is -- everybody brings

22  their own gut reactions to these things.  The question is

23  when you're sitting in the jury room, if you are -- and you

24  get the Judge's instructions, which will probably be read to

25  you, you will have an instruction that says you are not to

1    consider whether or not Mr. Dermen testifies.  That's,

2    unequivocal, his right under the Constitution.

3            So are you able -- in your mind, when you are

4    considering, okay, the government has presented this, I need

5    to decide whether or not they reached beyond a reasonable

6    doubt, are you able to put that aside intelligently while

7    you consider the evidence the government has?  That's what

8    he is entitled to under the Constitution.

9            Everybody comes in with these gut feelings

10   about -- you know, you might have gut feelings about taxes

11   or the federal courthouse, the fact you have to serve on

12   jury duty at all.  Everyone has the feelings they have.

13   What we need to know is when you are in here, intelligently

14   can you put it aside and say maybe I had that gut feeling,

15   but I'm not going to take it into consideration because the

16   Judge told me he is entitled, under the Constitution, to say

17   nothing?

18           JUROR NO. 10:  I believe that I can.  Once again,

19   I'm kind of trying to clarify that.

20           MR. GERAGOS:  That's what I was asking.  Is it

21   fair to say it's always in the back of your mind?

22           JUROR NO. 10:  Whether your client or anyone else?

23           MR. GERAGOS:  I think I gave the example of my

24   mother.

25           JUROR NO. 10:  That's what I was thinking about,

1    saying that as an example.  I seemed to walk away with the

2    impression kind of stating, as an extension of your example,

3    your client has every right not to testify on his own

4    behalf.  I understand the law in that regard.

5              MR. GERAGOS:  You still have that nagging -- is it

6    fair to say -- not putting say words in your mouth -- if you

7    were innocent, you would take the stand?

8              JUROR NO. 10:  Absolutely.  I don't understand why

9    you wouldn't.

10             MR. GERAGOS:  I get it.

11             MR. SULLIVAN:  May I ask one question?

12             THE COURT:  Yes.

13             MR. SULLIVAN:  If you were instructed to put that

14   aside, what would you base your decision on in this case as

15   to whether or not the government --

16             JUROR NO. 10:  The facts as they were presented,

17   both the prosecution side and the defense side.

18             MR. SULLIVAN:  So what we're really asking is can

19   you deliberate with 11 other people if you are chosen and

20   stick to the facts?

21             JUROR NO. 10:  Absolutely.  Once again, the only

22   reason -- that was a question I had.

23             MR. SULLIVAN:  Thank you.

24             THE COURT:  All right.  Thank you.

25             JUROR NO. 10:  Thanks, guys.

1        (Excused)

2        MR. GERAGOS:  To make sure the record is clear, I

3   probably -- that was number ten?

4        THE COURT:  That's number ten.

5        (Ms. Porter, jury administrator, enters jury

6   room.)

7        THE COURT:  I can't read your writing necessarily,

8   so why don't you summarize what you have been told.

9        MS. PORTER:  Okay.  We have number 12, who her and

10  number eight work together.  And I guess the boss is

11  freaking out.  Pick one, but don't pick both.  But number 12

12  has a work conference she is in charge of at Utah State on

13  March 11th she has to be at.  She's in charge of it.

14  There's that one.

15       THE COURT:  What's the date of that?

16       MS. PORTER:  March 11th.

17       THE COURT:  Number 37 has a torn ACL and he needs

18  surgery on that as soon as possible.  If he's on this trial

19  for eight weeks --

20       MR. GERAGOS:  He mentioned that.  I thought

21  before --

22       THE COURT:  He said he didn't know.

23       MR. WILLIAMS:  He hadn't scheduled it yet.

24       MR. PORTER:  He says he really needed to get in.

25       Number 43, on question five of the questionnaire,

1    on Monday he put answer no.  But he did plead guilty to a

2    DUI in his past.

3                MR. WILLIAMS:  What number was that?

4                MS. PORTER:  Number 43.  So he wanted full

5    disclosure.

6                Number 46, his wife is in her third trimester, due

7    in mid April.  He will not get paid while he's on this jury.

8    It will be a financial hardship.

9                MR. GERAGOS:  He doesn't get paid on jury duty?

10               MS. PORTER:  No.

11               MS. GOEMAAT:  Is he self-employed?

12               MS. PORTER:  His employer doesn't pay, that's what

13   he said.

14               Number 50, her work.  She's the executive

15   assistant to a CFO.  She has a board of directors meeting,

16   and also two seven-year-old twins who had a really hard time

17   on Monday when she was not home when they got home from

18   school.  That's 50.

19               THE COURT:  That's 14.  How many extra did we

20   have?

21               MR. GERAGOS:  Eighteen.  We're getting razor thin

22   here.

23               THE COURT:  Thank you.

24               MS. PORTER:  If you want, I will bring those guys

25   up.

```
 1              THE COURT:  Bring those up as well.
 2              Ms. Schaerrer, let's keep moving.  Let's go to 27.
 3              MR. SULLIVAN:  Thirty-six.
 4              THE COURT:  Everyone stipulated to get rid of
 5    four.  I haven't ruled yet.  So I haven't excused her yet.
 6    Let's see what happens.
 7              MS. GOEMAAT:  If we kept her, it would just extend
 8    recesses.  They don't come that often.
 9              THE COURT:  That's the reason I didn't immediately
10    jump on your stipulation.  I want to see where we are after
11    we work through all of these.
12              MR. WILLIAMS:  How long does a migraine last?
13              MS. MORENO:  It can last two to four days.
14              MS. SCHAERRER:  Number 27.
15              THE COURT:  Thank you for coming in.
16              We received a message through our jury
17    administrator that you had some additional information you
18    thought we should know and we wanted to call you in and let
19    you tell us about that.
20              JUROR NO. 27:  Okay.  Monday evening, as I was
21    processing the events of the day, thinking about how I felt
22    about either side, and I just -- this thing about the IRS
23    just kept coming back to me.  I just have a negative
24    feeling about them, and I personally feel like that's what
25    they want is to be fearful of them.
```

1          But, anyway, the thing that really caught my mind

2   is that it seemed like both legal teams were equally

3   represented, but then when the prosecution was introducing

4   their team, we had to turn around, and there was a whole

5   entire bench full of men in suits.  That felt like an

6   intimidation tactic to me in a way, a statement of power

7   and -- I don't know.  So that bugs me.  I have a problem

8   with that.  That's pretty much it.

9          THE COURT:  I'll let the lawyers follow up.

10         MR. GERAGOS:  Is that something you can put aside?

11  I know you brought it to our attention exactly what

12  Her Honor says.

13         JUROR NO. 27:  I don't know because I do have a

14  feeling that the IRS wants to be powerful and wants us to be

15  fearful.  So I don't know.  That just kind of bothered me,

16  just the statement of more power came in.

17         MR. GERAGOS:  I understand.  So I guess our

18  question -- I won't speak for the government, but the

19  question is if you are told that -- I mean obviously

20  everybody has got some kind of a feeling.  Anybody who

21  says -- except maybe the government lawyers -- they are fans

22  of the IRS, most people kind of recoil to the IRS.  So I get

23  that.  What you are saying, you're observing in the

24  courtroom, you know, having all of their agents in there and

25  that seems to be intimidating.  Can you still judge the

1    evidence by what happens from the witness stand, whatever we

2    put on the Elmo -- you know what an Elmo is?  I call it an

3    Elmo -- the projector -- documents, and testimony?  Can you

4    judge it by that and wait and hear the instructions from

5    Her Honor, and then the arguments, and come back here and

6    deliberate fairly?

7           JUROR NO. 27:  I'm not sure.

8           MR. GERAGOS:  What gives you pause?

9           JUROR NO. 27:  I think just the feeling that I

10   have that the IRS is not candid.  I'm not sure I want to go

11   with that personal feeling.

12          MR. GERAGOS:  Do you think that that would push

13   you to be against -- or vote against the government?

14          JUROR NO. 27:  Yes.

15          MR. GERAGOS:  Okay.  You think you just can't be

16   fair to the government?

17          JUROR NO. 27:  I don't know, when all the evidence

18   is presented.  But I feel like they have got resources to,

19   you know, come up with a lot of stuff, and maybe it's all

20   not fair.

21          MR. GERAGOS:  They could.  They have unlimited

22   resources.  They don't joke.

23          JUROR NO. 27:  It would seem they have unlimited

24   resources.  They probably don't, being a government entity.

25          MR. GERAGOS:  I understand.

1          JUROR NO. 27:  Just right now I'm feeling like I

2     would be against the IRS.

3          THE COURT:  Anything further?

4          MS. GOEMAAT:  No.

5          Thank you for your candor.

6          THE COURT:  Thank you for letting us know that.

7     We appreciate it.

8          (Excused)

9          MS. GOEMAAT:  Make a motion to strike.

10          THE COURT:  Let's do it all at the end.

11          MR. GERAGOS:  We're going to just keep moving

12     through?

13          THE COURT:  I think she's grabbing the next one.

14     Thirty-six.

15          MS. SCHAERRER:  Number 36.

16          THE COURT:  Hi.  Come on in.

17          We understand that something occurred to you after

18     we broke.  Have a seat, and we just want to give everyone an

19     opportunity to tell us anything that they didn't think to

20     mention that they think we ought to be aware of.

21          JUROR NO. 36:  Thank you.  I apologize for not

22     thinking about it.

23          THE COURT:  You are not the only one.  A lot of

24     folks have.

25          JUROR NO. 36:  On Thursday it -- I am a service

1    missionary for The Church of Jesus Christ of Latter-Day

2    Saints, and I do -- I don't know if you've heard of

3    PathwayConnect?  It's a program through BYU Idaho, and I

4    facilitate a group of students in the Philippines.  And

5    their time is six o'clock in the morning and our time is

6    five o'clock in the afternoon.  I have to be the

7    facilitator.  We just have one.  I do it at my home through

8    Zoom, through the Internet.

9            MR. GERAGOS:  I forgot, how far away are you?

10           JUROR NO. 36:  I'm in Sandy.

11           THE COURT:  Let me ask you this.  If we were to be

12   able to break by 4:30 on Thursdays, would that work for you?

13           JUROR NO. 36:  At that time of day, getting back

14   to Sandy, it's a 45-minute drive at a minimum.

15           MR. GERAGOS:  Would you be stressed if Her Honor

16   recessed at 4:15 or four o'clock?  Would that stress you in

17   terms of getting home?

18           JUROR NO. 36:  I have to open Zoom up at 4:50 for

19   the people to --

20           THE COURT:  If we recess by 4:00 -- probably the

21   traffic would not be so bad at 4:00.  If we were to break at

22   4:00?

23           JUROR NO. 36:  Just depends on the traffic and the

24   day.

25           THE COURT:  Okay.  All right.

```
 1            JUROR NO. 36:  But I have talked to them.  They
 2   really do not have another person.
 3            MR. GERAGOS:  I'm so slow.  You have to open the
 4   app because it's six o'clock in the morning?
 5            JUROR NO. 36:  Their time.  It's usually about 15
 6   minutes.
 7            THE COURT:  Any questions?
 8            MS. GOEMAAT:  Sounds like you would be okay as
 9   long as we always recessed with a big enough cushion for you
10   to get home on Thursdays?
11            JUROR NO. 36:  Probably, yeah.
12            MS. GOEMAAT:  You say probably?
13            JUROR NO. 36:  Stressed about being on the jury.
14            MR. GERAGOS:  That's a whole different issue.
15            THE COURT:  If that were the criteria, we wouldn't
16   have a jury.
17            JUROR NO. 36:  Yeah, I understand.  But there is
18   about between -- they keep adding students.  There is
19   between eight to ten, and they keep adding more students to
20   the class.
21            MR. GERAGOS:  That's a good thing, isn't it?
22            MR. SULLIVAN:  Can you open up the Zoom remotely
23   from here?  Do you have to be there to do it or do you have
24   to be online yourself?
25            JUROR NO. 36:  I have to be online.  I have to get
```

1   it on the phone, you know, and there is a lot of noise, and

2   back and forth, you know.

3          MR. SULLIVAN:  Done via the phone?

4          JUROR NO. 36:  I probably add it to the phone.

5   It's talking.  They are doing lessons and answering

6   questions.

7          MR. GERAGOS:  You can't do it in the car?

8          JUROR NO. 36:  Yeah.

9          MR. SULLIVAN:  Okay.  I get it.

10          THE COURT:  Okay.  All right.

11          JUROR NO. 36:  Thank you for your time.

12          MR. GERAGOS:  Thank you.

13          (Excused)

14          THE COURT:  Fifty-one.

15          MR. GERAGOS:  Here's the question.  Do you think

16   she is going to bring 51 in or 46?

17          THE COURT:  I think the juror coordinator has not

18   brought the last group up yet.

19          MS. SCHAERRER:  Fifty-one.

20          THE COURT:  How are you?

21          JUROR NO. 51:  Good.

22          THE COURT:  We have a number of folks who thought

23   of things after they left here on Monday that they thought

24   we should be aware of and we are just pulling everyone in to

25   hear what you want to tell us.

```
 1                 JUROR NO. 51:  Yes.  I was just -- so I wasn't
 2     exactly sure about the actual length of the trial, how long
 3     that it would be going.  But I was just like worried, if I
 4     do get selected, that I won't be able to pay for like the
 5     monthly bills that I have to do.
 6                 THE COURT:  Can you remind me about your work?
 7                 JUROR NO. 51:  I work at Smith's.
 8                 THE COURT:  That's right.  And do you know what
 9     their policy is when someone is on jury duty?
10                 JUROR NO. 51:  I don't know exactly.  I know that
11     they have a policy where if -- I don't know if this is like
12     for jury duty.  I haven't looked into it yet.  But it was
13     like 50 percent of what you normally make in like the week,
14     because we get paid biweekly.  So yeah.
15                 THE COURT:  So you haven't actually called their
16     human resources people to inquire?
17                 JUROR NO. 51:  No.
18                 THE COURT:  Okay.  And now are you aware that you
19     do get some pay for being on the jury?
20                 JUROR NO. 51:  Yes.  Yes.
21                 THE COURT:  All right.  And maybe this is a bad
22     idea.  I will let the lawyers tell me if they disagree.
23     Would it be possible to call anybody at the Smith's human
24     resources department while we are waiting and just say
25     what's your policy and how much would I get paid?  I'm at
```

1    the courthouse and I'm on jury duty, and then you can know

2    where you stand.

3              JUROR NO. 51:  Yeah, for sure.

4              THE COURT:  Is that an okay idea?

5              MR. GERAGOS:  It is.  I assume you didn't ask the

6    jury coordinator, because sometimes they know this stuff?

7              JUROR NO. 51:  No, I didn't.

8              THE COURT:  Let's do this.  Why don't you talk to

9    the jury coordinator and maybe she can help you make some

10   phone calls.

11             JUROR NO. 51:  Okay.  Cool.

12             THE COURT:  We don't want you to be stressed.  We

13   don't want you to not be able to pay your bills.  On the

14   other hand, if they have a policy between what their policy

15   is and what the court would pay, you won't lose any money,

16   then that would be a different issue.

17             JUROR NO. 51:  Right, definitely.

18             THE COURT:  I think it's wise you brought it to

19   our attention.  Why don't you have Ms. Schaerrer put you

20   back in touch with the jury coordinator, make some phone

21   calls, and let us know.

22             JUROR NO. 51:  Awesome.  Thanks you, guys.

23             (Excused)

24             THE COURT:  Juror 60.  Have a seat.

25             You are number 60, right?

```
 1              JUROR NO. 52:  Fifty-two.

 2              THE COURT:  Okay.  That's right.  We have stuff

 3    out of order.  We have lots of folks who had issues that

 4    came to them after we broke.  It sounds like you have.

 5              JUROR NO. 52:  I forgot that I have a vacation

 6    planned.  I will be out of town March 4th, 5th, and 6th,

 7    that weekend.

 8              THE COURT:  March 4th through the 6th.  Where are

 9    you planning on going?

10              JUROR NO. 52:  Mexico City.

11              THE COURT:  Do you have tickets?

12              JUROR NO. 52:  I do.

13              THE COURT:  Nonrefundable I'm assuming?

14              JUROR NO. 52:  I assume so.  I didn't

15    double-check.

16              I can check right now.

17              THE COURT:  On March 4th through the 6th?

18              JUROR NO. 52:  Wednesday, Thursday, Friday.

19              THE COURT:  All right.  You are leaving on the

20    morning of the 4th?

21              MR. GERAGOS:  That's a Wednesday.

22              JUROR NO. 52:  Correct.

23              MR. GERAGOS:  You're gone --

24              JUROR NO. 52:  I come back Sunday night.

25              MR. GERAGOS:  So it would technically be two court
```

```
 1    days if we are not working on Fridays?

 2              JUROR NO. 52:  Uh-huh.  (Affirmative)

 3              MR. GERAGOS:  You have prepaid, I take it?

 4              JUROR NO. 52:  Correct.

 5              THE COURT:  I don't remember the last time I had a

 6    nonrefundable ticket.  The folks who travel a lot for work,

 7    on short notice, probably have refundable tickets.

 8              MR. GERAGOS:  We don't do it refundable.  I have a

 9    travel bank.  I deposit in the travel bank and use it again.

10              JUROR NO. 52:  I'm pretty sure it's nonrefundable.

11    I could call them.

12              This ticket is nonrefundable.

13              MR. GERAGOS:  Which airline?

14              JUROR NO. 52:  It's Delta.

15              MR. GERAGOS:  I'm a whatever flier.  Ever since I

16    become diamond medallion, it's gotten worse.  So I get it.

17              THE COURT:  All right.  Does anyone have any

18    questions?

19              MS. GOEMAAT:  Quick question.  If hypothetically

20    we recessed the trial for those days, the 4th and the 5th

21    when you are unavailable, any other unavailability that you

22    have?

23              JUROR NO. 52:  No.  No.  That's it.  And it felt

24    so far in the future it hadn't even crossed my mind.

25              THE COURT:  Okay.  Thank you.  We appreciate it.
```

```
 1              MR. SULLIVAN:  Are you sure you don't want to
 2   spend a lot of time in this courtroom?
 3              JUROR NO. 52:  I would be very happy to serve.
 4              THE COURT:  Thank you.
 5              (Excused)
 6              MS. SCHAERRER:  Sixty.
 7              THE COURT:  Come on in.
 8              JUROR NO. 60:  I apologize for this.
 9              THE COURT:  You're not the only one.  We have a
10   lot of folks who left the courtroom, things occurred to them
11   that they hadn't thought to raise with us.  We are calling
12   everyone in to hear what they have to say so we can consider
13   all the information.
14              JUROR NO. 60:  I have two situations.  Well,
15   misunderstanding, I guess, the questionnaire that was filled
16   out about the time frame of the court proceeding, I can't
17   afford to be out six to eight weeks, because, you know, I'm
18   the primary income for my house, for my home.  And number
19   two, with my job and being superintendent -- I mean we're
20   not a large company, but I'm in charge of, you know, 15 to
21   20 guys, that we travel six western states, and scheduling
22   with Rocky Mountain Power and the power companies, I have
23   schedules and things I have to meet that cannot be changed.
24   And I have to be there on certain things.  To be out six to
25   eight weeks and try to reschedule with the power company is
```

1    impossible.

2              THE COURT:  Okay.

3              MR. GERAGOS:  How many of those six kids do you

4    support?

5              JUROR NO. 60:  Three of them.

6              MR. GERAGOS:  I get that.  I assume you have

7    already checked, they don't pay for jury duty?

8              JUROR NO. 60:  My employer doesn't.  He agrees to

9    let us be gone for jury duty.  He will not pay.  I sat down

10   with him last night about how much time I would be gone, and

11   it's devastating.

12             MR. GERAGOS:  He says he will let you go, but he's

13   not going to pay?

14             JUROR NO. 60:  He won't pay.  But then I have

15   schedules I already made with -- when the power company

16   gives you outages -- power outages, you have to take them.

17   You cannot reschedule them.  So I have jobs in Idaho in the

18   middle of this month that I have to be there for.  Stuff

19   like that.  I apologize, but I can't change that.

20             THE COURT:  Any questioning?

21             JUROR NO. 60:  I'm sorry.  I should have said it

22   Monday.  I was waiting to.  I didn't know when to bring it

23   up.

24             THE COURT:  No.  It's good that you brought it up

25   now.  We appreciate it.  Thank you.

1    JUROR NO. 60:  Thank you.

2    (Excused)

3    MS. SCHAERRER:  Juror 72.

4    THE COURT:  We have a bunch of folks who thought

5    of issues that they didn't raise on Monday that they wanted

6    to raise with us, and you're on the list.  So we're happy to

7    hear what it is you think we should know.

8    JUROR NO. 72:  I can't financially afford eight

9    weeks off of work.

10    THE COURT:  Can you remind me where you work?

11    JUROR NO. 72:  Met Auto.

12    THE COURT:  You are a mechanic, right?

13    JUROR NO. 72:  Uh-huh.  (Affirmative)

14    THE COURT:  And is that a fairly small business?

15    JUROR NO. 72:  It is.  There's a total of six of

16    us in the building.

17    THE COURT:  So your employer would let you go, but

18    you wouldn't be paid.  Is that fair?

19    JUROR NO. 72:  That is correct.

20    MR. GERAGOS:  I don't have any questions.

21    MS. GOEMAAT:  I don't have any questions.

22    THE COURT:  Thank you for coming in and sharing

23    that.

24    (Excused)

25    THE COURT:  Number 70, he's an independent

1   contractor and cannot afford to be here.

2          I forgot to say something.  You guys need to

3   remind me.  Can you just tell them -- well, I will tell them

4   when they are in here not to go talk to the rest of them,

5   how they are getting out of this.

6          MR. WILLIAMS:  A cancer spreading.

7          THE COURT:  It's terrible.

8          I have lost track.  We had 27 from session one.

9   And how many survived from -- and 24 from session two.

10          MS. GOEMAAT:  Can someone clarify?  I have

11   inconsistent notes on number 63.

12          MS. SCHAERRER:  Juror number 12.

13          JUROR NO. 12:  Good morning.

14          THE COURT:  Hi.  Come on in.

15          We have a list of folks who have things they

16   didn't tell us on Monday that they think we should know.

17   Are you number 12?

18          JUROR NO. 12:  I am.

19          THE COURT:  So I understand you have told our

20   juror coordinator you have some things you think we should

21   know about.

22          JUROR NO. 12:  Well, there are two of us from the

23   same office.  My employer is a little concerned that both of

24   us will be gone for that length of time.  She did not ask me

25   to say that, but I know she is --

```
1            THE COURT:  Remind me where you work.

2            JUROR NO. 12:  Southwest Spine and Pain.  It's a

3    small medical office, two doctors, two nurse practitioners,

4    and about 20 employees.

5            THE COURT:  So they will give you time off for

6    jury duty.  Do they pay you as well?

7            JUROR NO. 12:  Yes.  We do both have different

8    jobs.  This is juror number eight and I'm 12.  So we both

9    have different jobs that we do.  But, I mean, it's a small

10   medical practice so it might be difficult.  And then I

11   have -- on March 11th, I am the chairperson for a

12   conference -- there's about 700 women that have been

13   invited -- at Utah State.  It's in the evening.  I would

14   need to be there by about 5:00.

15           THE COURT:  Okay.  So just let me see if I

16   understand.  If we were able to accommodate the March 11th

17   issue, you would be all right as long as we didn't also have

18   juror number eight on the jury?

19           JUROR NO. 12:  We can both serve.  Our doctors are

20   both military.  They are like go for it.  We're both in

21   this.  They were like, oh.  That's about all the response we

22   got from them.  But I can tell there was some concern there,

23   so yeah.

24           THE COURT:  All right.

25           JUROR NO. 12:  If we could accommodate the 11th,
```

 1    yes, I think we can both still serve.  But that's my biggest

 2    problem is the 11th.

 3              THE COURT:  To your knowledge juror eight doesn't

 4    have any?

 5              JUROR NO. 12:  Not that I'm aware.

 6              THE COURT:  It sounds like you don't know her well

 7    anyway.

 8              Do we have any questions?

 9              MR. GERAGOS:  I don't.

10              MS. GOEMAAT:  No.

11              THE COURT:  Thank you for letting us know.

12              (Excused)

13              MR. GERAGOS:  Number 37 will just be limited to

14    his --

15              THE COURT:  I'll ask him what it was he wanted to

16    tell us that he didn't mention on Monday and leave it at

17    that.

18              MS. SCHAERRER:  Number 37.

19              THE COURT:  Hi.  Come on in.

20              We have had a whole list of folks who had things

21    come up since we met on Monday, or things that they hadn't

22    told us about on Monday, and we understand that you have

23    some additional information you think we should know.  So

24    we're just calling folks in to get that information.

25              JUROR NO. 37:  I think I brought it up briefly

1    last time we met, but I have a torn ACL in my right knee

2    that needs to be fixed.  I'm currently not working

3    because -- well, I'm an assistant jujitsu instructor, mixed

4    martial arts, starting my fighting career, and I can't do

5    anything until I have knee surgery, and an eight-week trial

6    would put me back eight more weeks.

7                THE COURT:  So is your concern, then, that if you

8    don't get your knee fixed, you can't get back to work?

9                JUROR NO. 37:  I won't be able to get back to work

10   and the risk of further injury to an already torn ACL.

11                THE COURT:  All right.  So I guess you are saying

12   what?

13                JUROR NO. 37:  What do you mean?

14                THE COURT:  I guess are you saying you can't

15   serve?

16                JUROR NO. 37:  I can.  I can serve as a juror.

17   It's just an eight-week trial would just set me back.  And

18   then having knee surgery, be back out for the recovery time

19   for that too.

20                THE COURT:  What you're saying is it would be a

21   hardship for you financially and medically?

22                JUROR NO. 37:  Yes.

23                THE COURT:  Okay.

24                Are there any questions about his circumstance?

25                MR. GERAGOS:  You haven't scheduled it yet?

```
 1                    JUROR NO. 37:  No, I have not.

 2                    MR. GERAGOS:  Has somebody like looked -- is it

 3      arthroscopic or not?

 4                    JUROR NO. 37:  I'm not sure if it will be

 5      arthroscopic surgery or not.  All I know is my ACL is

 6      completely torn.  (Showing his leg to the Court and

 7      attorneys.)

 8                    THE COURT:  The concern is twofold.  One, you need

 9      to get the knee fixed, and, secondly, you have got some

10      financial hardship that accompanies that?

11                    JUROR NO. 37:  It's kind of hard to work.

12                    THE COURT:  All right.  Thank you for sharing

13      that.

14                    JUROR NO. 37:  Am I good?

15                    THE COURT:  Just go back.  And then, again, don't

16      talk to the other folks in the group about, you know, what

17      we've been discussing.  These are personal issues for

18      people.

19                    JUROR NO. 37:  Okay.

20                    THE COURT:  Thank you.

21                    (Excused)

22                    MR. WILLIAMS:  Good reminder.  The record can't

23      pick up things when you see a knee move.

24                    THE COURT:  The whole kneecap went up his leg.

25                    MR. WILLIAMS:  I can't un-see that.  I don't have
```

 1    a good stomach for that.

 2              MR. GERAGOS:  That's why you became a lawyer.

 3              MS. SCHAERRER:  Number 43.

 4              THE COURT:  Hi.  Come on in.

 5              JUROR NO. 43:  Hi.

 6              THE COURT:  So just have a seat.  We had a whole

 7    list of people who had things occur to them, who have had

 8    questions that weren't asked on Monday.  So we're just

 9    giving everyone a chance to raise any issues that they think

10    we ought to be aware of before we make the final selection.

11              JUROR NO. 43:  Okay.  I am here because one of the

12    women I spoke with on Monday said I should tell you.  On

13    question five I wrote no.  But I didn't because I think -- I

14    still think routine is ambiguous.  I have no felony

15    convictions, but I have in the past pled guilty to a DUI.

16              THE COURT:  Okay.  That was a misdemeanor I'm

17    assuming?

18              JUROR NO. 43:  That what was?

19              THE COURT:  Was it a misdemeanor?

20              JUROR NO. 43:  Yes.

21              THE COURT:  A traffic --

22              JUROR NO. 43:  Yes, it was.

23              THE COURT:  Okay.  And can you tell us how long

24    ago that was?

25              JUROR NO. 43:  Yes.  It was last -- March 7th,

1    2019.

2              MR. GERAGOS:  Here in Utah?

3              JUROR NO. 43:  Yes.

4              THE COURT:  Are you able to drive now?

5              JUROR NO. 43:  Yes.

6              THE COURT:  Okay.  I just wondered if that would

7    present a problem getting to the courthouse?

8              JUROR NO. 43:  No.  I'm driveable.

9              THE COURT:  Is there anything about that

10   experience that would have any impact on your ability to be

11   fair and impartial here?

12             JUROR NO. 43:  Not that I can think of, no.

13             THE COURT:  Okay.  Any questions?

14             MS. GOEMAAT:  Maybe one.  Sounds like it was kind

15   of recent.  Did you feel like -- in your experience with the

16   justice system in this traffic incident, did you feel like

17   you were treated fairly?

18             JUROR NO. 43:  Yeah.  I can be fair.  I'm

19   embarrassed about the fact that I got a DUI.  I thought

20   about pleading innocent and decided that it was just wrong.

21   So no, I don't hold any grudges about it.

22             MS. GOEMAAT:  In your interaction with whoever was

23   involved, police officers, or the prosecutor who might have

24   been involved, or anyone else, did you feel like they

25   treated you fairly, they were professional?

```
 1              JUROR NO. 43:  Actually so fairly that I wrote one
 2    of the officers of the Salt Lake City Police to say I pled
 3    guilty to a DUI and I just want to let you know how
 4    professionally the arresting officer behaved.  I hope he
 5    reflected the composition of the police force in general.
 6              MS. GOEMAAT:  I have no further questions.  Thank
 7    you so much for your candor.
 8              THE COURT:  Anything else?
 9              MR. GERAGOS:  No.
10              THE COURT:  Okay.  Thank you for sharing that.  We
11    appreciate your candor.  And we're asking folks not to talk,
12    obviously, about what goes on in this room.  It's
13    confidential.
14              JUROR NO. 43:  Sure.
15              THE COURT:  Thank you.
16              JUROR NO. 43:  Done?
17              THE COURT:  Done.  You can't leave, but you are
18    done with this part.
19              JUROR NO. 43:  I get it.
20              (Excused)
21              MS. SCHAERRER:  Forty-six.
22              THE COURT:  Come on in and have a seat.
23              There are a number of folks who have issues that
24    occurred to them after we met on Monday, or they have
25    questions.  So we're just here to let you -- we understand
```

1   that you let the jury coordinator know there were some

2   things you wanted to talk to us about.

3             JUROR NO. 46.  Yes.  The biggest thing was after

4   Monday, when I met with my boss and our HR director, I was

5   told that I would have to use my own PTO to cover the

6   eight-week trial.

7             THE COURT:  What's PTO?

8             JUROR NO. 46:  Paid time off, or vacation time.  I

9   only have about two weeks accrued.  My wife is due with our

10  second kid in the middle of April.  So going that remainder

11  six weeks unpaid, only being compensated $50 from the court

12  would put us in a bind financially.  Second kid.

13            THE COURT:  You wouldn't have any time to take off

14  with the new baby?

15            JUROR NO. 46:  Yeah, which would be tougher.

16            THE COURT:  Do any of you have questions?

17            MS. GOEMAAT:  What's the name of your company?

18            JUROR NO. 46:  Bamboo HR.

19            MS. GOEMAAT:  How many employees do they have?

20            JUROR NO. 46:  We have about 550.

21            MS. GOEMAAT:  All in Utah.  You met with your boss

22  and HR, they told you you would not be paid or you would be

23  required to use PTO?

24            JUROR NO. 46:  PTO, or unanticipated leave.

25            MS. GOEMAAT:  Jury duty is not meant to bankrupt

1    people.

2              JUROR NO. 46:  Yeah.

3              MR. GERAGOS:  There should be an exclusion, they

4    can't use the courts if they don't pay for jury duty --

5    somewhat hypothetical -- don't you think?

6              JUROR NO. 46:  I'm the first employee that has had

7    an eight-week trial come up.  Before it's been kind of two

8    or three days.  So it's been manageable, I guess, but yeah.

9              MS. GOEMAAT:  PTO or unanticipated leave, that's

10   what they told you?

11             JUROR NO. 46:  Yeah.

12             THE COURT:  Any other questions?

13             MR. GERAGOS:  No.

14             THE COURT:  Again, if you can just not share what

15   we've discussed in here.  What goes on in this part is

16   confidential.  Thank you.

17             JUROR NO. 46:  You bet.

18             (Excused)

19             MS. SCHAERRER:  Number 50.

20             THE COURT:  Come on in.

21        So a number of potential jurors have had issues

22   that have occurred to them or issues that have arisen since

23   we met on Monday.  We're calling everyone back to let them

24   share those issues.

25             JUROR NO. 50:  Yeah.  So when I went to work on

1   Tuesday, we found out that the board of directors is coming

2   out to our company and --

3          THE COURT:  Remind me where you work?

4          JUROR NO. 50:  L3Harris.  It was L3 Technologies.

5   We merged with Harris.  I report directly to the CFO.  I am

6   very involved in this kind of thing with customers.  We have

7   our bosses -- the next level coming out next week.

8          But on top of that, I have seven-year-old twins.

9   I thought it wouldn't be a struggle for them.  But when I

10  came home, it was very hard for them to be off their

11  schedule.  I'm just -- I know -- I just know I'm not going

12  to focus a hundred percent on this case.  I really want to,

13  but I just wanted to let you guys know this was kind of

14  coming up.

15         THE COURT:  So what is your company's policy with

16  respect to jury duty?  Will they allow you --

17         JUROR NO. 50:  They will.

18         THE COURT:  Will they pay you?

19         JUROR NO. 50:  Uh-huh, yeah, I will get my pay.

20  I'm not worried about that.  But there's a lot of things

21  coming up in the next three weeks that I'm very highly

22  involved with being the CFO's assistant.  So I just -- if I

23  do get selected -- have to deal, but I just wanted to get it

24  out there for you guys.  It would be a hardship, especially

25  for my boys.  I have one that is very anxious and doesn't

1    like a lot of change.  And I know other people have this

2    issue too, but --

3              THE COURT:  Typically do you get home earlier?

4              JUROR NO. 50:  I have to pick them up from the

5    daycare around 4:00, or 4:30 at the latest.  And then it's,

6    you know, homework and activities, and all of that stuff

7    right after school, because my husband doesn't get off until

8    later in the evening.

9              THE COURT:  You said you typically pick them up

10   from daycare at 4:00 to 4:30.  Could you pick them up a bit

11   later?

12             JUROR NO. 50:  I could.  I do have family.  But

13   some children just have a lot of hard issues getting off

14   that schedule.  I didn't think it was going to be as rough

15   as it was, but even that night, and then the next morning it

16   was -- they are seven.  I didn't think it was going to be as

17   big a deal as it was, but it was awful.

18             So I just wanted to get it out there and let you

19   guys know.  We'll work it out, but I felt I needed to let

20   you know this so my anxiety wasn't off the charts too.

21             THE COURT:  You did the right thing.

22             JUROR NO. 50:  Thank you.

23             THE COURT:  Also, what happens in this room is

24   confidential.  So if you just don't tell your other panel

25   members what we were asking about or talking about.

```
 1                 JUROR NO. 50:  I'm good with that.  Thank you.
 2                 (Excused)
 3                 THE COURT:  Is that everyone?  I think it might
 4     be.
 5                 MR. GERAGOS:  Seventy is what I've got.
 6                 THE COURT:  I have 70 off my list.
 7                 MS. SCHAERRER:  The independent contractor.
 8                 THE COURT:  I was trying to count how many people
 9     are --
10                 MS. SCHAERRER:  This is number 70.
11                 THE COURT:  Have a seat.
12            So it sounds like there is something you wanted to
13     share with us that we didn't discuss previously.
14                 JUROR NO. 70:  Actually just asked a question
15     downstairs of one of the ladies from here, asking how does
16     someone afford to be a juror for eight weeks.  I'm new to
17     all this.  Some people get reimbursed from their job if they
18     are on jury duty.  I do not.  I'm a contractor, as a
19     Realtor.  So if I'm contracting work with one particular
20     builder, my job is to be at the model home every day.  So
21     for eight weeks I'm not at the model, not meeting people
22     that can purchase a home from me.
23                 THE COURT:  So you are not an employee of anyone,
24     just an independent, self-employed Realtor?
25                 JUROR NO. 70:  But contracted just to work for
```

1    that builder as a Realtor.  So I guess I didn't understand

2    that everybody was allowed to be available for jury duty and

3    not have a job basically.

4              MR. GERAGOS:  If I understand, you're a 1099?

5              JUROR NO. 70:  Yes.

6              MS. GOEMAAT:  Are you commission based?

7              JUROR NO. 50:  Yes.

8              MS. GOEMAAT:  You sell a house, you get a specific

9    commission?

10             JUROR NO. 50:  So if I'm not meeting people that

11   may buy a house, I have no income.

12             THE COURT:  All right.  Thank you for letting us

13   know.

14             (Excused)

15             THE COURT:  We need to do some math, and then I

16   guess we need to see where we are.

17             We need 36.

18             MR. SULLIVAN:  We agree.

19             THE COURT:  And based on my count on this seating

20   chart, we have 54.  Do we agree on that?

21             MR. SULLIVAN:  The government agrees with that

22   figure.

23             THE COURT:  We had 14 people come in right now.

24   So we have a cushion of four.  That's a very thin cushion,

25   but I suppose that everyone who came back deserves to be

```
 1   excused or removed for cause.  So perhaps we should go down

 2   the list now.

 3             MR. GERAGOS:  Could I ask we take a short break so

 4   I can caucus regarding that because I do have one issue that

 5   occurred to me that I want to talk with co-counsel about

 6   before I raise the issue?

 7             THE COURT:  Okay.  You can do that.

 8             I suppose we can go through and make decisions on

 9   hardship and any challenges that counsel would like to

10   raise.

11             MR. GERAGOS:  Well, I want to be heard.  I don't

12   think we can until we resolve the other issue.  I'm willing

13   to make a proffer ex parte as to why that is, but I think

14   there is a significant issue before we do this.

15             THE COURT:  Okay.

16             MR. GERAGOS:  What I'm referring to is what's been

17   represented to the Court earlier today about the NCIC.  But

18   before we do that, we go down this road, I want to

19   address -- I will make the proffer, either ex parte, or we

20   can go out and put it on the record with Mr. Hatcher on the

21   stand.

22             THE COURT:  All right.  Well, can you give me a

23   preview of what it is?

24             MR. GERAGOS:  I can as long as I have the

25   government's pledge not to go out and tell Hatcher
```

```
 1    something.  I'd be happy to do it.
 2              MR. SULLIVAN:  You have the pledge.
 3              MR. GERAGOS:  Number 43 wrote a letter to the Salt
 4    Lake City Police Department.  I would like to know whether
 5    or not they ran number 43 and they didn't bring that to our
 6    attention.  It was represented -- at least somebody
 7    represented it to Mr. Sullivan that they got no other hits.
 8    My understanding is a DUI -- Mr. Sullivan, I haven't
 9    finished yet.  That's one.  Number 43 admitted to a DUI.
10              It's my understanding Mr. Williams has developed
11    that in this district it is not apropos, and we've got that
12    on pretty good authority already.
13              MR. WILLIAMS:  I'm happy to follow up with what he
14    means by that.
15              THE COURT:  Yes.
16              MR. WILLIAMS:  I informed -- I won't draw her into
17    this.  I queried an AUSA.  In her experience, when NCIC
18    searches were ever done on prospective jurors, the response
19    I got is they reported it to the criminal chief at the
20    office.  Her understanding is it's not done in this district
21    and she questions whether it's appropriate under any
22    circumstances.
23              THE COURT:  Okay.
24              MR. GERAGOS:  So I don't know where we are at this
25    point.
```

1              THE COURT:  Well, do you want to give me a preview

2    of that?

3              MR. GERAGOS:  I may ask that we bring in a whole

4    new panel.  I know what's going to happen.  It doesn't

5    require prognostication, a front page article on the Salt

6    Lake Tribune newspaper -- or it's probably already online

7    because I saw the reporter in the back.  The reporter

8    mentioned to me in the cafeteria when I went to fill up my

9    coffee -- he's the one who goes to these meetings -- you

10   know, Mr. Geragos, it's funny you talk officers and

11   estranged girlfriends.  Every month I hear about this.  I'm

12   typing it up.  It's going to be an article.

13             All the jurors know about it.  They are going to

14   complain -- they, meaning the government -- because it's

15   going to be the same reason we've got a juror who came in

16   intimidated by all the agents -- people standing up

17   tomorrow, I can't, the government is investigating me based

18   on my jury service.

19             This is a serious issue.  And I think it's going

20   to spin out is my prediction based on my experience.  I

21   could be completely wrong, and it just goes under the radar,

22   but the fact that Mr. Williams -- maybe because I took what

23   Mr. Sullivan said at face value, I thought maybe this is

24   just something I'm unaware of, never heard of this before.

25             When I looked yesterday evening after Mr. Ewenczyk

1    sent me this, the only cases that I have been able to find,

2    based on everyone's research, is in a civil context.  They

3    are running NCIC.  District court judges order them not to

4    do it because it's unfair.  In a criminal case, I think

5    there is a real problem.

6            THE COURT:  Okay.

7            MR. SULLIVAN:  Could I respond briefly?

8            I stated that I was told about one.  Me, John

9    Sullivan, just know there was one hit.  The last trial I

10   had, a two- to three-week trial in Hawaii, they do it every

11   time.  They turn it over to both sides, the hits.  It's my

12   understanding that federal law enforcement has access to

13   this information maintained by the Department of Justice

14   through the Federal Bureau of Investigation, and it's all

15   based on public records.

16           THE COURT:  Okay.

17           MS. GOEMAAT:  I just want to say I do think -- my

18   understanding is we had sort of split the team in half to do

19   the research the Court asked for.  I'm certain they are

20   doing that, and then we were going to go through it.  It

21   seems to me we can cover cause, if somebody is removed for

22   cause.

23           THE COURT:  I agree.  I don't want to go back to

24   the courtroom.  I think we can make the decisions about

25   who's gone for hardship and who's gone for cause.  Your

1    arguments with respect to whether or not you have to start

2    over with a new panel can be made in the courtroom.  But

3    there's no reason we need to go out and then come back in.

4              So let's just start down the list and see how many

5    jurors we have left.

6              We have juror number four, who had the migraines.

7    I believe we had a stipulation that she could be released.

8    Is that still --

9              MS. GOEMAAT:  I think it's fine.  If we were out

10   of jurors, I think we could seat her.  We'd have to be

11   prepared to recess if she got a migraine.

12             THE COURT:  At this point I'm willing to remove

13   her for medical hardship.

14             We have juror number ten.  Do we have a motion on

15   him?

16             MR. GERAGOS:  Yes.  For cause.

17             THE COURT:  That motion is granted.

18             Juror number 27, this is the woman with the gray

19   hair.

20             MR. GERAGOS:  The bias against the IRS because of

21   the agents.

22             MS. GOEMAAT:  We move for cause.

23             THE COURT:  That motion is granted.

24             We have the woman who needs to leave at four

25   o'clock on Thursdays for her Philippines call.

```
 1              MR. GERAGOS:  Somebody who likes to go home
 2   occasionally on a Thursday.  I have no objection.
 3              MS. GOEMAAT:  I think if we seat her, we have a
 4   hard stop at four o'clock on Thursday, and that's what we
 5   do.
 6              THE COURT:  I'm fine that she stays in.
 7              We need to follow up with the woman who works for
 8   Smith's.  Then we have the woman who's going to Mexico City
 9   on March 4th through the 6th.
10              Fifty-two, I would like to know what the parties
11   view is on her.
12              MS. GOEMAAT:  I think that because we have a
13   stringing jury pool, she stays in.  The worst case scenario,
14   if she gets seated, is two days we recess.  I mean in an
15   ideal world maybe the government -- maybe we could all cross
16   our fingers the government would rest and we have a break
17   before the defense started their case.
18              THE COURT:  Okay.  Mr. Geragos.
19              MR. GERAGOS:  I don't really have a position.  I
20   don't care.
21              THE COURT:  We can leave her in for now.
22              Then we have number 60, the superintendent with 15
23   to 20 guys, six western states.
24              MS. GOEMAAT:  I think he said he doesn't get paid.
25              MR. GERAGOS:  Correct.  He still supports three of
```

1    his six kids.  So I would submit it on that.

2            MS. GOEMAAT:  If somebody is not getting paid, we

3    think it's too much to ask them to sit for six to eight

4    weeks.

5            THE COURT:  I will remove him for hardship.  He

6    was 60.

7            Then we have the mechanic who works in a small

8    auto shop, six employees, wouldn't be paid.

9            MS. GOEMAAT:  Same.

10            MR. GERAGOS:  I would submit it on that too.

11            THE COURT:  I grant her a release for hardship.

12    Seventy-two.

13            Now we have the issue of jurors eight and 12, who

14    both work in the same office.  And one of them, juror 12,

15    has a one-day conference that she has to be there by 5:00.

16            MS. GOEMAAT:  I think if she gets seated, we just

17    end well in advance, allow her to get to the conference.

18    I'm sympathetic to the employer since they are two potential

19    jurors who are actually going to get paid.  They are still

20    in the pool.  I think it's unfortunate, but I don't think

21    it's enough to kick them out.

22            THE COURT:  What's the defense's position?

23            MR. GERAGOS:  I think you've got to let one or the

24    other go.  I think it is a hardship on the employer to have

25    two people in that small of an office.  And since she's got

```
 1    the issue, I'd suggest we let go of 12 and just keep eight,
 2    or, in the alternative, you could not release either.  If
 3    one gets selected, we could renew the motion as to the
 4    other.
 5              MS. GOEMAAT:  I don't think at this time we have
 6    extra jurors that we should just strike them for any reason.
 7    There's a lot of preemptories.  It's possible one of these
 8    two, or both, get struck anyway.
 9              THE COURT:  The problem is how do we do that
10    passing the list back and forth?  Suddenly say okay?
11              MR. GERAGOS:  Exactly.  I don't see a practical
12    way to do it unless you eliminate one of them.
13              THE COURT:  I'm going to allow number 12 to be
14    released for hardship.  And I guess we can see what happens
15    with number eight, if people want to exercise something on
16    her.
17              Number 37.
18              MR. GERAGOS:  Well, the reason that I had
19    suggested that we wait was because of the issue with number
20    37, and number 43.
21              THE COURT:  I think that issue is an issue that
22    we'll have argument on, and I will decide.  But I think if
23    we are to remove that issue from consideration, I don't
24    believe -- I know that I would have released him for
25    hardship based on the information he provided without any
```

1    questioning or prompting from any of us.  So I would remove

2    him for hardship grounds, not for any other grounds.

3            MR. SULLIVAN:  The government agrees.

4            MR. GERAGOS:  I bet they do.

5            THE COURT:  But I think it's fair to say that if

6    this issue wouldn't have arisen, if any other juror would

7    have come in and said look at my knee, which comes all the

8    way up to my thigh, and I'm a martial arts instructor and I

9    can't work until I have my knee fixed, and I'm going to put

10   off surgery for eight weeks, and then rehabilitate, and go

11   without income for this long, it would not be a close call.

12           MR. GERAGOS:  I understand, but -- well, I will

13   argue the rest later.  I hear you.

14           THE COURT:  I'm going to grant him an excuse for

15   hardship.

16           Jury number five.  I'm sorry.  It was question

17   five -- juror 43, question five, the one that asked

18   convicted of something than other a routine traffic

19   violation.

20           MS. GOEMAAT:  Your Honor, I think he was right.

21   The question was ambiguous.  I thought he was very genuine

22   when he said he didn't think -- he did qualify because he

23   thought it was a routine traffic violation.  We have no

24   problem with juror number 43.

25           MR. GERAGOS:  Of course not.  Same problem with

 1   37, was a plea in abeyance.  I would ask to reserve on 43

 2   until we do find out what actually happened here.

 3              THE COURT:  Okay.  So you've asked to reserve on

 4   that one, and I'm happy to reserve for a brief period.

 5              MR. GERAGOS:  Correct.

 6              The other thing that obviously was new today was

 7   the SLC Police Department.  I don't believe that that was

 8   known to either of us -- well, on our side of the table.  I

 9   can't speak for the agents.

10              THE COURT:  Okay.  So reserving on 43.

11              And then who was the woman who worked for Smith's?

12   What number was she?

13              MR. GERAGOS:  She worked for Smith's, was the

14   executive, 51.

15              THE COURT:  All right.  Then the last, 46.

16              MR. GERAGOS:  Fifty-one was going to go check,

17   right?

18              THE COURT:  Fifty-one was going to check with her

19   employer.

20              Fifty-six was the one whose wife is expecting a

21   baby in April, will have to use all of his paid time.

22              MS. MORENO:  Forty-six.

23              MR. GERAGOS:  Correct.  The one who worked for the

24   company that apparently may force them no PTO.

25              THE COURT:  What about the government's position?

1            MR. SULLIVAN:  A financial hardship.  We
2    stipulate.
3            THE COURT:  Okay.  I will grant that juror 46 be
4    released for hardship.
5            Then we have number 50, who has the twins who are
6    struggling and the folks coming in at her job.
7            MR. GERAGOS:  That's fine.  We will submit it.
8            MS. GOEMAAT:  I'm worried about the jury pool.
9    Again, if we did seat her, we would need to end early for
10   her in order to do daycare pickup.  If that is something we
11   could do, she could still be seated.  I think most people --
12   I do think most people with jobs, there is going to be some
13   discomfort with the employer to miss the employee.
14           MR. GERAGOS:  We are working only four days a week
15   right now.
16           THE COURT:  I understand that having an anxious
17   child can present -- can throw a wrench in the works that
18   would prevent her from focusing on this trial.  I'm going to
19   grant that request for hardship.
20           The last one is 70, the Realtor who will go
21   without pay for two months.
22           MR. GERAGOS:  I know the government has got no
23   objection to that.
24           THE COURT:  I'll grant that request for hardship.
25           Let's recap.  If I can find my new seating chart.

1          MR. GERAGOS:  Do we want to go quickly through the

2     ones on one through 75 that are no longer with us so we're

3     all on the same page?

4          THE COURT:  I think that makes sense.

5          So number four I have released for hardship,

6     number ten I have removed for cause, number 27 I have

7     removed for cause, number 36 we did not remove, number 51 we

8     reserved on.  Number 52, the vacation to Mexico, I did not

9     release.  Number 60 I have removed for hardship.  Number 72

10    I have removed for hardship.  Number 12 I have removed for

11    hardship.

12         MR. GERAGOS:  Would it make sense for me to run

13    through what I've got in front of me.  Would it make sense

14    if I just started from one and went up in order?

15         THE COURT:  I was just going through the order we

16    went through them here.  I can make a copy of this chart for

17    all of you.

18         MR. GERAGOS:  Okay.

19         THE COURT:  Number 37 I have removed for medical

20    hardship.

21         MS. SCHAERRER:  I'll give them new copies.

22         THE COURT:  Those are the remaining jurors.  We

23    combined the two lists.

24         MR. GERAGOS:  Got it.

25         THE COURT:  If there is an error, let's find it.

1              Number 43.

2              MR. GERAGOS:  Forty-three.

3              THE COURT:  Forty-three we did not remove.  We

4    reserved.

5              MR. GERAGOS:  Number 46.

6              THE COURT:  We removed.

7              Number 50 we have removed.

8              MR. GERAGOS:  Forty-nine too.

9              THE COURT:  Seventy we removed.

10             Let me tell you what's on my chart.  I will read

11   through it.  And then if I made errors, please correct me.

12             So on the new chart that has the combined morning

13   and afternoon panel jurors who survived, we are now removing

14   number four, number ten, number 12, number 27, number 37,

15   number 46, number 50, number 60, number 70, and number 72.

16             Does that match up with your charts from Monday

17   afternoon and Monday morning.

18             MR. GERAGOS:  Seventy and 72, and then I think

19   that does it.

20             THE COURT:  Then the two we reserved on, again,

21   are 51 --

22             MR. GERAGOS:  Fifty-one is going to check, right?

23             THE COURT:  That's the one woman who's employed by

24   Smith's, and 43 is the DUI.

25             MS. GOEMAAT:  Should we see if number 51 has

1    gotten any information since we started?

2         THE COURT:  I suppose we can ask the jury

3    administrator to do that while we are hearing argument on

4    the other issue.

5         MS. GOEMAAT:  Okay.

6         THE COURT:  So I propose we go back into the

7    courtroom and allow the parties -- part of the prosecution

8    team who was looking at the issue to respond, and then we'll

9    hear from Mr. Geragos.

10        MR. ROLWING:  Can I ask one question?  I'm not

11   trying to in any way -- we always have questions like this

12   arise.  Of course we always have district practice.

13   District practice varies across the country, of course, but

14   I'm in a difficult position trying to understand where --

15   can I just have the name of the AUSA?

16        THE COURT:  I don't care about district practice.

17   District practice is not binding precedent.  It's not law.

18   It's not regulation.  And I think we start treading on very

19   dangerous ground when we start having folks call up AUSAs.

20   They are not a legal authority.  They don't make the law.

21   And I think we need to turn to regularly accepted sources of

22   law, such as regulations, judicial decisions.  And so I

23   don't want to go down a path of calling up a bunch of AUSAs

24   and trying to find out what district practice is.

25        I suppose it may be that in this district, for

1    whatever reason, reasons that are completely unrelated to

2    the merits or the law.  That practice may be a practice in

3    Hawaii, a practice completely opposite.  I don't really

4    think that that matters.  What matters is the statute, and

5    regulations, and case law that govern this situation.

6              MR. ROLWING:  I understand.

7              THE COURT:  So, I mean if I'm wrong about that, if

8    you can tell me district practice ought to matter, then I'm

9    happy to listen to that.  But I think that the answer to

10   that question would depend on who you asked.  And we could

11   get so caught up in the weeds and going down rabbit holes,

12   we'd never finish.

13             MR. ROLWING:  Thank you, Your Honor.

14             PROCEEDINGS CONDUCTED IN COURTROOM

15             THE COURT:  Before we begin, I'm wondering if it

16   would make sense to allow the members of the jury pool to go

17   for 45 minutes to lunch.

18             MR. GERAGOS:  I would think that makes sense, yes.

19             THE COURT:  Is 45 minutes enough time or should we

20   give them an hour?

21             MR. GERAGOS:  Selfishly I would like to give them

22   an hour because at some point I'd like 15 minutes for

23   myself.

24             THE COURT:  Ms. Schaerrer, can you contact our

25   jury administrator and have her tell the panel that we are

1  hearing some argument on legal matters and we therefore will

2  give them one hour to go to lunch, and they need to report

3  back here at 1:15?

4          All right.  Who wants to begin?

5          Mr. Rolwing.

6          And you may want to move the podium and we'll have

7  to move it back.

8          MR. ROLWING:  I think I will, Your Honor.

9          I guess it's good afternoon, Your Honor.

10          THE COURT:  And I thought we would be starting

11  opening statements by now.

12          MR. ROLWING:  I certainly hope we will today.

13          We were able to do some quick and dirty research

14  and some fact investigation, and I have uncovered that the

15  IRS special agent in charge did have some of his staff run

16  all 75 panel members yesterday through their database, and

17  he reported back to us not only Juror 37, but there was

18  another juror who had a criminal history he reported.  But

19  when he reported that to us, that juror had already

20  disclosed that to the Court back in the conference room.

21          MR. GERAGOS:  I hesitate to get in the middle of

22  this, but could we have the witnesses excused while we're

23  doing this?

24          THE COURT:  Yes.

25          I suppose if Mr. Geragos wants to cross-examine

```
 1    the agents involved, I suppose we need to have them leave

 2    the courtroom.

 3               MR. ROLWING:  Which agents, Mr. Geragos?

 4               MR. GERAGOS:  I don't know which agents actually

 5    assisted Special Agent Hatcher, but I would ask that all

 6    agents be removed.  I would ask Mr. Washburn be removed if

 7    he was texting anything with Special Agent Hatcher prior to

 8    doing the research.

 9               MR. ROLWING:  I don't think that's necessary,

10    Your Honor.

11               THE COURT:  Well, let's do it.

12               So you were saying -- back to what your

13    investigation uncovered.

14               MR. ROLWING:  Yes.  So yesterday -- what day is

15    today?

16               THE COURT:  Today is Wednesday.

17               MR. ROLWING:  Either Monday night or Tuesday, I

18    can't remember which -- I believe it was Tuesday after the

19    panel had all been voir dire'd, we were informed of this

20    criminal conviction for Juror No. 37, and one other juror

21    who responded to the agents -- yeah, that juror had revealed

22    his criminal history already.  But 37 had not.  So we raise

23    that with the Court.

24               We went to the Exchange website and uncovered the

25    records and shared them with the defense, and wrote an email
```

1    last night containing that information.

2            So the defendant has complained that this process

3    is somehow unfair and violates some sort of due process,

4    even privacy, and we were able to do some quick and dirty

5    research, and if the Court wants more, we certainly can.

6            But I will assert that this is wholly proper under

7    C.F.R. -- 28 C.F.R. 20.33, dissemination of criminal history

8    record information.  It's made available to federal

9    agencies, quote, to criminal justice agencies for criminal

10   justice purposes.

11           And we submit that many courts have found -- both

12   federal and state courts have found that using criminal

13   history background checks for potential juror, actual juror

14   information, and in many other contexts in criminal cases,

15   is for criminal justice purposes and have been approved by

16   the court, and I will go through a list of some of the more

17   important cases that we found in our short review of this.

18           I'll start with -- in a variety of contexts, we

19   found that courts have approved the prosecution's use of

20   NCIC information or criminal history background checks in

21   criminal cases.  In a case from the First Circuit, which I

22   believe is pronounced U.S. v. Ronayne, R-o-n-a-y-n-e,

23   53 F.3d 332, after the jury was impaneled, the trial

24   prosecutors ran criminal record checks on the jurors to see

25   whether any of them had lied during voir dire concerning

1    their criminal history.  The check indicated that at least

2    one of the jurors may have had a criminal history that had

3    not been revealed.  The prosecutor attempted to confirm that

4    the criminal history background did apply to that juror by

5    seeking to match it up with the juror's questionnaire, and

6    he disclosed this undisclosed criminal history to the court,

7    and the court ultimately found that there was no error when

8    the criminal history check revealed that the juror had lied.

9    That's a Sixth Circuit case, Your Honor.

10              There is also a First Circuit case, McIntosh --

11   U.S. v. McIntosh, 380 F.3d 548, and -- yes, First Circuit

12   case.  In that case, because the issue of a mistrial was on

13   the table due to a hung nature of a jury -- and I haven't

14   been able to read exactly how this played out in that

15   mistrial communication -- but the AUSA ran a criminal

16   background check on one of the jurors and there were

17   arguments about the impropriety of this.  And the First

18   Circuit said we see no impropriety in the AUSA's actions,

19   and then they briefly explained their last point.

20              The obtaining of the background check did not

21   harass the juror because the check was invisible.  Until the

22   AUSA presented his findings to the district court, no one,

23   including the juror, knew that the check had been performed.

24   Moreover, the AUSA never confronted the juror with the

25   results of the background check.  Instead, he presented the

1    information to the court for the entirely proper purpose of

2    determining juror number one's eligibility to serve.  Again,

3    a court saying this is a proper purpose.

4         And I will say that the federal statute -- the

5    policy argument here is that the federal statute that

6    governs which members of the public may serve on juries is

7    instructive on the question of prosecutorial access to

8    prospective jurors' criminal backgrounds.  28 U.S. Code 1865

9    sets forth basic criteria regarding which members of society

10   may or may not be considered for jury service.

11        That statute designates five categories of people

12   who may not serve on a federal jury.  The last of the five

13   criteria -- any one of which, by the way, is sufficient to

14   disqualify a potential juror -- disqualifies a person who

15   has a charge pending against him for the commission of or

16   has been convicted in a state or federal court of record of

17   a crime punishable by imprisonment for more than one year

18   and his civil rights have not been restored.  So that is the

19   disqualifying criteria of jury service.

20        Thus Congress has unequivocally expressed the view

21   that the justice system is best served by disqualifying

22   felons from determining whether others have committed

23   crimes.  The importance Congress places on this criteria

24   compels the conclusion that verification of potential

25   jurors' criminal histories is crucial to the implementation

1   of congressional intent and to the fulfillment of the

2   constitutional objective of impartial and unbiased juries.

3   Congress's expressed intent should not be vulnerable to

4   nullification by the dishonesty of a potential juror.

5          And can it not be said that the only reason the

6   prosecution engaged in this -- or the agents associated with

7   the prosecution team engaged in this search was so that they

8   could help this Court impanel a fair and impartial jury, a

9   permissible and proper criminal justice purpose?

10          I will also note that there are other really

11   important cases from around the country, both federal and

12   state, that have approved this.  U.S. v. Falange is a Second

13   Circuit case, 426 F.3d 930, that is nearly directly on

14   point.  In that case, the defendant argued that the exercise

15   of the preemptory challenges based upon the information

16   about the jurors that the prosecution was able to get in

17   their criminal history background was improper, and it

18   resulted in a jury that was not impartial, but rather was

19   sort of done to get a jury favorable to the government.  And

20   that court, again Second Circuit, wrote, Can it honestly be

21   said that the government's investigation was not designed to

22   secure a jury favorable to the government's position?

23   That's the question.  The more appropriate question is, he

24   wrote, Can it be said that the jury which was sworn was

25   prejudiced against the defendants.

1          So the court was like this isn't about the

2    question whether it could be said this was done to prejudice

3    the defendant or for the purpose of being favorable to the

4    government.  Instead, the court said it's a proper purpose

5    to impanel a fair and impartial jury.  The defendants'

6    arguments that to permit such an investigation of

7    prospective jurors as occurred here will discourage citizens

8    from serving as jurors were dismissed, in another case, as

9    far-fetched bogies.  The additional contention that it is

10   fundamentally unfair to deprive defendants of a similar

11   opportunity was rejected in Best v. United States, a First

12   Circuit case, 184 F.2d 131, where, like the defense here,

13   the defendants in that case argued that they should be

14   allowed to inspect and use the FBI reports of its

15   investigation of the veniremen, and the court upheld the

16   denial of the defendants' motion to inspect the prosecutor's

17   work product on the jury.

18          There is also a Tenth Circuit case, United States

19   vs. Martinez-Jimenez, 464 F.3d 1205, where it held that a

20   sentencing court could rely on NCIC to establish the

21   defendant's criminal history.

22          There is a Sixth Circuit case, Forest, in order to

23   support and rebut a Batson challenge by the defense to the

24   prosecution's exclusion, using a preemptory against a juror

25   member, the prosecution relied upon the NCIC criminal

1    history background of that juror to support its -- to rebut

2    the Batson challenge.  In United States vs. Forest, the

3    Sixth Circuit, 402 F.3d 678, found that the NCIC record

4    supported the government's first reason provided, and so

5    approved the use, again, of NCIC information in criminal

6    cases for criminal justice purposes.

7            I will also say that there is a -- it's also

8    approved amongst the various states.  In Salmon v.

9    Commonwealth, 32 Va. App. 586, at 591, it describes, in most

10   of our sister states in which the prosecution's review of

11   potential jurors' criminal background information has been

12   challenged, the practice has been upheld, and it has a

13   string cite of the various states uploading this practice.

14           What the government submits is that this review of

15   their -- by the way, I will mention that the NCIC database,

16   as I understand it -- even though we prosecutors did not

17   access it, it was a federal agent and his staff who had the

18   access to it -- is a database of publicly available

19   information.  It is a database to which only law enforcement

20   agencies have access, and it may be a better database than

21   other databases containing publicly available information.

22   It's my understanding it compiles publicly available

23   information from a variety of databases and makes it

24   available to law enforcement agencies to do their jobs.

25           By the way, I will say that the Code of Federal

1    Regulations, by the way, in response to Mr. Williams'

2    argument and Mr. Geragos's argument that it can only be used

3    for criminal investigation on targets or subjects, it says

4    to criminal justice agencies for criminal justice purposes,

5    which purposes include the screening of employees.  So you

6    can run a background check on the screening of employees for

7    federal agencies, or applicants for employment hired by

8    criminal justice agencies.  Those have nothing to do with

9    targets, but it is in accord with criminal justice purposes.

10          And if there is anything more in accord with

11   criminal justice purposes, it is the seating of a fair and

12   impartial jury, a jury who can follow the instructions of

13   the Court and is candid with the Court, so that the

14   defendant, Lev Dermen, can have a fair trial.  I will

15   submit, Your Honor, that had the government not uncovered

16   what we consider deception by a juror and the omission and

17   concealing of information on his criminal history, that was

18   publicly available, and had that juror been seated on this

19   jury, the defense at any time during the trial could have

20   raised his deception and called for a mistrial.  That's what

21   this search is designed to prevent so that we have a fair

22   and impartial jury of honest jury members who can provide a

23   decision on Mr. Dermen's case.

24          And so they raised all sorts of arguments.  They

25   didn't provide the Court with one case.  I will also say

```
 1   that they also complained that somehow this juror's rights
 2   to privacy were violated through this search, and that he
 3   might have to be notified.  That argument, I suggest, is
 4   specious.  And I will provide a case that says so.
 5            Eagle vs. Morgan, it's an Eighth Circuit case,
 6   88 F.3d 620, where the court said, quote, as we have
 7   discussed earlier in this opinion, the type of information
 8   contained within these criminal history files is not the
 9   sort of data over which an individual can successfully
10   assert a right to privacy.
11            So I believe I have addressed all their various
12   arguments concerning alleged impropriety of this conduct.
13   It was done for the purposes of this Court being able to
14   seat a fair and impartial jury.  We submit it was proper,
15   and it is approved in a variety of contexts in criminal
16   cases.
17            Does the Court have any other questions?
18            THE COURT:  I do not.
19            Mr. Geragos.
20            MR. GERAGOS:  Well, I'd like to carefully read
21   three of the cases he cited.  I will tell you that the one
22   case that was just cited, which was United States vs.
23   Anthony Falange, F-a-l-a-n-g-e, contrary to what I think was
24   just represented, that was also a prosecution for income tax
25   evasion.  And I believe that what the government did in that
```

1    case was search for credit bureaus, not NCIC.  And I just

2    read the case as he was citing it.

3            There hasn't been one case, unless I missed it,

4    but I was trying to do it, that he cited that talked about

5    the specific issue of running NCIC.  Now I want to make sure

6    that the record --

7            THE COURT:  I suppose, Mr. Geragos, we can look at

8    the cases, but my law clerks did some quick research as

9    well, and it appears to me that what they did is fully

10   supported by the applicable regulations, and it indicates in

11   the NCIC manual, in all of the applicable regulations, that

12   they can be used in connection with the administration of

13   criminal justice, and I'm struggling to see how this doesn't

14   fall under that very broad category.

15           MR. GERAGOS:  Because the courts that have talked

16   about this have said specifically -- and the Federal Bureau

17   of Investigation defines exactly what this can be used

18   for -- and it's only accessed by the prosecution, the courts

19   have found either that you cannot do it in a civil context,

20   as I had mentioned before, unless the access is equal

21   opportunity.  And we've now established that they ran all

22   75 --

23           THE COURT:  But this isn't a civil context.

24           MR. GERAGOS:  Correct, it's worse.  This is when

25   somebody's liberty is at stake.  In a civil context, you're

1   not allowed to do it, give an unfair advantage.  In a

2   criminal context where they specifically have said that we

3   brought 37 to your attention, they've now run 75, that's

4   what I was getting to.  They ran all 75 jurors.  They did

5   not bring to the Court's attention number 43.  And I would

6   submit that the reason they didn't bring it to the Court's

7   attention, number 43, was precisely because it was used for

8   an improper purpose.

9          THE COURT:  But, Mr. Geragos, what they've

10   represented is that that's been disclosed.  You now have all

11   of the information.  I'm really struggling to see how any of

12   this results in any prejudice to your client.

13          MR. GERAGOS:  Because all the courts that have

14   looked at this, that I've seen, specifically NCIC, have said

15   that -- they've either barred the defendants from doing it,

16   in a case in a civil context, or they have ordered that it's

17   equal opportunity and they must provide the database.

18          THE COURT:  And I suppose they can give you the

19   results of their search, but we already know what the

20   results are.

21          With respect to the first juror, that's a complete

22   nonissue because that juror has been excused for hardship.

23   So there's nothing about what happened with respect to that

24   that could result in any prejudice to your client.  It is of

25   no moment to this case.

1           With respect to the other juror, that information

2    is now on the table as well, and I suppose you now have

3    access to the same information that the prosecution team

4    does in exercising your preemptory challenges.

5           MR. GERAGOS:  I have access to the information of

6    two out of the 75.  I don't know what the other information

7    is, and that's -- and, by the way, Mr. Sullivan, on the

8    record, stated that in one district where it was done, the

9    information was provided to both sides.  The information was

10   not provided.  We got one source of information after we

11   demanded it.  It was not provided to both sides.

12          And with all due respect to your clerks, the

13   Federal Bureau of Investigation Privacy Impact Assessment

14   for the National Crime Information Center, which is issued

15   by Erin Prest, which was approved by Peter A. Winn, the

16   acting chief privacy and civil liberties officer, approved

17   on March 12th, 2019, does not seem to address that the

18   purpose for use of this system is for jury -- there's

19   nothing in here that says this is for jury selection.

20          All of the cases -- and I would cite, once again,

21   Dyson vs. Szarzynski, which is 2014 U.S. District, Lexis

22   174671, Northern District in the --

23          MR. ROLWING:  Can you repeat that citation?

24          MR. GERAGOS:  I've got these and I'll hand them to

25   you.  Gonzalez vs. Wilson, which is Northern District.

1          THE COURT:  Can you give the cites again more

2     slowly so we can check them as well?

3          MR. GERAGOS:  Yes.  What I would ask for is that I

4     will have them -- we've got a printer here.  I will print

5     out the items and submit it, because there's other items on

6     here, and I will submit it both to the Court and to counsel.

7          The only cases that I have been able to find that

8     show NCIC are in a civil context, and the courts have either

9     barred its use or said it has to be equally supplied.

10          THE COURT:  And that makes sense, because I'm

11     looking at the regulation and it clearly indicates that it

12     can be used for the administration of criminal justice,

13     which includes the detection, apprehension, detention,

14     pretrial release, posttrial release, prosecution,

15     adjudication of accused persons.  Clearly a civil case

16     doesn't fall within the definition of criminal justice

17     administration.

18          MR. GERAGOS:  Right, and I don't think that the

19     use of the database for looking at jurors -- they're not

20     accused persons.

21          THE COURT:  Well, and I suppose, Mr. Geragos, the

22     bigger concern that I have is that you -- assume for

23     argument's sake that you're right and that what they did is

24     a violation of a regulation.  I suppose they can be

25     disciplined.  They could be prosecuted.  But what you have

1    to establish here is that it somehow has prevented the

2    impaneling of a fair and impartial jury to decide

3    Mr. Dermen's case, and I just don't see how you bridge that

4    logical leap.

5           MR. GERAGOS:  And what I would ask -- my immediate

6    request is for the Court to order the agents to turn over

7    the work that they did so that we can review it before we

8    pick a jury.  Otherwise I believe that that is unfair, and

9    that the government has access to databases which, by their

10   very terms, include information that isn't accessible to us

11   and only accessible to them.

12          THE COURT:  And I suppose we could have

13   Mr. Rolwing clarify, but my understanding is that the

14   jurors' names were run, that there were only two pieces of

15   information that the search yielded, and that you are now

16   both aware of that information.  With respect to the one

17   stack of information, that's now irrelevant because that

18   juror had a medical hardship.  And with respect to the other

19   information, I suppose they could provide that to you.

20          MR. GERAGOS:  If that's the case.  If their

21   representation is that's the only thing that was produced

22   were those two bits of information, that would be an

23   interesting, I suppose, take on this.  But my understanding

24   is, the representation that was made to the Court, all 75

25   jurors were run and a number of people, staff members, ran

```
 1   that information.  I don't know what other information was

 2   provided.  I just don't know.

 3              THE COURT:  All right.  Let's hear from

 4   Mr. Rolwing.

 5              MR. ROLWING:  For the record, Your Honor, I will

 6   also note that the district court -- there are cases where

 7   the district court has ordered criminal history backgrounds

 8   to be run on potential jurors.  So it's perfectly proper in

 9   this context.

10              I can give you the cite, United States vs.

11   Batista.  It's 2008 WL 11333658.  And then a Northern

12   District of Illinois case, U.S. v. Razook [sic]I think, and

13   it's case number one -- document number 1:03-CR-978, ECF

14   664.  The court ordered probation and pretrial services to

15   conduct criminal background checks on the special panel

16   members and provide the results of said checks to the court

17   in advance of trial.

18              THE COURT:  I think what's at issue now,

19   Mr. Rolwing, is what information came about from the search,

20   and it sounds like that Mr. Geragos is now taking the

21   position that he's entitled to that.  Is there anything to

22   share?

23              MR. ROLWING:  There is nothing more than I've

24   already shared, which is the information we shared about

25   Juror No. 37.  And the other juror member, who came back a
```

1    positive hit through their search of NCIC, had already

2    disclosed that to the parties back in chambers in the

3    conference room.

4            THE COURT:  Today or Monday?

5            MR. ROLWING:  I believe it was Monday.  It was the

6    individual who had the two misdemeanor thefts.  He's no

7    longer on the panel.  I think he's been excused.  So we did

8    not need to share that information because they already knew

9    about it.  It was honestly disclosed by the juror.

10           THE COURT:  So are you telling me at the time you

11   obtained the information on the other panel member, he'd

12   already been excused?

13           MR. ROLWING:  I don't remember when he was

14   excused.

15           THE COURT:  What number was he initially?

16           MR. ROLWING:  Sixty-one, Juror 61.  I suspect it

17   was this individual that was identified through the NCIC

18   search as having a criminal --

19           THE COURT:  You say you suspect.  You don't know.

20           MR. ROLWING:  Because I didn't -- just for the

21   record, what didn't happen is what Mr. Geragos suspects

22   happened, is that they printed off 75 reports and gave them

23   to us.  That's not what happened.  I think Special Agent in

24   charge, Tyler Hatcher, asked one of the analysts to run a

25   criminal history background on these 75 names, and they

```
 1   reported to us two individuals for whom a criminal history

 2   was uncovered, orally reported to us what it was.  We said,

 3   oh, well, that individual already disclosed that.  We were

 4   aware of that.  The other one had not.  So we went on the

 5   Public Exchange database and found his dockets -- which

 6   Mr. Williams found within minutes yesterday --

 7              THE COURT:  He did.

 8              MR. ROLWING:  -- and then sought to get his

 9   driver's license record to confirm it was indeed the right

10   juror, and provided that and shared that with the defense.

11   If he wants information about the other juror, who has

12   already been excluded, it's really of no import.  It doesn't

13   have any effect.

14              THE COURT:  Just to be clear, then, you're telling

15   me that the only information the prosecution team received

16   was information with respect to Juror No. 37 and Juror

17   No. 61, both of whom have now been excused for reasons

18   completely independent of your investigation?

19              MR. ROLWING:  And --

20              THE COURT:  Is that correct?

21              MR. ROLWING:  The only qualification I would say

22   is -- this is based upon my memory of that individual

23   revealing that criminal history -- I can't recall, as I sit

24   here, whether there was another juror who had a criminal

25   history who revealed -- that he might have disclosed.
```

```
 1              THE COURT:  Can you tell us which juror it was?
 2              MR. ROLWING:  Well, there was one who disclosed --
 3              THE COURT:  Well, do you have the information to
 4    tell us which juror number it was?
 5              MR. ROLWING:  Yes.  I can quickly find it.  He was
 6    getting sentenced next month.
 7              MR. SULLIVAN:  Your Honor, I believe we know who
 8    that is, and I think that would be someone we know.  Do you
 9    want a number?
10              MR. ROLWING:  Yeah.
11              MR. SULLIVAN:  It's 43, I think.
12              MR. ROLWING:  Juror No. 64 revealed a criminal
13    history.
14              THE COURT:  Was that the juror that you received
15    the information about?
16              MR. ROLWING:  I honestly only can tell you what --
17    I do not know which one it was, but when he told me orally
18    that there was a criminal history, I reviewed it and said,
19    well, he already revealed that.  That's of no import to us.
20              THE COURT:  Okay.  Can you tell me, in unequivocal
21    terms, that the information that was revealed to you
22    regarding the other juror's criminal history related to a
23    juror who had been removed from the panel?
24              MR. ROLWING:  I can tell you that I believe it was
25    either Juror 61 or 64, and both of them have been excluded.
```

1    I can't remember exactly why and when.  But when the

2    information was conveyed to us, I confirmed, through my

3    notes, to the special agent, well, that's already been

4    revealed.  He's already declared that, or disclosed that.

5    So we focused on the one who hadn't disclosed it.

6            THE COURT:  So your representation to the Court is

7    that none of the information provided to the prosecution

8    team would have been useful to the defense essentially?

9            MR. ROLWING:  Going forward, yes, absolutely.

10   But 37 was still out there.  So that's the one that was of

11   import, and that's why we shared that information about

12   Juror No. 37.

13           THE COURT:  All right.

14           Mr. Geragos.

15           MR. GERAGOS:  And the representation to the Court

16   is that number 43, they didn't have the hit on Monday?

17   That's the representation?

18           MR. ROLWING:  No, we did not have that.  So their

19   search didn't come up with whatever was disclosed today with

20   number 43.

21           MR. GERAGOS:  So we now have -- my understanding,

22   I want to be clear, is the representation to the Court is

23   that they had three pieces of information that was only

24   orally disclosed, and the three -- when I say three pieces

25   of information, about three jurors, and that --

```
 1            THE COURT:  I'm missing something.  I thought he
 2   said two jurors.
 3            MR. GERAGOS:  That's what I thought at first as
 4   well, but then he said something to the effect that one of
 5   them had already disclosed.
 6            THE COURT:  No.  If I understood correctly, and
 7   please correct me if I'm wrong, Mr. Rolwing or
 8   Mr. Sullivan, my understanding was that the search revealed
 9   two hits, one on Juror 37, and the other one was on either
10   Juror 64 or 61, he doesn't recall which, but that all three
11   of those jurors have now been excused for unrelated reasons,
12   and that there were just two pieces of information conveyed,
13   but he can't remember which juror the second piece of
14   information related to.
15            MR. ROLWING:  That is accurate, Your Honor.  And I
16   believe Special Agent Hatcher also said he thought there was
17   another juror who had a criminal conviction, but it was
18   dismissed, so it was not a criminal conviction.  That's the
19   way he phrased it.
20            THE COURT:  And did you even follow up on that?
21            MR. ROLWING:  I don't know who it was, and it
22   didn't matter because he said it wasn't a conviction.
23            THE COURT:  Mr. Sullivan.
24            MR. SULLIVAN:  I only knew about the one hit.  I
25   didn't know about the second one, or any others.
```

1          MR. ROLWING:  It was only orally conveyed.  You've

2    expressed it exactly correctly with that last qualification.

3          THE COURT:  Let me ask the other members of the

4    prosecution team, did you receive any information in

5    addition to what Mr. Rolwing has testified he received?

6          MR. EWENCZYK:  Arthur Ewenczyk, Your Honor.  I

7    only received -- I personally only received information

8    about Juror No. 37.

9          THE COURT:  Ms. Goemaat.

10          MS. GOEMAAT:  Yes.  Thank you, Your Honor.

11          This was a meeting -- I think it was late Monday

12    night with the agents, and the only notes -- I've just

13    looked through my notes.  I don't have a very good memory,

14    so I have to check my notes.  My memory from that meeting

15    late Monday night was that we discussed Juror No. 37.  I

16    don't even personally have a memory of talking about

17    somebody who had been struck, but I was present for the

18    meeting, and it seems plausible.  And the only document that

19    I've taken notes on, I can't find any additional notes.

20          So yes, right now what I remember is Juror No. 37.

21    I believe that we asked for personal -- people who had

22    been -- we were looking for anyone who had been prosecuted

23    because that's the way the question was phrased, and I think

24    that's what we asked to know, and I remember much discussion

25    of Juror No. 37.

```
 1              THE COURT:  All right.

 2              Mr. Sullivan, do you remember any other jurors

 3    being involved?

 4              MR. SULLIVAN:  I was told of number 37.  That's

 5    all I was told of.

 6              THE COURT:  Okay.

 7              Anything further, Mr. Geragos?

 8              MR. GERAGOS:  Yes.  I reiterate that I do not

 9    agree with the research that was done.  I believe that the

10    use of a NCIC database for jury purposes is improper.  I

11    believe that it is an unfair utilization of a database which

12    gives an edge to the prosecution.  I don't believe that the

13    fact that the agents communicated the results of that -- or

14    the propriety of that -- orally makes any difference

15    whatsoever, and that to permit that to happen I believe is

16    an unfair imbalance in information.  And that the access of

17    that and the lack of pursuit of 43, and why 43's hit not

18    only -- apparently didn't get conveyed.  If that's true -- I

19    don't know if that's true.  I'm now told that memories are

20    fuzzy from 36 hours ago.  I don't think that there is any

21    settled law that says during jury selection, in a criminal

22    case, the prosecution in an income tax or IRS setting is

23    allowed to use NCIC for jury selection purposes.

24              THE COURT:  All right.  Thank you.

25              MR. GERAGOS:  My remedy is that I request a new
```

1    panel.

2            THE COURT:  All right.

3            Well, I am prepared to rule.  My reading of the

4    regulations is that this use that was made by the

5    prosecution falls within the definition of being used for

6    duties in connection with the administration of criminal

7    justice.

8            I believe that Mr. Rolwing's point is well taken.

9    We have a statute, 28 U.S. Code 1865, that disqualifies from

10   service those who have been convicted of felonies.  If they

11   were checking to see if, in fact, the jury panel was

12   qualified and had been truthful in their answers, I think

13   that that does further the administration of criminal

14   justice because it enables us to ensure that we are seating

15   a panel that is qualified and that has been truthful during

16   the voir dire process.

17           But if I'm wrong about that, I still believe that

18   the remedy that you are requesting, Mr. Geragos, is not

19   supported by the facts of what happened here.

20           Do you wish to say something?

21           MR. GERAGOS:  I was just going to ask a further

22   request that whatever reports were run by Agent Hatcher and

23   the other agents be lodged with the Court.

24           THE COURT:  All right.  So even assuming that I'm

25   wrong with respect to the applicable regulations, I think

1    what I have to determine is whether or not we can impanel a

2    fair and impartial jury who will provide a fair trial to

3    Mr. Dermen, a jury that will not be prejudiced against

4    Mr. Dermen.  And it seems to me that there's a huge logical

5    leap between the violation of a regulation and a conclusion

6    that the jury that's impaneled is not fair and impartial.

7            It also seems to me that the NCIC is a database of

8    publicly available information.  Now it may be one form in

9    which that information is available, that's available to law

10   enforcement to run searches, but as we saw in court the

11   other day, it took Mr. Williams all of about two minutes to

12   pull up the same information on the Utah State Exchange

13   Service, which is a publicly available database.  It was

14   available to the defense, as Mr. Williams' ability to pull

15   that information up showed.  In fact, he had more

16   information about this issue within a matter of five minutes

17   than the prosecution had.

18           And so there was nothing that prevented the

19   defense from running these jurors on the Exchange system,

20   and they would have had access to the same information, and

21   it sounds like maybe even better information than the

22   prosecution had.

23           So I don't believe that any potential juror has a

24   privacy interest in information that's publicly available.

25   If you suffer a criminal conviction, that information is

1    publicly available.  Landlords can find it out.  Credit

2    bureaus can find it out.  It's publicly available

3    information when you're convicted of a crime.  And so that's

4    another logical leap that I'm not following here in terms of

5    the defense's argument.  So I suppose that there's no right

6    to privacy in that information and that that seems like it's

7    a nonissue.

8         And I guess the most compelling reason for denying

9    your motion, Mr. Geragos, is that we have been arguing about

10   a lot of law here that is completely divorced from the facts

11   of the actual case.  The reality is that two pieces of

12   information were obtained.  They both related to jurors who

13   are no longer on the panel.  So regardless of what the

14   information was, regardless of whether or not it should be

15   shared, it's irrelevant.  It's been mooted by events that

16   have transpired that have nothing to do with the

17   government's obtaining of that information.  The information

18   that the government obtained is completely worthless because

19   none of the information pertained to individuals who are

20   still in the jury venire panel.  So that is my ruling.

21        I think the jurors should be back at 1:15.  We

22   will come back into the courtroom at 1:15, and allow you to

23   exercise your preemptory challenges, and we will get this

24   jury seated.

25        I will tell you, for purposes of looking at the

1    seating charts, that I just received word from the jury

2    administrator, Juror No. 51 has checked with the human

3    resources department of her employer and she will receive

4    pay for the average number of hours that she works in a

5    week.  So her financial concerns have been addressed, and I

6    am not going to remove her from the panel for hardship.

7            There was one other juror on whom we reserved.  I

8    did not see a reason, based on what had been presented, to

9    remove that juror for cause.  But if either of the parties

10   wishes to remove that juror for cause, they can do so now.

11           MR. GERAGOS:  May I have one moment, Your Honor?

12           MS. MORENO:  Are you talking about Juror No. 43?

13           THE COURT:  I am.

14           MS. MORENO:  We move for cause, Your Honor.

15           THE COURT:  You move for cause?

16           MS. MORENO:  Yes.

17           MS. GOEMAAT:  Thank you, Your Honor.

18           We see no reason to strike him for cause based on

19   the discussion we had in chambers.

20           THE COURT:  I'm going to grant the motion.  He's

21   removed for cause.

22           MS. MORENO:  Thank you.

23           THE COURT:  All right.  Let's take a recess.

24   We'll come back in 20 minutes.

25           (Recess)

1          THE COURT:  One quick matter that I need to bring

2     to everyone's attention is that the jury administrator

3     called me a moment ago and said that Juror 51, who was the

4     young woman we visited with today, has been in our office in

5     tears since finding out that she was still on the panel and

6     feels completely overwhelmed.  In light of that --

7          MR. GERAGOS:  Fifty-one is the one that --

8          THE COURT:  She's a young woman, 21 years old, who

9     was worried about the financial hardship.  The jury

10    coordinator thought they'd worked through that, but

11    apparently not.

12         MR. GERAGOS:  Could I have one moment, Your Honor?

13         THE COURT:  You could.

14         MS. MORENO:  Your Honor, respectfully, we don't

15    join in the stipulation to have her dismissed.

16         MR. EWENCZYK:  Your Honor, in light of the

17    emotional toll of just being selected for jury duty seems to

18    be having on this young woman, the government submits that

19    she should be stricken for cause.

20         THE COURT:  I'm going to overrule the motion, and

21    she'll stay on the panel.

22         All right.  Just one more time I want to run

23    through and have Ms. Schaerrer double-check with our

24    official list of folks who have been removed since coming

25    this morning.  Numbers four, ten, 12, 27, 37, 43, 46, 50,

```
 1   60, 70, and 72.

 2              Are we all in agreement?

 3              MS. MORENO:  Yes, Your Honor.

 4              THE COURT:  Let's get the panel into the courtroom

 5   and you can begin exercising your preemptory challenges.

 6              The other thing I wanted to throw out while

 7   Ms. Schaerrer is getting the members of the panel is that I

 8   am amenable to your input with respect to the schedule.  I

 9   think we get them up here.  We select them.  I give them the

10   preliminary instructions.  If you're okay to start opening

11   today, I'm fine with that.  If you believe that all the

12   waiting in the jury room has been an issue, then I will hear

13   your input with respect to scheduling.

14              MR. GERAGOS:  I'd prefer to do it first thing in

15   the morning.

16              MS. GOEMAAT:  Your Honor, the government is

17   prepared to do their opening statement this afternoon.

18              THE COURT:  All right.  Do you have an

19   objection -- the only thing that I'm concerned about, and

20   maybe we even ask the panel when it's sworn, they've been

21   here 9:30 this morning just waiting, and I don't know what

22   kind of an agitated state they may be in as a result for

23   waiting that long.

24              MR. GERAGOS:  I have an objection based on -- I

25   assume the government -- I know that they've estimated 50 to
```

1   70 minutes.  I'm going to take a wild stab that I don't

2   believe that will happen and it's going to be longer than

3   that.  And if we start this afternoon, I don't want to do

4   partial this afternoon and partial tomorrow morning.  I

5   would ask, since they've been there and since we've been

6   going all day, at least I have, that we recess until

7   tomorrow morning, start to do our opening statements and go

8   straight in as a fresh day.  I think that's fair.

9              MS. GOEMAAT:  Mr. Geragos is correct, that the

10  government's opening is likely to be more like an hour 15 to

11  an hour 30.  We'll leave it to the Court's discretion, but

12  we are prepared to proceed if the Court wants us to proceed.

13             THE COURT:  Okay.  Thank you.

14             I'll assess it as I sense the temperature of the

15  jury, and see how long this process takes.

16             Do you have questions?

17             MR. GERAGOS:  I'm used to a different format, so

18  Ms. Moreno is acclimating me.

19             THE COURT:  I am going to attempt to turn off all

20  microphones at counsel tables.  I may or may not be

21  successful.

22             We will have Ms. Schaerrer help when she gets

23  back.

24             MR. GERAGOS:  Thank you, Your Honor.

25             (Jury panel present in courtroom.)

1              THE COURT:  Thank you.  You may be seated.

2        I hate to have to keep apologizing, but I will

3   apologize.  I came prepared this morning to start in very

4   early, but we had a couple of things that happened.

5              First, a number of you, after consulting with

6   employers or having things occur to you that didn't occur to

7   you when you were here on Monday, there were a number of you

8   that wanted to bring additional matters to our attention,

9   and I very much appreciate your doing that, because as I

10  indicated earlier, what's important to us is that we seat a

11  jury that is fair and impartial.  And so it took more time

12  than we had anticipated to meet with everyone who had

13  additional information to share with us.  But that was an

14  important part of the process.  So I apologize that you had

15  to wait while we worked through that.

16             We then had a legal issue arise that we had not

17  anticipated, so we needed to work through that.  So, again,

18  I apologize that we kept you waiting.

19             I do find that a lot of times the jury selection

20  process is the one that throws the most curveballs at you in

21  a trial.  So I have every expectation that once we get the

22  jury seated, we can stick to a schedule and we will not have

23  a situation while you're just waiting.

24             We weren't ignoring you.  We were actually working

25  very hard while you were down there.  And it's sad, because

1    we had a lunch for the jury, but we don't have the jury

2    picked yet.  So I thought it best to let you grab some lunch

3    so that you weren't starving to death by the time we got to

4    this part of the process.  Again, I apologize.

5            I have met with the attorneys and we've considered

6    all of the additional information that was provided this

7    morning.  I have agreed to allow some of you to be excused

8    because of hardship issues, but we're not going to announce

9    that now.

10           What we're going to do at this point is to allow

11   the attorneys to exercise what are called preemptory

12   challenges.  That's just another word for discretionary

13   challenges.  Each set of attorneys has the ability to

14   challenge jurors for reasons of their own choosing.

15           So we have a list with the juror numbers on it.

16   They're going to look at that list.  And we'll pass it back

17   and forth as they exercise their discretionary challenges.

18   Once they've done that, I will then announce the members of

19   the jury, and we will get you sworn in and give you some

20   preliminary instructions.

21           But it's important that we have you all seated in

22   the courtroom as the lawyers exercise those discretionary

23   challenges.  That way they can put a face with a number in

24   this case as opposed to a face with a name.  But they can

25   put a face with a number and remember the answers that you

1    may have given or the interaction they had with you here in

2    court as they exercise those challenges.

3            So I am going to be quiet and allow them to do

4    that.  We'll have the clerk pass the official juror sheet

5    back and forth between the two sets of lawyers.  And then

6    once they have finished, I will let you know whether or not

7    you have been selected.

8            (Juror preemptory challenge process proceeds.)

9            MR. GERAGOS:  May we approach?

10           THE COURT:  You may.

11           (Side-bar conference)

12           MR. GERAGOS:  Can the Court instruct as to -- I

13   haven't asked this question before.  If we were to strike

14   one of the -- this would be our last strike, correct?  If we

15   strike one who's in the first 12, that means we don't

16   have -- that the next person up goes into the box as opposed

17   to if we were to strike one who would be an alternate at

18   this point?  Does that make sense?

19           THE COURT:  I think the point is we take the first

20   12 people who haven't been stricken, that makes the panel.

21   So I suppose if you strike an alternate, then that person --

22           MR. GERAGOS:  That person goes in.

23           THE COURT:  I don't think you can strike an

24   alternate.  You can pass I suppose.  So you would go -- you

25   would take the first 12 people.  So if you wanted somebody

1   who is now an alternate to be -- I'm trying to think.

2           MR. EWENCZYK:  The 12 jurors are going to be

3   chosen among the jurors one through 45.  It's the alternates

4   chosen from the jurors 47 through 59.  So there is a

5   12-juror pool and an alternate pool.

6           MR. GERAGOS:  That's the problem.  That's the

7   problem.

8           Can we caucus for a second?

9           THE COURT:  Have you exercised a regular strike on

10  someone past 45?

11          MR. GERAGOS:  Not yet.

12          THE COURT:  Just to confirm, you have two strikes

13  for the alternates.

14          MR. EWENCZYK:  He has two left for the jury.

15          THE COURT:  Your ten strikes have to be used on

16  jurors one through 45, and then your remaining two can be

17  used on 47 through 59.

18          MR. GERAGOS:  Okay.  Thank you.

19          (Side-bar concluded.)

20          THE COURT:  We're getting very close.  We just had

21  a couple of questions about some numbers, but I appreciate

22  your continued patience.

23          Just to clarify the record, I correctly said that

24  both sides have passed your last pass, your last strike?

25          MR. GERAGOS:  Yes, on behalf of the defense.

```
 1              MR. ROLWING:  No.  We have our second one.  We did
 2   not pass.
 3              MR. GERAGOS:  Could I approach?
 4              THE COURT:  Yes.
 5              (Side-bar conference)
 6              THE COURT:  I see only one listed here.
 7              MR. ROLWING:  Alternate number one, alternate
 8   number two, those are our two.
 9              THE COURT:  Oh, okay.
10              MR. ROLWING:  These were reversed.
11              THE COURT:  That's what has confused me.
12              MR. ROLWING:  These are our two.
13              MR. GERAGOS:  And that's mine.  And then --
14              MR. ROLWING:  The confusion was on the first page
15   it got corrected.  On the second page it didn't get
16   corrected.
17              THE COURT:  Just so the record is clear, the
18   defense passed its second strike on the alternate panel?
19              MR. GERAGOS:  Yes.
20              THE COURT:  Thank you.
21              (Side-bar concluded.)
22              THE COURT:  Finally, ladies and gentlemen, we are
23   ready to announce the members of the jury.
24              I want to ask the lawyers to please make sure that
25   I read these numbers correctly.  It seems like no matter how
```

1    careful I am, every time I either leave someone off or read

2    the wrong number.  So I'm asking that the lawyers

3    double-check me on this.

4            What I would like to do, as I read your number, if

5    your number is read, then take the first seat there in the

6    jury box, go along the front row, and then along the back

7    row.

8            If your name is not called, you can exit the jury

9    box if you're sitting there.  But please don't leave the

10   courtroom until I make sure that the lawyers have told me

11   that I have read the names correctly, because we wouldn't

12   want someone whose name I should have read to leave and then

13   we'd have to go find you, I guess.

14           MR. ROLWING:  Not to be picayune, I know the Court

15   has used the word names.  You're just going to read the

16   numbers?

17           THE COURT:  Yes.  I'm going to read the numbers.

18   That was a mistake on my part.

19           So I will read the numbers.  If your number is not

20   called, then you can just move to the center of the

21   courtroom here and wait until all the numbers have been

22   called.

23           So those who have been selected to serve and who

24   will be on the jury in this case are juror number one, juror

25   number two, juror number 13, juror number 15, juror number

17.

And if your number has been skipped, you can start moving.

Juror number 21, juror number 25, juror number 36, juror number 38, juror number 41, juror number 42, juror number 45, juror number 54, juror number 55, juror number 56, and juror number 57.

So let's have all of the numbers that I have just read make their way to the jury box. And then what I would like to do is have each of you who are seated in the box announce your number so that we can make sure that we have done this correctly.

All right. So let's start on the front row. Just give me your number only, and I'm going to check off I've read this correctly.

JURORS IN JURY BOX: One, two, 13, 15, 17, 21, 25, 36, 38, 41, 42, 54, 55.

THE COURT: Just a minute. Did we have a 45?

Oh, we're in the wrong order.

I'm sorry. Can I get you to rearrange your order?

So I suppose everyone needs to scoot down one.

And then if we can have juror number 45 come to his seat.

All right. So we have 42. And then you are?

JURORS IN JURY BOX: 45, 54, 55, 56, 57.

```
 1                    THE COURT:  All right.  Let me ask the members of
 2       the prosecution team if this is the jury that you have
 3       selected?
 4                    MR. ROLWING:  Yes, Your Honor.
 5                    THE COURT:  And apart from the issues that have
 6       already been ruled upon, do you pass this jury for cause?
 7                    MR. ROLWING:  Yes.
 8                    THE COURT:  Let me ask the defense team, is this
 9       the jury that you have selected?
10                    MR. GERAGOS:  Yes, Your Honor.
11                    THE COURT:  Apart from issues on which I have
12       already ruled, do you pass this jury for cause?
13                    MR. GERAGOS:  Yes, Your Honor.
14                    THE COURT:  All right, then.  For those of you
15       whose numbers were not called, we want to thank you for your
16       patience.  I know this has taken two full days, and very
17       long days.  We appreciate your service, and wish you the
18       best.  And thank you again for coming.
19                    (Jurors excused)
20                    THE COURT:  Members of the jury, the first thing
21       that we need to do is have you sworn in.  So let me ask the
22       clerk to administer the oath to you as jurors.
23                    If you can all stand and raise your right hands.
24                    (Jury sworn in.)
25                    THE COURT:  Thank you.  You may be seated.
```

 1           Let me just first tell you that because this

 2    process has taken so much longer than I anticipated this

 3    morning, I have just made a unilateral determination that we

 4    will not start with opening statements until the morning.

 5    And I do that because it's already three o'clock, and I'm

 6    not sure exactly how long the opening statements would be.

 7    But we would need to take a break now for everyone's sake,

 8    including our court reporter's sake, and I seriously doubt

 9    that we could finish the opening statements by five o'clock.

10    And I believe that it is important for both parties to have

11    continuity so they are not interrupted by breaking in the

12    middle of their statement.

13           So what I think makes the most sense is I will

14    read you some preliminary instructions -- they aren't very

15    long -- that will explain how the trial will unfold and a

16    little bit more about your duties as jurors.  As soon as I

17    have read those preliminary instructions, then we will

18    recess for the day.  I will ask the clerk to take you back

19    to the jury room so you will get to see where you will be.

20           What you will notice, and for those of you who

21    came in during questioning, when they built this courthouse

22    they made the jury rooms far too small, and it gets a bit

23    claustrophobic in there.  But we have a conference room that

24    is adjacent to the juror room.  So we'll put chairs in there

25    and you will be able to use both of those rooms on breaks

 1    and for lunch, and for that kind of a thing.  So hopefully

 2    that will give you a little bit of room to spread out.

 3            So let me begin with the instructions.  And you

 4    will notice -- at least you should have some things

 5    appearing on your screens there.

 6            Let me ask first of all is everyone's screen

 7    working?

 8            (Hand raised)

 9            THE COURT:  It looks like one screen is not

10    working.  Let me ask Mr. Bahr -- occasionally those plugs on

11    the bottom of the screen wiggle loose, and then the screen

12    stops working.  Let me see if Mr. Bahr could figure that

13    out.  But this is a good illustration.  If at any time

14    during the trial your screen is not working, please raise

15    your land and let us know and we'll make sure that someone

16    comes and gets the screen working.  We want everyone to be

17    able to see anything that's on the screens.

18            When we have exhibits that are in evidence, then

19    those exhibits can be put up on the screen so you will be

20    able to follow along with the witness as the witness might

21    look at an exhibit.

22            Is that screen working?

23            They tend to do that.  I think it's part of having

24    a movable screen there.  The little plugs tend to jiggle

25    out.  If we can't get that one working right now, I'm just

```
 1    going to be reading out loud what will be appearing on the

 2    screen.  If we can't get it working right now, you can look

 3    at the screens next to you, or just carefully listen.  They

 4    are also on the big screen.  That way we can see what's on

 5    the screen of the jury members.

 6            I will tell you, at the end of the trial you will

 7    have copies -- hard copies of all the instructions that I

 8    read to you and you will be able to take those into the jury

 9    room.

10            Did we get it working?

11            MR. BAHR:  No.  I have to lay it down to get

12    underneath it.

13            THE COURT:  Are you two jurors okay to look at the

14    screens next to you or listen to me?  These won't be too

15    long.  We will make sure that the screens are fixed before

16    you come in in the morning.

17            Is everyone ready?

18            Members of the jury, you have been selected and

19    sworn as the jury to try the case of the United States of

20    America vs. Lev Aslan Dermen, also known as Levon

21    Termendzhyan.  This is a criminal case, meaning that the

22    defendant is accused of committing certain crimes.  You will

23    decide if the defendant is guilty or not guilty.  I will

24    give you some instructions now and some later.  You are

25    required to consider and follow all my instructions.  Keep
```

1  an open mind throughout the trial.  At the end of the trial

2  you will discuss the evidence and reach a verdict.  You have

3  each taken an oath to well and truly try the issues in the

4  case now on trial and render a true verdict according to the

5  evidence and instructions that I will give you.  The oath is

6  your promise to do your duty as a member of the jury.  Be

7  alert.  Pay attention.  Follow my instructions.

8        The prosecution has filed a document called an

9  indictment that contains the charges against the defendant.

10  In this case, there are ten charges, or counts.

11        Count 1 charges Lev Dermen with conspiring with

12  Jacob Kingston, Isaiah Kingston, Rachel Kingston, Sally

13  Kingston, and others, to commit mail fraud by participating

14  in a scheme to defraud the United States out of $1.1 billion

15  in refundable renewable fuel tax credits and RINs between

16  2010 and May 2017.

17        Count 2 charges Levon Termendzhyan with conspiring

18  with Jacob Kingston, Isaiah Kingston, and others, to commit

19  international money laundering, concealment money

20  laundering, and expenditure money laundering, from in or

21  about April 2013 through at least November 2016, involving

22  over $148 million in financial transactions.

23        Count 3 charges Lev Dermen with money laundering

24  by knowingly causing the making of a $1 million principal

25  payment on a $11.2 million loan on or about June 4th, 2014,

which loan had been made to Borrower X using proceeds of the
mail fraud scheme alleged in Count 1, which Lev Dermen knew
to be the proceeds of unlawful activity, knowing that the
$1 million payment was designed in whole or in part to
conceal and disguise the nature, location, source,
ownership, and control of the proceeds of the mail fraud
scheme alleged in Counts 1 and 2.

Counts 4 through 6 charge Lev Dermen with money
laundering by bringing about three interest payments
totaling $350,000 between on or about February 20th, 2015
and on or about April 15th, 2015 on the same $11.2 million
loan to Borrower X, knowing the loan was made using proceeds
of unlawful activity, and knowing that the payments were
designed in whole or in part to conceal and disguise the
nature, location, source, ownership, and control of the
proceeds of the mail fraud scheme alleged in Counts 1 and 2.

Count 7 charges Lev Dermen with money laundering
by knowingly causing the making of a $1 million principal
payment on or about April 23rd, 2015 on the same $11.2
million loan to Borrower X, which Lev Dermen knew to be the
proceeds of unlawful activity, knowing that the $1 million
payment was designed in whole or in part to conceal and
disguise the nature, location, source, ownership, and
control of the proceeds of the mail fraud scheme alleged in
Count 1.

1            Count 8 charges Lev Dermen with concealment money

2     laundering by knowingly causing a $3.1 million wire transfer

3     on or about August 5th, 2013 from Noil Energy Group to a

4     title company in connection with the purchase of real

5     property in Sandy, Utah.  This wire transfer involved

6     proceeds of the mail fraud scheme alleged in Count 1, which

7     Lev Dermen knew to be the proceeds of unlawful activity,

8     knowing that the $3.1 million wire transfer was designed in

9     whole or in part to conceal and disguise the nature,

10    location, source, ownership, and control of the proceeds of

11    the mail fraud scheme alleged in Counts 1 and 2.

12            Count 9 charges Lev Dermen with expenditure money

13    laundering by knowingly engaging in a monetary transaction

14    involving criminally-derived property of greater than

15    $10,000 derived from the money laundering scheme alleged in

16    Counts 1 and 2, specifically a March 5, 2014 wire transfer

17    of $483,000 to Levon Termendzhyan's account at Garanti Bank

18    in Turkey.

19            Count 10 charges Lev Dermen with expenditure money

20    laundering by knowingly engaging in a monetary transaction

21    involving criminally-derived property of greater than

22    $10,000 derived from the mail fraud scheme alleged in Counts

23    1 and 2, specifically a March 26, 2015 wire transfer of

24    $3.5 million from SBK Holdings USA, Inc. to a title company

25    to purchase a residence in Huntington Beach, California.

1          The indictment is only an accusation.  The

2     indictment is not evidence of anything, and should not be

3     treated as evidence.  The indictment is only a method of

4     accusing a defendant of a crime.

5          The defendant has entered a plea of not guilty and

6     denies committing the crimes charged in the indictment.

7     Every crime has component parts called elements.  The

8     prosecution must prove each element beyond a reasonable

9     doubt.  Until then, you must presume that the defendant is

10    innocent.  The defendant does not have to prove anything.

11    The defendant does not have to testify, call witnesses,

12    present evidence, or prove his innocence.

13          Mail fraud.  The prosecution has the burden of

14    proving the defendant guilty beyond a reasonable doubt.

15    Some of you may have served as jurors in civil cases where

16    you were told that it is only necessary to prove that a fact

17    is more likely true than not true.  In criminal cases, the

18    prosecution's proof must be more powerful than that.  It

19    must be beyond a reasonable doubt.  Proof beyond a

20    reasonable doubt is proof that leaves you firmly convinced

21    of the defendant's guilt.  There are very few things in this

22    world that we know with absolute certainty, and in criminal

23    cases the law does not require proof that overcomes every

24    possible doubt.  If, based on your consideration of the

25    evidence, you are firmly convinced that the defendant is

1    guilty of the crime charged, you must find him guilty.  If,

2    on the other hand, you think there is a real possibility

3    that the defendant is not guilty, you must give the

4    defendant the benefit of the doubt and find the defendant

5    not guilty.

6          Remember, the fact that the defendant is charged

7    with one or more crimes is not evidence of guilt.  The law

8    presumes that the defendant is not guilty of the crimes

9    charged.  This presumption persists unless the prosecution's

10   evidence for a defendant convinces you beyond a reasonable

11   doubt that the defendant is guilty.  So long as reasonable

12   doubt exists, you must find the defendant not guilty.

13         All of us, judge, jury, and lawyers, are officers

14   of the court and have different roles during the trial.

15         As the judge, I will supervise the trial, decide

16   legal issues, and instruct you on the law.

17         As the jury, you must follow the law as you weigh

18   the evidence and decide the factual issues.  Factual issues

19   relate to what did or did not happen in this case.

20         The lawyers will present evidence and try to

21   persuade you to decide the case in one way or the other.

22         Neither the lawyers nor I decide the case.  That

23   is your role.  Do not be influenced by what you think our

24   opinions might be.  Make your decision based on the law

25   given in my instructions and on the evidence presented in

1    court.

2         As jurors you will decide whether the defendant is

3    guilty or not guilty.  You must base your decision only on

4    the evidence.  Evidence usually consists of testimony and

5    exhibits presented at trial.  Testimony is what witnesses

6    say under oath.  Exhibits are things like documents,

7    photographs, or other physical objects.  The fact that the

8    defendant has been accused of crimes and brought to trial is

9    not evidence.  What the lawyers say is not evidence.  For

10   example, their opening statements and closing arguments are

11   not evidence.

12        There are two kinds of evidence, direct and

13   circumstantial.  Direct evidence is testimony by a witness

14   about what that witness personally saw, heard, or did.

15   Circumstantial evidence is indirect evidence, that is, it is

16   proof of one or more facts from which one can find another

17   fact.

18        You must consider both direct and circumstantial

19   evidence in deciding this case.  The law permits you to give

20   equal weight to both, but it is for you to decide how much

21   weight to give to any evidence.

22        Statements and arguments of counsel are not

23   evidence in the case.  But when the parties on both sides

24   agree as to the existence of a fact, you must accept that

25   fact as true.

1          Unless you are otherwise instructed, anything you

2     may have seen or heard outside of the courtroom is not

3     evidence and must be entirely disregarded.

4          While you must consider only the evidence in this

5     case, you are permitted to draw reasonable inferences from

6     the testimony and exhibits, inferences you feel are

7     justified in the light of common experience.  An inference

8     is a conclusion that reason and common sense may lead you to

9     draw from facts which have been proved.

10         By permitting such reasonable inferences, you may

11    make deductions and reach conclusions that reason and common

12    sense lead you to draw from the facts that have been

13    established by the testimony and evidence in this case.

14         Some evidence is admitted for a limited purpose

15    only.  When I instruct you that an item of evidence has been

16    admitted for a limited purpose, you must consider it only

17    for that limited purpose.

18         During the course of the trial, I might ask a

19    witness a question.  Do not assume that I hold any opinion

20    on the matters to which my question may have related.  You

21    as jurors may consider what evidence you deem relevant.

22         You are to determine which witnesses to believe,

23    what parts of their testimony to believe, and what weight or

24    value to give that testimony.  In making these

25    determinations, you may consider some or all of the

1    following:  One, the demeanor and deportment of the witness;

2    two, the witness's interest in the result of the trial;

3    three, any tendency to favor or disfavor one side or the

4    other; four, the probability or improbability of events

5    having occurred the way the witness describes the events;

6    five, whether the witness was actually able to see or hear

7    or otherwise perceive the things described; six, whether

8    this witness can now accurately recall the things the

9    witness observed; seven, whether the witness is able to

10    describe what he or she observed accurately and in a form

11    that you can understand; eight, whether the witness made

12    earlier statements or expressions that are consistent or

13    inconsistent with what is now being said; and, nine, whether

14    or not the witness speaks the truth.

15            Whatever tests you use, the value of a witness's

16    testimony is for you to determine.

17            From time to time during the trial it may become

18    necessary for me to talk with the lawyers out of the hearing

19    of the jury, either by having a conference at the bench when

20    the jury is present in the courtroom or by calling a recess.

21    Please understand that while you're waiting we are working.

22    The purpose of these conferences is not to keep relevant

23    information from you, but to decide how certain evidence is

24    to be treated under the rules of evidence and to avoid

25    confusion and error.  We will do what we can to keep the

number and length of these conferences to a minimum.  I may

not always grant a request for a conference.  Do not

consider my granting or denying a request for a conference

as any indication of my opinion of the case or what your

verdict should be.

At the end of the trial you will have to make your

decision based on what you recall of the evidence.  You will

not have a written transcript to consult.  I urge you to pay

close attention to the testimony as it is given.

Rules govern what evidence may be presented to

you.  On the basis of these rules, the lawyers may object to

proposed evidence.  If they do, I will rule in one of two

ways.  If I sustain the objection, the proposed evidence

will not be allowed.  If I overrule the objection, the

evidence will be allowed.

When I sustain an objection to a question, ignore

the question and do not guess what the answer would have

been.  Sometimes I might order that evidence be stricken

from the record and that you disregard or ignore the

evidence.  When I do so, you must not consider that

evidence.

Do not evaluate the evidence on the basis of

whether objections are made.  Do not allow yourselves to be

influenced by my rulings.  If I receive evidence after it is

objected to by one of the lawyers, that only means that you

1    may have that evidence for your consideration.  What weight

2    or value you place upon it is still for you to determine.

3           You must not disfavor lawyers who make a legal

4    objection to evidence, because that is their job.

5           I will now explain how the trial will unfold.  The

6    prosecution will first give its opening statement.  An

7    opening statement gives an overview of the case from one

8    point of view, and summarizes what that lawyer thinks the

9    evidence will show.  Defense counsel may choose to make an

10   opening statement right after the prosecutor, or wait until

11   after all the prosecution's evidence has been presented, or

12   not make one at all.

13          You will then hear the prosecution's evidence.

14   Evidence is usually presented by calling and questioning

15   witnesses.  What they say is called testimony.  A witness is

16   questioned first by the lawyer who called that witness and

17   then by the opposing lawyer.  Consider all testimony,

18   whether from direct or cross-examination, regardless of who

19   calls the witness.

20          After the prosecution has presented all its

21   evidence, the defendant may present evidence, though the

22   defendant has no duty to do so.  If the defendant does not

23   present evidence, the prosecution may then present

24   additional evidence.  After both sides have presented all

25   their evidence, I will give you final instructions on the

1    law you must follow in reaching a verdict.  You will then

2    hear closing arguments from the lawyers.  The prosecutor

3    will speak first, followed by defense counsel.  The

4    prosecutor then speaks last, because the government has the

5    burden of proof.  Finally, you will deliberate in the jury

6    room where you will discuss the case and reach a verdict.

7    Keep an open mind until then.

8            From time to time I will call a recess.  It may be

9    for a few minutes or longer.  During recesses, do not talk

10   about this case with anyone, not family, not friends, not

11   even with each other.  Until the trial is over, do not

12   mingle or talk with the lawyers, parties, witnesses, or

13   anyone else connected with the case.  Court clerks or

14   bailiffs can answer general questions, such as the length of

15   breaks or the location of restrooms.  They cannot comment

16   about the case or anyone involved.  The goal is to avoid the

17   impression that anyone is trying to influence you

18   improperly.  If people involved in the case seem to ignore

19   you outside of court, they are just following this

20   instruction.

21           Until the trial is over, do not read or listen to

22   any news reports about this case.  Do not do any research or

23   visit any locations related to this case.  If you

24   inadvertently hear or see news stories about the case, or if

25   you observe anything that seems to violate this instruction,

1    report it immediately to a clerk or bailiff.

2            Jurors have caused serious problems during trials

3    by using computer and electronic communication technology.

4    You may be tempted to use these devices to investigate the

5    case, or to share your thoughts about the trial with others.

6    However, you must not use any of these electronic devices

7    while you are serving as a juror.

8            You violate your oath as a juror if you conduct

9    your own investigations or communicate about this trial with

10   others, and you may face serious consequences if you do.

11   Let me be clear:  Do not Google the parties, witnesses,

12   issues, or counsel; do not Tweet or text about the trial; do

13   not use your phone to gather or send information on the

14   case; do not post updates about the trial on Facebook pages;

15   do not use Wikipedia or other Internet information sources,

16   et cetera.  Even using something as seemingly innocent as

17   Google Maps can result in a mistrial.

18           Please understand that the rules of evidence and

19   procedure have developed over hundreds of years in order to

20   ensure the fair resolution of disputes.  The fairness of the

21   entire system depends on you reaching your decisions based

22   on evidence presented to you in court, and not on other

23   sources of information.

24           Post-trial investigations are common and can

25   disclose these improper activities.  If they are discovered,

1   they will be brought to my attention and the entire case

2   might have to be retried, at substantial cost.

3          If you wish, you may take notes to help you

4   remember what a witness said.  If you do take notes, please

5   keep them to yourself until you and your fellow jurors go to

6   the jury room to decide the case.  Do not let note-taking

7   prevent you from hearing other answers by the witnesses.

8   When you leave at night, you must leave your notes in the

9   jury room.

10          If you do not take notes, you should rely on your

11   own memory of what was said and not be overly influenced by

12   the notes of other jurors.  If you do take notes, remember

13   they are not evidence and may be incomplete.  Do not be

14   overly influenced by your notes.  Rely on your own memory

15   and the collective memory of the members of the jury.

16          That concludes the preliminary instructions.  I

17   have to add one more instruction, which is that it is often

18   very cold in this courtroom.  We get a lot of complaints

19   from jurors about the temperature.  If you want to bring a

20   jacket or a blanket to put over your lap, feel free to do

21   that.  And if you're still cold, don't hesitate to raise

22   your hand.  And let us know if you're too hot.  You can let

23   us know that as well.  We want to make sure that you are

24   comfortable so that you can focus on listening to the

25   evidence and not shivering or roasting, one or the other.

1          And if you want to bring water bottles, or

2    whatever, into the jury box as well, that's fine.

3          I anticipate that we will take a break in the

4    morning, sort of a midmorning break.  We'll break for lunch

5    around 12:30 each day.  There will be lunch provided for you

6    in the jury room.  And then we'll take another break in

7    midafternoon.

8          Do you have any questions as members of the jury

9    at this juncture?

10         JUROR:  The examples given when talking about

11   using electronic devices, examples given and examples

12   pertaining to the case, the statements about do not use

13   these devices were not specific to the case, it seemed to be

14   saying don't use.

15         THE COURT:  You can certainly use your phone to

16   call your wife and see whose picking up the children.  You

17   can call your employer to tell him how much longer you'll be

18   gone.  You can get on the computer to check your bank

19   balance when you're at home.

20         But what I am trying to impress upon you is that

21   we can't have any information about -- you can't get any

22   information about the case through the use of the Internet,

23   or through newspapers, or through conversations with other

24   people.  All evidence about the case has to come from what

25   transpires in the courtroom.  And I think you're all aware

1    of the danger if you open up your Web browser and a headline

2    pops up, that's not a good situation.

3         I know sometimes my husband and I would watch a

4    show on television and we'd get a couple weeks behind, and

5    then some headline would show up when someone opened the Web

6    browser and it would spoil the whole TV show because you

7    know what happened.

8         So we need to be incredibly careful, if you're

9    getting on your phone or if you're getting on your computer,

10   to not go to Web pages where anything might exist about this

11   case.

12        And I will tell you that we have had some

13   journalists who have indicated with our clerk's office that

14   they plan to cover this case.  And so that makes this

15   instruction particularly important in this case because it

16   very much increases the possibility that you might open that

17   Web browser and see something inadvertently.  If you do see

18   something, shut it, leave the room, and come report it

19   immediately upon coming to court the next morning.

20        Does that make sense?

21        JUROR:  Yes.

22        THE COURT:  Are there any questions about that?

23        JUROR:  Just to follow up on that, I'm in the

24   middle of a research project organizing my stamp collection.

25   It involves Google Maps and Wikipedia.  Everything is there.

1   There's nothing newer than 1960.  Most of the countries

2   don't exist anymore.  Do I need to stand down?

3              THE COURT:  I don't see a problem -- and counsel

4   can jump in.  I don't see a problem if you're on a Wikipedia

5   page looking at stamp collection articles or if you're doing

6   geography research.

7              JUROR:  Right now I'm doing Cuba.

8              THE COURT:  I think the risk of seeing anything

9   about this trial, if you're on a website that contains

10  information about Cuba, would be very low.

11             JUROR:  I can stay away from Google News and the

12  newspapers, and all that.

13             THE COURT:  And when I made the reference to

14  Google Maps -- and I don't know if that would come into play

15  in this case, but, for example, if you were on a jury

16  involving a traffic accident, it would be very bad for you

17  to go on Google Maps and try to get an aerial view of the

18  intersection where that traffic accident occurred, because

19  that would be outside information that the lawyers didn't

20  hear, that they didn't have a chance to respond to.  And you

21  might just be completely -- it would just be completely

22  wrong and would violate all the rules of evidence for you to

23  do that kind of research.

24             But it doesn't mean that if you're trying to go to

25  the store on Saturday to buy some material for a painting

1   project and you're lost, you can't turn on Google Maps.

2          Does that make sense?

3          You can find your way to the store using Google

4   Maps because that would not be anything that could possibly

5   have any relationship to this case.

6          JUROR:  Good.  Thank you.

7          THE COURT:  Yes.

8          JUROR:  Separate situation.  If you're in an area

9   where somebody is bringing up the case or discussing the

10  case, I assume the best thing is to remove yourself from

11  that situation as quickly as possible?

12         THE COURT:  Absolutely, and then come report what

13  happened.

14         JUROR:  Don't divulge you are involved in that

15  case at all, correct?

16         THE COURT:  Right.  So you can tell people I have

17  been selected to be a juror in a case in federal court and I

18  will be gone from work for eight weeks.  You can say that.

19  But you can't go in and say this is the case that I'm

20  involved in and relate to people anything about the case.

21         We had a juror in a trial recently who actually

22  worked for -- I think it was The Salt Lake Tribune.  So it

23  was very difficult for him.  He had to be very careful.  And

24  he did some -- I think he actually worked some night shifts,

25  or something, and he was wrestling with, even though he

 1   might have been able to do some work in the evenings, was it
 2   safe for him to go to a newsroom where he might be exposed
 3   to information about the case.  So I don't know if we have
 4   anybody there.
 5        But if you do end up talking to people who have
 6   heard or seen something, then that could be a serious
 7   problem if they blurt something out, because sometimes it's
 8   very difficult to remove things from your mind once you've
 9   heard them.
10        Do we have any other questions about any of that?
11        I know that this is a huge time commitment on your
12   part.  Jury duty is never convenient, and especially in a
13   lengthy trial, it becomes even less convenient.  So we
14   appreciate your service very much, but I hope you can
15   appreciate how much time and effort has gone into getting
16   the case ready thus far.  And so we're really dependent on
17   you to follow the rules because the consequences of having
18   to start over would be not good, to put it mildly.
19        Are there any more questions from members of the
20   jury?
21        We have the jury coordinator back there.  She can
22   help you with questions about hotels.  I know we have some
23   of you who are from far away.  She can help explain about
24   mileage reimbursement and parking reimbursement, and all of
25   those issues.  So we'll have her follow you back to the jury

```
 1   room right now and answer any of those logistical questions.
 2              We will be starting court promptly at 9:00 a.m.,
 3   and the jury coordinator can talk to you about arriving at
 4   the courthouse and trying to avoid the security lines.  So
 5   I'll let her deal with all of those issues with you unless
 6   you have any more questions for me at this point.
 7              Okay.  I don't see any questions.
 8              There's one very important thing that I can't
 9   forget to do, and that is that I need to ask -- I need to
10   have the court security -- do we need to have him sworn
11   right now or not until they go back to deliberate?
12              And again, once you're sent to deliberate, then
13   we'll have the court security officer sworn in.  Until then,
14   you're on your honor and on your oath to not pollute your
15   mind with outside sources of information.
16              Let me just make sure that I'm not missing
17   anything.
18              Let me ask counsel, have I missed anything that I
19   need to instruct this jury on?
20              MR. GERAGOS:  I don't believe so, Your Honor.
21              THE COURT:  All right.
22              MR. ROLWING:  Nothing from the government,
23   Your Honor.
24              THE COURT:  Thank you.
25              I will let you go with the jury administrator.
```

```
 1                  Let's everyone stand for the jury.
 2                  (Jury excused)
 3                  THE COURT:  Are there matters we need to address
 4   before we recess?
 5                  MR. GERAGOS:  Could I have just one moment,
 6   Your Honor?
 7                  THE COURT:  You could.
 8                  MR. GERAGOS:  Not from the defense, Your Honor.
 9   Thank you.
10                  THE COURT:  Are there matters that the prosecution
11   needs to raise?
12                  MS. GOEMAAT:  No, Your Honor.  Thank you.
13                  THE COURT:  All right.
14                  Before we leave, there's just one housekeeping
15   matter that relates to security that I want to address with
16   counsel.  I'm trying to think of the best way to do that.
17   Maybe we can just have counsel come to the bench and I'll
18   quickly tell you what the issue is.
19                  (Bench conference)
20                  THE COURT:  So apparently one of the jurors in the
21   panel this morning said to the jury coordinator that there
22   was a news reporter out front clicking pictures of the jury
23   panel as they entered the courtroom.  We're concerned about
24   that.  We're also concerned with just press trying to
25   interfere with our jury.  We also have a bunch of other
```

1    trials going on in the courthouse right now, and the

2    security lines are very long -- or can be very long at 9:00

3    in the morning.

4              So what we have concluded makes sense is to have

5    the jurors meet at a downtown location.  We'll have them

6    driven here in a couple of vans.  We'll have them enter the

7    courthouse underneath, and have them screened in the

8    basement of the building, and then walk straight up to the

9    jury room in the back so that we don't have the press out

10   there intimidating them.

11             MS. MORENO:  Your Honor, I would just say that

12   it's important for the jurors to know this is only being

13   done to protect their privacy rights.  There should be no

14   other insinuation or innuendo they should take from this

15   action.

16             THE COURT:  Absolutely.  I agree with you, and I

17   have told our jury coordinator -- and I think that she's

18   going to send out an email.  I will review it and I will

19   share it with you in the morning.  It is going to say this

20   is being done because the press has been hanging around the

21   courthouse, and we also want to minimize the time it takes

22   you to get through security.  But I am just -- I don't want

23   these folks -- and the juror ended up being someone who had

24   been previously crossed off the list, but I assumed that

25   other jurors saw that and I just -- I don't think they ought

```
 1   to feel like the press is up in their face.
 2            MR. WILLIAMS:  The issue we ran into this morning,
 3   when we were coming through security as a group, there were
 4   a couple of jurors that were ahead of us.  It wasn't the
 5   prosecution team, but it was some of the case agents that
 6   walked right through security.  They showed their badges.
 7   And the concern that we have -- but I think your suggestion
 8   sort of resolves this -- when we're coming through and
 9   jurors see us being scrutinized, but the government has
10   badges that they wave and they walk right in, it doesn't
11   look like a level playing field.
12            THE COURT:  I agree, and that's why the jury
13   coordinator is going to talk to them about a place
14   relatively close to the courthouse where they can park.  And
15   we have some vans, and we'll just have some court personnel
16   dressed in plain clothes, nobody that looks like an officer,
17   drive them, and then just get them through the screening in
18   the basement so they don't have to be out there mingling
19   with either -- and it's going to be better I think for
20   counsel to not be bumping into them in the halls.
21            (Bench conference concluded.)
22            THE COURT:  All right.  Thank you.
23            MS. GOEMAAT:  Thank you, Your Honor.
24            THE COURT:  All right.  I guess the last thing we
25   need to address is we'll start with opening statements at
```

```
 1   9:00 a.m.  Is there any need to come any earlier than that?

 2   Is there anything that we need to handle in the morning?

 3            MR. GERAGOS:  No, Your Honor.  Thank you.

 4            THE COURT:  All right.  Well, I will be here

 5   before 9:00 if something comes up.

 6            MR. GERAGOS:  If something comes up, we'll let you

 7   know.

 8            THE COURT:  Otherwise, we'll see you at 9:00, and

 9   have a nice evening.

10            MR. GERAGOS:  Thank you, Your Honor.

11            MR. ROLWING:  Thank you, Your Honor.

12            (Whereupon, the trial was continued to Thursday,

13   January 30, 2020 at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         C E R T I F I C A T E

2

3

4              I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 7-21-2023
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   385-215-5889

19

20

21

22

23

24

25