**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

LEV ASLAN DERMEN,

Defendant - Appellant.

No. 23-4074

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:18-CR-00365-JNP-3)**

---

Benjamin S. Waxman (Howard M. Srebnick, with him on the briefs), Black Srebnick, Miami, Florida, for Defendant-Appellant.

Elissa Hart-Mahan, United States Department of Justice, Tax Enforcement Division, Washington, D.C., (David A. Hubbert, Deputy Assistant Attorney General, S. Robert Lyons, Chief, Criminal Appeals and Tax Enforcement Policy Section, and Katie Bagley and Joseph B. Syverson, Attorneys, Tax Enforcement Division, Washington, D.C. and *Of Counsel*: Trina A. Higgins, United States Attorney, Office of the United States Attorney, Salt Lake City, Utah, with her on the brief), for Plaintiff-Appellee.

---

Before **HOLMES**, Chief Judge, **SEYMOUR**, and **EBEL**, Circuit Judges.

---

**HOLMES**, Chief Judge.

---

Defendant-Appellant Lev Aslan Dermen (formerly "Levon Termendzhyan") appeals his convictions for conspiracy to commit mail fraud, conspiracy to commit money laundering offenses, and money laundering. He raises seven issues on appeal. First, he argues that the district court erred by failing to grant his motion for a mistrial based on juror misconduct and exposure to extraneous information. Second, he maintains that the district court erred by failing to grant his motion for mistrial based on COVID-19. Third, he contends that the district court erroneously denied his motion for a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963). More specifically, as to this third claim, Mr. Dermen alleges that the government violated *Brady* by failing to produce evidence concerning a government witness and another individual. Fourth, he argues that the district court erred by admitting improper expert testimony in the guise of summary testimony. Fifth, he asserts that there was insufficient evidence to sustain five of his money laundering convictions. Sixth, Mr. Dermen contends that the district court improperly calculated his sentence. And seventh, he challenges the court's forfeiture and money judgment on substantive and procedural grounds.

Having carefully assessed all of Mr. Dermen's arguments in support of these issues, we reject them. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we **affirm**.

## I. BACKGROUND

By way of introduction, this case concerns an alleged conspiracy, fraud, and money laundering operation orchestrated from 2012 to 2018 by Mr. Dermen, Jacob

Kingston, Isaiah Kingston (Jacob Kingston's brother), and other co-conspirators. Specifically, Mr. Dermen, Jacob Kingston, and their co-conspirators designed a fraud scheme in which they filed false claims for federal biofuel incentives with the Internal Revenue Service ("IRS") and the Environmental Protection Agency ("EPA"), received payouts through the mail from the U.S. Department of Treasury, and laundered the fraud proceeds.

These false claims were tremendously valuable: the conspiracy sought over $1 billion in fraudulent tax credits and tradeable credits called Renewable Identification Numbers ("RINs") and successfully received over $500 million in payouts from the federal government. Mr. Dermen and his co-conspirators laundered these proceeds through a variety of channels, including cycling fraud proceeds through domestic and foreign entities and accounts and purchasing houses, cars, and a yacht. In total, Mr. Dermen directly received over $70 million in fraud proceeds and indirectly received over $100 million of deposits into Turkish bank accounts in which he had an interest.

The conspiracy continued until 2018, when Mr. Dermen and the Kingstons were indicted. Mr. Dermen was charged with one count of Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1349 (Count 1); one count of Conspiracy to Commit Money Laundering Offenses, in violation of 18 U.S.C. § 1956(h) (Count 2); and eight counts of Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957 (Counts 3–10).

At trial, Mr. Dermen attempted to rebut the government's case against him by alleging that Jacob Kingston and his family members were the primary perpetrators

of the fraud scheme and that Jacob Kingston was scapegoating him for the fraud to receive a lighter prison sentence. After a seven-week trial, the jury convicted Mr. Dermen on all counts, and the district court sentenced him to forty years' imprisonment. The district court also ordered a forfeiture and money judgment against him.

We trace the essential features of this case's sweeping factual and procedural background in the following sections, before turning to the seven issues that Mr. Dermen raises on appeal.

### A. *Factual Background*[1]

#### 1.

Biofuel is a renewable fuel manufactured from feedstock such as vegetable oil. This matter concerns two biofuel products: "B100" and "B99." Pure biofuel is called "B100" because it is 100 percent biofuel. B99 is a blend of B100 and a small amount

[1] Our summary of the factual background is based on the evidence presented at trial, viewed in the light most favorable to the verdict. *See United States v. Goldesberry*, 128 F.4th 1183, 1191 (10th Cir. 2025) ("To determine whether evidence is sufficient to uphold a conviction, 'we examine, in the light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1116 (10th Cir. 1993)); *United States v. Flechs*, 98 F.4th 1235, 1241 n.1 (10th Cir.) ("This factual summary derives from the evidence presented at trial."), *cert. denied*, 145 S. Ct. 310 (2024); *United States v. Pursley*, 577 F.3d 1204, 1210 n.2 (10th Cir. 2009) ("We recount the facts in the light most favorable to the government. [Defendant] does not challenge the sufficiency of the evidence to support his conviction for the charged crimes." (citation omitted)).

of petroleum diesel; it is approximately 99 percent biofuel. *See generally United States v. Wilson*, 879 F.3d 795, 798–99 (7th Cir. 2018).

Mr. Dermen, Jacob Kingston, and their co-conspirators targeted two federal biofuel incentive programs in their fraud scheme. The first was an IRS tax credit. At all times relevant here, Congress intermittently authorized a federal tax credit. Specifically, the federal government incentivized biodiesel production by providing a tax credit for every gallon of B100 that was blended to form B99. *See* Lynn J. Cunningham et al., Cong. Rsch. Serv., R42566, *Alternative Fuel and Advanced Vehicle Technology Incentives: A Summary of Federal Programs*, 3, 11 (Sept. 13, 2021). Taxpayers could claim the tax credit with the IRS. *See id.*

The second biofuel incentive was an EPA incentive system of tradeable credits—called RINs—that was a component of the EPA's Renewable Fuel Standard ("RFS"). *See* Kelsi Bracmort, Cong. Rsch. Serv., R43325, *The Renewable Fuel Standard (RFS): An Overview*, 1–2, 4 (Sept. 4, 2019). The RFS was established by the Energy Policy Act of 2005. *See id.* at 2. The RFS mandate requires that transportation fuels sold or introduced into commerce in the United States contain an increasing volume of renewable fuels. *See id.* at 2–3. The EPA regulates compliance with the RFS using RINs. *See id.* at 4. RINs are attached to each gallon of qualifying renewable fuel once that fuel is produced and are ultimately used to demonstrate compliance with the RFS. *See id.* at 4–5. Biofuel producers may comply with the RFS's mandate either by producing compliant fuel inventory or purchasing RINs. *See id.* at 5. Thus, RINs carry independent economic value from

the renewable fuel from which they are generated—they may be bought and sold on the open market so that large oil producers can comply with regulatory targets set by the EPA. *See id.*

**2.**

Although Mr. Dermen ultimately played an instrumental role in the conspiracy, the record shows that Jacob Kingston originally designed the biofuel incentive fraud scheme. After completing his PhD at the University of Utah in 2006, Jacob Kingston started Washakie Renewable Energy ("Washakie") with his wife, his brother—Isaiah Kingston—and various other family members.

Washakie obtained IRS and EPA licenses to apply for biofuel tax credits and RINs, and the Kingstons created another company, United Fuel Supply, to market Washakie's fuel. From 2007 to 2009, Washakie struggled to get off the ground as a legitimate biofuel business. In 2010, Jacob Kingston, Isaiah Kingston, and several of their family members began the conspiracy to fraudulently claim biofuel tax credits and RINs from the EPA and the IRS, supported by false paperwork. From 2010 to 2011, Washakie filed twenty false claims for biofuel tax credits, and received approximately $40 million in fraudulent proceeds from the IRS.

Mr. Dermen met Jacob Kingston in December 2011, when Jacob flew to California to finalize a biofuel deal. Mr. Dermen owned several biofuel-related businesses in California, including a fuel distribution company, Noil Energy ("Noil"), and a trucking company, Lion Tank Lines. Mr. Dermen told Jacob Kingston that he could buy all the fuel Washakie could produce and placed an initial

order for 1.3 million gallons of B99. In January 2012, Mr. Dermen travelled to Utah to tour the Washakie plant. Shortly after that trip, a deal that Jacob Kingston had orchestrated fell through, requiring him to ship an inventory of B99 from India to Long Beach, California.

Mr. Dermen agreed to purchase the excess Indian B99 from Jacob Kingston and, with Jacob Kingston's acquiescence, orchestrated the first of many schemes to fraudulently claim RINs on the B99 by "rotating" it through the Washakie plant. Specifically, after the inventory arrived in Long Beach, California, Mr. Dermen and Jacob Kingston "rotated" it by the following steps: falsifying paperwork to make it appear that the inventory was feedstock—not fully processed B99, trucking the mislabeled inventory to the Washakie plant, falsely "processing" the inventory from feedstock to B99 (while, in fact, doing nothing to alter the composition of the already-marketable B99), and then trucking the relabeled inventory back to Mr. Dermen's companies in California. Then, Mr. Dermen and Jacob Kingston used the fabricated "processing" paperwork to claim RINs on the inventory.

**3.**

From 2012 to 2018, Mr. Dermen, Jacob Kingston, and their other co-conspirators built upon the initial "Indian scheme" and orchestrated a robust conspiracy to defraud the federal government in which they operated an international collection of entities to simulate biofuel production and distribution, filed false claims for federal biofuel incentives with the IRS and EPA, received payouts from the Department of Treasury, and laundered the fraud proceeds. At the heart of the

conspiracy were two basic fraud schemes: (1) generating false RINs through the EPA by "rotating" biofuel, and (2) filing false claims with the IRS for biofuel production tax credits.

**i.**

Mr. Dermen, Jacob Kingston, and their co-conspirators claimed false RINs by "rotating" biofuel. Akin to the "Indian scheme," the "rotations" were orchestrated by: purchasing processed biofuel (i.e., B99 or B100) from a biofuel producer; mislabeling the inventory as unprocessed biofuel or feedstock; transporting the inventory through various entities to create the appearance of a supply or distribution chain; claiming to "process" the already-processed biofuel at the Washakie plant; generating false invoices and other paperwork at each step of the process; using the false paperwork to generate false RINs; and then reselling the "processed" biofuel on the market or, at steep discounts, to Mr. Dermen's companies in California.

Indeed, the Kingstons funneled payments to Mr. Dermen at each step of the "rotation" process through a variety of fraudulent means, including: fabricating fees for shipping, storage, and other expenses; providing steep discounts on biofuel sales; conducting various exchanges of checks for cash; creating false contracts and paying fraudulent invoices between Mr. Dermen's and the Kingstons' businesses, including Noil, Washakie, and United Fuel Supply; and paying sales fees for the fraudulent RINs.

Mr. Dermen and Jacob Kingston orchestrated several RIN frauds using variations on this biofuel "rotation" model in 2012. And from 2013 through early

2016, as Mr. Dermen and Jacob Kingston continued to “rotate” biodiesel, they also “cycled” funds—that is, they moved funds between Mr. Dermen’s and Jacob’s companies, thus simulating biodiesel purchases, processing, and sales—in order to claim RINs multiple times on the same underlying fuel.

**ii.**

The second fraud scheme was filing false claims for biofuel tax credits with the IRS using false paperwork generated by the conspirators’ biofuel “rotations.” The Kingstons began this fraud in 2010, before Jacob Kingston met Mr. Dermen. And Mr. Dermen and Jacob Kingston began filing false biofuel tax credit claims in 2013. For example, in February of 2013, Washakie filed a claim for $3.9 million, which falsely stated that Washakie had sold 2.9 million gallons of biodiesel to Noil in 2012. The IRS paid the claim by check through the mail in full in March, and Jacob flew to California in April to deliver Mr. Dermen’s share of the fraud proceeds: a $1.3 million check. The conspirators gradually increased their false claim amounts over the course of 2013. In sum, the IRS paid the conspirators through the mail approximately $250 million on the fraudulent claims they filed through Washakie in 2013, which were based on false paperwork generated by their biofuel “rotations.” In total, from 2010 to 2016, Washakie filed over $1 billion in false claims and received over $500 million in fraudulent tax credits. And Washakie received nearly $400 million of that total from the IRS through the mail between 2012 and 2016, during which time Mr. Dermen was an orchestrator of the conspiracy.

**4.**

Mr. Dermen, Jacob, and their co-conspirators laundered fraud proceeds through a variety of methods, including by cycling funds through various businesses and accounts, purchasing homes and cars, and transferring funds abroad. The following money laundering conduct relates to Mr. Dermen's convictions on Counts 3–10.

**i.**

The conduct charged in Counts 3–7 occurred in June 2013, when Mr. Dermen laundered fraud proceeds by purchasing a debt owed by his friend, Zubair Kazi. Mr. Dermen purchased the debt by directing Jacob Kingston to pay an $11.2 million loan owed by Mr. Kazi to G.E. Capital, Mr. Kazi's creditor. On June 21, 2013, Jacob Kingston wired approximately $11.2 million in fraud proceeds from Washakie to G.E. Capital. Then, Mr. Dermen instructed Mr. Kazi to repay him, not Washakie, and secured the debt with liens on several of Mr. Kazi's properties. Through several transactions and a lawsuit, Mr. Kazi repaid Mr. Dermen $2 million in deposits to a joint account that he had opened with Mr. Dermen, and $1.3 million in installments to Mr. Dermen's company, SBK Holding USA ("SBK USA").

**ii.**

In January 2013, Mr. Dermen and Jacob Kingston purchased a house in Sandy, Utah using fraud proceeds. This conduct is the subject of money laundering Count 8. Laundering fraud proceeds through this real property transaction was a three-step process. First, Jacob wrote a $3 million check to Noil (one of Mr. Dermen's

companies) on June 5, 2015, from a Merrill Lynch loan account in his name. The collateral for this loan account was $15 million in fraud proceeds that Jacob had transferred from a Washakie account to another Merrill Lynch account he controlled. Second, Jacob repaid the $3 million Merrill Lynch loan with fraud proceeds from Washakie. Third, Jacob made a $3.1 million offer on a house in Sandy, Utah, which was to be financed by Noil using the $3 million that Jacob had paid the company using the check. The offer was accepted, and the sale was finalized: the home purchase contract listed Noil as the buyer, and the house was titled in Jacob Kingston's name. At closing, Mr. Dermen wired the $3.1 million purchase price to the title company from the Noil account into which Jacob's check had been deposited.

**iii.**

Beginning in 2013, Mr. Dermen directed Jacob Kingston to send a total of $115 million in fraud proceeds to various accounts in Turkey and Luxembourg. For example, in March 2014, Mr. Dermen instructed Jacob to wire $483,000 from Washakie to an account Mr. Dermen controlled at Garanti Bank, Turkey. This 2014 wire is the offense conduct underpinning Count 9.

**iv.**

In 2015, Mr. Dermen and Jacob Kingston used fraud proceeds to purchase a house for Mr. Dermen in Huntington Beach, California. This conduct is the basis for money laundering Count 10. This time, the money laundering was a four-step process. First, on March 4, 2015, Mr. Dermen instructed Jacob to wire $50,000 from

Washakie to Versal Settlement Services, a title company, to pay a deposit on the house. The $50,000 wire was traced to fraud proceeds. Second, on March 19, at Jacob's direction, Isaiah Kingston wired $8.55 million to an SBK USA account. This $8.55 million wire was also traced to fraud proceeds. Third, Mr. Dermen then transferred $3.5 million from that account to a second SBK USA account. Fourth, Mr. Dermen wired a little over $3.5 million from the second SBK USA account to the settlement company, Versal. The closing documents listed the buyer as "Gilbert Island Property LLC," an entity that was jointly owned by Mr. Dermen and his brother, Grigor, and that they created shortly before the purchase.

### B. *Procedural History*

Mr. Dermen was indicted by a grand jury in Utah federal court on January 17, 2019, for his role in the biofuel tax incentive fraud conspiracy, money laundering conspiracy, and money laundering. Specifically, the indictment—which was renumbered in a later filing—charged Mr. Dermen with ten counts: Count 1 charged Conspiracy to Commit Mail Fraud, in violation of 18 U.S.C. §§ 1341 and 1349; Count 2 charged Conspiracy to Commit Money Laundering Offenses, in violation of 18 U.S.C. § 1956(h); Counts 3–8 charged Money Laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and Count 9–10 charged Money Laundering, in violation of 18 U.S.C. § 1957. In 2019, Jacob and Isaiah Kingston—who initially had been charged with conspiracy-related offenses in the same indictment—pleaded guilty and agreed to cooperate with the government, including by testifying against Mr. Dermen at trial.

Before trial, Mr. Dermen moved for discovery relating to one of his associates, Edgar Sargsyan, a potential defense witness, and, during trial, he moved for discovery of Mr. Sargsyan's sealed plea agreement. The district court denied these motions, and Mr. Dermen did not call Mr. Sargsyan as a witness at trial.

Mr. Dermen's seven-week trial began on January 27, 2020. On February 28, during the fifth week of trial, Mr. Dermen moved for a mistrial based on alleged juror misconduct and exposure to extraneous information. After investigating the alleged extraneous information and juror misconduct, the district court denied Mr. Dermen's motion.

The jury began deliberating on Thursday, March 12, 2020, took Friday off, and resumed deliberations on the following Monday, March 16. Over the weekend, Mr. Dermen again moved for a mistrial, this time based on prejudice that he allegedly suffered from the trial taking place during the onset of the COVID-19 pandemic. The jury convicted Mr. Dermen on all counts on Monday, March 16, 2020, and the district court denied Mr. Dermen's second mistrial motion.

On April 7, Mr. Dermen moved for a judgment of acquittal or, in the alternative, for a new trial, based on the alleged insufficiency of the evidence on all counts under Rules 29 and 33 of the Federal Rules of Criminal Procedure. Mr. Dermen also filed a supplemental motion for a new trial pursuant to Rule 33, alleging a discovery violation under *Brady v. Maryland*, 373 U.S. 83 (1963). The court denied Mr. Dermen's Rules 29 and 33 motions.

The district court held a bench trial on the issue of forfeiture in November 2021, made findings, and issued a preliminary order of forfeiture.

Finally, on April 7, 2023, the district court sentenced Mr. Dermen to 480 months' incarceration, ordered him to pay $442.6 million in restitution to the IRS, and adopted the preliminary order of forfeiture as final.

## II. DISCUSSION

Mr. Dermen timely filed this appeal and raises seven separate issues—five challenges to his convictions and two to his sentence. First, he argues that the district court erred by failing to grant his motion for mistrial based on prejudicial juror misconduct and exposure to extraneous information. Second, he maintains that the district court erred by failing to grant his motion for a mistrial based on COVID-19. Third, he contends that the district court erroneously denied his motion for a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963). More specifically, Mr. Dermen alleges that the government violated *Brady* by failing to produce evidence concerning a government witness and another individual.

Fourth, Mr. Dermen argues that the district court erred by admitting improper expert testimony in the guise of summary testimony. Fifth, he asserts that there was insufficient evidence to sustain five of his money laundering convictions. Sixth, Mr. Dermen contends that the district court improperly calculated his sentence. And seventh, he challenges the forfeiture and money judgment ordered against him on substantive and procedural grounds.

We consider each challenge in turn. On each challenge, we ultimately conclude that Mr. Dermen's arguments are without merit and, therefore, decline to disturb the district court's rulings.

### *A. Alleged Juror Misconduct and Exposure to Extraneous Information*

We begin our analysis with Mr. Dermen's argument that the district court erred by failing to grant his motion for mistrial based on juror misconduct and exposure to extraneous information. We find Mr. Dermen's arguments unpersuasive.

**1.**

**i.**

We review the district court's denial of a mistrial motion for abuse of discretion. *See United States v. Lawrence*, 405 F.3d 888, 903 (10th Cir. 2005). The court's factual findings are reviewed for clear error; its legal findings are reviewed de novo. *See, e.g.*, *Gonzales v. Thomas*, 99 F.3d 978, 986 (10th Cir. 1996).

**ii.**

The Sixth Amendment guarantees a criminal defendant "the right to a . . . public trial[] by an impartial jury." U.S. Const. amend. VI; *see also Tanner v. United States*, 483 U.S. 107, 126 (1987) ("[A] defendant has a right to 'a tribunal both impartial and mentally competent to afford a hearing.'" (quoting *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912)). But "due process does not require a new trial every time a juror has been placed in a potentially compromising situation," *Smith v. Phillips*, 455 U.S. 209, 217 (1982); "[t]he Constitution guarantees a defendant a fair trial, not a perfect one," *United States v. McHorse*, 179 F.3d 889,

904 (10th Cir. 1999). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith*, 455 U.S. at 217.

Mr. Dermen argues that his right to an impartial jury was violated by exposure to prejudicial extraneous information and juror misconduct. Although juror exposure to extraneous information and juror bias both present due process concerns, the legal standard for each scenario is distinct. Therefore, we review both standards at the outset to lay a foundation for our analysis of Mr. Dermen's position on appeal.

**iii.**

We begin with extraneous information. A jury's exposure to extraneous information may result in a mistrial, but it need not in every case. *Compare Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 924–26 (10th Cir. 1992) (affirming the district court's decision to grant a motion for a new trial where at least four members of the jury were found to be in possession of two dictionary definitions that constituted evidence not offered at trial), *with United States v. Lawrence*, 405 F.3d 888, 896, 904 (10th Cir. 2005) (affirming the district court's decision to deny a mistrial motion where a pamphlet about jury nullification was found in the jury room but jurors indicated that the pamphlet would not influence their deliberations and the court issued a curative jury instruction). Whether a jury's exposure to extraneous information warrants a mistrial is a fact-intensive inquiry that turns on whether the jury's exposure can be said to have caused prejudice to the defendant. *See Smith v.*

*Ingersoll-Rand Co.*, 214 F.3d 1235, 1241–43 (10th Cir. 2000); *Mayhue*, 969 F.2d at 924–26; *Lawrence*, 405 F.3d at 904.

"When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *United States v. Scull*, 321 F.3d 1270, 1280 (10th Cir. 2003) (quoting *United States v. Hornung*, 848 F.2d 1040, 1045 (10th Cir. 1988)); *see also Ingersoll-Rand*, 214 F.3d at 1242 ("When it learned of the presence of extraneous evidence in the jury room during deliberations, the trial court notified the parties, and as the law of this circuit requires, held hearings to determine the extent of the improper contact."); *cf. Remmer v. United States*, 347 U.S. 227, 228, 230 (1954) (remanding to the district court with instructions to hold a hearing to determine whether an improper outside contact of a juror was harmful to the petitioner, and if after conducting the hearing the court were to find the incident to have been harmful, to grant a new trial).

In *Hornung*, we outlined a hearing process for examining the impact of extraneous information on the fairness of a trial, based on the hearing process set forth by the Supreme Court in *Remmer*:

> When a trial court is apprised of the fact that an extrinsic influence may have tainted the trial, the proper remedy is a hearing to determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant. . . . The court's questioning of a juror who is the recipient of extraneous information is limited to the circumstances and nature of the improper contact . . . . Accordingly, an objective test should be applied in making an assessment of whether the defendant was prejudiced by the extraneous information. The court "should

> assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware."

*Hornung*, 848 F.2d at 1045 (citing, *inter alia*, *Remmer*, 347 U.S. at 229–30) (additional citations omitted) (quoting *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985)). As we have noted in past decisions, "[t]his evidentiary hearing [process] is often called a '*Remmer* hearing.'" *Stouffer v. Trammell* ("*Stouffer I*"), 738 F.3d 1205, 1214 (10th Cir. 2013). In a *Remmer* hearing, the trial judge's evaluation of the impact of extraneous information is entitled to great weight because the trial judge "has the advantages of close observation of the jurors and intimate familiarity with the issues at trial," *Ingersoll-Rand*, 214 F.3d at 1242 (quoting *Mayhue*, 969 F.2d at 922), and is thus "uniquely able to assess the likelihood that the extraneous information was prejudicial," *Mayhue*, 969 F.2d at 922.

Our circuit has "developed two different standards by which a trial judge is to assess the impact of exposure to extraneous material on a jury." *Ingersoll-Rand*, 214 F.3d at 1241; *accord United States v. Muessig*, 427 F.3d 856, 865 (10th Cir. 2005) (quoting *Ingersoll-Rand*, 214 F.3d at 1241); *United States v. Daniels*, 755 F. App'x 796, 800 (10th Cir. 2018) (quoting *Muessig*, 427 F.3d at 865).[2] "Under the first standard, a new trial is appropriate if the 'slightest possibility' exists that the exposure to extraneous material affected the verdict." *Muessig*, 427 F.3d at 865

[2] We rely on unpublished cases herein for their persuasive value only and do not treat them as binding precedent. *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

(quoting *Ingersoll-Rand*, 214 F.3d at 1241). By contrast, the second standard instructs that "jury exposure to extraneous information creates a 'presumption of prejudice' which may be rebutted by showing the exposure was harmless." *Ingersoll-Rand*, 214 F.3d at 1241. "The difference between the two standards lies in which party has the initial burden of proof." *Muessig*, 427 F.3d at 865. The "slightest possibility" approach places the burden of showing prejudice on the movant, whereas the "presumption of prejudice" approach "forces the nonmovant to prove any exposure was harmless." *Ingersoll–Rand*, 214 F.3d at 1241–42.

"Under either standard, we review the district court's determination for an abuse of discretion, reversing only where the decision was 'arbitrary, capricious, whimsical, or manifestly unreasonable.'" *Id.* at 1242 (quoting *United States v. Byrne*, 171 F.3d 1231, 1235 (10th Cir. 1999)). Similarly, under either standard, where exposure is harmless, "we [] need not resolve these different approaches."[3] *Muessig*, 427 F.3d at 865; *see also Ingersoll-Rand*, 214 F.3d at 1242 (holding that the defendant-appellant "was not harmed by the presence of the extrinsic material in the jury room regardless of which standard is applied"); *Daniels*, 755 F. App'x at 800 ("We need not decide which standard to apply in this case because under either standard, the extraneous information was harmless.").

---

[3] Moreover, as we explained in *Ingersoll-Rand*, "precise resolution" of the question of which approach is controlling—that is, the "slightest possibility" or the "presumption of prejudice" approach—would "require[] adopting one standard to the foreclosure of the other, an act which may only be undertaken by this court sitting *en banc*." 214 F.3d at 1242.

The Supreme Court declared in *Chapman v. California*, 386 U.S. 18 (1967), that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24. We have not consistently applied this standard in cases concerning juror exposure to extraneous information, however. Several of our decisions explicitly apply the "reasonable doubt" standard. *See United States v. Thompson*, 908 F.2d 648, 653 (10th Cir. 1990), *opinion modified on reh'g* (Oct. 10, 1990) ("In applying harmless error analysis, we must ask ourselves whether we can 'declare a belief that [the error] was harmless beyond a reasonable doubt.' Specifically, . . . an error is harmless if [its] beneficiary . . . can prove beyond a reasonable doubt that it did not contribute to the verdict." (quoting *Chapman*, 386 U.S. at 24)); *United States v. Davis*, 60 F.3d 1479, 1485 (10th Cir. 1995) ("In order to conclude the exposure was harmless, in the context of this direct appeal, 'we must ask ourselves whether we can declare a belief that [the error] was harmless beyond a reasonable doubt.'" (alteration in original) (quoting *Thompson*, 908 F.2d at 653)); *United States v. Morales*, 108 F.3d 1213, 1222 (10th Cir. 1997) (concluding that "the jury's misconduct in researching the dictionary definition of [']distribution['] was harmless to [the defendant] beyond a reasonable doubt"). However, *Hornung* and *Mayhue* do not refer to the "reasonable doubt" standard in assessing the harmlessness of juror exposure to extraneous information. *See Hornung*, 848 F.2d at 1044–46; *Mayhue*, 969 F.2d at 923. In light of this uncertainty, the district court applied the "reasonable doubt" standard, and, out of an abundance of caution, we do the same on appeal.

**iv.**

We turn next to the legal standards governing the judicial response to juror misconduct. "There are two broad areas of juror misconduct claims. One involves that of juror bias, the other that of improper juror contacts." *United States v. Day*, 830 F.2d 1099, 1103 (10th Cir. 1987). "Both are at the core of the Sixth Amendment's right to a trial by an impartial jury, free from prejudicial contact." *Id.* Mr. Dermen argues, as relevant here, that the district court abused its discretion by failing to award a mistrial based on a finding of *juror bias*. *See* Aplt.'s Opening Br. at 33–39.

Our law contemplates two types of juror bias: actual and implied. Actual bias is a "[g]enuine prejudice that a . . . juror . . . has against some person or relevant subject." *Bias*, BLACK'S LAW DICTIONARY (12th ed. 2024). "Actual bias may be shown either by a juror's express admission, or by proof of specific facts which show the juror has such a close connection to the facts at trial that bias is presumed." *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1467 (10th Cir. 1994). "The district judge is entitled to rely upon its self-evaluations of allegedly biased jurors in determining actual juror bias." *United States v. Wacker*, 72 F.3d 1453, 1467 (10th Cir. 1995), *modified* (Mar. 11, 1996); *accord Day*, 830 F.2d at 1105 (citing *Smith*, 455 U.S. at 217 n.7). "Whether a juror was actually biased is a factual question we review only for clear error." *Gonzales*, 99 F.3d at 986.

Implied bias—also termed "inherent bias" in some authority, *see Lawrence*, 405 F.3d at 903—is "[b]ias, as of a juror, that the law conclusively presumes because

of kinship or some other incurably close relationship" or "prejudice that is inferred from the experiences or relationships of a . . . juror." *Bias*, BLACK'S LAW DICTIONARY (12th ed. 2024). "Whether implied bias exists in a juror is a legal determination that turns on an objective evaluation of the challenged juror's experiences and their relation to the case being tried." *Gonzales*, 99 F.3d at 987 (citation omitted). "Thus, implied bias may be found even though a juror denies any partiality." *Id.* "Though a juror might honestly believe she can be impartial, she nevertheless may have 'such a close connection to the circumstances at hand that bias must be presumed.'" *Id.* (quoting *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988)). "Whether a juror was impliedly biased is a legal question we review de novo." *Id.* at 986.

Importantly, our cases make clear that "[t]he implied bias doctrine should not be invoked lightly." *Id.* "[S]ituations that would support a finding of implied bias 'might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'" *Id.* (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).

In *Remmer*, the Supreme Court articulated the hearing procedure for addressing potential juror misconduct involving improper outside contact with jurors during deliberations. *See* 347 U.S. at 228–30. There, a juror was told by an unnamed person that "he could profit by bringing in a verdict favorable to the petitioner." *Id.*

at 228. Subsequently, in *Smith v. Phillips*, 455 U.S. 209 (1982), the Supreme Court held that the "the remedy for allegations of juror partiality is a [*Remmer*] hearing in which the defendant has the opportunity to prove actual bias," *Smith*, 455 U.S. at 215, and the "trial judge . . . determine[s] the effect of [any prejudicial] occurrences," *id.* at 217. Thus, the *Remmer* hearing framework applies *both* to allegations of improper exposure to extraneous information and juror bias.

Notably, in *Remmer*, the Court signaled that the "presumption of prejudice" approach applies to findings of improper juror contacts. *See* 347 U.S. at 229 ("In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial[.]"); *see also Hornung*, 848 F.2d at 1044–45 (applying *Remmer*'s "presumption of prejudice" approach in analyzing the effect of an improper juror contact); *Day*, 830 F.2d at 1105–06 (same).

However, in *United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995), we expressed "uncertain[ty] that the presumption of prejudice called forth in *Remmer*, *Hornung* and *Day* would apply to communications *among* venirepersons, as opposed to communications from outside sources." *Id.* at 1466. Because "we [were] persuaded that appellants were not prejudiced," we did not expressly resolve the issue. *Id.* However, instead of applying the presumption of prejudice, we held that when conversations among venirepersons are alleged to show prejudicial bias, "the test of juror impartiality is whether 'the juror can lay aside his impression or opinion

and render a verdict based on the evidence presented in court.'" *Id.* at 1467 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)).

We have similar doubts that the presumption of prejudice applies to the juror bias inquiry after jury selection is complete. Although the Supreme Court in *Smith* applied the *Remmer* hearing procedure to the juror bias inquiry, it did not expressly apply the presumption of prejudice to the actual bias inquiry presented in *Smith*; the Court held only that prejudice determinations "may properly be made at a hearing like that ordered in *Remmer*." *Smith*, 455 U.S. at 217. And in *Lawrence* and *McHorse*, we stopped short of applying the presumption of prejudice to the juror bias inquiry, and instead we explained only that "the appropriate test is whether actual bias existed or whether the circumstances compel an imputation of inherent bias to the juror as a matter of law such that *the misconduct has prejudiced the defendant to the extent that he has not received a fair trial*." *Lawrence*, 405 F.3d at 903 (emphasis added); *see McHorse*, 179 F.3d at 904 ("The test is whether . . . the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." (omission in original) (quoting *United States v. Jones*, 707 F.2d 1169, 1173 (10th Cir. 1983))).

Both *Lawrence* and *McHorse* concerned juror bias inquiries stemming from conversations between jurors during trial—after the jury was selected and before the jury retired to deliberate. *See Lawrence*, 405 F.3d at 895 (considering potential juror bias where, *inter alia*, a deputy clerk overheard a juror state, "I have already made up my mind, I don't know what the other side could say [to change it]" (alteration in original)); *McHorse*, 179 F.3d at 903 (considering potential juror bias where a

witness overheard one juror state to another in a restroom, "I'm a school teacher. I'm very disturbed about what I'm hearing"). Because *Lawrence* and *McHorse* are directly on point, we adopt their test for prejudice in resolving Mr. Dermen's challenge here. Thus, in a situation involving juror bias, "the appropriate test is [1] whether actual bias existed or [2] whether the circumstances compel an imputation of inherent bias to the juror as a matter of law[,] such that the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Lawrence*, 405 F.3d at 903. As in the exposure-to-extraneous-information inquiry, "not every incident [involving bias] requires a new trial"; instead, the test asks "whether . . . the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Id.* at 904 (quoting *McHorse*, 179 F.3d at 904) (alteration and omission in original)).

**v.**

Finally, a district court may employ a curative jury instruction to ameliorate the risk of prejudice. *See Wacker*, 72 F.3d at 1467 ("[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and juries are presumed to follow their instructions." (quoting *Zafiro v. United States*, 506 U.S. 534, 540 (1993))); *Lawrence*, 405 F.3d at 904 (holding that "the district court's strongly worded cautionary instruction was an appropriate response" to juror misconduct and exposure to extraneous information).

**2.**

On February 25, 2020—during the fifth week of trial, more than two weeks before the jury began deliberating on March 12, 2020—the district court was informed by members of the U.S. Marshals Service ("USMS") that a Court Security Officer ("CSO") had overheard two jurors discussing what seemed to be extraneous information related to the trial following the conclusion of proceedings the prior day. The CSO later testified that he heard Juror 6 say to an unidentified juror, "he's the one who got Michael Jackson off," Aplt.'s App., Vol. VII, at 1427 (Suppl. Order Regarding Def.'s Mot. for Mistrial, filed Mar. 26, 2020), and assumed that the jurors were discussing and researching Mr. Dermen's counsel at trial, Mark Geragos. Although the CSO did not hear Mr. Geragos mentioned by name, the CSO believed that Mr. Geragos had represented Michael Jackson in a trial. As the district court explained in a subsequent order, "Mr. Geragos is a well-known attorney who regularly appears on television and other media outlets." *Id.* at 1419 n.14.

The district court promptly relayed the information from the USMS to the parties, before the jurors were called into the courtroom, and paused trial proceedings to investigate the matter. The court first called the USMS representative to the front of the courtroom to make a record regarding the report. The parties were present for his interview, but the jury was not recalled. The USMS representative informed the court the CSO "overheard [Juror 6] saying Mr. Geragos represented Michael Jackson and for every count that he was dismissed on they released doves at the courthouse." *Id.* at 1413. Based on the USMS representative's testimony, the district court

terminated the presentation of evidence for the day and proceeded to voir dire each of the jurors "to find out what each juror may have heard regarding this conversation, and if they had been exposed to any extraneous information that might jeopardize their impartiality." *Id.* at 1414. During the course of its investigation, the district court did the following: conducted a voir dire of each juror and heard testimony from the CSO on February 25; interviewed Jurors 6 and 16 individually and conducted a second voir dire of each juror and a second interview with the CSO on February 27; and interviewed Jurors 3 and 6 individually on March 2. We describe the district court's findings from each stage of the investigation below.

**i.**

The district court conducted the first voir dire on February 25, 2020, after receiving the USMS representative's summary of the CSO's report. Before the voir dire process began, the court brought all members of the jury into the courtroom and explained that "it came to [the court's] attention that one or more of you may have been exposed to information about the case that was not coming through exhibits or from the witness stand." Aplt.'s App., Vol. XXVII, at 6533 (Jury Trial Tr., held Feb. 25, 2020). The court emphasized its "absolute obligation" to ensure that the jury is "fair and impartial," and that the jury "decides the case only on the evidence that has been presented." *Id.* Pursuant to that obligation, the court interviewed each juror—individually, in open court, and in the presence of the parties but without the other jurors present—and inquired as to whether they had overheard or participated in any discussions relating to case-related information from outside sources. While each

juror was interviewed individually, the other jurors waited in the jury room. The court instructed the jury not to discuss the interviews in the jury room or to "speculate on what's happening or who's involved." *Id.* at 6534.

The district court uncovered information relevant to the CSO's report from Jurors 6 and 16 during the first voir dire. Pursuant to the CSO's report, the court asked Juror 6—the juror identified by the CSO as having made the Michael Jackson comment—whether she was familiar with any of the attorneys of record, both in general terms and with respect to each attorney, individually. Juror 6 denied any such knowledge, including knowledge of the attorneys' professional histories or previous clients. She stated that she had not discussed the attorneys with other jurors, aside from "remarks just about like funny things that have happened." *Id.* at 6542. Juror 6 also denied conducting outside research about the attorneys.

Juror 16, by contrast, stated that she "did hear one of the lawyers represented other clients"; "[s]omeone said that [Mr. Geragos] represented Michael Jackson." *Id.* at 6562–63. Juror 16 stated that she had heard this comment "recently, like maybe a week and a half" prior, *id.* at 6563, and that the comment was uttered "in the hallway as we were like waiting or going in or out or something like that," *id.* at 6564. However, Juror 16 did not recall which juror was the source of the information.

Separately, the district court learned that Juror 11 had recently seen Mr. Geragos on television and promptly changed the channel; he informed the court that he had told Jurors 7 and 15 about the incident. Juror 7 confirmed that Juror 11 had mentioned that Mr. Geragos represented high profile defendants in California,

including Scott Peterson and Winona Ryder. When Juror 15 was interviewed, she confirmed the incident.

According to the district court's findings of fact, "[n]one of the other interviews with jurors yielded any information about conversations that would indicate exposure to outside material." Aplt.'s App., Vol. VII, at 1417.

**ii.**

Following the first voir dire, the district court heard testimony from the CSO. The court asked the CSO questions and provided the attorneys the opportunity to ask questions as well, all out of the presence of the jury. The CSO testified that he was present in the hallway the afternoon prior, while the jurors were waiting for transportation. There, he overheard a conversation between two jurors: he heard one juror say, "he's the one that got Michael Jackson off," and another female juror respond, "Oh, I remember that. People outside the courtroom released white doves every time there was an acquittal." Aplt.'s App., Vol. XXVII, at 6567. The CSO also testified that the second juror said that her husband wished he could have been there to shoot the doves as they were released. The CSO's description of the first juror was consistent with the appearance of Juror 6, and, subsequently, the CSO identified the second juror as Juror 16.[4]

[4] Ultimately, the district court would determine that the CSO was mistaken: Juror 3—not Juror 16—was the second participant in the conversation.

**iii.**

Based on the jurors' testimony at the first voir dire, the district court shared with the parties its initial impression that Jurors 6 and 16 had been involved in the Michael Jackson conversation that the CSO had reported and that they had not been forthcoming about the incident during questioning. Therefore, the court informed the parties of its inclination to remove Jurors 6 and 16.

Separately, the court surmised that Jurors 7, 11, and 15 had been forthcoming about Juror 11's exposure to Mr. Geragos on a television program and the subsequent conversation about the episode. The court also noted that Juror 11 had appropriately turned off the television program when confronted with potentially extraneous information involving Mr. Geragos. After stating these preliminary findings, the court granted defense counsel's request to adjourn for the day to confer with his client.

**iv.**

The following day, February 26, 2020, Mr. Dermen moved for a mistrial and a newly empaneled jury based on jury misconduct. Mr. Dermen argued that a mistrial was warranted because Jurors 6 and 16 had been "deceptive" in their testimony and because the "group" conversation described by the CSO was both prejudicial and indicative that jurors may have been contaminated by extraneous information.[5]

[5] In a subsequent order, the district court further characterized Mr. Dermen's position related to Mr. Geragos's prior representation as follows:

Aplt.'s App., Vol. VI, at 1268 (Def.'s Position Regarding Jury Misconduct, filed Feb. 26, 2020). Mr. Dermen also argued that the conversation between Jurors 7, 11, and 15 indicated that Juror 11 may have known of Mr. Geragos before the trial. The government opposed the motion, contending that any potential juror misconduct could be remedied by removing Jurors 6 and 16.

On February 27, 2020, the district court heard oral argument on Mr. Dermen's motion for a mistrial, after which the court denied the motion and issued a ruling from the bench that Jurors 6 and 16 would be removed. The court also stated that a written ruling would follow, which would detail the court's factual findings and legal analysis, and it invited counsel to propose "any kind of curative instruction" for consideration. Aplt.'s App., Vol. XXVII, at 6591.

**v.**

Following its rulings from the bench, the district court conferred with the parties and concluded that the least disruptive way to excuse Jurors 6 and 16 was to meet with them individually in a conference room with a court reporter present to make a record. The parties also agreed that a curative jury instruction should be provided to the remaining jurors, informing them that Jurors 6 and 16 were being

---

> Although Mr. Geragos briefly represented Michael Jackson, he did not serve as trial counsel for Mr. Jackson when he was charged with child molestation. But Mr. Geragos believes many people erroneously believe that he represented Mr. Jackson at that trial.

Aplt.'s App., Vol. VII, at 1419 n.14.

dismissed to ensure a fair trial because they may have been exposed to outside information.

But in the first conference-room meeting, Juror 16 adamantly denied having any knowledge of the conversation the CSO reported, conversing with Juror 6, or discussing the Michael Jackson trial at any length. For example, when asked about a conversation "ha[ving] to do with a prior Michael Jackson case that Mr. Geragos had handled," Juror 16 responded: "I have no idea what that conversation was. That was definitely not me. . . . The conversation that I had about Michael Jackson, someone had just said that -- I don't even know if that's true because I've never done any research on the case." *Id.* at 6603–04. Juror 16 reiterated that "I don't know Mr. Geragos. I've never researched any information about him. . . . I've never had a conversation about doves. . . . I just want to make it very clear that I did not have that conversation." *Id.* at 6604. Based on the vehemence of Juror 16's denial of the incident, the district court deferred on excusing her from the jury.

Next the district court met with Juror 6. When the court inquired about the conversation reported by the CSO, Juror 6 denied knowing that Mr. Geragos had represented Michael Jackson and explained that she had looked up the verdict of the Jackson trial after seeing "Michael Jackson" listed on a "flyer" posted on the jury room door:

> THE COURT: . . . [O]n Monday night after . . . the day was over and the court security officers were ready to take folks down the elevator, one of the court security officers heard you and another juror having a conversation about Mr. Geragos and the fact that he previously represented Michael Jackson.

JUROR NUMBER 6: No. I didn't know that. I don't know that. I can tell you exactly what happened. There's a flyer on our door for a TV show, and it's like The Jury Show, and the names on it was [sic] OJ Simpson and Michael Jackson, and I don't even know the other two. And I looked at the flyer, and I didn't know . . . what happened with Michael Jackson, so I just Googled it. And I saw the counts, and I just saw he was found not guilty on all counts. . . . I didn't see anything about his counsel or anything.

THE COURT: Okay. And was there a discussion about how folks were releasing doves after he was acquitted?

JUROR NUMBER 6: Yeah. . . . And I was like, I don't remember. I was little when it happened.

THE COURT: Do you remember who said that?

JUROR NUMBER 6: I know who it was. I don't know her name or number. She's the one from Payson.

THE COURT: She's the one from Payson?

[COURT STAFF MEMBER]: Juror Number 3.

JUROR NUMBER 6: But I looked up each of the things on the flyer because it just said their decision united the nation, and I didn't know what the outcomes of those were. And so I just Googled them, and I just saw not guilty, not guilty, and then I like did all four. But I didn't look at anything besides what the --

THE COURT: Were you looking at who the lawyers were?

JUROR NUMBER 6: No, I didn't. I did it really fast, like I knew the first, I know OJ Simpson, and I looked at Michael Jackson and saw not guilty, and then I looked up the next guy and I saw he was being charged again, and I looked up the other guy, and I think they were all found not guilty, which is probably what the show is about. But . . . .

THE COURT: Where did this flyer come from that's on the door?

JUROR NUMBER 6: I don't know. It's right on the door of our room.

*Id.* at 6605–07. Based on these responses, the court deferred on excusing Juror 6 and instructed courtroom staff to retrieve the "flyer" to which Juror 6 had referred.

**vi.**

Upon further investigation, the district court determined that the "flyer" Juror 6 described was a full-page advertisement, which had apparently been torn out of a magazine and affixed to the jury room door. The parties were given an opportunity to review the advertisement, which the court found to contain the following:

> [T]he advertisement[] [] had the words "The Jury Speaks" in capital letters across the top of the page. Underneath those words, the advertisement listed four well-known cases in smaller letters—Michael Jackson, O.J. Simpson, George Zimmerman, and Robert Durst. The bottom of the page listed information about when the "epic four-night event" would begin airing (July 22, 2017), and what network it would be airing on (Oxygen). In the top left-hand corner of the page, the advertisement stated, "their verdicts ignited the nation." The advertisement contained a picture of a wooden chair, presumably a juror chair, on fire.

Aplt.'s App., Vol. VII, at 1422 (footnote omitted).

Upon seeing the advertisement, Mr. Dermen renewed his motion for mistrial, arguing that it constituted prejudicial, extraneous information. The district court suggested additional factfinding—specifically, an individual interview of each juror, once again, in a second voir dire—to determine the source of the advertisement. The parties agreed.

**vii.**

Through its second voir dire, the district court learned the origin of the advertisement. Like before, the court interviewed each juror individually in the courtroom, in the presence of the parties, while the other jurors waited in the jury room. The parties suggested questions for the court to ask, and they were given the opportunity to ask follow-up questions to each juror. Juror 3 testified that she picked up a copy of a 2017 edition of People magazine from the waiting area of the jury assembly room during jury selection. She kept the magazine with her throughout jury selection, and after she was selected, she brought the magazine to the jury deliberation room, where it remained during the first several weeks of trial.

One evening, as the jurors waited for their transportation to arrive, Juror 5 noticed the magazine and began reading it. He noticed the advertisement and found it humorous, so he tore it out of the magazine and, at some point, affixed it with post-it notes to the interior door of the jury deliberation room. Several jurors testified that the advertisement had been secured to the door for quite a while. Juror 12, for example, testified that the advertisement had been affixed to the jury room door for at least a week. A court staff member stated that, during that time, she had noticed the advertisement, found it humorous, observed that it was stuck to the door with Post-It notes, and rehung it with tape.

Juror 6 testified that she noticed the advertisement on the door during the third week of trial—again, at the end of the day, as the jurors awaited transportation. She used her phone to search for the verdicts in three of the cases listed, including

Michael Jackson's case. As Juror 6 was reading about the Michael Jackson verdict, she said aloud, "oh I didn't know he was found not guilty on all counts." *Id.* at 1412. Juror 3 overheard her, and asked if she remembered the doves that were released outside the courthouse as each acquittal was announced. Juror 6 responded that she was too young to remember any details about the case, at which point Juror 3 remarked that her husband wished he had been there to shoot the doves as they were released. Several other jurors who were waiting in the hallway overheard these remarks, as did the CSO. In their second voir dire interviews, Juror 3 clarified that her husband was a hunter and a "smart aleck," and Juror 7 confirmed that the mention of the doves was "kind of a joke." *Id.* at 1426–27. Juror 3 testified that, during the conversation, she didn't correlate the remarks about Michael Jackson with the advertisement at all. Similarly, Juror 7 did not connect the conversation to anyone involved in Mr. Dermen's case.

In a subsequent order, the district court made the following findings of fact as to the impact of the advertisement on each member of the jury, based on the second round of voir dire interviews:

> Juror 1 noted that "[t]he only thing I saw was The Jury Speaks. I haven't even paid attention to it. You kind of walk past it. I have no idea what's on there other than that."
>
> When Juror 2 was asked if he remembered what the advertisement said under "The Jury Speaks," he said he remembered that it mentioned O.J. Simpson, but stated "I've never even really gone up and looked at it. I've just seen it in passing."
>
> Juror 3 stated "I have no idea what it was about."

When Juror 4 was asked if he recalled ever having seen the advertisement, he answered affirmatively, but could not correctly recall the details of the advertisement. He stated, "Yes. It was a chair. I didn't read it. I just saw the chair that's on in [sic]. It said Hot Seat."

[Juror 5 posted the advertisement on the jury room door.]

Juror 6, who had indicated the magazine page had spurred her to search for the cases listed on the page, made no connection between the advertisement and this trial.

Juror 7 thought the advertisement was the cover page for an article, stating, "I think the contents was [sic] regarding – I haven't looked at the article, but I think it pertains to an article about jurors that were on, I think the O.J. Simpson trial, Michael Jackson, the Trayvon case in Florida. Just about that. That's my understanding." He also erroneously believed that the picture showed "an empty chair. . . with a flag."

Juror 8 did not remember the advertisement or any discussions about it at all.

Juror 9 understood that the advertisement was for "a TV show about like the OJ Simpson case," and believed the picture showed "[a] wood chair like the old jury you see on TV I guess."

Juror 10 could not recall any case names on the advertisement, what the picture on the advertisement depicted, or any conversations about the advertisement.

Juror 11 remembered that there was an advertisement on the jury room door but had "a hard time even remembering that it said The Jury Speaks. . ." He did, however, recall that O.J. Simpson was listed on the page.

Juror 12 had seen the advertisement but noted, "I didn't really pay a lot of attention to it. It seemed to be a reference to a TV show. I don't watch a lot of TV. It didn't resonate with me." To Juror 12, "[i]t was a decoration." He stated that he witnessed the courtroom deputy affixing the advertisement to the door. . . .

Juror 13 stated that he "Never even looked to read it [the advertisement]." All he knew was that "the title . . . says The Jury, or something like that."

> Juror 14 also only recalled that the advertisement said the word "jury." She stated, "It might have said "jury." However, I don't remember exactly. But I think it said that in big writing. But I don't—I think. I could be wrong." She stated she thought there "was black on the picture."
>
> When asked about the advertisement, Juror 15 stated, "Honestly I didn't even read it. I passed by it, thought about it, didn't look appropriate, so I didn't look at it."
>
> Juror 16 could accurately identify the picture, but believed that the advertisement "had some dates, I don't know what the dates were. And it said something about—I can't even remember what it said. It looked like a conference or something that you can come and learn about jurors or jury duty. Like you're in the hot seat is what I would[.]" She believed that the picture symbolized the jury's role in being "the judge of somebody else's of—whatever narrative is being presented to you, so I guess it puts you in the hot seat."

*Id.* at 1423–25 (footnotes and citations omitted; line spacing added).[6] In sum, the court found that "most jurors indicated that they had paid little attention to [the advertisement]." *Id.* at 1423.

**viii.**

The district court also ascertained additional details regarding the hallway conversation that had been reported to the CSO in a second interview of him, in which the court gave the parties the opportunity to question him out of the presence of the jury. The CSO's second interview was broadly consistent with the first; however, when the CSO was asked specifically if he remembered Mr. Geragos's name being mentioned in the conversation, he responded that he did not. And, when

[6] The district court noted in its findings of fact that the words "hot seat" did not appear anywhere on the advertisement. Aplt.'s App., Vol. VII, at 1423 n.18.

asked if he thought that Mr. Geragos was the attorney who "got Michael Jackson off," he responded that he did believe that to be the case—and was surprised to learn that Mr. Geragos was not involved in Michael Jackson's trial at all. *Id.* at 1427.

**ix.**

Based on its second round of interviews, the district court determined that Juror 5 had torn the advertisement out of an old magazine and hung it on the door; that Juror 3, not Juror 16, had been the other participant in the conversation that the CSO had overheard;[7] and that Juror 3 had told Juror 6 that her husband would have liked to shoot the doves. Notably, during each round of interviews, each juror was asked whether conversations with fellow jurors regarding other cases or the magazine advertisement would affect his or her decision or impact his or her ability to be fair and impartial in Mr. Dermen's case.[8] The jurors were consistent and unanimous in responding to both questions in the negative. Jurors 3 and 6 also testified that neither their conversation nor the advertisement would impact their ability to decide the case fairly and impartially. Pursuant to these findings, the district court again denied Mr. Dermen's motion for mistrial and decided not to remove Jurors 3 and 6.

---

[7] Based on this misidentification, the district court "aborted" its dismissal of Juror 16. Aplt.'s App., Vol. VII, at 1425 n.23. Juror 16 was ultimately designated as an alternate when the jury was excused for deliberations.

[8] The court conducted follow-up interviews with Jurors 3 and 6 on March 1, 2020, to ask them these questions.

**x.**

After soliciting the parties' input, the court proposed a curative jury instruction to address the events of February 25–27, to which neither party objected. The instructions addressed five issues: (1) the reason for the two sessions of voir dire; (2) any concerns jurors may have had regarding the nature of their conversations; (3) the fact that the magazine advertisement was not to be considered as evidence and had nothing to do with this case; (4) the fact that Mr. Geragos did not represent Michael Jackson at trial; and (5) the neutrality of court staff. The court concluded its inquiry by calling the jury back into the courtroom and delivering the curative instructions from the bench.

**xi.**

On March 26, 2020, the district court issued a supplemental order to its ruling from the bench to detail the court's factual findings and legal analysis. The court made the following four key findings based on its investigation—that is, the two individual voir dires of the full jury and additional individual interviews of Jurors 3, 6, 16, and the CSO.

First, the court found that the CSO erroneously assumed that Jurors 3 and 6 were discussing Mr. Geragos. The court acknowledged that "[b]ased on initial reports from the USMS on February 25, 2020, the court and the parties believed that an improper conversation had taken place between Jurors 6 and 16 regarding Mr. Geragos's prior representation of Michael Jackson." *Id.* at 1438. Ultimately, however, the court found that the CSO had mistakenly identified Juror 16 as the

second participant; in actuality, the second participant was Juror 3. And, more importantly, the court found that its investigation revealed that "[a] convergence of mistaken identity, confusion regarding the nuances of a conversation, and assumptions regarding Mr. Geragos's prior clients erroneously led the court and the parties to initially conclude that this innocuous conversation between jurors somehow related to this case. In fact, it did not." *Id.*

Second, the court found that the advertisement was not extraneous information because it "does not relate to this case in any way," *id.* at 1445, and, in the alternative, that even if the advertisement was extraneous information, it was harmless because it had no effect on the jury.

Third, the court found that Jurors 3, 5, 6, 7, and 11 were forthcoming during the court's voir dire interviews and thus should not be disqualified.

Fourth, the court concluded that the curative jury instruction would mitigate any possibility of prejudice.

Finally, with respect to prejudice, the court elaborated based on its investigation that "none of the issues raised by the defense have anything to do with [Mr.] Dermen or the charges he is facing." *Id.* at 1454. Thus, the court was "convinced beyond a reasonable doubt that neither the hallway conversation overheard by [the] CSO [] nor the magazine advertisement ha[s] given rise to any prejudice against [Mr.] Dermen and that neither will have any bearing whatsoever on the ability of any juror to fairly and impartially judge this case." *Id.*

**3.**

On appeal, Mr. Dermen raises four arguments to show that he was prejudiced by the advertisement and alleged juror misconduct. First, he maintains that the district court erred by finding that the advertisement did not amount to improper extraneous information. Second, Mr. Dermen challenges the district court's finding that any exposure to the advertisement was harmless. Third, he argues that the district court erred in finding that the conversations between jurors did not evince prejudicial juror bias. Fourth, Mr. Dermen argues that the district court's curative jury instruction was insufficient to cure the prejudice that he faced from the advertisement and conversations between jurors. Reviewing for abuse of discretion, *see Lawrence*, 405 F.3d at 903, we find all of these arguments to be unpersuasive.

**i.**

We begin with Mr. Dermen's assertion that the advertisement was extraneous information. Specifically, Mr. Dermen challenges the district court's factual finding that the advertisement had no connection to his case; he argues that the advertisement was extraneous information because it "highlighted the judgment that the jury had to pass upon [Mr.] Dermen." Aplt.'s Opening Br. at 32. But, as we demonstrate *infra*, Mr. Dermen does not show that the court clearly erred in making its finding concerning the absence of extraneous information. Thus, we affirm the district court's decision "because there is credible evidence in the record to support it." *Mayhue*, 969 F.2d at 922.

For the advertisement to be prejudicial extraneous information, it must be connected to the defendant's case. *Cf. Remmer*, 347 U.S. at 229 (explaining that any contact with a juror during trial "about the matter pending before the jury" is deemed presumptively prejudicial). Our authority provides examples of extraneous information that is connected to a defendant's case, including the following: information from a third party about a defendant's financial transactions, *see Hornung*, 848 F.2d at 1045; news coverage of the case being tried, watched by jurors during trial, *see Davis*, 60 F.3d at 1483; dictionary definitions of terms at issue in the case before the jury, which jurors consulted, *see Aguirre*, 108 F.3d at 1288–89; an exhibit that was not admitted as evidence and inadvertently sent to the jury room along with properly admitted trial exhibits, *see Muessig*, 427 F.3d at 864–65; an easel and large notepad which, unbeknownst to the court, contained nine pages of information written by the plaintiffs' counsel and one of the plaintiffs' experts during trial, *see Ingersoll-Rand Co.*, 214 F.3d at 1240–41; and information one juror shared with the rest of the jury about the manner in which her husband stored his gun during a felon-in-possession-of-a-firearm trial, *see Daniels*, 755 F. App'x at 797. By contrast, in *Lawrence*, we found "no indication" that a pamphlet about jury nullification that was found in the jury room had "affect[ed] their view of the case." *Lawrence*, 405 F.3d at 904.[9]

---

[9] Mr. Dermen argues that we treated the jury nullification packet as extraneous information in *Lawrence* in that we analyzed whether it had a prejudicial effect on the jury. To be sure, we considered prejudice in *Lawrence*. But we did not expressly conclude that the packet was extraneous information; Mr. Dermen

Here, as in *Lawrence*, the district court found that the advertisement was not connected to Mr. Dermen's case, based on its extensive investigation into the advertisement and its impact on the jury:

> Although the defense has portrayed the advertisement as an inflammatory warning to any juror who would consider acquitting [Mr.] Dermen, after sixteen individual voir dire sessions and an additional follow-up interview with Juror 3, there is simply no evidence that any juror viewed the advertisement in this way.

Aplt.'s App., Vol. VII, at 1446–47. Reviewing for clear error, we find that this conclusion has ample support in the record. *See Mayhue*, 969 F.2d at 922.

We first note that the district court's second voir dire complied precisely with the *Remmer* hearing procedure set forth in *Hornung*. *See* 848 F.2d at 1045 (citing, *inter alia*, *Remmer*, 347 U.S. at 229–30). During the district court's interview with Juror 6, following the first voir dire, the court became aware of the advertisement on the jury room door. Upon discovering and reviewing the advertisement, the court correctly identified a *possible* exposure to extraneous information and conducted a *Remmer* hearing—the second voir dire—to "determine the circumstances of the improper contact and the extent of the prejudice, if any, to the defendant." *Hornung*, 848 F.2d at 1045.

---

overstates our holding in that respect. *See Lawrence*, 405 F.3d at 904. In any event, *Lawrence*'s analysis of the *relevance* of the packet *to the defendant's case* is the guiding element of our reasoning here. *Cf. Remmer*, 347 U.S. at 229. Therefore, we conclude that *Lawrence*'s analysis of the nullification packet is instructive to our extraneous information inquiry, notwithstanding Mr. Dermen's portrayal of the case.

The court developed an exemplary record through this hearing process, from which it determined that the advertisement was not extraneous information because, in the first instance, it "does not relate to this case in any way." Aplt.'s App., Vol. VII, at 1445. The propriety and thoroughness of the record that the district court made—judged through the prism of *Remmer*—underscore why we should accord the court's findings great weight. *Cf. Mayhue*, 969 F.2d at 922 ("The trial judge presided over the proceedings from start to finish; thus, he knows better than we how the [extraneous information] might have diverted the jurors' attention away from the theories presented at trial and the instructions that were to govern their deliberations.").

Against this backdrop, we conclude that there is ample support in the record for the district court's finding that the advertisement was unrelated to Mr. Dermen's case. Although all but one juror remembered seeing the advertisement when asked about it during voir dire interviews, none of the jurors drew any clear connection between the advertisement and Mr. Dermen or Mr. Geragos. Mr. Dermen asserts that the advertisement "emphasized that verdicts in notorious cases—like [Mr.] Dermen's, in which the defendant and prominent members of the most powerful church in Utah [i.e., Jacob and Isaiah Kingston] were accused of fraud against the U.S. in excess of $1 billion—could 'ignite the nation.'"[10] Aplt.'s Opening

[10] The Kingstons are members of the Davis County Cooperative Society, also known as "the Order." The Order is a religious organization that is primarily based in Utah and associated with the fundamentalist Church of the Latter Day Saints.

Br. at 32 (footnote added). But Mr. Dermen is the only one expressing this view: the record shows that no juror made this connection.

To the contrary, eleven jurors stated that they had not "paid attention to," "looked at," or "read" the advertisement, or that they saw it only "in passing" (or stated variations of those phrases). Juror 6 made no connection between the advertisement and Mr. Dermen's trial, despite her deeper engagement with the advertisement—as evidenced by her internet research and subsequent conversation with Juror 3—and, similarly, Juror 3 did not connect her conversation with Juror 6 about Michael Jackson to the advertisement or Mr. Dermen. The evidence from the second voir dire shows that the district court's finding that the advertisement was unrelated to Mr. Dermen's case was, at the very least, plausible. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985).

To be sure, as Mr. Dermen argues, Juror 16 indicated that the advertisement related to her role as a juror. Juror 16 stated that the advertisement "symbolized the jury's role in being the judge of somebody else[] . . . I guess it puts you in the hot seat." Aplt.'s App., Vol. VII, at 1425 (quotation omitted). But we can hardly say that this general invocation of the solemn duty of a juror to sit in judgment on their fellow citizens amounts to a material and particularized connection between the advertisement and Mr. Dermen's case. In other words, the court could plausibly find that the evidence does not show that the advertisement was connected by Juror 16 in any material way with Mr. Dermen or the charges against him. Indeed, neither Juror 16 nor any other juror stated that the magazine's content would affect his or her

decision as to Mr. Dermen. *See Lawrence*, 405 F.3d at 904 ("Each of the jurors who recalled seeing the pamphlet stated that it did not affect their view of the case."). As such, Juror 16's testimony does not show that the district court clearly erred in its finding that the advertisement was irrelevant to Mr. Dermen.

We conclude, therefore, that the record supports the district court's finding that the advertisement was not extraneous because it "does not relate to this case in any way." Aplt.'s App., Vol. VII, at 1445. This finding is "plausible in light of the record viewed in its entirety"; thus, Mr. Dermen does not show clear error.[11] *Anderson*, 470 U.S. at 574; *see also Gonzales*, 99 F.3d at 986.

---

[11] Mr. Dermen argues that *Stouffer v. Trammell*, 738 F.3d 1205 (10th Cir. 2013), shows that the district court erred because our circuit broadly construes the types of extraneous information that might prejudice a jury and necessitate the removal of jurors or a new trial. In *Stouffer*, in an appeal from the denial of habeas relief, we considered an improper jury communication between a state-court juror and her husband. *See id.* at 1215. A court security officer testified that he had observed repeated non-verbal communication between the juror and her husband, including nods and winks. *See id.* Most notably, "[a]t one point during the prosecution's final closing argument, [the] Juror [] looked to her husband with 'a questioned look in her face,'" and he "responded by nodding and rolling his eyes." 738 F.3d at 1215 (quoting state-court record). We held that these courtroom communications were improper, and we remanded to the district court to conduct a *Remmer* hearing to determine whether the defendant was prejudiced. *See id.* at 1216–17, 1220. But *Stouffer* does not address the question presented here—whether the district court abused its discretion in determining whether certain information that the jury was exposed to constituted *extraneous information*. Rather, *Stouffer* involved improper jury contact, a form of *juror bias*. In any event, our disposition in *Stouffer* underscores the propriety of the *Remmer* hearing that the district court conducted here. There would be no basis here to remand for the district court to conduct a *Remmer* hearing where it already has conducted an exemplary one. In sum, Mr. Dermen's *Stouffer* argument is unpersuasive.

**ii.**

Even assuming, *arguendo*, that Mr. Dermen could show clear error in the district court's finding that the advertisement did not constitute extraneous information about his case, the district court did not abuse its discretion in finding that the impact of the advertisement was harmless beyond a reasonable doubt. *See Morales*, 108 F.3d at 1222. Most fundamentally, that is because the record supports the district court's finding that no juror found the advertisement to be material to Mr. Dermen's case; thus, it was not prejudicial.

Our decision in *Lawrence* is instructive. There, a pamphlet about jury nullification was found in the jury room and the defendant-appellant moved for a mistrial. *See Lawrence*, 405 F.3d at 896. The district court in *Lawrence* implemented the familiar *Remmer* hearing process: the court paused the trial and interviewed each of the jurors in the presence of counsel, allowing the attorneys to question the jurors if they so desired. *See id.* Through the *Remmer* hearing, the district court determined that "[w]hile several of the jurors indicated they had seen the pamphlet, the court determined that there was, at most, very limited discussion of the contents" and that "[a]ll of the jurors who reviewed the pamphlet stated that they would not be influenced by it in their deliberations." *Id.* In light of this record, the district court found "no indication the pamphlet had affected the jury's ability to follow the instructions or decide the case." *Id.* Therefore, the district court denied the motion for a mistrial and gave the jury a curative instruction. *See id.* On appeal, we affirmed the district court's decision. *See id.* at 904, 909.

The similarities between *Lawrence* and Mr. Dermen's case are striking. Here, upon being notified of *potential* jury exposure to extraneous information, the district court conducted a near-identical *Remmer* hearing to the hearing conducted in *Lawrence* and found near-identical facts. In both cases, although jurors remembered the potentially extraneous information at issue, discussions of its contents were limited. Here, engagement with the advertisement was limited to Juror 5 putting it on the jury room door, Juror 6 researching the verdicts of the cases listed on the advertisement, and Jurors 6 and 3 discussing the Michael Jackson case. No jurors made a connection between the advertisement and the counts against Mr. Dermen. Importantly, all jurors stated that "neither the conversations nor the magazine advertisement would bear on their decision or have any impact on their ability to be fair and impartial in [Mr. Dermen's] case." Aplt.'s App., Vol. VII, at 1429. And, as in *Lawrence*, the district court issued a curative instruction, as a prophylactic measure, to mitigate any outstanding risk of prejudice. Under either of the two standards our circuit has developed to assess the impact of exposure to extraneous material on a jury—*viz.*, the "slightest possibility" approach or the "presumption of prejudice" approach—we cannot conclude that the district court erred in finding no prejudice; nothing in the record supports a finding of prejudice. *See Muessig*, 247 F.3d at 865. Specifically, here, as in *Lawrence*, "[g]iven the absence of any evidence regarding juror prejudice, the district court did not abuse its discretion by denying the motion for a mistrial." *Id.* at 904.

**iii.**

Next, we consider and reject Mr. Dermen's challenges to the district court's decision to deny his motion for mistrial based on juror misconduct and, more specifically, juror bias. Mr. Dermen contends that "Jurors 3, 5, 6, and 7 should have been excused for cause due to lack of candor, failing to abide by the court's admonishments and instructions, and for having actual or implied bias towards the defense." Aplt.'s Opening Br. at 36 (quotation omitted). Accordingly, we review the district court's findings as to each juror and ask "[1] whether actual bias existed or [2] whether the circumstances compel an imputation of inherent bias to the juror as a matter of law[,] such that the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *Lawrence*, 405 F.3d at 903. We review the district court's findings as to actual bias for clear error and the court's findings as to implied bias de novo. *See Gonzales*, 99 F.3d at 986.

**a.**

Mr. Dermen argues that the hallway conversation between Jurors 3 and 6 shows that they "drew a connection between [Michael] Jackson's acquittal and [Mr.] Dermen's counsel, [Mr.] Geragos." Aplt.'s Opening Br. at 30. According to Mr. Dermen, "[t]he affected jurors possessed a disqualifying bias and should have been removed." *Id.* Recall that the district court found that "[a] convergence of mistaken identity, confusion regarding the nuances of a conversation, and assumptions regarding Mr. Geragos's prior clients erroneously led the court and the parties to initially conclude that this innocuous conversation between jurors somehow

related to this case. In fact, it did not." Aplt.'s App., Vol. VII, at 1438. We review Mr. Dermen's challenge to the district court's factual finding for clear error and find that it is well supported by the record. *See Gonzales*, 99 F.3d at 986.

To the extent that Mr. Dermen challenges the district court's findings of actual bias, we conclude that two facts show that the district court did not clearly err—that is, demonstrate that the district court's account of the evidence is plausible in light of the record. *See Anderson*, 470 U.S. at 573–74. First, the CSO's second interview revealed that the CSO did *not* specifically remember Mr. Geragos's name being mentioned in the conversation, and he was surprised to learn that Mr. Geragos was *not* involved in Michael Jackson's trial. Second, Jurors 3 and 6 denied having a conversation about Mr. Geragos. "The district judge is entitled to rely upon its self-evaluations of allegedly biased jurors in determining actual juror bias," *Wacker*, 72 F.3d at 1467, in "a [*Remmer*] hearing in which the defendant has the opportunity to prove actual bias," *Smith*, 455 U.S. at 215. That is precisely the procedure the district court employed to clarify that no actual bias was present here, and we conclude that the district court's evaluation enjoys support in the record.

Mr. Dermen points to Juror 16's statement that "[s]omeone had said [Mr. Geragos] had represented Michael Jackson," Aplt.'s App., Vol. XXVII, at 6562–63, and the CSO's testimony that he heard a juror state "he's the one that got Michael Jackson off," *id.* at 6700, as countervailing evidence. But after weighing this evidence, the district court found that:

> Because of [the CSO's] erroneous belief that Mr. Geragos had previously represented Michael Jackson on child molestation charges, [the CSO] erroneously assumed that Jurors 6 and 3 were discussing Mr. Geragos, when they were in fact making an innocuous reference to popular culture that neither of them believed related in any way to this case.

Aplt.'s App., Vol. VII, at 1439–40. Based on our review of the record, we cannot say that the evidence that Mr. Dermen points to makes the district court's factual finding implausible. *See Anderson*, 470 U.S. at 573–74. Nor can we weigh evidence on appeal. *See id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. Therefore, we conclude that the district court did not clearly err in finding that its initial conclusions about the hallway conversation actually amounted to a harmless misunderstanding—not actual bias.

Mr. Dermen also argues that the hallway conversation—and Juror 3's "shooting the doves" comment, in particular—show that Jurors 3 and 6 harbored implied bias against him and Mr. Geragos, which they had an interest in concealing. But the record shows that the jurors viewed the "shooting the doves" comment as humorous and benign. In their second voir dire interviews, Juror 3 clarified that her husband was a hunter and a "smart aleck," and Juror 7 confirmed that the doves comment was "kind of a joke." Aplt.'s App., Vol. VII, at 1426–27.

Our authority makes clear that "[t]he implied bias doctrine should not be invoked lightly." *Gonzales*, 99 F.3d at 987. And the "'extreme' and 'exceptional' circumstances that 'leav[e] serious question whether the trial court . . . subjected the

defendant to manifestly unjust procedures resulting in a miscarriage of justice'" are simply not present here. *Id.* (alteration and omission in original) (quoting *Smith*, 455 U.S. at 222 & n.* (O'Connor, J., concurring)). For example, no juror was found to harbor the sort of close relationship to an interested party that is often associated with our implied bias doctrine. *See id.*

Accordingly, we conclude that the district court did not abuse its discretion in denying Mr. Dermen's motion for mistrial on account of juror bias.[12] *See Lawrence*, 405 F.3d at 904; *Gonzales*, 99 F.3d at 986.

---

[12] Mr. Dermen advances two further bias arguments as to Jurors 5 and 6. We find them meritless. First, Mr. Dermen suggests that the research Juror 6 conducted on her phone about the verdicts in each case that was depicted on the advertisement evinces juror bias. However, the district court found that the research was ultimately unrelated to Mr. Dermen's case:

> Juror 6 searched for Michael Jackson on the internet simply because she noticed it listed on the magazine advertisement and was curious to learn the verdict of the case. She did not believe she was violating her oath or the court's instruction not to conduct outside research related to the trial because she had no reason to suspect that [Mr. Dermen's] case was in any way relevant to a case from fifteen years ago involving a deceased figure from popular culture.

Aplt.'s App., Vol. VII, at 1439 (footnote omitted). Mr. Dermen fails to specify why this finding is clearly erroneous and offers no further argument as to how Juror 6's research into an unrelated case evinced bias or otherwise prejudiced him.

Second, Mr. Dermen intimates that Juror 5 harbored bias because he posted the advertisement on the jury room door and related the advertisement to the experience of serving as a juror. This argument is meritless because Mr. Dermen does not specify a theory as to the bias Juror 5 held against Mr. Dermen, Mr. Geragos, or any other related individual.

**iv.**

Finally, Mr. Dermen argues that the district court's jury instruction could not cure the prejudice resulting from the jurors' exposure to the advertisement—that is, the curative instructions could not "ameliorate the ominous warning that an acquittal in [Mr.] Dermen's high publicity trial, like the acquittals in the cases in the advertisement, could 'ignite the nation.'"[13] Aplt.'s Opening Br. at 38. In support of

[13] Mr. Dermen objects to the efficacy of the district court's curative jury instruction for the first time on appeal. Specifically, the record shows that Mr. Dermen did not object to the district court's curative jury instruction; in fact, he *collaborated* with the district court and the government to craft an approach to delivering curative instructions that he now challenges. It is at least arguable that Mr. Dermen has thereby waived any objection to the court's instruction on appeal under the doctrine of invited error. *See United States v. Harris*, 695 F.3d 1125, 1130 n.4 (10th Cir. 2012) (explaining that a defendant knowingly and voluntarily waives the right to attack the sufficiency of a jury instruction when he proffers his own instruction and persuades the court to adopt it); *United States v. Sturm*, 673 F.3d 1274, 1281 (10th Cir. 2012) (holding that the defendant was barred from attacking the sufficiency of an instruction that he proffered himself); *United States v. Visinaiz*, 428 F.3d 1300, 1310–11 (10th Cir. 2005) (concluding that the defendant was barred from attacking the sufficiency of an instruction that he approved after the district court adopted his proffered modifications); *cf. Earthgrains Baking Cos. Inc. v. Sycamore Fam. Bakery, Inc.*, 573 F. App'x 676, 681 (10th Cir. 2014) ("We are particularly bound to apply the waiver rule in the case at bar, because by stipulating to the instructions to which he now objects, [Defendant] affirmatively assented to their being read to the jury."); *United States v. Wells*, 38 F.4th 1246, 1255 (10th Cir. 2022) (similar). And at minimum, it would seem that Mr. Dermen has effectively waived an objection to the efficacy of the court's curative jury instruction by failing to object to the instruction below and failing to seek plain-error review on appeal. *United States v. Woodmore*, 135 F.4th 861, 880 (10th Cir. 2025) ("[Defendant] has not preserved his appellate challenge to the [jury] instruction. This challenge is effectively waived because [he] failed to raise the specific theories underlying the challenge before the district court, and he does not argue for plain-error review on appeal."); *United States v. McBride*, 94 F.4th 1036, 1045 (10th Cir. 2024) ("Because [Defendant] both failed to preserve [his] arguments below and failed to argue plain error here, [his] arguments have 'come to the end of the road and [are] effectively

his argument, Mr. Dermen invokes our decision in *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), in which we held that "in some instances, instructions are insufficient to cure the prejudice resulting from extraneous information received by jurors." *Id.* at 1251. Mr. Dermen argues that his case is one such instance. We disagree.

In *Chanthadara*, the district court judge stated outside of the jury's presence that he believed the defense's evidence to be "a smoke screen." *Id.* at 1247.

---

waived.'" (last alteration in original) (quoting *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016))).

All that said, however, the government does not specifically contend that Mr. Dermen has not preserved for review an objection to the curative instruction—even though the government does note in its brief that Mr. Dermen "did not object to the court's proposed curative instructions," Aplee.'s Resp. Br. at 56; *see also id.* at 50 ("[T]he parties did not object to the court's proposed curative instructions, which the court gave before trial resumed."). Therefore, regarding a potential claim of lack of preservation, the government has a preservation problem of its own. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1138–39 (10th Cir. 2010) ("[Plaintiffs'] brief does not raise a forfeiture challenge. Accordingly, Plaintiffs have themselves forfeited any forfeiture argument they may have on this issue, and this court will consider the merits of Defendants' argument."); *United States v. Reider*, 103 F.3d 99, 103 n.1 (10th Cir. 1996) (holding that "we do not consider the [waiver] issue" where "the government has not contended that these actions [of defendant, bespeaking waiver] preclude defendant from challenging" the relevant district court rulings).

Therefore, we exercise our discretion to consider the merits of Mr. Dermen's objection to the efficacy of the court's curative jury instruction. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *United States v. Montgomery*, 550 F.3d 1229, 1231 n.1 (10th Cir. 2008) (concluding that "we [may] exercise our discretion to ignore the waiver"); *cf. United States v. McGehee*, 672 F.3d 860, 873 n.5 (10th Cir. 2012) ("[W]e are not obliged to apply forfeiture principles to the government's briefing omission; such decisions are discretionary.").

However, the judge did not consider that journalists were in the court room. *See id.* The following morning, a local newspaper ran an article reporting on the judge's comments. *See id.* The headline read: "JUDGE IN MURDER CASE CALLS DEFENSE STORY A 'SMOKE SCREEN.'" *Id.* We held that a jury instruction could not cure the resulting prejudice. *See id.* at 1264.

Mr. Dermen's case bears no resemblance to the facts in *Chanthadara*; the case is simply inapposite. *Chanthadara* concerned a highly prejudicial statement from the district court itself. Conversely, the district court's instructions here were a prophylactic measure, designed to cure any *potential* prejudice from the advertisement and jury conversations—despite the district court's proper finding that the advertisement and jury conversations were harmless in the first instance.

Under our precedent, this is not a circumstance in which prejudice is too damaging to be cured by a well-tailored jury instruction. Rather, the district court's curative instruction simply reflected its prudent "belt-and-suspenders" approach to curing *potential* prejudice despite having actually found none. Thus, *Chanthadara* is inapposite and our general rule controls: the district court may employ a curative jury instruction to ameliorate the risk of prejudice, and the court did not err in doing so here. *See, e.g., Zafiro*, 506 U.S. at 540–41.

* * *

Therefore, we conclude that the district court did not abuse its discretion in denying Mr. Dermen's motion for mistrial based on juror misconduct.

### B. *Mistrial Based on COVID-19*

Mr. Dermen next contends that the district court erred by denying his motion for mistrial based on the onset of the COVID-19 pandemic, which, he argues, amounted to an abuse of the district court's discretion. We disagree. Faced with the uncertain and difficult situation that COVID-19 presented in March of 2020, the district court acted reasonably in its management of Mr. Dermen's trial. Moreover, we are unpersuaded that the COVID-19 pandemic had any prejudicial effect on Mr. Dermen's case. Accordingly, we reject his challenge and uphold the district court's denial of his motion for mistrial.

#### 1.

##### i.

We review the denial of a mistrial for abuse of discretion, *see Lawrence*, 405 F.3d at 903, "reversing only where the decision was 'arbitrary, capricious, whimsical, or manifestly unreasonable,'" *Ingersoll-Rand*, 214 F.3d at 1242 (quoting *Byrne*, 171 F.3d at 1235).

##### ii.

A district court may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. 579, 580 (1824) (emphasis added); *see Renico v. Lett*, 559 U.S. 766, 774 (2010). "On multiple occasions, the Supreme Court has refused to adopt a mechanistic formula for the presence of 'manifest necessity' and has repeatedly reiterated that trial judges

must be accorded broad discretion to declare a mistrial." *Walck v. Edmondson*, 472 F.3d 1227, 1236 (10th Cir. 2007) (citation and footnote omitted); *see Renico*, 559 U.S. at 774. "The decision to declare a mistrial is [thus] left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.'" *Renico*, 559 U.S. at 774 (quoting *Perez*, 22 U.S. at 580). And "a trial judge's finding of manifest necessity is entitled to the 'highest degree of respect' when juror bias . . . is involved." *United States v. Crotwell*, 896 F.2d 437, 440 (10th Cir. 1990) (quoting *Arizona v. Washington*, 434 U.S. 497, 510–11 (1978)).

**2.**

**i.**

Mr. Dermen moved for a mistrial while the jury was deliberating, arguing that the COVID-19 pandemic would have a prejudicial effect on the deliberations. The jury began deliberating shortly before noon on Thursday, March 12, 2020. At 2:15 p.m., the jury sent a note stating that it would be leaving at 4:00 p.m., would take Friday off, and planned to restart its deliberation on Monday at 9:00 a.m. The jury deliberated until approximately 3:45 p.m. on that Thursday. On Sunday, March 15, 2020, at approximately 6:30 p.m., Mr. Dermen filed a motion requesting that the court declare a mistrial in light of the spread of COVID-19. Specifically, Mr. Dermen argued:

> [A]bsent the declaration of a mistrial[,] our jurors will be tasked with continuing their duties and responsibilities as fact-finders in a complex criminal matter with very serious implications for this

> defendant while being in close quarters in direct violation of every medical directive to socially distance. . . . Any verdict that results from these conditions would be unreliable, not the product of the unfettered deliberative process[,] and we would be horribly remiss to not consider the obvious fact that jurors will rush through their responsibilities as the fact-finders to simply be physically released from a medically unhealthy, perhaps life threatening environment.

Aplt.'s App., Vol. II, at 345–46 (Def.'s Mot. for a Mistrial, dated Mar. 15, 2020).

The next morning, Monday, March 16, the court ordered the government to respond to Mr. Dermen's motion for mistrial by 5:00 p.m. At approximately 1:30 p.m., the jury reached its verdict, finding Mr. Dermen guilty of all counts. Following the announcement of the verdict, the government submitted its memorandum opposing Mr. Dermen's motion for a mistrial, to which he replied later that evening. Supplemental briefing by both parties followed.

**ii.**

Several instances of illness precipitated Mr. Dermen's motion for a mistrial and were referenced in his arguments therein. On March 1, Juror 1 notified the court that she had developed a "severe head cold" and "coughing fits," and on March 2, before returning to court, she developed "flu symptoms" and "dizz[iness]." Aplt.'s App., Vol. XX, at 4633 (Jury Trial Tr., held Mar. 2, 2020). The district court noted that illness of a juror is "one of the reasons that we have alternates." *Id*. at 4633–34. That same day, the district court excused Juror 1 due to illness. As such, Juror 1 "had not been with fellow jurors for 18 days by the time they returned to deliberate on the morning of March 16." Aplt.'s App., Vol. II, at 427 (Order Denying Def.'s Mot. for Mistrial, dated Apr. 6, 2020) (footnote omitted).

On March 3, Juror 9 wore a mask into the courtroom. The district court asked whether Juror 9 was okay. Juror 9 reported having "a fever and [] some chills" the night prior, but was "feel[ing] pretty good" that morning. Aplt.'s App., Vol. XXI, at 4856 (Jury Trial Tr., held Mar. 3, 2020). The court noted its appreciation for Juror 9's consideration, offered to make available "a separate room to go into during the breaks," and advised that "if you at any point feel ill or feel like you need a break, or a drink, or anything, don't hesitate to raise your hand." *Id.*

On the morning of March 4, the district court inquired as to the wellbeing of Juror 10. He had been wearing a mask to court since Monday, March 2, as a precaution, but he reported to the court that he felt fine and was merely suffering from a cold. The district court then checked whether "everybody else [was] doing ok?" and reminded the jury that the court was taking precautions to prevent illness, including providing hand sanitizer and "wiping absolutely everything down" in the jury room. *Id.* at 5088.

On Friday, March 6, Juror 10 was excused for illness after visiting his doctor, who diagnosed him with pneumonia. The following Monday, March 9, the district court notified the parties and jury about his dismissal, reminded the jury that the court "ha[s] had the cleaning staff here with hospital grade disinfectants wiping down everything," and encouraged them to continue to take precautions. Aplt.'s App., Vol. XXIII, at 5499 (Jury Trial Tr., held Mar. 9, 2020). The court also noted that Juror 10 had been using a separate room for breaks during the week prior.

**iii.**

During this time, the U.S. District Court for the District of Utah remained open for regular operations, pursuant to Phase I of its Coronavirus Response Plan. On March 12, 2020, the Chief Judge of the District of Utah implemented mitigation protocols that included denying courthouse access to individuals diagnosed with COVID-19 or those at high risk for infection—but no further directive was issued until after the jury here had returned its verdict. No hearings had been continued or cancelled in the District of Utah up until that point.

On the evening of March 16, 2020, several hours *after* the jury had returned its verdict, the Chief Judge issued a new order, which instructed that the "courthouse shall remain open for mission-critical functions of the judiciary, but the public and members of the bar are encouraged to come to the courthouse only as necessary for official court-related activities, including . . . in-person criminal hearings. . . ." Aplt.'s App., Vol. II, at 421 (omissions in original) (quoting D. Utah, General Order 20-009, at 5). The order further stated: "All civil and criminal jury trials scheduled to begin between today and May 1, 2020[,] are CONTINUED pending further order of the court. . . . Criminal jury trials already underway are not affected by this Order." *Id.* (bold typeface omitted) (quoting D. Utah, General Order 20-009, at 1). Pursuant to its terms, the March 16 order did not pertain to Mr. Dermen's trial.

**iv.**

The district court denied Mr. Dermen's motion by written order on April 6, 2020. In its written order, the district court found that Mr. Dermen "failed to

establish a miscarriage of justice or the existence of a 'manifest necessity' for a mistrial." *Id.* at 423. Specifically, the court found that "Defendant has offered no evidence that the jury's decision was compromised in any way by the coronavirus outbreak. No member of the jury raised any concerns or made any attempt to communicate with the court or the jury coordinator regarding the coronavirus outbreak." *Id.* Similarly, the court found "absolutely no evidence to suggest that either Juror 1 or 10 was ill with [COVID]-19 or that other jurors believed the two excused jurors posed any risk to their health." *Id.* at 427.

Finally, the court rejected Mr. Dermen's suggestion that the jury's "relatively swift verdict" was indicative of prejudice, *id.* at 435:

> [T]here is no requirement that jurors deliberate for a minimum length of time. And here, the jury deliberated for over eight hours. They began deliberations on Thursday, sent a note indicating they had "found a good stopping point for the weekend," and returned the following Monday. They then deliberated for another four and a half hours and returned their verdict just after lunch. Nothing about this scenario suggests that jurors were angry, panicked or in a rush to leave the deliberation room.
>
> * * *
>
> The court has observed these jurors and their demeanor over the course of a seven-week trial and finds absolutely no evidence to suggest that they were scared, irritated, and/or angry as a result of the coronavirus. The court similarly finds no basis to conclude that the jury verdict was rushed, that the jury failed to conscientiously fulfill their duties as jurors, that Defendant was denied his right to be tried before a fair and impartial jury, or that the jury's verdict constituted a miscarriage of justice.

*Id.* at 435–36 (footnote omitted). The district court thus denied Mr. Dermen's motion for a mistrial.

**3.**

On appeal, Mr. Dermen argues that the jury deliberation process was "unsafe," Aplt.'s Opening Br. at 39, because at least three jurors experienced symptoms of COVID-19 and jurors "were forced to deliberate in a confined space, without any ability to socially distance," *id.* at 48, such that the jury's ability to deliberate impartially was impeded by fear. According to Mr. Dermen, this confluence of factors deprived him of his Sixth Amendment right to an impartial jury and a fair trial. Moreover, he contends that jurors' fear of COVID-19 created an "implicit bias" that caused them to render a swift verdict to avoid sitting in close proximity to each other during deliberations. *Id.* at 47–48. We are unpersuaded.

First, Mr. Dermen argues that a mistrial was warranted because at least three jurors experienced symptoms associated with COVID-19, and the district court "fail[ed] to take *any* steps to determine if anyone in the not-socially-distanced courtroom had contracted COVID-19," such that "[t]he jurors' fear of COVID-19 was palpable"—and ultimately prejudicial to him. Aplt.'s Opening Br. at 45–46. This argument lacks merit.

To the extent that by this argument Mr. Dermen challenges the district court's factual findings, he does not show clear error. *See Gonzales*, 99 F.3d 986. First, the district court's finding that there was no evidence Juror 1 and Juror 10 were made ill by COVID-19 was not clearly erroneous. True, Jurors 1 and 10 reported symptoms that are consistent with common viruses, including COVID-19. But Juror 1 was

dismissed for illness on March 2—and never appeared in court while symptomatic. And Juror 10 was ultimately diagnosed with pneumonia, not COVID-19.

Though perhaps we cannot know definitively, the record contains no evidence that either Juror 1 or Juror 10 was exposed to or contracted COVID-19. And the record *is* clear that "[n]o member of the jury raised any concerns or made any attempt to communicate with the court or the jury coordinator regarding the coronavirus outbreak." Aplt.'s App., Vol. II, at 423. Mr. Dermen argues that the jurors' fear was "palpable," but he does not point to any statement from a juror to contradict the district court's finding that the jury's decision was not compromised by fear of COVID-19. *See Stouffer v. Duckworth* ("*Stouffer II*"), 825 F.3d 1167, 1180 (10th Cir. 2016) ("Surmise and suspicion may not be used to assail the integrity of a jury[.]" (quoting *Vigil v. Solano*, 947 F.2d 955, 1991 WL 230177, at *4 (10th Cir. Nov. 8, 1991) (unpublished))). In any event, we conclude that the district court's "account of the evidence is plausible in light of the record." *Anderson*, 470 U.S. at 573–74.

Moreover, far from evincing an abuse of discretion, the district court's COVID-19 precautions were eminently reasonable. *See Ingersoll-Rand*, 214 F.3d at 1242. The court regularly asked the jurors whether they were feeling sick, reassured them that the court's cleaning staff were taking extra care to sanitize the jury's facilities, and offered separate rooms to accommodate jurors who felt ill. *See, e.g.*, Aplt.'s App., Vol. XXI, at 5088 (Jury Trial Tr., held Mar. 4, 2020) ("I don't see any other masks. Is everybody else doing okay?"); Aplt.'s App., Vol. XXIII, at 5500

("[P]lease, please be careful. We certainly don't want any more illnesses among members of the jury."). Ultimately, the district court excused Jurors 1 and 10 for illness and replaced them with alternates. These instances of juror illness occurred between March 2 and 5—at least eight days before the jury began its deliberation on March 12, and eleven days before it delivered its verdict on March 16. Consequently, these ill jurors would not have been in close proximity to the deliberating jurors, such that they could potentially inspire fear or concern in those jurors. Moreover, we conclude that the district court's adherence to the District of Utah's Coronavirus Response Plan further demonstrates the reasonableness of its approach. *See* Aplt.'s App., Vol. II, at 420–21.

Viewed in its entirety, this record shows that the district court acted quite reasonably in its management of Mr. Dermen's trial when faced with the uncertain challenges that COVID-19 presented in March of 2020. On these facts, Mr. Dermen fails to show that the district court abused its discretion in finding no "manifest necessity" for a mistrial.[14] *See Renico*, 559 U.S. at 774.

---

[14] Mr. Dermen points to *United States v. Thrush*, No. 22-1588, 2023 WL 4564769 (6th Cir. July 17, 2023), *cert. denied*, 144 S. Ct. 574, 217 (2024); *United States v. Coversup*, No. 20-30266, 2022 WL 2207309 (9th Cir. June 21, 2022); *United States v. Colon*, 64 F.4th 589 (4th Cir. 2023); and *United States v. O'Lear*, 90 F.4th 519 (6th Cir. 2024), as persuasive authority to support his abuse-of-discretion argument. Putting aside the fact that this out-of-circuit authority is not binding on us, the cases are distinguishable from the facts of Mr. Dermen's case and, thus, are unpersuasive.

First, in *Thrush*, a Sixth Circuit panel considered whether a district court judge abused his discretion by declaring a mistrial after he was exposed to COVID-19 and the jury was unavailable for a continuance. *See* 2023 WL 4564769, at *1–3. The

Next, Mr. Dermen argues that the jury's fear of COVID-19 created an implicit bias that prejudiced jurors against him. This argument fails at the threshold: even assuming, *arguendo*, that Mr. Dermen could show that the jury was operating under a fear of COVID-19, he cites no authority to support his assertion that such fear would have engendered implicit bias against him in the jurors. Importantly, we have

---

panel narrowly affirmed, holding that "given the judge's exposure to COVID-19," the district court did not abuse its discretion in finding manifest necessity and declaring a mistrial. *Id.* at *6. But the panel did not hold that the COVID-19 pandemic alone would justify or mandate a mistrial. And here, the record contains no convincing evidence that *anyone*—judge or juror—actually contracted COVID-19 during trial. Accordingly, *Thrush* is inapposite. Moreover, the panel there specifically noted that "[t]he district court did not abuse its discretion by following [the lower court's] [COVID-19] policy," which included the instruction that "anyone 'exposed within the last ten days' to COVID-19 was 'not permitted to enter the courthouse.'" *Id.* (capitalization and citation omitted). Contrary to Mr. Dermen's intent, the panel's reasoning thus supports the district court's decision here to follow the District of Utah's policy by completing Mr. Dermen's trial pursuant to Phase I of its Coronavirus Response Plan.

Next, in *Coversup*, a panel of the Ninth Circuit upheld the district court's denial of a motion for mistrial where the district court had continued trial for two weeks after a juror reported a potential COVID-19 exposure. *See* 2022 WL 2207309, at *1; *United States v. Coversup*, 2020 WL 4260519, at *2 (D. Mont. July 24, 2020), *aff'd sub nom. Coversup*, 2022 WL 2207309, at *1. The panel held that the continuance based on the juror's potential exposure did not prejudice the defendant. *See Coversup*, 2022 WL 2207309, at *1 ("The district court did not abuse its discretion in denying [Defendant's] motion for a mistrial, because [Defendant] failed to show that he suffered actual prejudice resulting from the fourteen-day jury separation."). The case is patently inapposite. And, like *Thrush*, it involved a COVID-19 exposure—of which there is no record evidence here.

Finally, *Colon* affirmed a district court judgment to strike unvaccinated jurors for cause, *see* 64 F.4th at 596, and *O'Lear* affirmed a district court decision to only allow individuals to serve on a jury if they had been fully vaccinated against COVID-19, 90 F.4th at 524–530. These holdings are irrelevant to Mr. Dermen's appeal.

explained that "[t]he implied bias doctrine should not be invoked lightly. It must be reserved for those 'extreme' and 'exceptional' circumstances that 'leav[e] serious question whether the trial court . . . subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.'" *Gonzales*, 99 F.3d at 987 (alteration and omission in original) (quoting *Smith*, 455 U.S. at 222 & n.* (O'Connor, J., concurring)). Mr. Dermen has shown no such extreme or exceptional circumstances here.

To the contrary, any assumed juror fear would have been significantly ameliorated by the district court's reasonable procedures. The district court regularly inquired as to the jury's wellbeing, *see, e.g.*, Aplt.'s App., Vol. XXI, at 5088 (asking the jury if "everybody [was] doing ok" and reminding them that the court was taking precautions to prevent illness); updated the jury on its hygienic practices, *see* Aplt.'s App., Vol. XXI, at 5499 (reminding the jury that the court "ha[s] had the cleaning staff here with hospital grade disinfectants wiping down everything"); provided opportunities for the jury to practice social distancing during recesses, *see* Aplt.'s App., Vol. XXI, at 4856 (offering to make available "a separate room to go into during the breaks"); and complied with the District of Utah's Coronavirus Response Plan. These are hardly "manifestly unjust procedures resulting in a miscarriage of justice,'" *Gonzales*, 99 F.3d at 987 (quoting *Smith*, 455 U.S. at 222 & n.* (O'Connor, J., concurring)). Put succinctly, Mr. Dermen fails to show that the district court's response to any assumed juror fear could be deemed unreasonable and likely to contribute to a manifest injustice. *Cf. Crotwell*, 896 F.2d at 440 ("[A] trial judge's

finding of manifest necessity is entitled to the 'highest degree of respect' when juror bias . . . is involved." (quoting *Arizona*, 434 U.S. at 510–11)).

Finally, we reject Mr. Dermen's argument that the jury's swift verdict is evidence of prejudicial implicit bias caused by COVID-19. We presume that jurors follow their oath and the instructions given to them by the court. *See Stouffer II*, 825 F.3d at 1180 ("Surmise and suspicion may not be used to assail the integrity of a jury; it is presumed that jurors will be true to their oath and will conscientiously observe the instructions and admonitions of the court." (quoting *Vigil*, 947 F.2d 955, at *4)); *Banks v. Workman*, 692 F.3d 1133, 1150 (10th Cir. 2012) ("The law presumes juries follow instruction."). And here, there is no evidence to suggest that the jury did not comply with its instructions to render a just verdict or was unduly rushed in its deliberation. *See Chandler v. Florida*, 449 U.S. 560, 581 (1981) (refusing to assume jury impairment absent specific evidence).

Nor does the duration of the jury's deliberation suggest to the contrary and show bias. *Lawrence* is directly on point. There, we explained that "[a]lthough there was a large amount of evidence [presented], two hours is not so short a time as to obviate a serious discussion of the issues." *Lawrence*, 405 F.3d at 905. Therefore, we "decline[d] to impute any bias on the part of the jury based on [the two-hour] period of deliberations." *Id.*; *cf. United States v. Harris*, 51 F.4th 705, 711–12 (7th Cir. 2022) (upholding verdict returned March 17, 2020, on plain error review, where "[t]he record suggest[ed] . . . that the jurors carefully considered the evidence before rendering a verdict" and "no evidence [showed] that they rushed a verdict to

go home early"). We similarly decline to impute any jury bias here based on its eight-hour deliberation.

* * *

For the foregoing reasons, we conclude that the district court did not abuse its discretion by denying Mr. Dermen's motion for a mistrial on the basis of COVID-19.

## C. *Alleged* Brady *Violations*

Mr. Dermen contends that the district court erroneously denied his motion for a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Mr. Dermen alleges that the government violated *Brady* by failing to produce evidence concerning a key government witness, Zubair Kazi, and another individual, Edgar Sargsyan, who Mr. Dermen maintains was a cooperating, unindicted co-conspirator. Mr. Dermen avers that the undisclosed evidence would have undermined confidence in the jury's verdicts.

We disagree. At bottom, Mr. Dermen's *Brady* arguments fail because the undisclosed evidence concerning Mr. Kazi and Mr. Sargsyan was immaterial to Mr. Dermen's case. Therefore, we affirm the district court's denial of his *Brady* motion.

### 1.

#### i.

"[I]n the new-trial context[,] we review de novo a district court's ruling on a *Brady* claim, with any factual findings reviewed for clear error." *United States v. Reese*, 745 F.3d 1075, 1083 (10th Cir. 2014).

**ii.**

"The law governing *Brady* claims is well established: Due process requires a new trial if the government withholds evidence that is favorable to the defendant and material to guilt or punishment." *Id.* at 1083. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence effecting credibility falls within this general rule." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)).

"[I]n order to establish a *Brady* violation, the defendant bears the burden of establishing: '1) that the prosecution suppressed evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material.'" *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995) (footnote omitted) (quoting *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir. 1994)).

The first element of a *Brady* violation stems from the government's "duty to learn of [and disclose] any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Thus, "the 'prosecution' for *Brady* purposes encompasses not only the individual prosecutor handling the case, but also extends to the prosecutor's entire office as well as law enforcement personnel and other arms of the state involved in investigative aspects of a particular criminal venture." *Sec'y of N.M. Dep't of Corr.*, 50 F.3d at 824 (citation and footnote omitted). "Accordingly, we impute knowledge of material impeachment evidence to the prosecutor for *Brady* purposes when that knowledge is in the possession of other 'agents of the

prosecution.'" *McCormick v. Parker*, 821 F.3d 1240, 1247 (10th Cir. 2016) (quoting *Sec'y of N.M. Dep't of Corr.*, 50 F.3d at 825).

*Brady*'s second element "requires proof the evidence in question was exculpatory, or favorable, to the defendant." *United States v. Combs*, 267 F.3d 1167, 1175 (10th Cir. 2001) (quoting *Sec'y of N.M. Dep't of Corr.*, 50 F.3d at 825). "Impeachment evidence . . . satisfies this standard." *Id.*

As to the third element, "[w]e have explained that 'evidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Smith v. Cain*, 565 U.S. 73, 75–76 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" *Id.* (alteration in original) (quoting *Kyles*, 514 U.S. at 434); *see Reese*, 745 F.3d at 1083 ("Put another way, we ask whether the absence of the withheld evidence at trial 'shakes our confidence in the guilty verdict.'" (quoting *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011)). "To make the materiality determination, we view the suppressed evidence's significance in relation to the record as a whole." *Cooper*, 654 F.3d at 1120 (quoting *Hughes*, 33 F.3d at 1252).

**2.**

After the jury returned its verdict against him, Mr. Dermen filed a series of motions for a judgment of acquittal or in the alternative for a new trial under Federal Rules of Criminal Procedure 29 and 33; the motions alleged, *inter alia*, the same *Brady* violations concerning the evidence related to Mr. Kazi and Mr. Sargsyan that Mr. Dermen now asserts on appeal.[15] As related to Mr. Kazi, Mr. Dermen averred that the government violated *Brady* by failing to disclose: (i) the contents of Mr. Kazi's cell phone; (ii) facts contained in a civil fraud lawsuit Mr. Kazi had filed against another individual, Santiago Garcia, and several related entities; and (iii) relevant information known to agents of a law enforcement group that was commonly known by the acronym "LA BEST."[16] Additionally, Mr. Dermen sought disclosure of the plea agreement of Edgar Sargsyan, an associate of Mr. Dermen's and Mr. Kazi's, who was indicted in the Central District of California for conspiracy to commit bank fraud, among other charges. Mr. Sargsyan's plea agreement was

---

[15] On April 7, 2020, Mr. Dermen moved for a judgment of acquittal or, in the alternative, for a new trial, based on the insufficiency of the evidence under Rules 29 and 33 of the Federal Rules of Criminal Procedure. On April 29, 2020, he submitted a supplemental Rule 33 motion for a new trial based on newly discovered evidence and to reopen discovery. Then, on May 21, 2020, he filed a supplemental motion requesting Rule 33 relief and to reopen discovery. And on August 3, 2020, he filed another supplemental motion for a new trial and to reopen discovery. The government opposed Mr. Dermen's motions. On February 10, 2021, the district court denied each of these motions.

[16] LA BEST is the acronym for the Los Angeles Border Enforcement Security Task Force. It was formed by Homeland Security Investigations ("HSI"), an arm of the Department of Homeland Security, and includes HSI agents and state and local law enforcement officers.

unsealed on April 28, 2020, after Mr. Dermen's trial had concluded. After reviewing it, Mr. Dermen argued that the government violated *Brady* by failing to disclose the plea agreement.

On February 10, 2021, the district court issued a memorandum opinion and order denying Mr. Dermen's motions for a judgment of acquittal or in the alternative for a new trial. In its opinion, the district court held that the government had not violated *Brady* by failing to disclose the information related to Mr. Kazi based on the court's findings that the government did not have an obligation to obtain an image of Mr. Kazi's cell phone, LA BEST was not part of the prosecution team in Mr. Dermen's case, and—most relevant here—the undisclosed evidence was not material to Mr. Dermen's convictions. Similarly, the district court held that Mr. Sargsyan's plea agreement was "entirely irrelevant" to Mr. Dermen's convictions and thus not material to his trial. Aplt.'s App., Vol. IV, at 831.

By way of background, we provide an overview Mr. Kazi's testimony, each of the four *Brady* issues Mr. Dermen raises on appeal, and the district court's dispositions in the following sections.

**i.**

Mr. Kazi's trial testimony focused on the facts undergirding Counts 3–7 (money laundering). The primary subject of Mr. Kazi's testimony was the $11.2 million loan that he received from Mr. Dermen in 2013, his arrangement with Mr. Dermen to repay it, and several such repayment transactions which formed the basis for Counts 3–7. According to Mr. Kazi's testimony, in 2013, he told

Mr. Dermen that he was concerned about a debt that he owed to G.E. Capital, which was collateralized, in part, by an $11.2 million personal guarantee that had come due. Mr. Kazi testified that he asked Mr. Dermen for help with the $11.2 million debt payment. Mr. Kazi stated that Mr. Dermen told Mr. Kazi "he would take care of it" and that "he was going to ask Jacob [Kingston] to send the money." Aplt.'s App., Vol. XIX, at 4438. Shortly thereafter, Washakie wired G.E. Capital $11.2 million.

Mr. Kazi also testified at length about the discussions he had with Mr. Dermen regarding repayment of the $11.2 million loan. Mr. Kazi stated that Mr. Dermen instructed him to discuss repayment matters with him alone, not with Jacob Kingston. Mr. Dermen and Mr. Kazi ultimately agreed that Mr. Kazi would pay back the $11.2 million loan to SBK USA, a company controlled by Mr. Dermen, in monthly payments of $70,000. Further, Mr. Dermen proposed the collateral structure of the loan, in which liens were placed on several of Mr. Kazi's properties, and Washakie and Lion's Aviation, another of Mr. Dermen's companies, were listed as the liens' beneficiaries. Additionally, Mr. Kazi testified that in 2013, at Mr. Dermen's direction, he opened a bank account that included Mr. Dermen as a signatory and falsely listed Mr. Dermen as an officer of one of Mr. Kazi's businesses.

Mr. Kazi testified that he deposited $2 million into the account, and Mr. Dermen later withdrew $2 million in two separate transactions. Mr. Kazi testified that he made seventeen payments totaling $3.3 million on the $11.2 million loan between February 2015 and July 2016. Subsequent testimony and documentary evidence established that the $11.2 million loan was made with fraud proceeds.

On cross-examination, defense counsel impeached Mr. Kazi's credibility at length. The defense introduced evidence that a $135 million tax assessment against Mr. Kazi had been reduced by the IRS to $500,000 on the eve of trial. This line of questioning suggested that Mr. Kazi was testifying on behalf of the government as part of an undisclosed cooperation agreement, although Mr. Kazi denied that he was doing so. Mr. Kazi also testified that he stopped making payments on the $11.2 million loan in July 2016 after an agent of the Department of Homeland Security ("DHS") had advised him to do so because of a pending investigation involving Mr. Dermen. Additionally, the defense cross-examined Mr. Kazi at length about his inconsistent grand jury testimony.

On appeal, Mr. Dermen alleges that the government violated *Brady* by failing to disclose (i) the contents of Mr. Kazi's cell phone, (ii) facts contained in a civil fraud lawsuit that Mr. Kazi filed against another individual, Santiago Garcia, and several related entities, and (iii) relevant information known to LA BEST agents. Each alleged violation and the district court's dispositions are summarized below.

**a.**

During discovery, Mr. Kazi's attorney gave the government screenshots of messages from his phone, and the government forwarded them to Mr. Dermen. Defense counsel then asked whether the government had imaged the contents of Mr. Kazi's phone. The government responded that it had not. In his motion to compel discovery, Mr. Dermen argued that the government committed a *Brady* violation by failing to create a forensic image of Mr. Kazi's cell phone and provide the data to the

defense because the phone was in the government's constructive control. The district court found no discovery violation, reasoning that the government did not have an obligation to obtain evidence from third parties.

**b.**

On March 13, 2020, after jury deliberations had begun in Mr. Dermen's trial, Mr. Kazi and an entity he controlled filed a civil lawsuit in the Southern District of Texas against Santiago Garcia, several related companies controlled by Mr. Garcia, and an unnamed individual ("John Doe")—who either was a federal law enforcement officer in the Los Angeles, California area or was impersonating one. The complaint alleged that Mr. Garcia and his companies, along with John Doe, defrauded Mr. Kazi of $3.1 million by promising to sell him government assets, including vehicles, at a discounted price. The complaint further alleged that agents of the government informed Mr. Garcia that Mr. Kazi's cooperation "in a criminal matter in Utah" was necessary if they approved the sale of various vehicles and airplanes. Aplt.'s App., Vol. III, at 634 ¶¶ 45–47 (Kazi Civil Compl., filed March 13, 2020). Mr. Dermen argued below that the facts detailed in this lawsuit were directly relevant to Mr. Kazi's credibility and motive as a witness, and that Mr. Kazi's potential belief that he "had $3 million on the line" for his cooperation with the government influenced his testimony. Aplt.'s App., Vol. III, at 616 (Def.'s Notice of Suppl. Mot. for New Trial, filed Apr. 29, 2020).

The government has maintained that it was not aware of the transactions or lawsuit between Mr. Kazi and Mr. Garcia until Mr. Dermen filed a new trial motion

asserting *Brady* claims. But in his motion to compel discovery, Mr. Dermen argued that the government's failure to notify him of the alleged scheme amounted to a *Brady* violation. Mr. Dermen asserted that the prosecution team for the government knew about the scheme because Mr. Garcia claimed that he was working with John Doe to gain access to government assets. Mr. Dermen contended that John Doe worked for LA BEST, which had independently opened its own investigation into Mr. Dermen and his associates. And based on the parallel investigations and Mr. Garcia's alleged contact with the LA BEST agent, Mr. Dermen argued that the government had constructive knowledge about Mr. Garcia's scheme against Mr. Kazi because LA BEST was functionally part of the prosecution team in Mr. Dermen's case, and, as such, the LA BEST agent's knowledge was imputed to the government.

The district court rejected Mr. Dermen's theory. Specifically, the court found that the government did not violate its discovery obligations because LA BEST was not part of the government's prosecution team related to the instant offenses, and, additionally, that evidence of the alleged Garcia scheme was not material to Mr. Dermen's case.

**c.**

In his motion to compel, Mr. Dermen also sought from the government all materials related to the LA BEST investigation of him conducted in Los Angeles, including any memoranda of the interviews conducted by LA BEST agents. The district court denied his request, finding that "members of LA BEST . . . are not members of the prosecution team in this case." Aplt.'s App., Vol. IV, at 840.

**ii.**

Mr. Dermen also sought production of Mr. Sargsyan's plea agreement. Mr. Sargsyan acted as Mr. Dermen's lawyer, owned Pillar Law Group, and was CEO of SBK USA from late 2014 until 2016. Notably, Pillar Law Group served as an intermediary between Mr. Kazi and SBK USA for some of Mr. Kazi's loan repayments to Mr. Dermen. Importantly, however, Mr. Sargsyan did not testify in Mr. Dermen's trial.

Before trial, Mr. Dermen sought discovery of a plea agreement that Mr. Sargsyan entered into in a separate case brought by the U.S. Attorney's Office for the Central District of California ("USAO-CDCA"). In the agreement, Mr. Sargsyan pleaded guilty to conspiracy to commit bank fraud, bribing two federal officials, and making false statements to federal officials. The conspiracy involved nearly $1 million in fraudulent credit card charges, which were paid, in part, to Pillar Law Group.

On January 29, 2020, the government informed Mr. Dermen that the prosecution team had received a copy of Mr. Sargsyan's plea agreement from USAO-CDCA, reviewed the agreement, and determined that it did not contain any discoverable information; therefore, the government declined to produce the agreement absent a court order. After the parties raised the issue during trial, the district court ordered *ex parte* briefing regarding the discoverability of the plea agreement and ordered the government to submit *ex parte* a summary of the relevant facts contained in the "Factual Basis" section of the plea agreement.

After reviewing these submissions, the district court determined that the plea agreement and the facts contained therein were irrelevant and thus not discoverable. As pertinent here, the district court said the following:

> *The court finds that Mr. Sargsyan's plea agreement is simply not relevant to the case on trial.* Nothing in the factual basis for the plea relates in any way to charges against [Mr. Dermen] or to the payments . . . that were deposited into the client trust account of the Pillar Law Group for the benefit of [Mr.] Dermen. Rather, they relate to completely independent schemes in which Mr. Sargsyan was involved; schemes that are wholly unrelated to [Mr.] Dermen or to the money laundering counts asserted against him here.
>
> The Court was initially persuaded by the [d]efense's argument that the plea agreement would help show that it was Mr. Sargsyan, and not [Mr.] Dermen, who had received the interest payments on the $11.2 million loan . . . . However, after carefully reviewing the plea agreement in light of the [d]efense's theory as articulated in its *ex parte* briefing, the Court does not see any evidence within the factual basis that is at all relevant to this theory. In fact, *the plea agreement does not contain any references to the loan or interest payments associated with it. Thus, the Court finds that the agreement has no potential exculpatory value.*

Aplt.'s App., Vol. VII, at 1406 (Order Regarding Denial of Defense Mot. to Compel Produc. of Witness Plea Agreement, filed March 13, 2020) (emphases added).

After trial, the plea agreement was filed publicly, and the defense reviewed it. In a subsequent motion, Mr. Dermen argued that the government's failure to disclose the plea agreement violated *Brady* because the information contained in the plea agreement impacted Mr. Dermen's decision not to call Mr. Sargsyan in his case-in-chief. The district court denied Mr. Dermen's motion, again finding that the factual basis for Mr. Sargsyan's plea agreement was "simply not relevant" to Mr. Dermen's case because the facts related to "completely independent schemes in which Mr.

Sargsyan was involved; schemes wholly unrelated to [Mr.] Dermen or the money laundering counts asserted against him here." Aplt.'s App., Vol. IV, at 836 (quotation omitted). "In short," the district court concluded, "the Sargsyan plea agreement evidence was not material because there is not a reasonable probability that the result of the trial would have been different if the evidence had been disclosed to [Mr. Dermen]." *Id.* at 837.

**3.**

Mr. Dermen challenges the district court's findings on appeal. Specifically, Mr. Dermen argues that the district court erred by failing to compel disclosures of evidence under *Brady* regarding Mr. Kazi—that is, the contents of Mr. Kazi's phone, the facts contained in Mr. Kazi's lawsuit against Mr. Garcia, and information known by LA BEST agents—and also Mr. Sargsyan's plea agreement. Mr. Dermen maintains that this evidence was exculpatory and would have undermined confidence in the jury's verdict.

We are unpersuaded by these arguments. Mr. Dermen's *Brady* arguments fail on materiality grounds—*viz.*, Mr. Dermen fails to show that "the absence of the withheld evidence at trial 'shakes our confidence in the guilty verdict.'" *Reese*, 745 F.3d at 1083 (quoting *Cooper*, 654 F.3d at 1120). Even though the district court did not always reach the materiality question in rejecting Mr. Dermen's *Brady* challenges, "it is axiomatic that ordinarily we may affirm on 'any ground that finds support in the record.'" *United States v. Garcia*, 946 F.3d 1191, 1207 (10th Cir. 2020) (quoting *United States v. Richards*, 27 F.3d 465, 468 (10th Cir. 1994)).

Accordingly, we proceed to discuss and reject each of Mr. Dermen's *Brady* challenges—concluding that he cannot make a sufficient showing of materiality.

**i.**

Mr. Dermen argues that Mr. Kazi's credibility was material because he "was a key witness regarding five of [the] ten counts of the indictment." Aplt.'s Opening Br. at 64. And he maintains that "[t]he details of [Mr.] Kazi's deal with [Mr.] Garcia, obtaining high-value assets at below market prices in exchange for cooperation against [Mr.] Dermen wholly undermined any credible accusation [Mr.] Kazi made against [Mr.] Dermen at trial." *Id.* at 64–65. Moreover, Mr. Dermen continues, the "treasure trove of exculpatory information that was on [Mr.] Kazi's phone" including "communications with [Mr.] Garcia . . . and LA[ ]BEST agents . . . could have been used to cross-examine [Mr.] Kazi and IRS [Special Agent] Washburn to . . . 'attack [] the integrity of the investigation.'" *Id.* at 65 (quoting *Kyles*, 514 U.S. at 435). Stated succinctly, Mr. Dermen argues that the details of Mr. Kazi's deal with Mr. Garcia, information about the LA BEST investigation, and the image of Mr. Kazi's phone were material as impeachment evidence.

It is well-established that "[i]mpeachment evidence is considered exculpatory for *Brady* purposes." *United States v. Torres*, 569 F.3d 1277, 1282 (10th Cir. 2009). But we are mindful that impeachment evidence "may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Cain*, 565 U.S. at 76. We assume without deciding here that the Kazi evidence at issue could be

deemed favorable and suppressed for purposes of *Brady*. And thus the narrow question presented is whether this evidence's "significance in relation to the record as a whole" would cause it to "shake[] our confidence in the guilty verdict"—that is, whether the evidence can be properly considered material. *Cooper*, 654 F.3d at 1120 (first quoting *Hughes*, 33 F.3d at 1252; and then quoting *United States v. Smith*, 534 F.3d 1211, 1223 (10th Cir. 2008)).

Mr. Dermen cannot make this materiality showing. This is so for two reasons. The first—and most persuasive—reason is that Mr. Kazi's testimony was corroborated by voluminous evidence presented at trial. More specifically, Mr. Kazi's testimony about the loan transactions underlying Counts 3–7 was corroborated by extensive witness testimony and documentary evidence, including testimony from Jacob and Isaiah Kingston and corroborative bank records showing that, at Mr. Dermen's direction, Jacob Kingston used fraud proceeds to transfer $11.2 million from Washakie to Mr. Kazi's creditor. It was also supported by testimony from Jacob Kingston and corroborative documentary evidence demonstrating that Mr. Dermen and Mr. Kazi agreed that repayment would flow to Mr. Dermen. Mr. Dermen argues that Jacob and Isaiah Kingston both had "substantial credibility problems." Aplt.'s Opening Br. at 66. But their testimony, too, was corroborated by IRS Special Agent Washburn's summary evidence and volumes of financial records. Thus, Mr. Kazi's testimony hardly stood alone as proof of Mr. Dermen's guilt as to Counts 3–7; rather, his testimony was extensively corroborated by "the record as a whole." *Cooper*, 654 F.3d at 1120 (quoting *Hughes*, 33 F.3d at 1252).

The second reason that Mr. Dermen cannot show materiality is that Mr. Kazi was thoroughly impeached as a witness at trial. Specifically, Mr. Kazi recanted portions of his grand jury testimony on direct. And on cross-examination, the defense further impeached him with questions about: the alleged agreement with the IRS to reduce a $135 million civil tax assessment against him to $500,000 on the eve of trial, his admission that he stopped making payments on the loan in 2016 based on information he received from a federal agent, and his inconsistent grand jury testimony. Let's accept for purposes of argument the (questionable) assumption, as Mr. Dermen contends, that the additional impeachment evidence that Mr. Dermen sought would not have been merely cumulative but, instead, would have provided a new basis for impeachment. *See Cooper*, 654 F.3d at 1120 ("[E]vidence that provides a new basis for impeachment is not [considered] cumulative and could well be material." (second alteration in original) (quoting *United States v. Robinson*, 583 F.3d 1265, 1273 (10th Cir. 2009))). Even so, in light of the extensive impeachment that Mr. Kazi was otherwise subjected to, we have difficulty discerning how additional lines of impeachment would have significantly altered the jury's overall perception of Mr. Kazi's credibility.

Specifically, the jury would have already been aware of—and had an opportunity to factor into its verdict—the fact that Mr. Kazi had significant credibility problems based on his alleged side deals with the government, Mr. Kazi's incentives to testify against Mr. Dermen, and his prior inconsistent statements. In other words, we are hard pressed to believe that there is a reasonable probability that

the additional impeachment evidence that Mr. Dermen proffers would have significantly altered the calculus of the jury's decision-making, such that the absence of this evidence would undermine confidence in the outcome.

According to Mr. Dermen, *United States v. Torres*, 569 F.3d 1277 (10th Cir. 2009), should guide our analysis. We disagree. There, the defendant filed a motion for a new trial under Federal Rule of Criminal Procedure 33, claiming that the government suppressed certain evidence relating to a confidential informant ("CI"). *See id.* at 1278–80. The defendant's conviction arose out of a controlled methamphetamine buy with the CI. *See id.* at 1279. In his motion for a new trial, the defendant argued that he was entitled to a new trial based on his discovery of impeachment evidence related to the CI, which the government had failed to disclose prior to his trial. *See id.* at 1280. The district court denied the motion because the evidence was "merely impeaching," and the defendant appealed. *Id.* at 1278, 1282. We reversed, holding that "[m]erely because other impeachment evidence was presented does not mean that additional impeachment evidence is cumulative; rather, this is a case where the agents' identification is weak at best and no physical evidence exists to link the defendant to the alleged crime." *Id.* at 1284. Mr. Dermen argues that *Torres* is dispositive because here, as in *Torres*, "[Mr.] Kazi's undisclosed bias against [Mr.] Dermen would have placed 'the whole case in such a different light as to undermine confidence in the verdict.'" Aplt.'s Opening Br. at 66–67 (quoting *Kyles*, 514 U.S. at 435).

But the circumstances of this case are a far cry from those in *Torres*. Consequently, Mr. Dermen's reliance on *Torres* is unavailing. Specifically, *Torres* involved impeachment evidence that undermined the credibility of a witness whose testimony was the *primary evidence* linking the defendant to the basis of the crime (i.e., the narcotics buy at issue). *See id.* at 1284 ("The government's near-total reliance on the testimony of the CI to establish that [Defendant] was indeed the person participating in the controlled buy requires a new trial."). Mr. Dermen's *Brady* argument stands in stark relief. Unlike the CI in *Torres*, Mr. Kazi's testimony was only a small part of the evidence that the government used to establish Mr. Dermen's guilt of Counts 3–7; that testimony was extensively corroborated by other witness testimony and documentary evidence. This was not a situation, as in *Torres*, where the government's proof was "weak at best" and "no [other] evidence exists to link the defendant to the alleged crime." *Id.*

For the foregoing reasons, we conclude that Mr. Dermen's *Brady* arguments related to Mr. Kazi are unpersuasive. In our view, the district court did not err in finding that the government did not violate *Brady*; the evidence at issue was not material.

**ii.**

Mr. Dermen argues that Mr. Sargsyan's plea agreement was material with respect to Counts 3–7 because "evidence of Sargsyan's own criminal conduct and his efforts to incriminate [Mr.] Dermen to save himself would have undermined the government's narrative that [Mr.] Sargsyan was acting in concert with Jacob

[Kingston] and [Mr.] Dermen to launder funds" through Pillar Law Group and SBK USA. Aplt.'s Opening Br. at 70. But to the extent that facts from the plea agreement would have come into evidence, it is unclear from Mr. Dermen's arguments how they would "shake[] our confidence in the guilty verdict[s]" for Counts 3–7. *Reese*, 745 F.3d at 1083.

At the outset, we note that Mr. Dermen's materiality argument is strongly undercut by the fact that Mr. Sargsyan did not testify as a witness at trial; in other words, there was no testimony to impeach. Rather, Jacob and Isaiah Kingston, Mr. Kazi, and IRS Special Agent Washburn testified as to the transactions between Pillar Law Group and SBK USA.

Moreover, Mr. Sargsyan's role in the money-laundering scheme at issue was comparatively minor. Mr. Sargsyan owned Pillar Law Group and served as CEO of SBK USA, which was owned by Mr. Dermen. Pillar Law Group served as an intermediary for three of the loan repayments—those at issue in Counts 4, 5, and 6. Those funds were ultimately transferred to an account of Mr. Dermen's company, SBK USA. Pillar Law Group's intermediary role in the money laundering scheme was thus comparatively minor—and, as noted, evidence necessary to establish that role did not depend on Mr. Sargsyan's testimony. And more importantly, it is far from obvious why Mr. Sargsyan's involvement in a *separate* bank fraud scheme would have had any bearing on his participation in those repayment transactions.

In sum, Mr. Sargsyan did not play a sufficiently significant role—in the offense conduct or the trial itself—for the facts in his plea agreement to be relevant.

Therefore, Mr. Dermen has not made a sufficient showing for us to find error in the district court's determination that Mr. Sargsyan's plea agreement was not discoverable. We agree with the district court: "in relation to the record as a whole," *Cooper*, 654 F.3d at 1120, Mr. Sargsyan's plea agreement was not material because it is irrelevant to Mr. Dermen's case.

* * *

Because the unproduced evidence concerning Mr. Kazi and Mr. Sargsyan was not material, we find no error in the district court's determination that no *Brady* violation occurred.

### D. *Alleged Improper Expert Witness Testimony*

Mr. Dermen argues that the district court erred by admitting improper expert testimony under the guise of summary testimony four times. Specifically, he asserts that an IRS Special Agent improperly testified based on technical methods and specialized knowledge and experience when he opined that the funds involved in Mr. Dermen's financial transactions were proceeds of specified unlawful activities.

At the outset, however, we conclude that only two of Mr. Dermen's expert-testimony arguments are preserved. Concerning the merits of those arguments that are properly before us, we conclude that the district court did not abuse its discretion in admitting the summary testimony over Mr. Dermen's objection. Accordingly, Mr. Dermen's expert witness arguments are unavailing.

**1.**

**i.**

"The Tenth Circuit 'review[s] de novo whether the district court applied the proper standard in admitting expert testimony.'" *United States v. Cushing*, 10 F.4th 1055, 1078 (10th Cir. 2021) (alteration in original) (quoting *United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012)). "We then review the trial court's actual application of the standard in deciding whether to admit or exclude an expert's testimony for abuse of discretion." *Id.* at 1078–79 (quoting *United States v. Roach*, 582 F.3d 1192, 1206 (10th Cir. 2009)); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1212 (10th Cir. 2011) ("We review a district court's determination regarding the admissibility of evidence under an abuse of discretion standard." (quoting *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008))). "If we conclude that the district court abused its discretion in admitting the testimony, we must then determine whether the error was harmless." *James River*, 658 F.3d at 1206. "An erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *Id.* (quoting *United States v. Yeley–Davis*, 632 F.3d 673, 685 (10th Cir. 2011)); *accord United States v. Dazey*, 403 F.3d 1147, 1167 (10th Cir. 2005).

"[I]f the defendant did not make a contemporaneous objection to the admission of testimony . . . then the district court's decision is reviewed for plain error," *United States v. Brooks*, 736 F.3d 921, 929–30 (10th Cir. 2013)—provided the defendant argues for plain error on appeal, *In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th

1126, 1181 (10th Cir. 2023) (explaining that "one also may waive appellate review of an issue by not arguing it"). To prevail under the plain error standard, Mr. Dermen must show "(1) error, (2) that is plain [i.e., clear or obvious], which (3) affects his substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1260 (10th Cir. 2020) (quoting *United States v. Adams*, 888 F.3d 1134, 1136 (10th Cir. 2018)); *accord United States v. Olano*, 507 U.S. 725, 732 (1993).

"Our preservation rules are part of the 'winnowing process' of litigation that permits a court to 'narrow what remains to be decided.'" *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (quoting *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 n.6 (2008)). Under that process, "[w]hen an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise." *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). Similarly, "we generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived." *Id.* at 1197. However, our preservation rules are discretionary. "[W]hen an error is obvious enough and satisfies Federal Rule of Criminal Procedure 52(b), we may exercise our discretion to recognize the error 'notwithstanding briefing deficiencies.'" *Id.* at 1198 (quoting *United States v. Courtney*, 816 F.3d 681 (10th Cir. 2016)). "But we will only exercise our discretion if it 'permit[s] the appellee to be heard and the

adversarial process to be served.'" *Id.* (alteration in original) (quoting *United States v. Isabella*, 918 F.3d 816, 844 (10th Cir. 2019)).

**ii.**

Mr. Dermen's challenges concern Federal Rules of Evidence 1006, 701, and 702. Federal Rule of Evidence 1006 permits the use of a "summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." A summary, chart, or calculation must be based on admissible documents, but those documents need not be actually admitted. *See United States v. Samaniego*, 187 F.3d 1222, 1223 (10th Cir. 1999) ("The materials upon which the summary is based need not themselves be admitted into evidence. Admission of summaries, however, is conditioned on the requirement that the evidence upon which they are based, if not admitted, must be admissible." (citation omitted)).

Federal Rule of Evidence 701 establishes the requirements for lay witness testimony. Under Rule 701, lay witness testimony must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Federal Rule of Evidence 702, in turn, provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if," *inter alia*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

The relationship between Rules 701 and 702 is central to Mr. Dermen's challenge. The two rules create a distinction between lay testimony, which is circumscribed by Rule 701, and expert testimony, which is subject to Rule 702. "Rule 701 'does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness.'" *James River*, 658 F.3d at 1214 (quoting *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 846 (10th Cir. 1979)). Therefore, a witness can testify under Rule 701 to "elementary mathematical operations," *id.*; however, opinions based on "technical judgment" and "[k]nowledge derived from previous professional experience fall[] squarely within the scope of Rule 702 and thus by definition outside of Rule 701," *id*. at 1215; *see also Cristerna-Gonzalez*, 962 F.3d at 1259 (10th Cir. 2020) ("Although a law-enforcement officer's testimony based on knowledge *derived from the investigation of the case at hand* is typically regarded as lay testimony, opinion testimony premised on the officer's professional experience *as a whole* is expert testimony." (emphasis added)). Rule 702 "'establishes a standard of evidentiary reliability' and places the trial court in the role of gatekeeper." *Cushing*, 10 F.4th at 1079 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)).

**2.**

**i.**

Before trial, the government notified Mr. Dermen that it intended to introduce summary exhibits and testimony. The summary exhibits were charts and tables,

which were to be used to diagram and aggregate transactions that took place between various actors in the alleged biofuel tax credit fraud. The summary exhibits were based on underlying financial documents and other documentary evidence. Summary witness testimony was to be offered to explain the charts and tables.

Mr. Dermen objected to some of the summary exhibits on the grounds that they were argumentative and unduly prejudicial. The district court provisionally admitted the exhibits, finding that "organizing the complex financial information in a graphic presentation is not argumentative under Rule 1006," and "the risk of confusing the jury does not substantially outweigh the probative value of the diagrams at issue." Aplee.'s Suppl. App., Vol. V, at 975 (Order Regarding Def.'s Objs. to Gov't's Ex. List, dated Jan. 24, 2020). Notably, Mr. Dermen did not object to any of the documents *underlying* the summary exhibits, nor did he argue that the summary exhibits or proposed testimony were improper under Federal Rules of Evidence 701 or 702.

Pursuant to the district court's order, IRS Special Agent Washburn was sworn in as a summary witness for the government on March 3, 2020. Agent Washburn testified that he was present in his capacity as "the designated representative for the government," pursuant to his duties as an agent of the IRS, which included "investigat[ing] [] potential violations of the United States tax code as well as other related financial crimes, such as money laundering" and "prov[ing] or show[ing] that funds that were obtained through a specified unlawful activity were used in a financial transaction." Aplt.'s App., Vol. XXI, at 5016–17. Agent Washburn

explained that he received specialized money-laundering training as a component of his training as an agent.

Agent Washburn testified that he was asked to review numerous summary exhibits—some of which were prepared by him and some of which were prepared by other IRS investigators—to verify their accuracy. He also explained that he had reviewed the documentary evidence underlying the summaries—including bank records, IRS records, and records from an online trading company. In total, Agent Washburn reviewed records from fifty-five different bank accounts, and his four-day testimony focused on charts and tables that summarized these documents. He testified on direct examination about the summary exhibits and their preparation, and he was extensively cross-examined about his methodology and the transactions summarized in the exhibits.

**ii.**

The parties agree that Mr. Dermen made two contemporaneous objections to Agent Washburn's testimony, on the theory that Agent Washburn was improperly testifying as an expert. The first occurred on direct examination. Agent Washburn was testifying as to Government Exhibit 2-2, a table summarizing various transfers between Washakie and SBK USA, and the documents underlying the table, which included various wire transfer and bank deposit receipts. Government Exhibit 2-2 related to a summary exhibit, Government Exhibit 10-1, that depicted the flow of funds, including fraud proceeds, that were used to purchase the Huntington Beach house, as charged in Count 10.

Explaining the exhibit, Agent Washburn testified that he traced the March 20, 2015, transfer of $8,550,000 from Washakie to SBK USA back to "two $82 million [U.S. Treasury] checks," ($164 million, in total), which "were deposited into the Washakie account" four days prior. Aplt.'s App., Vol. XXI, at 5044. The two Treasury checks Agent Washburn referenced were relevant because they were evidence of fraud proceeds derived from the biofuel tax credit scheme.

Defense counsel's first objection followed thereafter:

> [THE GOVERNMENT:] How certain are you that this 8.55 million -- how certain are you that that came from the proceeds of one of these claims made to the Internal Revenue Service?
>
> MR. GERAGOS: There's an objection as to certainty. . . . It's meaningless. He's not here as an expert. He's here as a summary witness.
>
> THE COURT: Why don't you rephrase it.
>
> [THE GOVERNMENT:] Is there any doubt in your mind that this 8.55 million came from the two Treasury checks that were deposited four days earlier?
>
> MR. GERAGOS: Same objection, no foundation. He's not an expert.
>
> THE COURT: Overruled.
>
> THE WITNESS: No.

*Id.* at 5045–46. The objected-to testimony and exhibit were introduced by the government as one of several transactions that laid an evidentiary foundation for the money laundering alleged in Count 10.

Mr. Dermen made his second contemporaneous objection during Agent Washburn's continued direct examination the next day. Agent Washburn was

testifying as to Government Exhibit 8-1, which is a chart summarizing the flow of funds for the purchase of the Sandy, Utah house and the financial documents underlying it.

Mr. Dermen's objection proceeded as follows:

> [THE GOVERNMENT:] [L]et's go back to the right-hand side of [Government Exhibit] 8-1. Based on your review of the underlying financial records here, the right-hand side, was the $3 million that was used to pay off the $3 million loan in account number 1352, were you able to trace that back to U.S. Treasury checks?
>
> [THE WITNESS:] Yes. Those are proceeds from Treasury deposits.
>
> MR. GERAGOS: Objection. He's not only not a summary witness, he's an expert.
>
> THE COURT: Overruled.

Aplt.'s App., Vol. XXI, at 5117. This objected-to testimony was related to the money laundering alleged in Count 8.

**iii.**

Additionally, Mr. Dermen points us to a third and fourth objection; however, the government contends that these objections do not constitute viable challenges under Rule 702.

The third objection occurred on March 9, during the government's redirect examination of Agent Washburn and after Mr. Dermen's cross-examination. During a colloquy between the parties and the court, out of the presence of the jury, defense counsel recalled his prior objection, Aplt.'s App., Vol. XXIII, at 5479 ("[D]uring the testimony of this witness, I had objected that not only was he testifying as a summary

witness but also as an expert. The Court overruled that objection."), and asked for clarification from the government as to whether Agent Washburn was testifying as a fact witness or summary witness. Specifically, defense counsel expressed concern on whether he had received mixed signals on the subject: "Apparently [Agent Washburn] is no longer a summary witness which is news to me because we have now done the direct and the cross and we're on redirect and apparently now the Government takes the position that he is not a summary witness." *Id.* at 5480.

The government offered the following clarifications:

> [THE GOVERNMENT:] We have just an issue of semantics. Of course we all agree that [Agent] Washburn is testifying to summaries which sometimes is colloquially called summary witness. But the summaries that he is testifying to are summaries of financial analysis that he has either done or meticulously adopted.
>
> So it is still factual testimony but it's factual testimony that is substantially aided by the use of summaries.

*Id*. at 5488. The government further clarified that Agent Washburn was "summarizing [] the financial analysis that he did, or the financial analysis of other agents on a team that he has meticulously checked and adopted"—not "summarizing trial testimony." *Id.* at 5489–90.

The fourth and final objection occurred later that day, also during the government's redirect examination. Agent Washburn was testifying about Government Exhibit 10-2, which is a flow chart summarizing the flow of funds used to purchase the Huntington Beach house, and about the documents underlying the summary. The objection proceeded as follows:

> [THE GOVERNMENT:] Did the method that you used to trace the funds emanating from the U.S. Treasury checks obtained pursuant to the mail fraud scheme take into consideration some of the transactions in these accounts or all of them?
>
> [THE WITNESS:] All of them.
>
> * * *
>
> [THE GOVERNMENT:] What is the name of the method? Does it have a name of the method that you used when you analyzed the financial transactions in the Washakie accounts, United Fuel Supply accounts and the Merrill Lynch account?
>
> MR. GERAGOS: Objection, calls for an expert conclusion.
>
> THE COURT: Well, I think he can testify as to what he did. I don't know that the name is particularly important.
>
> [THE GOVERNMENT:] All right.
>
> THE COURT: So I'll *sustain the objection* to that extent.

Aplt.'s App., Vol. XXIII, at 5510–11 (emphasis added).

Mr. Dermen does not cite to any other specific objections on the record.

**iv.**

The district court included the following jury instruction as to Agent Washburn's summary tables, charts, and testimony:

> Certain summaries have been admitted into evidence and certain witnesses have testified as to those summaries. Such testimony and exhibits are received in evidence where voluminous writings, documents and records are involved. You may consider these summaries and testimony as you would any other evidence admitted during the trial and give them such weight or importance, if any, you feel they deserve. In making that decision, you may consider evidence about the way in which they were prepared.

Aplt.'s App., Vol. II, at 295 (Final Jury Instrs., filed Mar. 10, 2020).

**3.**

**i.**

Before we reach the merits of Mr. Dermen's challenges to Agent Washburn's testimony, we briefly address Mr. Dermen's lack of preservation as to the third and fourth objections discussed *supra*. The government contends that those objections were not based on Rule 702—which is the rule that Mr. Dermen invokes on appeal. We agree. The third purported objection merely sought clarification as to whether Agent Washburn was testifying as a fact witness or a summary witness, and the government clarified he was testifying as the latter. Defense counsel's general reference to a prior Rule 702 expert-witness objection did not constitute a new, contemporary Rule 702 objection. And, as the government notes, the fourth objection "was an objection to [Agent] Washburn naming the method he used to analyze various financial transactions, *which the court sustained*." Aplee.'s Resp. Br. at 92 n.13 (emphasis added). So, Mr. Dermen has no grounds for complaint as to the fourth objection.

Accordingly, we turn to the merits of the two Rule 702 objections that Mr. Dermen has preserved for our review. Our review is for abuse of discretion. *See James River*, 658 F.3d at 1212.

**ii.**

We consider Mr. Dermen's contention that Agent Washburn's objected-to testimony was improper expert witness testimony under Federal Rule of Evidence 702. Mr. Dermen marshals two arguments. First, he argues that the objected-to

testimony transcended elementary mathematical operations into the realm of technical, specialized knowledge. Second, Mr. Dermen asserts that Agent Washburn's testimony runs afoul of our decision in *James River* because his testimony about "tracing" fraud proceeds was improperly based on his accounting expertise, IRS experience, and specialized training in money laundering.[17]

**a.**

We consider each of Mr. Dermen's arguments in turn—*viz.*, that Agent Washburn's testimony about "tracing" fraud proceeds (1) transcended elementary

[17] Mr. Dermen argues that "[f]inancial testimony including tracing akin to [Agent] Washburn's has been reviewed by this court as expert testimony," in *United States v. [Raymond] Torres*, 53 F.3d 1129 (10th Cir. 1995), and *United States v. Kaatz*, 705 F.2d 1237 (10th Cir. 1983). Aplt.'s Opening Br. at 76–77. In *[Raymond] Torres*, the government used an IRS special agent as an expert witness and did not present the agent as a summary witness. *See* 53 F.3d at 1141–42. In *Kaatz*, the government chose to qualify an IRS special agent as an expert witness prior to presenting summary testimony. *See* 705 F.2d at 1245. But neither case speaks to the issue presented in Mr. Dermen's case—that is, whether an IRS agent's *summary* testimony as to "tracing" fraud proceeds is proper under Rule 701. A summary witness does not necessarily need to be qualified as an expert witness under our law. *See United States v. Ray*, 370 F.3d 1039, 1042, 1048 (10th Cir. 2004), *cert. granted, judgment vacated*, 543 U.S. 1109 (2005), and *opinion reinstated in part*, 147 F. App'x 32 (10th Cir. 2005) (affirming the district court's decision to admit summary testimony and charts from a non-expert witness, a law enforcement officer, in a "particularly complex" drug case, where the witness "present[ed] summary testimony and exhibits regarding the activities of the alleged conspiracy and the amounts of drugs for which each defendant was responsible"); *see also United States v. Proctor*, 166 F.3d 349, 1998 WL 812057, at *4 (10th Cir. 1998) (unpublished) (finding no abuse of discretion where a district court admitted "various summaries based on evidence which had already been admitted during the trial" and allowed the IRS special agent who prepared them to testify as a non-expert witness as to "the process by which he compiled the summaries," which included "invoices . . . and checks"). Therefore, *[Raymond] Torres* and *Kaatz* are inapposite to the narrow issue presented here.

mathematical operations into the realm of technical, specialized knowledge and (2) was improperly based on his accounting expertise, IRS experience, and specialized training in money laundering.

Mr. Dermen rests his arguments on *James River*. There, we identified four factors to guide our review. *See James River*, 658 F.3d at 1214. First, we considered whether the testimony met the requirements of Rule 701—that is, whether the testimony was "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." FED. R. EVID. 701; *accord James River*, 658 F.3d at 1213. Second, we asked whether the testimony was based on professional experience. *See James River*, 658 F.3d at 1215. We explained that lay witnesses may rely on "a limited amount of expertise," provided their "opinions or inferences . . . could be reached by any ordinary person." *Id.* at 1214 (first quoting *United States v. VonWillie*, 59 F.3d 922, 929 (9th Cir. 1995); and then quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004)). Third, we looked to whether the expert relied on "a technical report by an outside expert." *Id.* at 1215. Fourth, we considered how the Federal Rules of Evidence generally classify the testimony at issue. *See id.*

Applying these factors, we held that the district court abused its discretion in admitting as lay opinion testimony what was in fact expert opinion testimony "based on technical or specialized knowledge." *Id.* at 1214, 1222. The facts of *James River* concerned a purported lay witness testifying regarding a "dilapidated, condemned,

[thirty-nine]-year old" building's value. *Id.* at 1214. The witness used a report authored by a construction company he had hired and a "depreciation factor" as the basis for his opinion. *Id.* at 1211–12. Applying the four factors enumerated *supra*, we found that this was improper expert opinion testimony. *See id.* at 1214. In reversing the district court's decision to admit the testimony, we explained that the witness's reliance on the report transcended "his own professional experience," *id.* at 1215, and the witness's depreciation calculations crossed the threshold from lay to expert testimony because the calculations required "[t]echnical judgment . . . in choosing among different types of depreciation." *Id.* at 1214. We also concluded that the witness's professional experience as a licensed real estate broker left him "better situated" than the ordinary property owner to offer valuation testimony. *Id.* at 1215. Lastly, we noted that "the Federal Rules of Evidence generally consider landowner testimony about land value to be expert opinion." *Id.* We now consider each of Mr. Dermen's arguments through the lens of *James River*.

**b.**

We first address Mr. Dermen's argument that the objected-to "tracing" testimony improperly transcended elementary mathematical operations to require technical, specialized knowledge. This argument implicates the first *James River* factor—whether the testimony satisfies the requirements of Rule 701.

In *James River*, we contrasted two of our prior decisions to illustrate the distinction between proper and improper calculations in lay testimony. *See id.* at 1214. The first was *Bryant v. Farmers Insurance Exchange*, 432 F.3d 1114 (10th

Cir. 2005). In *Bryant*, we considered whether the district court had properly excluded large portions of an affidavit at summary judgment as inadmissible under the Federal Rules of Evidence. *See id.* at 1121. The affidavit stated that the affiant had personally reviewed 103 audit reports, compiled data from the reports into a spreadsheet, and calculated the averages of several numerical scores that were included in the audit data. *See id.* We concluded that the district court's exclusion of portions of the affidavit was improper, explaining that:

> The Federal Rules of Evidence clearly permit the contents of voluminous writings to be presented in the form of a "chart, summary, or *calculation*." Fed. R. Evid. 1006 (emphasis added). Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy. A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701.

*Id*. at 1124.

In *James River*, we contrasted *Bryant* with *LifeWise Master Funding v. Telebank*, 374 F.3d 917 (10th Cir. 2004). In *LifeWise*, we concluded that the chief executive officer ("CEO") of a company who lacked the qualifications to testify as an expert could not offer opinion testimony on the company's lost profits as a lay witness because he lacked "sufficient personal knowledge . . . of the factors on which [he] relied to estimate lost profits." 374 F.3d at 929. The CEO's estimates of lost profits were based on sophisticated economic models. *See id.* at 928–29. Though we suggested the CEO could offer lay testimony if he based his "valuations . . . on straightforward, common sense calculations," we explained that he could not testify

to the "rolling averages, S-curves, and compound growth rates" that the CEO admitted he had not personally used but which nevertheless informed his estimates. *Id.* at 929–30.

Distilling these prior holdings, we explained in *James River* that whereas "a witness should [] be[] permitted under Rule 701 to testify to elementary mathematical operations," like the "simple average" we considered in *Bryant*, a witness may not testify about more "technical, specialized subjects," like the "sophisticated economic models" at issue in *LifeWise*, which employed "moving averages, compounded growth rates, and S-curves." *James River*, 658 F.3d at 1214 (quotations omitted) (first citing *Bryant*, 432 F.3d at 1124; and then citing *LifeWise*, 374 F.3d at 929). Therefore, as applied to the case before the court there, we concluded in *James River* that a witness may not calculate depreciation under Rule 701 because that operation "requires more than applying basic mathematics," and "[t]echnical judgment is required in choosing among different types of depreciation." *Id.*

Applying *James River*—particularly its discussion of *Bryant* and *LifeWise*—to Mr. Dermen's first argument, we conclude that the objected-to "tracing" testimony is proper testimony under Rule 701. More specifically, that testimony is more akin to taking a simple average (in the vein of *Bryant*) than testifying about a more complex mathematical model (like *LifeWise* and *James River* itself).

Agent Washburn explained his "tracing" methodology during an exchange following Mr. Dermen's fourth objection. Although Mr. Dermen's fourth objection itself is not properly before us—for the reasons that we discussed *supra*—we believe

that this exchange is illuminating for our analysis of Mr. Dermen's preserved objections. Describing the process he used to create the summary chart in Government Exhibit 10-2 (the chart summarizing the flow of funds used to purchase the Huntington Beach house), Agent Washburn testified that he used "a spreadsheet of all the transactional data from [] various accounts" to "maintain a balance" of fraud proceeds. Aplt.'s App., Vol. XXIII, at 5512. For each withdrawal, he would "reduce [the] [fraud] proceeds balance" and then "follow that money to the next account . . . and [update the] balance on that [subsequent] account." *Id.* Simply put, "whenever money was withdrawn, that [account's] balance would be reduced" and "[w]henever money that [he] could trace back to [fraud] proceeds was deposited, th[e] balance would go up." *Id.* at 5513. In other words, Agent Washburn's "tracing" method amounted to balancing the ledgers of a fifty-five-account checkbook.

Though undoubtedly laborious in its implementation, this methodology hardly requires "technical or specialized knowledge" to execute. *James River*, 658 F.3d at 1214. To the contrary, "anyone with a grade-school education" can use addition, subtraction, and a spreadsheet to summarize bank account ledgers. *Bryant*, 432 F.3d at 1124; *see also James River*, 658 F.3d at 1214 ("[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." (quoting *LifeWise*, 374 F.3d at 929)). Of course, repeating this process across more than fifty accounts to trace fraud proceeds involves a certain level of volume-based complexity. But summaries of

"voluminous" evidence are precisely the kind of testimony that Rule 1006 contemplates, FED. R. EVID. 1006 (permitting the use of a "summary, chart, or calculation offered to prove the content of voluminous admissible writings . . . that cannot be conveniently examined in court"), and, akin to *Bryant*, that kind of volume-based complexity does not convert otherwise lay testimony into expert testimony, *see* 432 F.3d at 1124.

The summary exhibits that Agent Washburn was explaining prior to Mr. Dermen's first and second objections—the ones at issue here—followed the same "tracing" methodology that Agent Washburn later elaborated on in connection with the fourth objection. The subject of Mr. Dermen's first objection is Agent Washburn's testimony concerning Government Exhibit 2-2. That exhibit is a table summarizing various transfers between Washakie and SBK USA. As Agent Washburn's methodological explanation makes clear, Government Exhibit 2-2 uses rudimentary math akin to the "simple average" at issue in *Bryant*. 432 F.3d at 1124. Agent Washburn simply maintained a ledger of account balances, using addition and subtraction, to track flows of funds between the two entities and testified about the results of that simple math. The exhibit's probative value derives not from its technical complexity, but from the simple transactions it "traces"—which are summarized in the exhibit in a clear and digestible format. *See* FED. R. EVID. 1006. The summary exhibit at issue in Mr. Dermen's second objection, Government Exhibit 8-1—the flow chart depicting the flow of fraud proceeds used for the purchase of the Sandy, Utah house—relies on the same simple methodology. The chart depicts a

series of transactions between a group of entities. The underlying arithmetic is the same as that used in Government Exhibit 2-2: addition and subtraction to track a series of account ledgers. And Agent Washburn's objected-to testimony regarding the exhibit reflected this simple math.

Because the challenged exhibits and summary testimony rely on ledger balancing—that is, documenting a series of financial transactions in a spreadsheet using addition and subtraction—we conclude that Mr. Dermen's first argument is without legs. More specifically, the district court did not abuse its discretion in admitting Agent Washburn's tracing testimony because the testimony did not transcend elementary mathematical operations or require "technical or specialized knowledge" to execute. *James River*, 658 F.3d at 1214. We reject Mr. Dermen's first argument.

**c.**

We turn next to Mr. Dermen's second argument, which largely implicates the second *James River* factor—whether the testimony was based on professional experience. *See James River*, 658 F.3d at 1215. We find this argument unavailing.

Whether Agent Washburn's "tracing" testimony was improperly based on his accounting expertise, IRS experience, and specialized training in money laundering is a nuanced question under our precedent. "Rule 701 does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness." *James River*, 658 F.3d at 1214 (quotation omitted). "Thus, '[w]hen the subject matter of

proffered testimony constitutes scientific, technical, or other specialized knowledge, the witness must be qualified as an expert under Rule 702.'" *United States v. Draine*, 26 F.4th 1178, 1188 (10th Cir. 2022) (alteration in original) (quoting *LifeWise*, 374 F.3d at 929).

However, the advisory committee notes explain that Rule 701 "does not distinguish between expert and lay witnesses, but rather between expert and lay testimony." FED. R. EVID. 701 advisory committee's note to 2000 amendment (italicization omitted). As such, a witness who possesses "scientific, technical or other specialized knowledge" (and could therefore be considered an expert witness in certain settings) can testify as a lay witness (i.e., offer lay testimony) so long as the testimony is not based on such knowledge. *Ryan Dev. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013) (quoting FED. R. EVID. 701(c)).

Our authority has traced the distinctions between particularized and specialized knowledge under Rules 701 and 702. In *Ryan Development Co.*, for example, the plaintiff-appellant solicited its owner's "long-time accounting firm" to assist its recovery under an insurance policy. *Ryan Dev. Co.*, 711 F.3d at 1167–68. Two accountants at that firm—both of whom were familiar with the company's business—handled the company's claims for lost income and tangible personal property. *See id.* at 1168. We concluded that the district court did not abuse its discretion in permitting the accountants (who arguably could offer expert testimony in some settings) to testify as lay witnesses under Rule 701, where they relied only on

"basic arithmetic, personal experience, and no outside expert reports in calculating lost income and other claims for coverage." *Id.* at 1170.

According to the rule's drafters, the result in *Ryan* squares with the approach of "most" courts. FED. R. EVID. 701 advisory committee's note to 2000 amendment ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business [under Rule 701] without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or *specialized* knowledge . . . , but because of the *particularized* knowledge that the witness has by virtue of his or her position . . . ." (emphasis added) (citation omitted)). *Compare Draine*, 26 F.4th at 1187 (noting that "'a law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony' under Rule 701" (quoting *Cushing*, 10 F.4th at 1080)), *with United States v. Starks*, 34 F.4th 1142, 1170 (10th Cir. 2022) ("Knowledge drawn from experience in a specialized job—including, as here, a law enforcement officer's knowledge of drug trafficking *patterns and practices*—falls 'squarely' within the scope of expert testimony under Rule 702" (emphasis added) (quoting *Cristerna-Gonzalez*, 962 F.3d at 1259)).

Under this authority, the narrow question presented by Mr. Dermen's second argument is whether Agent Washburn's "tracing" testimony was properly based on his *particularized* knowledge derived from his position in Mr. Dermen's investigation under Rule 701, or improperly based on his *specialized* knowledge

derived from his accounting expertise, IRS experience, and training in money laundering.

Agent Washburn undisputedly did possess expertise in accounting, tax, and money laundering. However, we conclude that, like the accountant-witnesses in *Ryan Development Co.*, Agent Washburn did not testify from his specialized knowledge of those subjects in offering the objected-to testimony. Rather, he testified based on his particularized knowledge derived from his experience as an investigator in Mr. Dermen's case.

For example, when Agent Washburn testified that he was certain that the $8,550,000 transfer from Washakie to SBK USA was derived from "two Treasury checks that were deposited four days earlier," Aplt.'s App., Vol. XXI, at 5046, he was not speaking from his specialized knowledge of money laundering "patterns and practices," *Starks*, 34 F.4th at 1170. Instead, Agent Washburn was speaking from his particularized knowledge of the flow of fraud proceeds in Mr. Dermen's case—knowledge that was derived from his role as an investigator in that case. *See Cristerna-Gonzalez*, 962 F.3d at 1259 ("Although a law-enforcement officer's testimony based on knowledge derived from the investigation of the case at hand is typically regarded as lay testimony, opinion testimony premised on the officer's professional experience *as a whole* is expert testimony." (emphasis added)). Therefore, we conclude that Mr. Dermen's second argument is unpersuasive.[18] Agent

---

[18] We also note that the third *James River* factor also supports the district court's decision to admit the challenged testimony. Agent Washburn did not rely on

Washburn did not improperly testify based on his "specialized knowledge." *Draine*, 26 F.4th at 1188 (quoting *LifeWise*, 374 F.3d at 929).

* * *

We therefore conclude that the district court did not abuse its discretion in admitting the challenged testimony from Agent Washburn over the defense's objection, under Rules 701 and 702. *See Cushing*, 10 F.4th at 1078–79.

**E. *Sufficiency of the Evidence***

Mr. Dermen argues that the district court erred by denying his motion for judgment of acquittal on Counts 3–7—which concerned transactions surrounding the $11.2 million loan that Mr. Dermen extended to Zubair Kazi. More specifically, Mr. Dermen contends that the evidence was insufficient for a reasonable jury to find him guilty beyond a reasonable doubt of the second, third, and forth prongs of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i)—that is, he argues the evidence was insufficient to show that he knew these funds were proceeds of unlawful activity, that the loan was, in fact, paid with proceeds of his biofuel mail fraud scheme (i.e., a specified unlawful activity), and that the loan transaction was designed to disguise or conceal the source of the funds. We find his arguments in

---

"a technical report by an outside expert." *James River*, 658 F.3d at 1215. Instead, he relied on documentary evidence and summary exhibits that were prepared by himself and other government investigators in Mr. Dermen's case. Additionally, because there is no dispute here regarding whether Agent Washburn's summary testimony and exhibits complied with Rule 1006, the *James River* fourth factor—how the Federal Rules of Evidence generally classify the testimony at issue—also supports the district court's decision to admit the challenged testimony. *See id.*

support of these contentions unpersuasive. The voluminous record in Mr. Dermen's case leaves us with no doubt about this conclusion: viewing the evidence in the light most favorable to the government, a reasonable jury could find Mr. Dermen guilty on Counts 3–7.

**1.**

**i.**

To assess sufficiency of the evidence, conducting de novo review, we "determine whether viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found [the defendant] guilty of the crime beyond a reasonable doubt." *United States v. Shepard*, 396 F.3d 1116, 1119 (10th Cir. 2005) (quoting *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004)); *see United States v. Irving*, 665 F.3d 1184, 1193 (10th Cir. 2011); *United States v. Doe*, 572 F.3d 1162, 1171 (10th Cir. 2009). We may "not weigh conflicting evidence" in our review, *United States v. Clark*, 717 F.3d 790, 805 (10th Cir. 2013) (quoting *United States v. Evans*, 318 F.3d 1011, 1018 (10th Cir. 2003)); we determine only "whether [the] evidence, if believed, would establish each element of the crime," *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001) (alteration in original) (quoting *Evans*, 238 F.3d at 589).

**ii.**

To prove money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), the government must show four elements beyond a reasonable doubt:

(1) that Defendant engaged in a financial transaction;

> (2) that Defendant knew that the property involved in that transaction represented the proceeds of his unlawful activities;
>
> (3) that the property involved was in fact the proceeds of that criminal enterprise; and
>
> (4) that Defendant knew that "the transaction [was] designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control" of the proceeds of the specified unlawful activities.

*United States v. Garcia-Emanuel*, 14 F.3d 1469, 1473 (10th Cir. 1994) (quoting 18 U.S.C. § 1956(a)(1)(B)(i)).[19] Proceeds include "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity." 18 U.S.C. § 1956(c)(9).

Financial transactions involving proceeds include those that are "part of a set of parallel or dependent transactions, any one of which involves the proceeds of

---

[19] In pertinent part, by its terms, the statute subjects to criminal penalties:

> **(a)(1)** Whoever, knowing that the property involved in a financial transaction represents the proceeds of *some form of unlawful activity*, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of *specified unlawful activity*—
>
> * * *
>
> **(B)** knowing that the transaction is designed in whole or in part—
>
> **(i)** to *conceal or disguise* the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

18 U.S.C. § 1956(a)(1)(B)(i) (emphases added).

specified unlawful activity, and all of which are part of a single plan or arrangement." 18 U.S.C. § 1956(a)(1). The underlying "specified unlawful activity" here was the biofuel mail fraud scheme—independently criminalized by 18 U.S.C. § 1341—in which Mr. Dermen and his co-conspirators filed false claims with the government related to biofuel incentives and in which, amongst other modes of delivery, the mails were used to deliver payouts to them from the U.S. Department of Treasury. *See* Aplt.'s App., Vol. I, at 249–50, 266 (Indictment, filed Oct. 19, 2019); *see also United States v. Kennedy*, 64 F.3d 1465, 1478 (10th Cir. 1995) (discussing the nature of a money laundering offense where mail fraud is the underlying specified unlawful activity).

**2.**

Counts 3–7 of the indictment charge Mr. Dermen with five counts of money laundering based on a total of approximately $2.5 million in payments that Mr. Kazi made on the $11.2 million loan from Mr. Dermen, originally paid by Jacob Kingston. Counts 3 and 7 related to Mr. Dermen's $1 million withdrawals from the joint account that he held with Mr. Kazi, and Counts 4, 5, and 6 were based on interest payments made by Mr. Kazi to SBK USA.

On March 7, several days before the case was submitted to the jury, Mr. Dermen filed a Rule 29 Motion for Judgment of Acquittal, arguing that the government's evidence was insufficient to prove beyond a reasonable doubt each of the element of Counts 3–7:

> The evidence was insufficient to prove beyond a reasonable doubt that [Mr.] Dermen conducted or attempted to conduct a financial transaction; that the financial transaction involved the proceeds of the mail fraud scheme alleged in Count 1 of the Indictment[;] that he [knew] that the property involved in the[se] financial transaction[s] represented the proceeds of some form of unlawful activity; and that Mr. Dermen conducted or attempted to conduct the financial transaction[s] knowing that [they] w[ere] designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

Aplt.'s App., Vol. II, at 447 (Def.'s Mot. for J. of Acquittal or In the Alternative for a New Trial, dated March 7, 2020).

On February 10, 2021, the district court denied Mr. Dermen's Rule 29 motion, finding "that, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found [Mr. Dermen] guilty of Counts 3 through 7 beyond a reasonable doubt." Aplt.'s App., Vol. IV, at 822.

**3.**

On appeal, Mr. Dermen argues that there was insufficient evidence to demonstrate the second, third, and fourth elements of money laundering—*viz.*, (2) that Mr. Dermen knew these funds were the proceeds of some form of unlawful activity, (3) that the funds involved were, in fact, proceeds of a specified unlawful activity, and (4) that the loan and repayment transactions were designed to disguise or conceal the source of those funds.[20] After addressing a preservation issue and two

[20] Perhaps acting out of an abundance of caution, the government briefly offers a rebuttal to any challenge that Mr. Dermen may be mounting to the first element of the money laundering offense—i.e., whether Mr. Dermen engaged in a financial transaction within the meaning of § 1956 (a)(1)(B)(i). *See* Aplee.'s Resp. Br. at 87–88. However, having carefully reviewed Mr. Dermen's Opening Brief, we

threshold questions, we address Mr. Dermen's specific challenges to these elements and find them unavailing.

**i.**

Mr. Dermen frames his sufficiency argument through two threshold legal challenges. First, Mr. Dermen contends that because Mr. Kazi's *repayments* of the $11.2 million loan were not made with fraud proceeds, he cannot be liable under 18 U.S.C. § 1956(a)(1)(B)(i). Second, Mr. Dermen contends that "*interest only payments* (i.e., without payment of any principal) as alleged in Counts 4, 5 and 6 do not constitute . . . 'the proceeds of some form of unlawful activity.'" Aplt.'s Opening Br. at 82 (emphasis added) (quoting 18 U.S.C. § 1956(a)(1)). Mr. Dermen cites *United States v. Paley*, 442 F.3d 1273 (11th Cir. 2006), and *United States v. Christy*, 916 F.3d 814 (10th Cir. 2019), to support his position on this point. The government responds that these arguments are unpreserved. We disagree with the government's waiver contention.

---

see no indication that Mr. Dermen challenges this element on appeal. Indeed, Mr. Dermen assumes *arguendo* that he directly or indirectly engaged in the transactions at issue. *See* Aplt.'s Opening Br. at 82 (stating that "assuming *arguendo* that [Mr.] Dermen exercised some control over these transactions and caused Kazi to make the payments when he did, and from the accounts that he did"). And his Table of Contents, Statement of the Issues, and Summary of the Argument sections of his brief offer not one glimmer to suggest that he challenges this element. *See id.* at iv (Table of Contents), 2 (State of the Issues), 22 (Summary of the Argument). Therefore, though we do not fault the government for being cautious, we do not detail our thinking on that issue here. Nevertheless, suffice it to say that Mr. Dermen's decision to stand down on contesting this element is a wise one. The government's evidence is overwhelming regarding it, and no rational factfinder would struggle in finding this element satisfied.

**a.**

The government contends that Mr. Dermen waived the foregoing, specific threshold arguments by not raising them within his general sufficiency-of-the-evidence challenge before the district court and by failing to argue under our plain error rubric on appeal. Our caselaw, however, is to the contrary.

We recently considered and rejected a similar preservation challenge. *See United States v. Murphy*, 100 F.4th 1184, 1192–95 (10th Cir. 2024). Like the defendant in *Murphy*, Mr. Dermen advanced a broad sufficiency-of-the evidence challenge to Counts 3–7 before the district court, but, as a consequence, "he is not foreclosed here from building on that argument through the articulation of specific theories" on appeal. *Id.* at 1192.

In this regard, we have explained in past decisions that "'[w]hen a defendant challenges in district court the sufficiency of the evidence on *specific grounds*, all grounds not specified in the motion are waived.'" *United States v. Maynard*, 984 F.3d 948, 961 (10th Cir. 2020) (emphasis added) (quoting *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007)). But, in *Murphy*, we noted that "this rule does *not require* 'specificity of grounds . . . in a Rule 29 motion.' Rather, it merely dictates that, 'where a Rule 29 motion is made on specific grounds, all grounds not specified are waived.'" *Murphy*, 100 F.4th at 1193 (emphasis added) (omission in original) (quoting *Goode*, 483 F.3d at 681). Thus, "[o]ur precedent makes clear that defendants do not waive appellate review of discrete theories that build upon broad arguments made before the district court." *Id.* at 1194 (collecting cases). "In other

words, defendants do not waive specific theories by asserting broader, related arguments in the district court." *Id.*

Here, as in *Murphy*, Mr. Dermen made a generalized Rule 29 challenge to the money laundering evidence against him, "thereby giving the district court notice that all potential insufficiency arguments were in play vis-à-vis his [money-laundering]-related charges." *Id.* at 1194. In other words, he argued that the evidence was insufficient to prove beyond a reasonable doubt the elements of money laundering as to the transactions charged in Counts 3–7; he "did not go beyond that" by "identify[ing] discrete arguments (or theories) to support his position." *Id.* By making only general arguments before the district court, Mr. Dermen "avoided effectively focusing the district court's decision-making on one specific theory, to the exclusion of other possible theories." *Id.* "Our preservation doctrine on this point is chiefly concerned with preventing defendants from raising for the first time on appeal entirely distinct arguments from those presented to the district court." *Id.* at 1195 (distinguishing *Leffler*, 942 F.3d at 1197–1200, cited by the government here, on these grounds).

Therefore, because Mr. Dermen presented only general sufficiency-of-the-evidence arguments before the district court, *Murphy* controls, and Mr. Dermen did not fail to preserve his specific sufficiency-of-the-evidence arguments on appeal.

**b.**

Having concluded that Mr. Dermen's threshold legal arguments are properly before us, we turn to considering them. Mr. Dermen first argues that the evidence is

insufficient because Mr. Kazi did not repay the $11.2 million loan using fraud proceeds. This argument is meritless.

Mr. Dermen's argument is foreclosed by the unambiguous meaning of the text of 18 U.S.C.A. § 1956(a)(1). The statute specifies that "a financial transaction shall be considered to be one involving the proceeds of specified unlawful activity if it is part of a set of *parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement.*" 18 U.S.C.A. § 1956(a)(1) (emphasis added). Here, the government alleged that the $11.2 million loan that Mr. Dermen conveyed to Mr. Kazi through Jacob Kingston and Washakie was derived from Mr. Dermen's share of proceeds from fraudulent tax credits filed with the IRS. The record also shows that Mr. Kazi made several repayments on that loan. A payment/repayment money laundering scheme is a "parallel" transaction under that statutory term's plain meaning. *See Parallel*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/parallel (last visited June 9, 2025) (defining "parallel" as "interdependent in tendency or development"). In other words, if "one" of the transactions—the loan payment—"involve[d] [] proceeds" from the fraudulent biofuel, mail fraud scheme, then the repayments—were "part of a single plan or arrangement" of Mr. Dermen to launder the proceeds of that fraud. § 1956(a)(1).

Thus, Mr. Dermen's argument runs counter to the unambiguous meaning of the statute. *See United States v. Hall*, 434 F.3d 42, 50–51 (1st Cir. 2006) (concluding that the evidence was sufficient to show money laundering where a loan was made

using proceeds and the repayment of the loan constituted a transaction involving proceeds); *United States v. Apazidis*, 523 F. App'x 17, 19 (2d Cir. 2013) ("[W]e reject [the defendant's] argument that, because the money used in the transactions for which he was convicted came from repayment of a loan of the unlawful proceeds, and not the original proceeds themselves, the jury could not convict."); *cf. United States v. Lovett*, 964 F.2d 1029, 1035 (10th Cir. 1992) (concluding that a series of banking loans secured by fraud proceeds were "closely related" to an initial purchase of a house with fraud proceeds).

**c.**

Next, we consider Mr. Dermen's argument that interest payments "do not constitute . . . 'the proceeds of some form of unlawful activity.'" Aplt.'s Opening Br. at 82 (quoting 18 U.S.C. § 1956(a)(1)). This argument is similarly unavailing because it ignores the statute's definition of "proceeds."

Here, too, we are guided by the text of § 1956(a)(1), which provides that a financial transaction is deemed "one involving the proceeds of specified unlawful activity if it is part of a set of parallel or dependent transactions, any one of which involves the proceeds of specified unlawful activity, and all of which are part of a single plan or arrangement." 18 U.S.C. § 1956(a)(1). In our view, the application of this unambiguous text is straightforward in Mr. Dermen's case. Interest is *dependent* on principal; thus, logic demands that interest is a "dependent transaction," relative to the principal being lent. *Id.* And where, as here, the loan principal is alleged to be "property *derived* from . . . some form of unlawful activity," 18 U.S.C. § 1956(c)(9)

(emphasis added)—that is, the "specified unlawful activity" of the mail fraud scheme—interest payments are similarly "derived from," and, at a minimum, "*involve*[]," the "proceeds of specified unlawful activity," *id.* (emphasis added), *viz.*, "some form of unlawful activity," § 1956(a)(1). In other words, both interest and principal payments of the money laundering scheme are covered by the statute. To hold otherwise would be to effect an unwarranted contortion of unambiguous statutory text.

Mr. Dermen cites *United States v. Paley,* 442 F.3d 1273 (11th Cir. 2006), and *United States v. Christy*, 916 F.3d 814 (10th Cir. 2019), for support. But *Paley* is inapposite: there, the Eleventh Circuit interpreted the United States Sentencing Guidelines—not 18 U.S.C. § 1956. *See Paley,* 442 F.3d at 1277–78 (considering whether "[t]he district court, in calculating the total amount of the laundered funds for which [the defendant] was accountable under United States Sentencing Guidelines § 2S1.1 (Nov. 2004), included the appreciated value of [] stock, instead of just the initial investment amount").

*Christy* is also distinguishable. Speaking of another case, we noted that "[w]e rejected the 'argument that the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity.'" *Christy*, 916 F.3d at 847 (quoting *United States v. Sanders*, 929 F.2d 1466, 1472 (10th Cir. 1991)). However, "the money laundering statute [does] reach commercial transactions intended (at least in part) to disguise [1] the relationship of the item purchased with the person providing the proceeds and [2]

[the fact] that the proceeds used to make the purchase were obtained from illegal activities." *Id.* Here, as explicated *infra*, the loan payment and repayments between Mr. Dermen and Mr. Kazi are not alleged to be mere "ordinary" instances of "money spending," within the meaning of *Christy*; rather, they are alleged to have been purposefully intended to disguise or conceal fraud proceeds. Therefore, neither *Paley* nor *Christy* support Mr. Dermen's tenuous reading of § 1956(a)(1). Accordingly, we conclude that interest payments are encompassed by the plain meaning of 18 U.S.C. § 1956(a)(1).

**ii.**

We are left with Mr. Dermen's more element-focused sufficiency-of-the-evidence arguments that challenge his convictions on Counts 3–7. Recall that Mr. Dermen argues that there was insufficient evidence to demonstrate the second, third, and fourth elements of money laundering. We address those elements below. We find dispositive the testimony of Jacob Kingston, Isaiah Kingston, Mr. Kazi, and IRS Special Agent Washburn, as well as the voluminous documentary evidence entered by the government at trial. Viewing this evidence in the light most favorable to the government, we conclude that a rational trier of fact could have found Mr. Dermen guilty of Counts 3–7 beyond a reasonable doubt. *See Shepard*, 396 F.3d at 1119.

**a.**

The evidence was sufficient for a reasonable jury to find that Mr. Dermen knew the property involved in the loan-and-repayment transaction represented "the

proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i).[21] Mr. Dermen's contention that there was insufficient evidence that he "knew these funds were proceeds of unlawful activity" is wholly without merit. Aplt.'s Opening Br. at 80 (bold typeface omitted).

Specifically, Jacob Kingston testified that Mr. Dermen directed him to file the false claims that caused the $23.1 million deposit into Washakie's bank account in June 2013. This testimony is supported by documentary evidence showing fraudulent tax credit claims and corresponding payments from the U.S. Department

---

[21] Occasionally, in his Opening Brief, Mr. Dermen suggests that the government has to prove beyond a reasonable doubt that he knew that the transactions involved proceeds of a "specified unlawful activity," § 1956(a)(1). *See, e.g.*, Aplt.'s Opening Br. at 82 (arguing that "there was no evidence that Dermen knew these payments were proceeds of a specified unlawful activity"); *see also id.* at 22 ("The evidence was legally insufficient to prove that (1) the funds involved in these alleged loan repayments were proceeds of a 'specified unlawful activity,' (2) [Mr.] Dermen had knowledge *of this* . . . ." (emphasis added)). However, such a suggestion would run afoul of the plain language of the statute and our precedent. The statute merely requires that a defendant know that the transaction involved "some form of unlawful activity," not that this activity constituted a "specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); *see Christy*, 916 F.3d at 845 (discussing the "mens rea" requirement for § 1956(a)(1)); *see also United States v. Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997) ("The first paragraph of § 1956(a)(1) is plainly crafted to distinguish between the actual source of laundered money and the defendant's knowledge as to the source of that money. The language of that paragraph requires proof that the laundered property 'in fact' involved the proceeds of 'specified unlawful activity,' as that term is defined in subsection (f), but it does not require proof that the defendant *knew what that unlawful activity was*." (emphasis added)). To be sure, this legal distinction may have little practical consequence in this case. Nevertheless, it is clear from other portions of his brief that Mr. Dermen understands the government's burden of proof on this element. *See, e.g.*, Aplt.'s Opening Br. at 2 (noting in his Statement of the Issues, the government's requirement to prove "that [Mr.] Dermen knew these funds were proceeds of unlawful activity"); 81 (reciting the elements of his motion for judgment of acquittal). Therefore, we need not consider this matter further.

of Treasury to Washakie. Jacob Kingston also testified that the $11.2 million was part of Mr. Dermen's share of the proceeds of that unlawful activity. *See* Aplt.'s App., Vol. XII, at 2526 ("Q. What was your understanding of how this $11 million would be treated, [whose] it was? A. It was going to be treated as [Mr. Dermen]'s."). And consistent with that testimony, Mr. Dermen instructed Mr. Kazi to repay him, not Washakie.

As the evidence established, in the 2013 timeframe, Mr. Dermen was the principal orchestrator of this biofuel mail fraud scheme—resulting in Treasury checks being delivered to Washakie. Accordingly, when he directed Jacob Kingston to transmit the $11.2 million to Mr. Kazi's creditors, a reasonable factfinder could infer that Mr. Dermen knew that those funds would come from the Washakie bank account and that this account held the proceeds of some form of unlawful activity (i.e., the biofuel mail fraud scheme).

In sum, treating the evidence in the record in the light most favorable to the government, a rational jury could find beyond a reasonable doubt that Mr. Dermen knew the property involved in the loan-and-repayment transaction represented the proceeds of his fraudulent biofuel mail fraud scheme involving tax credits—that is, the proceeds of "some form of unlawful activity." 18 U.S.C. § 1956(a)(1).

**b.**

Third, the evidence was sufficient to show that the loan funds involved were, in fact, the proceeds of a "specified unlawful activity." *See* 18 U.S.C. § 1956(a)(1)(B)(i). Ample trial testimony and documentary evidence, viewed in the

light most favorable to the government, could establish this element beyond a reasonable doubt to a rational jury.

Beginning with witness testimony, Jacob and Isaiah Kingston testified that the loan constituted fraud proceeds. Jacob Kingston testified that he wired $11.2 million to Mr. Kazi's creditors, that the money "came from these tax credits that w[ere] filed," and that Mr. Kazi repaid the loan to SBK USA. Aplt.'s App., Vol. XII, at 2529 (Jury Trial Tr., held Feb. 10, 2020). Similarly, when asked whether he knew "where the money came from to send [the $11.2 million] wire," Isaiah Kingston replied, "[t]he fraudulent IRS tax credits." Aplt.'s App., Vol. XVI, at 3641 (Jury Trial Tr., held Feb. 18, 2020).

Notably, Jacob Kingston agreed in his testimony with the prosecutor's statement that "all of these checks received by Washakie Renewable Energy" were received through "U.S. mails." *Id.*, Vol. XII, at 2582. Similarly, Isaiah Kingston testified that, as a result of the fraudulent filing of claims for biofuel tax credits, "a check came in through the mail roughly every two weeks" from the U.S. Department of Treasury. *Id.*, Vol. XVI, at 3715–16. This mailing testimony was confirmed by the government's summary witness, IRS Special Agent Washburn, who agreed with the prosecutor's statement that the government sent Treasury checks to taxpayers claiming biofuel tax credits "through the United States Mail." *Id.*, Vol. XXI, at 5040. Consequently, a rational factfinder could infer that any proceeds of the biofuel fraud scheme that were wired from Washakie's bank account had initially been delivered to Washakie in the form of Treasury checks through the mail.

Relevant to that point, Agent Washburn testified that the summary exhibits and underlying bank records entered as Government Exhibit 3-1 show that a $11.2 million wire left a Washakie account shortly after $23.1 million in fraud proceeds in the form of Treasury checks had been deposited into the same account in June 2013. *See id.*, Vol. XXI, at 5090 ("As you can see, there are two [IRS] checks that total $23.1 million that were deposited into Washakie Renewable Energy bank account 4874 on June 10th and June 17th of 2013. And then on June 21st, 2013, you can see the 11.2 million [] was transferred to a[] McDonald Hopkins trust account," which was controlled by Mr. Kazi.). This testimony was also corroborated by bank records documenting the transactions.

Therefore, viewed in the light most favorable to the government, we conclude that this evidence is sufficient for a rational juror to find beyond a reasonable doubt that the loan funds were in fact the proceeds of a "specified unlawful activity"—that is, the biofuel mail fraud scheme. *See* 18 U.S.C. § 1956(a)(1)(B)(i); *see Vallo*, 238 F.3d at 1247.

**c.**

Fourth, and finally, the evidence was sufficient to show that Mr. Dermen knew that the transaction was designed to "conceal or disguise the nature, the location, the source, the ownership or the control" of the proceeds of the "specified unlawful activity"—that is, the biofuel mail fraud scheme involving tax credits. 18 U.S.C. § 1956(a)(1)(B)(i). Mr. Dermen argues that "there was no effort to conceal the source of these funds: liens were recorded on the properties [Mr.] Kazi pledged as

collateral, [Mr.] Kazi sued SBK [USA] . . . to prevent foreclosure on his properties when repayment went into default, and loan repayments were made into an attorney's trust account." Aplt.'s Opening Br. at 83 (citations omitted). "These actions were done publicly," Mr. Dermen continues, and the "'mechanisms' through which the loan and its repayment were structured actually created a higher likelihood that any illegality would be discovered." *Id.* We find these arguments unpersuasive.

"Money laundering is 'the process by which one conceals the existence, illegal source, or illegal application of income, and disguises that income to make it appear legitimate.'" *Shepard*, 396 F.3d at 1120 (quoting PRESIDENT'S COMMISSION ON ORGANIZED CRIME, THE CASH CONNECTION: ORGANIZED CRIME, FINANCIAL INSTITUTIONS, AND MONEY LAUNDERING 7 (Interim Report, Oct. 1984)). "[W]e construe the money laundering statute as 'a concealment statute—not a spending statute.'" *Id.* (quoting *Garcia-Emanuel*, 14 F.3d at 1476). "[W]e require the government to present substantial evidence of concealment for a conviction." *Id.* at 1121. "[A]ctions that are merely suspicious and do not provide substantial evidence of a design to conceal will not alone support a conviction." *Id.* (alteration in original) (quoting *Garcia-Emanuel*, 14 F.3d at 1475). The following types of evidence may be indicia of an intent to disguise or conceal illegal proceeds:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Id.* at 1120 (quoting *Garcia-Emanuel*, 14 F.3d at 1475–76).

The flow of funds for the Kazi loan, as described in the evidence outlined *supra*, bears many of these indicia of intent to conceal or disguise. First, Mr. Dermen loaned Mr. Kazi $11.2 million in fraud proceeds—but he did not do so directly. Instead, he instructed Jacob Kingston to pay Mr. Kazi's creditor from a Washakie account. This disbursement phase of the transaction—in which Mr. Dermen made the $11.2 million loan to Mr. Kazi indirectly *through* the actions of Jacob Kingston and Washakie—evinced the following: the structuring of the transaction in a way to avoid attention, the depositing of illegal profits into the bank account of a legitimate business (i.e., G.E. Capital), and the using of third parties to conceal the real owner (i.e., Washakie). *See Garcia-Emanuel*, 14 F.3d at 1475–76.

Furthermore, at the repayment phase, there were further acts indicative of an intent to disguise or conceal illegal proceeds: Mr. Dermen instructed Mr. Kazi to make regular payments to Pillar Law Group and/or SBK USA or deposit funds into a joint account that Mr. Dermen instructed Mr. Kazi to create and to falsely identify Mr. Dermen as an officer of one of Mr. Kazi's companies. A rational jury could find these statements or actions by Mr. Dermen at the repayment phase to be probative of an intent to disguise or conceal (payments to Pillar Law Group and/or SBK), to involve unusual secrecy (the joint bank account), and to consist of a series of unusual financial moves cumulating in the transaction (as demonstrated by the unusual flow of funds, taken as a whole)—exactly the kind of factors enumerated in *Shepard*. *See* 396 F.3d at 1120.

In sum, the record contains ample evidence of Mr. Dermen's intent to conceal or disguise at every step—and was therefore sufficient for a rational jury to find that Mr. Dermen knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the fraud. *See United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001).

* * *

Accordingly, we conclude that the evidence was sufficient to show all of the contested elements of money laundering in Counts 3–7. Viewing the evidence in the light most favorable to the government, a rational trier of fact could have found Mr. Dermen guilty of Counts 3–7 beyond a reasonable doubt. *See Shepard*, 396 F.3d at 1119.

### F. ***Sentencing***

Next, Mr. Dermen argues that the district court improperly calculated his Guidelines range at sentencing. Specifically, Mr. Dermen contends that—notwithstanding Tenth Circuit law to the contrary—we should read the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013), as mandating that the "total loss amount"—which determines a defendant's base offense level under the U.S. Sentencing Guidelines Manual ("U.S.S.G." or "Guidelines") § 2B1.1(b)(1)(P)—be treated as an essential element of an offense, such that the amount must be found by a jury beyond a

reasonable doubt.[22] Under this theory, Mr. Dermen maintains that the district court erred by determining his base offense level using a total loss amount of "more than $550,000,000" because the jury did not make a beyond-a-reasonable-doubt factual finding that the loss was more than $550,000,000. Aplt.'s App., Vol. VIII, at 1707 ¶ 250 (Presentence Investigation Report, dated March 29, 2023). Mr. Dermen contends that his base offense level should have been calculated based on the total loss attributable to his counts of conviction: $9,513,000. This would have reduced his total adjusted offense level from 45 to 35 and his Guidelines range from life to 188–235 months' imprisonment.

Yet Mr. Dermen's argument is foreclosed by our decisions in *United States v. Zar*, 790 F.3d 1036 (10th Cir. 2015), and *United States v. Robertson*, 946 F.3d 1168 (10th Cir. 2020). In *Zar*, we held that "[t]he *Apprendi*/*Alleyne* rule *does not apply*" to "judicial fact finding . . . in the context of determining [a defendant's] applicable sentencing range[] under the advisory sentencing Guidelines." 790 F.3d at 1055 (emphasis added); *see also id.* at 1054–55 ("The defendant['s] reliance on *Apprendi* and *Alleyne* is misplaced" because he was not "subject to mandatory minimum sentences or sentenced beyond the statutory maximums for [his] convictions."). And in *Robertson*, we reiterated that "[t]his issue has been foreclosed in this Circuit." 946

[22] In *Apprendi*, the Supreme Court held that principles of due process and the Sixth Amendment require that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum . . . must be submitted to a jury." 530 U.S. at 490. And in *Alleyne*, the Supreme Court extended *Apprendi* to hold that any fact that increases the mandatory minimum sentence for a crime must likewise be submitted to the jury. *See* 570 U.S. at 111–12.

F.3d at 1171–72 (collecting Tenth Circuit cases). "The Supreme Court has not adopted a heightened standard of proof at sentencing for contested facts, thus we hold that the correct standard of proof . . . [i]s a preponderance of the evidence." *Id.* at 1171.

Mr. Dermen's argument is therefore foreclosed by our precedent. The district court calculated his Guidelines range under the correct standard of proof: a preponderance of the evidence. "Bound by our precedent, we find no error." *Zar*, 790 F.3d at 1055.

**G. *Forfeiture***

Mr. Dermen's final argument is that the district court erred substantively and procedurally in entering an order of forfeiture and money judgment against him. He maintains that the district court erred substantively by admitting and relying upon hearsay evidence in its forfeiture determination and erred procedurally by employing the preponderance-of-the-evidence standard instead of requiring the government to prove a nexus between the assets to be forfeited and his crimes beyond a reasonable doubt. Mr. Dermen preserved these arguments before the district court. However, we reject them for many of the same reasons that the district court did. He also raises four new arguments on appeal, which fail at prong two of plain error review: as to these arguments, Mr. Dermen fails to show any "clear or obvious" error in the district court's decision. We discuss and reject each argument below.

**1.**

In the forfeiture context, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Bader*, 678 F.3d 858, 893 (10th Cir. 2012). Issues that are forfeited in the district court are reviewed for plain error. *See United States v. Rosales-Miranda*, 755 F.3d 1253, 1257–58 (10th Cir. 2014). To prevail under the plain error standard, Mr. Dermen must show "(1) error, (2) that is plain [i.e., clear or obvious], which (3) affects his substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Cristerna-Gonzalez*, 962 F.3d at 1260 (quoting *Adams*, 888 F.3d at 1136).

"[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived." *Leffler*, 942 F.3d at 1197. But "when an error is obvious enough and satisfies Federal Rule of Criminal Procedure 52(b), we may exercise our discretion to recognize the error 'notwithstanding briefing deficiencies,'" *id.* at 1198 (quoting *Courtney*, 816 F.3d at 684)—"if it 'permit[s] the appellee to be heard and the adversarial process to be served,'" *id.* (alteration in original) (quoting *Isabella*, 918 F.3d at 844).

**2.**

After Mr. Dermen's conviction, the government sought forfeiture and money judgments against him, consistent with the operative indictment. Among other property, the government requested forfeiture of the Washakie biofuel plant, the sales proceeds of the Sandy and Huntington Beach Houses, the outstanding Kazi loan

balance, the assets of SBK USA and several of Mr. Dermen's other companies, and two sports cars. Additionally, the government sought a general order of forfeiture, which included property under the control of foreign companies in Turkey and Luxembourg, including SBK Turkey.

Mr. Dermen contested these forfeitures during a five-day bench trial, which was held during the week of November 15–19, 2021. The government put on eight witnesses to testify to the nexuses between Mr. Dermen's fraud and money laundering convictions and the assets the government sought to forfeit: specifically, Agent Washburn—who again testified as a summary witness and traced fraud proceeds—and seven fact witnesses offered testimony concerning the property the government sought to forfeit. At the bench trial, Mr. Dermen argued that the government was required to prove each nexus beyond a reasonable doubt and that hearsay was inadmissible.

On November 15, 2022, the district court issued its findings of fact. At the outset, the court determined that, at the forfeiture stage, the preponderance-of-the-evidence standard of proof applied and the Federal Rules of Evidence—which include proscriptions regarding the admission of hearsay evidence—did not. Additionally, the district court found that general orders of forfeiture were appropriate for assets transferred abroad. Thereafter, the government moved for a preliminary judgment of forfeiture and money judgment against Mr. Dermen. In March 2023, the district court granted the government's motion—imposing a $181,847,376 money judgment against Mr. Dermen and entering a preliminary

judgment of forfeiture. The court also imposed a money judgment against Jacob Kingston.

The preliminary judgment of forfeiture provided that the government: (1) could further investigate the location of assets that were subject to the general order of forfeiture and could move to amend the order to include assets located in the future; (2) could use the net value of properties and assets liquidated under the judgment to partially satisfy the money judgments; and (3) "need not credit any other forfeitures applied to Jacob Kingston's money judgment to [Mr.] Dermen's money judgment," or vice versa. Aplt.'s App., Vol. V, at 1030 (Prelim. Order of Forfeiture, filed Mar. 24, 2023).

**3.**

Mr. Dermen raises several challenges to the district court's order of forfeiture and money judgment against him—including some arguments raised for the first time on appeal. At the threshold, Mr. Dermen maintains that the district court erred substantively by admitting and relying upon hearsay evidence in its forfeiture determination, and he contends that the court committed a procedural error by employing the preponderance-of-the-evidence standard instead of requiring the government to prove the nexus between his criminal convictions and the forfeited properties beyond a reasonable doubt. *See* FED. R. CRIM. P. 32.2(b)(1)(A) ("If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must

determine the amount of money that the defendant will be ordered to pay."). We proceed to the merits of these preserved arguments—reviewing the district court's legal conclusions de novo and its factual findings for clear error. *See Bader*, 678 F.3d at 893. We conclude that these arguments are foreclosed by binding precedent and the Federal Rules of Evidence.

Mr. Dermen also raises challenges to the money judgment and general order of forfeiture that he did *not* present to the district court. First, Mr. Dermen argues that money judgments in multi-defendant cases were rendered improper by the Supreme Court's decision in *Honeycutt v. United States*, 581 U.S. 443 (2017). Next, Mr. Dermen attacks the general order of forfeiture. He contends that, under Federal Rule of Criminal Procedure 32.2, "money judgments and general orders [are] mutually exclusive remedies, with any general order extinguished by a forfeiture money judgment." Aplt.'s Opening Br. at 89–90. And, finally, Mr. Dermen asserts that the district court "lacked jurisdiction" to enter a general order of forfeiture against "non-party foreign and domestic . . . entities"—that is, oversees entities to which Mr. Dermen and his co-conspirators transferred fraud proceeds. *Id.* at 90 (italicization omitted). Because these challenges were not presented to the district court—and thus are not properly preserved for our review—Mr. Dermen can only seek relief under our rigorous plain error rubric. *See, e.g.*, *Rosales-Miranda*, 755 F.3d at 1257–58.

However, Mr. Dermen did not seek plain error review in his Opening Brief as to these challenges. But he does argue under the plain error rubric in his Reply Brief with sufficient depth for us to make out his argument; consequently, we allow him to

be heard. *See Leffler*, 942 F.3d at 1197 (quoting *Isabella*, 918 F.3d at 844). Nevertheless, we conclude that Mr. Dermen's arguments fail at prong two of the plain error rubric—that is, Mr. Dermen fails to show that the court's assumed error is "clear or obvious" under well-settled law. *Draine*, 26 F.4th at 1188–89 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 134 (2018)). Therefore, we conclude that Mr. Dermen's forfeited challenges fail under plain error review.

**a.**

We begin our forfeiture analysis with Mr. Dermen's properly preserved arguments. He contends that the district court applied the wrong standard of proof to his forfeiture determination—*viz.*, the court erred by employing the preponderance-of-the-evidence standard instead of requiring the government to prove the nexus between his criminal convictions and the forfeited properties beyond a reasonable doubt. This argument fails for the reasons that the district court ably articulated.

The district court concluded that the preponderance-of-the-evidence standard applied to its nexus finding in light of *Libretti v. United States*, 516 U.S. 29 (1995). In *Libretti*, the Supreme Court held that the Sixth Amendment does not apply to a criminal forfeiture because it is an aspect of sentencing. *See* 516 U.S. at 49 ("[O]ur analysis of the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection.").

Mr. Dermen argued before the district court that the Supreme Court implicitly overruled *Libretti* in *Apprendi* and *Southern Union Co. v. United States*, 567 U.S.

343 (2012). *See Apprendi*, 530 U.S. at 490 ("[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Southern Union*, 567 U.S. at 360 ("[T]he rule of *Apprendi* applies to the imposition of criminal fines."). The district court was not persuaded. *See* Aplt.'s App., Vol. V, at 907 (Mem. Decision: Findings Re Specific Property Subject to Forfeiture) ("[Mr.] Dermen argues that *Apprendi* and *Southern Union* overruled *Libretti* sub silentio. Thus, he contends that *Libretti*'s holding that the Sixth Amendment does not apply to forfeiture proceedings is no longer good law. The court disagrees. [Mr.] Dermen has not cited any cases supporting his theory . . . ."). We are equally unpersuaded on appeal.

As the district court highlighted below, the Tenth Circuit remains one of the few circuits that has not (for whatever reason) expressly held that *Apprendi* and *Southern Union* did not overrule *Libretti*. However, in *Bader*, we held that because "[f]orfeiture is an element of the sentence imposed following conviction," 678 F.3d at 893 (quoting *Libretti*, 516 U.S. at 38–39), "[a] forfeiture judgment must be supported by a preponderance of the evidence," *id*. Our decision in *Bader* was published in 2012, twelve years after *Apprendi*, so we may infer that nothing in *Apprendi* caused us to believe a higher, beyond-a-reasonable-doubt standard applied to a forfeiture judgment. To be sure, *Bader* was published approximately two months *before Southern Union*, so we cannot make a similar inference as to *Southern Union*: that is, we cannot infer that *Bader* saw nothing in *Southern Union* to disturb its preponderance-of-the-evidence standard because *Southern Union* was issued after

*Bader*. Still, in the years since *Apprendi*, we have held that "[a] forfeiture judgment must be supported by a preponderance of the evidence." *United States v. Gordon*, 710 F.3d 1124, 1165 (10th Cir. 2013) (quoting *Bader*, 678 F.3d at 893). And, as the district court correctly pointed out in its forfeiture order, every circuit court that has examined this issue has held that *Libretti* remains binding precedent.[23]

The weight of persuasive authority then counsels that *Libretti* controls, and, more specifically, that *Apprendi* and *Southern Union* do not supplant *Libretti* and require application of a beyond-a-reasonable-doubt standard. Coupling that

---

[23] *See United States v. Keene*, 341 F.3d 78, 85–86 (1st Cir. 2003) (rejecting an argument that *Apprendi* requires proof beyond a reasonable doubt in forfeiture proceedings); *United States v. Fruchter*, 411 F.3d 377, 381 (2d Cir. 2005) ("*Libretti* remains the law until the Supreme Court expressly overturns it . . . ."); *United States v. Najjar*, 300 F.3d 466, 485–86 (4th Cir. 2002) ("[T]here was no fact passed on by the trial judge but not charged in the indictment that would have increased the penalty the defendants faced beyond the statutory maximum penalty. Therefore, the district court did not err in applying a preponderance of the evidence standard." (citation omitted)); *United States v. Gasanova*, 332 F.3d 297, 301 (5th Cir. 2003) ("We therefore join all other circuit courts of appeals to consider the question and conclude that statutorily-prescribed forfeiture is warranted upon a showing of a preponderance of the evidence."); *United States v. Corrado*, 227 F.3d 543, 550–51 (6th Cir. 2000) ("Accordingly, we reject the defendants' argument that . . . the district court, as the agreed trier of fact, must make fact determinations based on the 'beyond a reasonable doubt' standard."); *United States v. Vera*, 278 F.3d 672, 672 (7th Cir. 2002) ("Like the other circuits that have considered this question, we hold that *Apprendi* does not disturb the rule that forfeiture is constitutional when supported by the preponderance of the evidence."); *United States v. Sigillito*, 759 F.3d 913, 935–36 (8th Cir. 2014) (noting that "*Libretti* continues to control"); *United States v. Phillips*, 704 F.3d 754, 770 (9th Cir. 2012) ("[E]very Circuit to consider the question has found that *Apprendi* and its progeny did not alter the rule in *Libretti*, and *Southern Union* does not change that determination."); *United States v. Cabeza*, 258 F.3d 1256, 1257–58 (11th Cir. 2001) (per curiam) ("Because *Apprendi* does not apply to forfeiture proceedings, our earlier decisions on the burden of proof in such proceedings remain good law: the burden of proof on a forfeiture count is a preponderance of the evidence.").

persuasive authority with our own decisions in *Bader* and *Gordon*, we are confident in holding that we may still look to *Libretti*—even after *Apprendi* and *Southern Union*—for the governing standard, and, as such, a forfeiture judgment must still be supported only by a preponderance of the evidence. Mr. Dermen's contrary contention is without merit.

Next, Mr. Dermen maintains that the district court erred by admitting and relying upon hearsay evidence in its forfeiture determination. This argument is meritless. The text of Rule 1101(d)(3) and our precedent interpreting it make clear that the Federal Rules of Evidence——which include proscriptions regarding the admission of hearsay evidence—do not apply to sentencing. *See* FED. R. EVID. 1101(d)(3) ("These rules . . . do not apply to . . . sentencing . . . ."); *see United States v. Ruminer*, 786 F.2d 381, 385 (10th Cir. 1986) ("Rule 1101(d)(3) is clear; it expressly excludes the application of the Federal Rules of Evidence (other than with respect to privileges) at 'sentencing.'"); *United States v. Scott*, 529 F.3d 1290, 1298 (10th Cir. 2008) ("By their own terms, [] the Federal Rules of Evidence do not apply to sentencing hearings."); *United States v. Ruby*, 706 F.3d 1221, 1229 (10th Cir. 2013) ("District courts are not strictly bound by the Federal Rules of Evidence at sentencing hearings."). "As a result, 'hearsay statements may be considered at sentencing if they bear some minimal indicia of reliability.'" *Ruby*, 706 F.3d at 1229 (quoting *United States v. Damato*, 672 F.3d 832, 847 (10th Cir. 2012)); *see also United States v. Browning*, 61 F.3d 752, 755 (10th Cir. 1995) ("[The defendant] argues the district court erred in admitting certain hearsay statements at the

sentencing hearing. Because the Federal Rules of Evidence on hearsay do not apply at sentencing, this argument must fail.").

Here, the district court correctly identified Rule 32.2(b)(1)(B) of the Federal Rules of Criminal Procedure as the relevant standard for admitting evidence relevant to forfeiture, not the Federal Rules of Evidence. Rule 32.2(b)(1)(B) provides: "The court's [forfeiture] determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." FED. R. CRIM. P. 32.2(b)(1)(B). Under both Federal Rule of Criminal Procedure Rule 32.2(b)(1)(B) and our precedent setting aside application of the Federal Rules of Evidence in the sentencing context, hearsay evidence is generally admissible in a forfeiture proceeding. The district court's evidentiary findings properly applied these rules; therefore, we find no error.

**b.**

We turn next to Mr. Dermen's unpreserved arguments, beginning with Mr. Dermen's challenge to the money judgment entered against him. Mr. Dermen's first argument is that money judgments in multi-defendant cases were rendered improper by *Honeycutt*. We conclude that, even assuming that there is error at all, Mr. Dermen fails to show "clear or obvious" error under *Honeycutt*. *Draine*, 26 F.4th at 1188–89 (quoting *Rosales-Mireles*, 585 U.S. 134).

In *Honeycutt*, the Supreme Court considered "whether . . . a defendant may be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire," under 21 U.S.C. § 853(c)(1),

which provides for criminal forfeitures in certain drug crimes. 581 U.S. at 445. The Court held that the text and structure of the statute did not authorize blanket joint and several liability for co-conspirators; rather, "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 454. Mr. Dermen argues that the district court's money judgment contravenes this ruling.

This argument fails at the second prong of the plain error standard because Mr. Dermen cannot show clear or obvious error. *See Draine*, 26 F.4th at 1188–89. Our decision in *United States v. Channon*, 973 F.3d 1105 (10th Cir. 2020), is determinative. There, we considered the defendant-appellant's argument that *Honeycutt* "made clear that the criminal forfeiture statute does not permit joint and several liability." *Id.* at 1114. Because the defendant-appellant did not raise the issue before the district court, we reviewed for plain error. *See id.* In our analysis, we noted the "textual difference between § 853 and § 981" and observed "a circuit split has developed over whether *Honeycutt* applies to a forfeiture under 18 U.S.C. § 981(a)(1)(C)." *Id.* at 1115.

We held that "because of the split in authority on whether *Honeycutt* applies to a § 981 forfeiture"—an issue as to which neither the Tenth Circuit nor the Supreme Court has ruled—"we cannot rely on *Honeycutt* as the basis for obvious error." *Id.*; *see also United States v. Teague*, 443 F.3d 1310, 1319 (10th Cir. 2006) ("If neither the Supreme Court nor the Tenth Circuit has ruled on the subject, we cannot find plain error if the authority in other circuits is split."); *United States v. Cingari*, 952

F.3d 1301, 1305–06 (11th Cir. 2020) (concluding that the defendant-appellants could not demonstrate an obvious error under *Honeycutt* because they needed to "show that it plainly applies to civil asset forfeiture under 18 U.S.C. § 981(a)(1)(C)"). Mr. Dermen's *Honeycutt* argument is thus foreclosed by *Channon* at prong two.

In the alternative, Mr. Dermen argues that "a money judgment may be imposed only to the extent that direct forfeitures are shown insufficient to account for all forfeitable property"; therefore, "if the fraud proceeds amounted to $10, and the identified forfeited property amounted to $8, only a $2 money judgment would be permissible under 21 U.S.C. § 853(p)." Aplt.'s Opening Br. at 89.

This argument is—at the very least—foreclosed at prong two of the plain error standard (i.e., clear or obvious error) by our decision in *United States v. McGinty*, 610 F.3d 1242 (10th Cir. 2010), in which we upheld this form of "hybrid" forfeiture order. *Id.* at 1248–49. Indeed, it is unlikely that the district court erred at all. In *McGinty*, the defendant was convicted of one count of misapplication of bank funds in violation of 18. U.S.C. § 656. *See id.* at 1243. At sentencing, his house, boat, and boat motor were subject to criminal forfeiture under 18 U.S.C. § 982(a)(2) as proceeds of his unlawful activity. *See id.* at 1243–44. Additionally, the government sought a money judgment representing the full amount of the defendant's criminal proceeds. *See id.* The district court denied the money judgment, and the government appealed. *See id.*

We held that the district court erred in refusing to order a money judgment representing the proceeds of the defendant's misapplication of bank funds, *see id.* at 1245, reasoning, in relevant part:

> Although the criminal forfeiture statute does not explicitly refer to money judgments, our sister circuits have uniformly recognized that money judgments representing the unlawful proceeds are appropriate. . . . We agree with the reasoning of our sister circuits and conclude that *in personam* money judgments are appropriate under criminal forfeiture.

*Id.* (collecting cases from the First, Third, Seventh, Ninth, Eleventh, and D.C. Circuits). We continued, "[t]he applicable statute provides that [the defendant] must forfeit 'any property constituting, or derived from, proceeds' that he obtained from his misapplication of bank funds. Thus, under this statute, *hybrid orders may be appropriate where the government is entitled to both proceeds and specific assets derived from those proceeds*." *Id.* at 1248 (emphasis added) (quoting 18 U.S.C. § 982(a)(2)).

Under *McGinty*, Mr. Dermen certainly cannot show clear or obvious error, and it is unlikely that he can show error at all. Contrary to Mr. Dermen's position, *McGinty* provides support for the district court's decision to issue a hybrid order by combining proceeds from the *in personam* money judgment against Mr. Dermen (for the proceeds of the fraud scheme) and the forfeiture of specific assets that were purchased with fraud proceeds. Accordingly, Mr. Dermen's alternative argument is unavailing.

Mr. Dermen also argues that the district court's general order of forfeiture was improper. First, Mr. Dermen asserts that "money judgments and general orders [are] mutually exclusive remedies, with any general order extinguished by a forfeiture money judgment" under Federal Rule of Criminal Procedure 32.2. Aplt.'s Opening Br. at 89–90. More specifically, Mr. Dermen contends that this is so because Rule 32.2(b)(2)(C) "excludes general orders of forfeiture if the court is able to 'calculate the total amount of the money judgment.'" *Id.* at 90 (quoting FED. R. CRIM. P. 32.2(b)(2)(C)). But this argument interprets the text too narrowly. Rule 32.2(b)(2)(C) provides:

> **General Order.** If, before sentencing, the court cannot identify all the specific property subject to forfeiture or calculate the total amount of the money judgment, the court may enter a forfeiture order that:
>
> (i) lists any identified property;
>
> (ii) describes other property in general terms; and
>
> (iii) states that the order will be amended under Rule 32.2(e)(1) when additional specific property is identified or the amount of the money judgment has been calculated.

FED. R. CRIM. P. 32.2(b)(2)(C); *see also id.* advisory committee's note to 2009 amendment ("[T]he court is authorized to issue a forfeiture order describing the property in 'general' terms, which order may be amended pursuant to Rule 32.2(e)(1) when additional specific property is identified.").

Here, the district court plausibly determined, *inter alia*, that "a significant portion of the fraud proceeds obtained by [Washakie] and the Kingston defendants were also transferred in money laundering transactions to Turkey and Luxembourg."

Aplt.'s App., Vol. V, at 917. "The court further [found] that [nearly $30 million] [of the] fraud proceeds [that were] transferred to Luxembourg and Turkey remained overseas with [various] companies . . . and individuals . . . associated with [Mr. Dermen] . . . ." *Id.* at 918. And it "[found] that general orders of forfeiture are appropriate for all of these entities and individuals as connected to the crimes of conviction." *Id.* at 919.

Mr. Dermen does not challenge these findings of fact. And according to the plain text of Rule 32.2, these seem to be precisely the circumstances under which a general order of forfeiture is proper. Most critically, Mr. Dermen does not point to a Tenth Circuit or Supreme Court case in which Rule 32.2(b)(2)(C) has been interpreted to render money judgments and general orders of forfeiture "mutually exclusive remedies." Aplt.'s Opening Br. at 90. Absent such authority, we certainly cannot say that the district court committed clear or obvious error under the plain error standard, if it erred at all. *See Draine*, 26 F.4th at 1188–89.

Finally, Mr. Dermen asserts that the district court "lacked jurisdiction" to enter a general order of forfeiture against "non-party foreign and domestic . . . entities"—that is, the overseas entities to which Mr. Dermen and his co-conspirators directed fraud proceeds. Aplt.'s Opening Br. at 90 (italicization omitted). But, here too, Mr. Dermen fails to support his argument with authority from our circuit or the Supreme Court that shows clear or obvious error, and his argument contorts the record. Most fundamentally, it bears underscoring that the preliminary order of forfeiture did *not* reach third parties' interests in the property at issue; rather, the order forfeited "the

defendant's interest in the property—whatever that interest may be." Aplt.'s App., Vol. V, at 914–15 (quotation omitted). And the district court announced its intention to comply with Rule 32.2(c)'s process for vindicating third-party property interests in forfeited accounts and assets.

Specifically, the district court explained that Rule 32.2(b)(2)(A) requires it to enter a preliminary order of forfeiture "without regard to any third party's interest in the property" because Rule 32.2(c) provides a separate procedure for determining third-party interests. Aplt.'s App., Vol. V, at 914 (quoting FED. R. CRIM. P. 32.2(b)(2)(A)); *see also id.* ("[T]he court conducts a separate proceeding in which all potential third party claimants are given an opportunity to challenge the forfeiture by asserting a superior interest in the property." (quoting FED. R. CRIM. P. 32.2 advisory committee's note to 2000 adoption)). Without more, Mr. Dermen cannot show under the plain error standard that the district court committed clear or obvious error—if the court erred at all—in entering its general order of forfeiture.[24]

---

[24] For the first time in his Reply Brief, as it relates to the forfeiture bench trial, Mr. Dermen rehashes his argument from the district court that Agent Washburn's summary charts and testimony tracing the flow of fraud proceeds were improper expert witness testimony. Before the district court, Mr. Dermen objected to several summary exhibits that depicted the flow of fraud proceeds to accounts and properties that Mr. Dermen controlled on the grounds that the summaries were not supported by admissible evidence. He also objected to the "bad-in-first-out" (BIFO) methodology that Agent Washburn used to trace the funds. Over his objections, the district court held that the charts were admissible. For the first time on appeal, Mr. Dermen argues that Agent Washburn offered improper expert witness testimony under Federal Rules of Evidence 702 and 1006 in Mr. Dermen's forfeiture bench trial, and that the district court erred by admitting it. Mr. Dermen, however, has waived these arguments by waiting until his Reply Brief to raise them with respect to the district court's forfeiture proceeding. *See, e.g., Leffler*, 942 F.3d at 1197 ("[W]e

* * *

Having concluded that all of Mr. Dermen's forfeiture arguments are unpersuasive under the applicable standards of review, we reject them.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment as to Mr. Dermen's convictions and sentence, including the district court's forfeiture order.

generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived.").

23-4074, United States v. Dermen
**EBEL**, J., joined by **SEYMOUR**, J., concurring.

I concur in the reasoning and conclusions in the opinion of Chief Judge Holmes disposing of this appeal. I write separately rather than simply joining that opinion because I am troubled by its length and the detail that it provides.

Without further burdening the bar with a concurring opinion, I will say simply that I concur in the majority result.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

July 9, 2025

Mr. Howard M. Srebnick
Mr. Benjamin S. Waxman
Black, Srebnick & Kornspan
201 South Biscayne Boulevard, Suite 1300
Miami, FL 33131-0000

**RE: 23-4074, United States v. Dermen**
Dist/Ag docket: 2:18-CR-00365-JNP-3

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. *See* Fed. R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc: Katie Bagley
Elissa Hart-Mahan
Samuel Robert Lyons
Joseph Brian Syverson

CMW/sls